Matthew H. Marmolejo (SBN 242964)
 *mmarmolejo@mayerbrown.com*
MAYER BROWN LLP
350 South Grand Avenue, 25th Floor
Los Angeles, CA 90071-1503
Tel:  (213) 229-9500
Fax: (213) 576-8185

Kelly B. Kramer (*pro hac vice*)
 *kkramer@mayerbrown.com*
MAYER BROWN LLP
1999 K Street, NW
Washington, D.C. 20006
Tel:  (202) 263-3007
Fax: (202) 263-5207

Attorneys for Relator
ISLAND INDUSTRIES, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* ISLAND INDUSTRIES, INC., <br><br> Plaintiff, <br><br> vs. <br><br> VANDEWATER INTERNATIONAL INC.; NEIL REUBENS; ANVIL INTERNATIONAL, LLC.; SIGMA CORPORATION; SMITH COOPER INTERNATIONAL; ALLIED RUBBER & GASKET COMPANY, and JOHN DOES Nos. 1-10., <br><br> Defendants. | Case No. 2:17-cv-04393 (RGK-KS) <br><br><br> **FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT** |

731991839

The United States of America *ex rel.* Island Industries, Inc. ("Relator"), complaining of VANDEWATER INTERNATIONAL, INC. ("VANDEWATER"); NEIL REUBENS ("REUBENS"); ANVIL INTERNATIONAL, LLC ("ANVIL"); SIGMA CORPORATION ("SIGMA"); SMITH COOPER INTERNATIONAL ("SMITH COOPER"); ALLIED RUBBER & GASKET CO., INC. ("ARGCO"); and JOHN DOES NOS. 1-10 (collectively "Defendants"), alleges and says as follows:

## INTRODUCTION

1.     Relator is an American manufacturer of fire protection and steel piping system supplies.  Among other things, it manufactures carbon steel butt-weld pipe fittings for use in fire protection systems.  Specifically, Relator manufactures grooved welded outlets.  Others in the market manufacture grooved and female threaded outlets.  Because all of these products are designed to be welded to another piece of pipe, they are all commonly referred to as "Welded Outlets."  Relator estimates that the domestic market for Welded Outlets is roughly $25 million annually.

2.     Several Chinese companies, including, but not limited to, Beijing Bell Plumbing Manufacturing Ltd. ("Beijing Bell"), Jinan Meide Casting Co., Ltd. ("Jinan Meide"), and Shanghai Vision Mechanical Joint Co., Ltd. ("Shanghai Vision") (collectively, the "Chinese Manufacturers"), also manufacture Welded Outlets ("Chinese Welded Outlets").  Other Chinese companies, including the China-East Resources Import and Export Company, which is owned and controlled by the Chinese government, assist the Chinese Manufacturers to export their Chinese Welded Outlets to the United States.

3.     For more than 25 years, Chinese carbon steel butt-weld pipe fittings, including Chinese Welded Outlets, have been subject to substantial antidumping duties.  In particular, as the Department of Commerce recently reiterated, Chinese Welded Outlets are subject to antidumping duties of 182.9 percent.  Obviously, this

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

substantial antidumping duty creates a powerful incentive for persons and companies to seek to evade its application when importing Chinese Welded Outlets.

4.      For more than a decade, Defendants, working in concert with the Chinese Manufacturers, the China-East Resources Import and Export Company, and JOHN DOES NOS. 1-10, have knowingly and intentionally evaded and avoided the substantial antidumping duties on Chinese Welded Outlets.  Defendants have used various and shifting means to evade the antidumping duties, including: (a) by falsely describing the Chinese Welded Outlets as steel products that are not subject to antidumping duties; (b) by falsely claiming that the Chinese Welded Outlets originated in countries (e.g., Vietnam or South Korea) that are not subject to antidumping duty orders; and (c) by co-mingling the Chinese Welded Outlets with larger shipments of similar products that are not subject to antidumping duties.  In all such cases, however, Defendants and their agents have made knowingly false statements to United States Customs and Border Protection ("CBP"), to wit, that shipments containing Chinese Welded Outlets were not subject to antidumping duties when, in truth and fact, they were.

5.      On information and belief, during the past five years alone, Defendants imported or facilitated the importation of at least $50 million of Chinese Welded Outlets without paying the applicable 182.9 percent antidumping duty; indeed, Defendants imported these products without paying *any* antidumping duties.  Accordingly, in just the past five years, Defendants' false statements and unlawful actions have deprived the United States of more than $90 million in antidumping duties.  Moreover, the damage to the United States dating back to 2004 likely exceeds $200 million.

## PARTIES, JURISDICTION, AND VENUE

6.      Relator is a corporation organized and existing under the laws of the State of Tennessee.  Relator's headquarters and home office is in Memphis, Tennessee.  Relator, through its officers, directors, agents, and employees, is the

original source of the allegations delineated herein, which it bases upon its own knowledge, investigation, and observation.

7.     VANDEWATER is a corporation organized and existing under the laws of the State of Florida.  VANDEWATER's headquarters and home office is in Plantation, Florida.  VANDEWATER transacts substantial business throughout the United States and imported the goods at issue here through this and other judicial districts.  REUBENS is the President and Chief Executive Officer of VANDEWATER and a resident of Florida.

8.     ANVIL is a limited liability company organized and existing under the laws of the State of Delaware.  ANVIL's headquarters and home office is in Exeter, New Hampshire.  ANVIL transacts substantial business throughout the United States and imported the goods at issue here through this and other judicial districts.[1]

9.     SIGMA is a corporation organized and existing under the laws of the State of New Jersey.  SIGMA's headquarters and home office is in Cream Ridge, New Jersey.  SIGMA transacts substantial business throughout the United States and imported the goods at issue here through this and other judicial districts.

10.    SMITH COOPER is a corporation organized and existing under the laws of the State of California.  SMITH COOPER's headquarters and home office is in Commerce, California.  SMITH COOPER transacts substantial business throughout the United States and imported the goods at issue here through this and other judicial districts.

11.    ARGCO is a corporation organized and existing under the laws of the State of California.  ARGCO's headquarters and home office is in Carlsbad, California.  ARGCO transacts substantial business throughout the United States and imported the goods at issue here through this and other judicial districts.

12.    Upon information and belief, JOHN DOES #1-10 are entities and

---

[1] In April 2019, ANVIL and SMITH COOPER announced that they intended to merge.  In May, ANVIL and SMITH COOPER announced that they had successfully completed the merger.

731991839

- 3 -

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

individuals whose names and addresses are unknown.  JOHN DOES #1-10 include, but are not limited to, the customs brokers, freight forwarders, and logistics companies that facilitate the Defendants' efforts to evade and avoid the antidumping duties on Chinese Welded Outlets.

13.     This Court has original federal question jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3730(b).

14.     Venue is proper here pursuant to 28 U.S.C. § 1391(b)(2) and 31 U.S.C. § 3732(a) because a substantial part of the events giving rise to the claim and many of the false claims occurred in this judicial district.  Specifically, it appears from Import Genius records that Defendants imported the bulk of the Chinese Welded Outlets at issue here through the Ports of Long Beach and Los Angeles, California.

## FACTUAL ALLEGATIONS

### The Products

15.     Welded Outlets are typically used in fire protection systems. Accordingly, they are always tested, listed, and approved by Underwriters Laboratory ("UL") and FM Global ("FM").  Welded Outlets are or have been marketed in the United States under a variety of names, including "Sprink-let," "Weld-Out-Let," "Weld-O-Let," "Welding Outlet," "Pipe Outlet," "Safe-Let," "Uni-Let," "COOPLET," "UL-FM O-Let," "T-Let," "SPF-OLET," "Groove-O-Let," "Grooved Outlet," "Grooved Shaped Nipples," and others.

16.     In their marketing materials, Defendants (and the Chinese Manufacturers) virtually *always* describe their Chinese Welded Outlets accurately (*e.g.*, each Defendant markets its products as "welded outlets").  By contrast, in the public shipping records, Defendants virtually *never* use the term "welded outlet." On information and belief, Defendants avoid the term "welded outlet" in their shipping records because they know that phrase would be likely to cause the U.S. government to impose antidumping duties.

**The Antidumping Duty Orders**

17.     In December 1986, the U.S. International Trade Commission ("Commission") determined that a U.S. industry was materially injured or threatened with material injury by reason of carbon steel butt-weld pipe fittings from Taiwan that the Department of Commerce ("Commerce") had determined were priced at less than fair value.  In June 1992, the Commission made the same determination with respect to Chinese carbon steel butt-weld pipe fittings.

18.     Relying on these findings, Commerce imposed antidumping duties on Taiwanese butt-weld pipe fittings in December 1986, *see* 51 Fed. Reg. 45152 (Dec. 17, 1986), and on Chinese butt-weld pipe fittings in July 1992, *see* 57 Fed. Reg. 29702, 29703 (July 6, 1992).  Commerce imposed antidumping duties of 182.9 percent on most Chinese suppliers, including all of the known suppliers of Chinese Welded Outlets.  *See id.*

19.     The scope of the antidumping duty orders against Taiwan and China is substantively identical.  Both orders cover:

> carbon steel butt-weld pipe fittings, having an inside diameter of less than 14 inches, imported in either finished or unfinished form.  *These formed or forged pipe fittings are used to join sections in piping systems where conditions require permanent, welded connections*, as distinguished from fittings based on other fastening methods (*e.g.*, threaded, grooved, or bolted fittings).

57 Fed. Reg. 29702, 29703 (July 6, 1992) (China) (emphasis added); 51 Fed. Reg. 45152 (Dec. 17, 1986) (Taiwan) (stating that the order applies to "carbon steel butt-weld type fittings, other than couplings, under 14 inches in diameter, whether finished or unfinished").

20.     Commerce has repeatedly renewed these antidumping duties.  In 2016, Commerce elected to maintain the existing antidumping duty orders on carbon steel butt-weld pipe fittings from China, Taiwan, and elsewhere.  *See* 81 Fed. Reg. 57562 (Aug. 23, 2016) (announcing decision).  Accordingly, at all times relevant to this

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

Complaint, the 182.9% antidumping duty on most Chinese butt-weld pipe fittings, including Chinese Welded Outlets, has been in effect.

21.     The antidumping duty is assessed at the time of import.  Every entry of goods into the United States requires the importer, shipper, or customs broker to complete an "Entry Summary," known as CBP Form 7501, that asks for (among other things) an "Entry Type."  Imported goods subject to an antidumping or countervailing duty must be identified as such in the "Entry Type" field.

22.     Assessment of the antidumping duty largely relies on self-reporting.  Because Customs only inspects a very small percentage of all foreign imports that come through U.S. ports, there is ample opportunity to evade the antidumping duty by falsely completing the CBP Form 7501.

**A 1992 Scope Ruling Confirms That Welded Outlets Are Within The Scope Of The Antidumping Duty Orders**

23.     In October 1991, following a meeting with Customs, Lloyd Perkins ("Perkins") wrote Commerce to request a formal ruling that Welded Outlets—specifically, Welded Outlets that were being marketed under the "Sprink-let" brand name—were beyond the scope of the antidumping duty order against Taiwan.  A copy of that request is attached hereto as Exhibit A.

24.     Commerce rejected Perkins's request.  Instead, Commerce ruled that Welded Outlets were within the scope of the order because of their physical characteristics (specifically, because they were used in piping systems where conditions require permanent, welded connections).[2]

25.     The Chinese Welded Outlets at issue here are physically identical to the "Sprink-Let" brand Welded Outlets.  *Compare* Exhibit A (Sprink-Let) *with*

---

[2] *See* Memorandum from Roland MacDonald to Joseph Spetrini, Final Scope Ruling on Request by Sprink, Inc. to Exclude Sprink-let Carbon Steel Butt Weld Pipe Fittings from the Antidumping Duty Order on Carbon Steel Butt-Weld Pipe Fittings from Taiwan at 2 (Mar. 18, 1992) ("Scope Ruling") (attached as Exhibit B); *see also* 57 Fed. Reg. 19602, 19603 (May 7, 1992) (providing notice of the ruling).

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

Exhibits C (Beijing Bell), D (Jinan Meide), E (Shanghai Vision), F (Vandewater), G (Anvil), H (Sigma) I (Smith Cooper) & J (ARGCO).  They are used for an identical purpose (i.e., in piping systems where conditions require permanent, welded connections).

26.     Notwithstanding this Scope Ruling, Chinese Welded Outlets have come to dominate the market.  As described herein, Chinese Welded Outlets have achieved their dominant market position only because Defendants and others have avoided and evaded the applicable antidumping duties.

**Relator's Investigation**

27.     To prepare its initial Complaint, Relator analyzed the historic antidumping duty orders and scope rulings; undertook a painstaking review of public and private import data; collected information and documents from the Defendants' current and former agents, employees, and consultants; secured the assistance of a confidential source; met with a variety of market players; and assessed the significance and veracity of the information it collected based on its historic experience in the Welded Outlet market.

28.     Relator's efforts revealed that the Defendants and their conspirators have been knowingly and intentionally evading the antidumping duties applicable to Chinese Welded Outlets since at least 2004.  Tellingly, Relator's investigation also revealed that Defendants price their Chinese Welded Outlets within pennies of one another.  Defendants' price levels are far too low to permit payment of the antidumping duties.  It would not be economically feasible for Defendants to price their products at the levels at which they do unless they are all avoiding and evading the antidumping duties.

**The 2018 Scope Rulings Reaffirm That Welded Outlets Are
Within The Scope Of The Antidumping Duty Orders**

29.     In 2017 and 2018, on information and belief, the Defendants became aware of the United States' investigation into evasion of the antidumping duties

731991839

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

applicable to Welded Outlets.  On information and belief, in 2018, VANDEWATER, SIGMA, and SMITH COOPER sought to defeat the United States' investigation by seeking formal scope ruling requests from Commerce.  In their respective scope ruling requests, VANDEWATER, SIGMA, and SMITH COOPER admitted both that they imported fully-finished Chinese Welded Outlets and that they did not pay any antidumping duties when doing so.

30.     ISLAND opposed these scope ruling requests.  ANVIL, which historically imported *unfinished* Chinese Welded Outlets, also opposed these scope ruling requests.  After due consideration, Commerce ruled that Chinese Welded Outlets are within the scope of the Chinese antidumping duty order.  Specifically, Commerce found that the Welded Outlets imported from China by VANDEWATER, SIGMA, and SMITH COOPER were all subject to the antidumping duty order.[3]

### Specific Allegations Regarding Vandewater

31.     VANDEWATER is an importer and distributor of Chinese Welded Outlets.  Although VANDEWATER historically purchased some American Welded Outlets from Relator, it began exclusively importing and distributing Chinese Welded Outlets in 2013.  Attached hereto as Exhibit F are VANDEWATER product specifications for its Chinese Welded Outlets.

32.     VANDEWATER pioneered the importation of Chinese Welded Outlets.  REUBENS began exploring the potential to import Chinese Welded Outlets in 2003.  To determine the business plan's feasibility, REUBENS relied heavily on a business associate ("CS1") who more recently agreed to provide

---

[3] *See* Memorandum from James Doyle to James Maeder, Final Scope Ruling on Smith-Cooper International Inc.'s Cooplet Weld Outlets (Dec. 20, 2018) (attached as Exhibit K); Memorandum from Christian Llinas to James Maeder, Final Scope Ruling on SIGMA Corporation's Fire-Protection Weld Outlets (Dec. 11, 2018) (attached as Exhibit L); Memorandum from Annathea Cook to James Maeder, Final Scope Ruling on Vandewater International Inc.'s Steel Branch Outlets (Sept. 10, 2018) (attached as Exhibit M).

1    information to Relator on a confidential basis.  CS1, in turn, recruited Perkins to

2    assist in assessing REUBENS' business plan.

3         33.    In 2004, as part of this effort, REUBENS, CS1, and Perkins developed

4    documents reflecting VANDEWATER's anticipated costs, pricing, and profits for

5    Chinese Welded Outlets.  REUBENS, CS1, and Perkins concluded that it would be

6    profitable for VANDEWATER to import and distribute Chinese Welded Outlets—

7    *but only if it paid no antidumping duties*.

8         34.    REUBENS, CS1, and Perkins knew that Chinese Welded Outlets were

9    subject to antidumping duties.  After all, Perkins personally requested the "Sprink-

10   let" scope ruling and knew that Welded Outlets were subject to antidumping duties.

11   Nevertheless, REUBENS, CS1, and Perkins agreed to work together to import

12   Chinese Welded Outlets, to market them, and to share the profits from their sale.

13        35.    Over the years, Relator's President has personally observed

14   REUBENS, CS1, and Perkins promoting VANDEWATER's Chinese Welded

15   Outlets at trade shows.

16        36.    VANDEWATER began importing Chinese Welded Outlets under the

17   "CERIECO" brand name in 2004.  Since that time, VANDEWATER has engaged

18   in various intentionally deceptive practices to avoid paying antidumping duties.

19   Those practices, which have evolved over time, include, but are not limited to, the

20   following:

21        a)    In February, April, and December of 2007, VANDEWATER imported

22              from China at least five shipments of "U-L FM Approved Steel Pipe-

23              O-Lets."  Although these were Chinese Welded Outlets, the product

24              description includes a Harmonized Tariff Schedule ("HTS") code that

25              applied only to "Parts and Accessories for Motor Vehicles."

26              VANDEWATER has never supplied the automotive market.

27        b)    Between 2007 and 2012, VANDEWATER imported from China more

28              than 40 shipments of products it described as "UL FM Approved Steel

1    Pipe-O-Lets."  Although these products were Chinese Welded Outlets
2    that were subject to the antidumping duty order, VANDEWATER paid
3    no such antidumping duties.

4    c)    In 2013, VANDEWATER began importing products it described as
5    "Grooved Outlets."  Although these products were Chinese Welded
6    Outlets produced by Beijing Bell, VANDEWATER never paid the
7    antidumping duties.  Based on Import Genius import records, it
8    appears that VANDEWATER sometimes evaded these duties in part
9    by falsely claiming that they were made in South Korea—a country
10   whose Welded Outlets are not subject to antidumping duties.

11   d)    On information and belief, VANDEWATER began falsely describing
12   Chinese Welded Outlets as "BLK Steel Coupling Blanks" in 2011.
13   Coupling blanks are beyond the scope of the antidumping duty order
14   on Chinese Welded Outlets.  Although importation records reflect that
15   VANDEWATER imported more than 145,000 pounds of coupling
16   blanks between 2011 and 2015, VANDEWATER did not advertise
17   coupling blanks during this era.

18   e)    On information and belief, VANDEWATER imported more than five
19   million pounds of Chinese Welded Outlets that it falsely described as
20   "adaptors" between 2013 and 2016.  (Adaptors are not subject to
21   antidumping duties.)

22   37.    All told, between 2013 and 2017, VANDEWATER imported more
23   than 180 shipments of Chinese Welded Outlets that collectively weighed more than
24   *eight million pounds.*  Relator estimates that the import value of these products well
25   exceeded $10 million.  All of these Chinese Welded Outlets were subject to
26   antidumping duties.  On the relevant importation documentation, however,
27   VANDEWATER falsely described the products and falsely represented to the U.S.
28   government that the products were not subject to antidumping duties.

38.     REUBENS' behavior raises multiple red flags.  Around 2004, REUBENS began making frequent trips to China.  During these visits, he met with representatives of the state-owned China-East Resources Import and Export Company.  On information and belief, the China-East Resources Import and Export Company authorized VANDEWATER to use the "CERIECO" brand name.  ("CERIECO" is an acronym for the China-East Resources Import and Export Company.)  Accordingly, in 2004, VANDEWATER filed a U.S. Trademark Application to use the "CERIECO" brand name, which was registered in 2005.  VANDEWATER has used that trademarked name ever since.

39.     REUBENS's relationship with the China-East Resources Import and Export Company appears suspicious.  The International Consortium of Investigative Journalists' Offshore Leaks Database reflects that REUBENS and Xing Guo, a Chinese national, own a Hong Kong Company known as Fonlingtel, Ltd.  Moreover, Guo appears to have profited from the relationship:  in 2013, she purchased an expensive villa in Florida and, in July 2015, she incorporated a for-profit corporation named "CERIECO INC." in the State of Florida.

40.     REUBENS' statements to Relator also raise red flags.  For example, in February 2013, REUBENS telephoned Relator to advise that he would no longer purchase any Welded Outlets from Relator because VANDEWATER had its own factory in China.  REUBENS then suggested that Relator could purchase Chinese Welded Outlets from VANDEWATER, finished or unfinished, with no "Made in China" markings.  REUBENS suggested that Relator could stamp the product "Made in the USA" and sell it in the United States as domestic Welded Outlets.  REUBENS stated that no one would find out about this arrangement because the Customs inspectors at the receiving ports were too busy to check the incoming shipments.  Relator rejected this proposal.

41.     Around this same time, Perkins passed away, and REUBENS advised CS1 that he would no longer share profits from importing Chinese Welded Outlets.

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

CS1 then provided Relator with documents reflecting VANDEWATER's initial pricing and profit assumptions.  (Copies are attached as Exhibit N.)  As noted above, those pricing documents confirmed that VANDEWATER never intended to pay any antidumping duties when importing Chinese Welded Outlets.

42.    After receiving these materials, Relator analyzed VANDEWATER's pricing.  After taking inflation in the steel markets into account, Relator confirmed that VANDEWATER's pricing for "CERIECO" Welded Outlets in 2013 was consistent with its initial pricing assumptions from 2003.  In other words, VANDEWATER could not have profited from importing and selling Chinese Welded Outlets at the prices it quoted unless VANDEWATER was evading and avoiding the antidumping duties.

43.    In 2016, as part of its investigation, Relator emailed Beijing Bell directly to request a quote on Chinese Welded Outlets.  REUBENS responded by email several days later.  He advised Relator that Beijing Bell had asked him to respond because VANDEWATER held "the UL FM approval on the product" and that it had an "exclusive relationship" with Beijing Bell.  REUBENS further stated that VANDEWATER would be willing to sell Relator Chinese Welded Outlets bearing "the 'CERIECO' brand on them" and that they would be "shipped in CERIECO cartons."  REUBENS provided price quotes for Welded Outlets that supposedly reflected the "duty, brokerage and handling."

44.    As it had in 2013, Relator again analyzed VANDEWATER's price quote in 2016.  After considering inflation in the steel markets, Relator determined that VANDEWATER's pricing in 2016 was consistent with the pricing assumptions from 2003.  Relator further determined that it would not have been economically feasible for VANDEWATER to sell Chinese Welded Outlets at the prices it had quoted unless it was evading and avoiding the antidumping duties.

45.    In its May 2018 scope ruling request, VANDEWATER confirmed what Relator alleged in the initial complaint:  namely, that VANDEWATER

imports Chinese Welded Outlets without paying the applicable antidumping duties. VANDEWATER has thus already admitted that it has long avoided paying the antidumping duty order applicable to Chinese Welded Outlets.

46.     Based on the foregoing facts and Relator's investigation, upon information and belief VANDEWATER and REUBENS entered into agreements between themselves and with other individuals and entities (such as Beijing Bell, China-East Resources Import and Export Company, and others known to VANDEWATER and REUBENS but unknown at this time to Relator) to violate the False Claims Act by falsely declaring that the Chinese Welded Outlets were not subject to antidumping duties.

**Specific Allegations Regarding Anvil**

47.     ANVIL has historically marketed several lines of Welded Outlets:  its "Merit" brand was sourced in the United States while its SPF brand was "internationally sourced."  On information and belief, the bulk of these internationally-sourced products are manufactured, in whole or part, in China. Attached hereto as Exhibit G are ANVIL's product specifications for its domestic and Chinese Welded Outlets.

48.     Since 2012, Anvil has imported more than $5 million of Chinese Welded Outlets every year.  Before that date, Anvil imported a lesser, but still substantial, amount of Chinese Welded Outlets.  On information and belief, most of the Chinese Welded Outlets that Anvil purchased were manufactured by Beijing Bell or Jinan Meide.

49.     Despite its substantial purchases of Chinese Welded Outlets, the import record suggests that ANVIL did not import *any* Chinese Welded Outlets. The records instead reflect that one of ANVIL's subsidiaries has been importing significant volumes of "merchant coupling blanks," "pipe fittings," "pipe nipples," and other products that are beyond the scope of the antidumping duty order on Chinese Welded Outlets.  On information and belief, ANVIL avoids the

antidumping duties on its Chinese Welded Outlets by, among other things, falsely describing its import products.

50.     Relator's investigation uncovered several reasons to believe that ANVIL's import documentation was false and fraudulent.  First, as noted, ANVIL's website describes its SPF-branded Welded Outlets as "internationally sourced."  Second, ANVIL's SPF-branded Welded Outlets do not feature country-of-origin markings.  Third, unlike the other defendants, ANVIL has the technical ability to thread or otherwise machine an unfinished product, which would make it easy for ANVIL to import *unfinished* Chinese Welded Outlets (which are nevertheless subject to antidumping duties) without accurately stating as much.  Fourth, the publicly-available import records do not reflect any instance where ANVIL has described its imported products as Welded Outlets (finished or unfinished).  Fifth, ANVIL's own statements confirm that it imports Welded Outlets from China.

51.     For example, in September 2018, ANVIL announced that it would increase its prices for certain products, including its "SPF Fire Protection O-Lets," as a result of the United States' decision to impose "a 10% tariff on a number of goods imported from China; *including the ones Anvil imports from China*."  (Copy attached as Exhibit O.)  ANVIL further noted that, because the tariff was "immediate" and because it included "all product not already landed at a port of entry," ANVIL would not be able to provide its customers with 30-days' notice.  Similarly, in October 2018, ANVIL announced that, in anticipation of a further 15% increase in tariffs on goods from China, it would be imposing a 15% price increase on the same product lines, including its SPF Fire Protection O-Lets.  (Copy attached as Exhibit P.)

52.     An ANVIL representative also orally advised an ISLAND representative, as recently as January 2019, that its "internationally-sourced" Welded Outlet is made in China, imported to the United States, and then threaded at one of ANVIL's facilities in the United States.  On information and belief, when

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

ANVIL's Chinese Welded Outlets are imported, the contour and bevel are already formed or forged into the product.

53.     Finally, Relator has confirmed that ANVIL's pricing for Chinese Welded Outlets has been virtually identical to VANDEWATER's. Accordingly, it would be economically infeasible for ANVIL to sell Chinese Welded Outlets at the prices it charges unless it was evading and avoiding the antidumping duties.

54.     Based on the foregoing facts and Relator's investigation, upon information and belief ANVIL entered into agreements with other individuals and entities (such as Beijing Bell, Jinan Meide, and others known to ANVIL but unknown at this time to Relator) to violate the False Claims Act by falsely declaring that the Chinese Welded Outlets were not subject to antidumping duties.

### Specific Allegations Regarding Sigma

55.     SIGMA markets and sells at least three brands of Welded Outlets. Two of these threaded outlet brands, the "Uni-Let" and the "Safe-Let" brands, are sourced from China and marketed as import products. SIGMA also markets and sells grooved outlets. Historically, SIGMA imported some grooved outlets from China. More recently, SIGMA has been marketing grooved outlets that supposedly are manufactured in the United States. On information and belief, however, SIGMA's grooved outlets were actually manufactured in China. Attached hereto as Exhibit H are SIGMA's product specifications for its Chinese Welded Outlets.

56.     In 2010, SIGMA hired Terry Clark ("Clark") as a Manager in its Fire Protection Division. Throughout his long career, Clark has advocated using Chinese Welded Outlets to develop product lines. In around 2005, for example, Clark approached Relator with an offer to import the "Uni-Let" product from China. After Relator declined this offer, Clark went to work for the fire protection division of Unique Industrial Products Company ("Unique") in Sugarland, Texas, which was eventually acquired by SIGMA.

57.     Around the time of Clark's hiring, SIGMA began importing its "Uni-

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

Let" and "Safe-Let" products.  Although these products are Chinese Welded

Outlets, the shipping records suggest that SIGMA has not imported any Welded

Outlets.  Instead, the import record reflects that, in around 2010, SIGMA began

importing "parts of pipe fitting" into Los Angeles, California.  The volume of

"parts of pipe fittings" imported by SIGMA is consistent with SIGMA's share of

the Welded Outlets market.

58.    SIGMA also has imported and marketed grooved outlets.  In early

2011, for example, SIGMA's then-purchasing agent advised Relator that SIGMA

had encountered extensive quality problems with its Chinese grooved outlets.

SIGMA asked Relator to determine whether it would be plausible to repair the

grooved outlets, which were manufactured by Shanghai Vision.  After Relator

advised that the products were not repairable, SIGMA began buying more

domestically produced grooved outlets from Relator.  In late 2015, however,

SIGMA advised Relator that it would no longer purchase product from Relator

because SIGMA had discovered a new "low cost" source that offered Welded

Outlets at prices that were significantly below Relator's costs.

59.    On information and belief, SIGMA's new "low cost" source was

Ageis.  Notably, for many years, Clark served as a Vice President at Ageis and as a

Manager at SIGMA.  (In 2016, Clark retired from SIGMA, but he continued to be

paid by SIGMA as a consultant for a period of time thereafter.)

60.    A former SIGMA employee, who was in a position to know, has

advised Relator that SIGMA sourced many of its Welded Outlets from Beijing Bell

and that it used Wor-Biz Trading to facilitate the shipments.  That same former

SIGMA employee has advised Relator that SIGMA was working with Ageis to

develop an alternative low cost source for Welded Outlets.  To Relator's

knowledge, Ageis does not own meaningful domestic manufacturing facilities.

Even if it did, it would not have been economically feasible for Ageis to have

supplied SIGMA with domestically produced Welded Outlets given the prices that

1   SIGMA charged for grooved outlets in the marketplace.

2       61.   Relator alleges, on information and belief, that Ageis supplied SIGMA

3   with Chinese-made grooved outlets.  Relator further alleges, on information and

4   belief, that SIGMA evaded the antidumping duties applicable to such Chinese

5   Welded Outlets.  Based on Relator's examination of the import records, Relator

6   believes that SIGMA (sometimes operating through its wholly-owned subsidiary

7   Unique Industrial Product Company) has repeatedly and falsely described the

8   grooved outlets as steel "couplings" so as to avoid the antidumping duties.

9       62.   Moreover, in its scope ruling request, SIGMA confirmed what Relator

10  had alleged all along:  namely, that SIGMA imports Chinese Welded Outlets

11  without paying the applicable antidumping duties.  SIGMA thus has already

12  admitted that it has long evaded the antidumping duty order applicable to Chinese

13  Welded Outlets.

14      63.   Based on the foregoing facts and Relator's investigation, upon

15  information and belief SIGMA and/or its subsidiaries entered into agreements with

16  other individuals and entities (such as Shanghai Vision, Ageis, Beijing Bell, Wor-

17  Biz Trading, and others known to SIGMA and its subsidiaries but unknown at this

18  time to Relator) to violate the False Claims Act by falsely declaring that the

19  Chinese Welded Outlets were not subject to antidumping duties.

**Specific Allegations Regarding Smith Cooper**

21      64.   SMITH COOPER is an importer and marketer of Chinese Welded

22  Outlets.  Since 2003 or 2004, SMITH COOPER has sold Chinese Welded Outlets

23  in the United States under the "Cooplet" brand name.  Attached hereto as Exhibit I

24  are SMITH COOPER's product specifications for its Chinese Welded Outlets.

25      65.   SMITH COOPER began importing Chinese Welded Outlets more than

26  10 years ago.  On information and belief, SMITH COOPER purchases its Chinese

27  Welded Outlets from Jinan Meide.  As part of larger shipments of products (which

28  often are characterized as steel pipe nipples), SMITH COOPER regularly imports

Chinese Welded Outlets under its "Cooplets" brand name.  (Steel pipe nipples are not subject to antidumping duties.)  On information and belief, SMITH COOPER does not pay antidumping duties on the Chinese Cooplets that are imported along with these other products.

66.    In or around late 2017 and early 2018, SMITH COOPER imported, or caused its agents to import, several shipments of Chinese Welded Outlets that it described as "Butt Weld Outlets."  On information and belief, SMITH COOPER began describing Cooplets as "Butt Weld Outlets" because SMITH COOPER was concerned that Cooplets could be subject to antidumping duties as the result of a then-ongoing trade case involving forged fittings.  On information and belief, SMITH COOPER stopped describing its products as "Butt Weld Outlets" a few months later in light of the scope requests to Commerce in which VANDEWATER, SMITH COOPER, and SIGMA argued that Welded Outlets were not butt-weld pipe fittings.

67.    Through its investigation, Relator discovered that SMITH COOPER's pricing for Chinese Welded Outlets was virtually identical to VANDEWATER's. Relator further determined that it would be economically infeasible for SMITH COOPER to sell Chinese Welded Outlets at these prices unless it was evading and avoiding the antidumping duties.

68.    Moreover, in its scope ruling request, SMITH COOPER confirmed what Relator had alleged all along:  namely, that SMITH COOPER imports Chinese Welded Outlets without paying the applicable antidumping duties.  SMITH COOPER thus has already admitted that it has long avoided the antidumping duty order applicable to Chinese Welded Outlets.

69.    Based on the foregoing facts and Relator's investigation, on information and belief SMITH COOPER entered into agreements with other individuals and entities (such as Jinan Meide and others known to SMITH COOPER but unknown at this time to Relator) to violate the False Claims Act by

falsely declaring that the Chinese Welded Outlets were not subject to antidumping duties.

## Specific Allegations Regarding ARGCO

70.     ARGCO is an importer and marketer of Chinese Welded Outlets. Based on markings on ARGCO product samples that Relator obtained as part of its investigation, Relator determined that ARGCO is supplied by Shanghai Vision. Attached hereto as Exhibit J are ARGCO's product specifications for its Chinese Welded Outlets.

71.     In April 2017, ARGCO's supplier—Shanghai Vision—e-mailed a solicitation to Relator regarding Chinese Welded Outlets. As part of its investigation, Relator responded to the solicitation by requesting detailed information about the costs of importing the Chinese Welded Outlets. Shanghai Vision's International Sales Representative responded by providing a detailed cost break-down. That break-down does not include any provision for paying antidumping duties. A copy of that e-mail exchange is attached as Exhibit Q.

72.     As a further part of its investigation, Relator met with Shanghai Vision's International Sales Representative on May 1, 2017. During that meeting, Vision's International Sales Representative informed Relator that Vision sells Chinese Welded Outlets to ARGCO. As the meeting progressed, Relator asked detailed questions about the potential costs of importing the Chinese Welded Outlets. Shanghai Vision's sales representative became defensive. He advised Relator to allow Shanghai Vision to handle the arrangements for importing the Chinese Welded Outlets.

73.     Through its investigation, Relator determined that ARGCO's pricing for Chinese Welded Outlets was consistent with (indeed, slightly lower than) VANDEWATER's pricing. Relator additionally determined that ARGCO's pricing was consistent with the prices quoted by Shanghai Vision (i.e., it did not allow for the payment of antidumping duties). Relator further determined that it would be

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

economically infeasible for ARGCO to sell Chinese Welded Outlets at these prices unless it were evading and avoiding the antidumping duties.

74.     Based on the foregoing facts and Relator's investigation, upon information and belief ARGCO entered into agreements with other individuals and entities (such as Shanghai Vision and others known to ARGCO but unknown at this time to Relator) to violate the False Claims Act by falsely declaring that the Chinese Welded Outlets were not subject to antidumping duties.

### The False Records And Statements—All Defendants

75.     To import the Chinese Welded Outlets, Defendants (or a broker acting on their behalf) completed a CBP Form 7501.  On that form, Defendants (or a broker acting on their behalf) were obligated to disclose in the "Entry Type" field (Block 2) whether the goods at issue were subject to an antidumping or countervailing duty.

76.     Defendants knew that the Chinese Welded Outlets were subject to an antidumping duty order.  Nonetheless, Defendants falsely represented (or caused a broker acting on their behalf falsely to represent) that the goods qualified for Entry Type 01, meaning they were not subject to an antidumping duty.  At the very least, Defendants were deliberately indifferent to, or acted with reckless disregard of, the truth of those representations.  By falsely marking the entry type, Defendants made or caused to be made a false record or statement material to their obligation to pay money to the United States.

### FIRST CAUSE OF ACTION

### Violation of the False Claims Act –
### 31 U.S.C. § 3729(a)(1)(G) (formerly 31 U.S.C. § 3729(a)(7))

77.     The preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

78.     Relator, as the original source of information regarding Defendants' violations of the False Claims Act, has direct and independent knowledge of the

information on which the allegations contained herein are based.

79.     Upon the arrival of the Chinese Welded Outlets in the United States, Defendants, knowing that the goods were subject to antidumping duties, claimed, or instructed their brokers to claim, that the Chinese Welded Outlets were not subject to antidumping duties.

80.     At all times material to this Complaint, Defendants had actual knowledge of the falsity, acted in deliberate ignorance of the truth or falsity, or acted in reckless disregard of the truth or falsity of their records and statements regarding whether the Chinese Welded Outlets were subject to antidumping duties.

81.     By falsely claiming that the Chinese Welded Outlets were not subject to antidumping duties, Defendants avoided paying an antidumping duty of 182.9 percent.

82.     Defendants were obligated to pay the antidumping duties on their entries of Chinese Welded Outlets as a matter of law.

83.     Defendants' aforementioned false statements had the predictable and intended effect of inducing CBP to assess Defendants no antidumping duties on their entries of Chinese Welded Outlets into the United States.

84.     By falsely declaring that the Chinese Welded Outlets were not subject to antidumping duties, Defendants made or caused to be made a false record or statement material to their obligation to pay money to the United States.  Further, Defendants knowingly concealed and knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the United States.

85.     Defendants' false records or statements, concealment, and avoidance violate 31 U.S.C. § 3729.  Through their violations of 31 U.S.C. § 3729, Defendants gained entry and release of their Chinese Welded Outlets into the United States without paying millions of dollars due to the United States. Defendants have knowingly or recklessly damaged the United States in an amount to be determined at trial, but believed to exceed $175 million.

## SECOND CAUSE OF ACTION

### Conspiracy to Violate the False Claims Act –
### 31 U.S.C. § 3729(a)(1)(C) (formerly 31 U.S.C. § 3729(a)(3))

86.     The preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

87.     Defendants, along with the Chinese Manufacturers and others, acted in concert to violate the False Claims Act by knowingly making, using, or causing to be made or used a false record or statement material to their obligation to pay money to the United States by falsely declaring that the Chinese Welded Outlets were not subject to antidumping duties.  Defendants also acted in concert to violate the False Claims Act by knowingly concealing or knowingly and improperly avoiding or decreasing their obligation to pay or transmit money or property to the United States.

88.     Defendants committed the overt acts described above in furtherance of the conspiracy, including but not limited to, by avoiding their obligation to pay antidumping duties.

89.     Defendants' conspiracy violates 31 U.S.C. § 3729(a)(1)(C), by which Defendants gained entry and release of their Chinese Welded Outlets into the United States without paying sums due to the United States.  Defendants have knowingly or recklessly damaged the United States in an amount to be determined at trial, but believed to exceed $175 million.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff United States *ex rel*. Island Industries, Inc., prays for the following:

1.     An award of treble damages, civil penalties, expenses, fees, and costs against Defendants, jointly and severally, in accordance with 31 U.S.C. § 3729 *et seq*. for Defendants' violations of 31 U.S.C. § 3729(a)(1)(G) (and/or the preceding version of such statutory section, 31 U.S.C. § 3729(a)(7));

2.      An award of treble damages, civil penalties, expenses, fees, and costs against Defendants, jointly and severally, in accordance with 31 U.S.C. § 3729 *et seq*. for Defendants' conspiracy and violation of 31 U.S.C. § 3729(a)(1)(C) (and/or the preceding version of such statutory section, 31 U.S.C. § 3729(a)(3));

3.      An award of a trial by jury on all issues so triable; and

4.      An award of such other and further relief, legal or equitable, that the Court deems just and proper.

MOREOVER, Relator Island Industries, Inc., on its own behalf, demands and prays that an award be made in its favor as follows:  for 25 percent (25%) of the proceeds collected by the United States if it intervenes in and conducts this action, or for 30 percent (30%) of the proceeds if the United States does not intervene; for an amount for reasonable expenses necessarily incurred by the Relator in prosecution of this action; for all reasonable attorneys' fees and costs incurred by the Relator; and such other and further relief to which the Relator may show itself justly entitled.

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

1

## **JURY DEMAND**

2      Pursuant to FRCP 38, Plaintiff-Relator demands a trial by jury on all issues

3  so triable.

4

5

Dated: July 10, 2019                    MAYER BROWN LLP

6

7

8                                          /s/Matthew H. Marmolejo

9                                       Matthew H. Marmolejo
                                        Attorneys for Relator
10                                      ISLAND INDUSTRIES, INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

1

**CERTIFICATE OF SERVICE**

2         Pursuant to 31 U.S.C. § 3730(c)(3) and the request of the United States to

3   receive pleadings filed in this action, the foregoing First Amended Complaint was

4   served on counsel for the Government via the Court's ECF system.

5

6   Dated: July 10, 2019

7                                                          By:   /s/Matthew H. Marmolejo
                                                                  Matthew H. Marmolejo

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

731991839

1

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**