MAYER BROWN LLP
MATTHEW H. MARMOLEJO (SBN 242964)
 mmarmolejo@mayerbrown.com
C. MITCHELL HENDY (SBN 282036)
 mhendy@mayerbrown.com
350 South Grand Avenue, 25th Floor
Los Angeles, CA 90071-1503
Tel: (213) 229-9500
Fax: (213) 576-8185

MAYER BROWN LLP
KELLY B. KRAMER (*pro hac vice*)
 kkramer@mayerbrown.com
1999 K Street, NW
Washington, D.C. 20006
Tel: (202) 263-3007
Fax: (202) 263-5207

Attorneys for Plaintiff-Relator
ISLAND INDUSTRIES, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* ISLAND INDUSTRIES, INC., <br><br> Plaintiff, <br><br> vs. <br><br> VANDEWATER INTERNATIONAL INC.; NEIL REUBENS; ANVIL INTERNATIONAL, LLC; SIGMA CORPORATION; SMITH COOPER INTERNATIONAL; ALLIED RUBBER & GASKET COMPANY, and JOHN DOES Nos. 1-10., <br><br> Defendants. | Case No. 2:17-cv-04393-RGK-KS <br><br> **PLAINTIFF-RELATOR ISLAND INDUSTRIES, INC.'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE FIRST AMENDED COMPLAINT** <br><br> Date: August 26, 2019 <br> Time: 9:00 a.m. <br> Courtroom: 850 <br> Judge: Hon. R. Gary Klausner |

# TABLE OF CONTENTS

**Page(s)**

I.  INTRODUCTION ................................................................................. 1

II.  ARGUMENT ..................................................................................... 2

    A.  The FAC Pleads Violations of the False Claims Act ......................... 2

        1.  Legal Standard ....................................................................... 3

        2.  The FAC Alleges False Statements and Fraudulent Conduct ................................................................................ 5

        3.  The FAC Alleges Defendants Acted with Scienter ................ 13

    B.  The FAC Pleads A Conspiracy to Violate the False Claims Act ....... 17

    C.  The Public Disclosure Bar Does Not Apply .................................. 19

        1.  Legal Standard ..................................................................... 19

        2.  There Was No Public Disclosure Under the Act .................... 21

            a.  2018 scope rulings ..................................................... 21

            b.  Shipping records ........................................................ 22

            c.  Defendants' marketing materials ................................. 26

        3.  Defendants Rely on Inapposite Case Law .............................. 26

        4.  Island Is an Original Source ................................................. 29

III.  CONCLUSION ................................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amphastar Pharm. Inc. v. Aventis Pharma SA,*
  856 F.3d 696 (9th Cir. 2017) ......................................................................... 20, 21

*U.S. ex rel. Antoon v. Cleveland Clinic Found.,*
  788 F.3d 605 (6th Cir. 2015) ................................................................................ 30

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ............................................................................................... 3

*U.S. ex rel. Beauchamp v. Academi Training Ctr., LLC,*
  816 F.3d 37 (4th Cir. 2016) ............................................................................ 21, 22

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ..................................................................................... 3, 4, 18

*U.S. ex rel. Brown v. Celgene Corp.,*
  226 F. Supp. 3d 1032 (C.D. Cal. 2016) ............................................................... 15

*U.S. ex rel. Campie v. Gilead Scis., Inc.,*
  862 F.3d 890 (9th Cir. 2017) ........................................................................... 3, 14

*U.S. ex rel. Compton v. Circle B Enterps., Inc.,*
  No. 07-32, 2010 WL 942293 (M.D. Ga. March 11, 2010) ................................. 29

*U.S. ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.,*
  839 F.3d 242 (3rd Cir. 2016) ..................................................................... 3, 5, 10

*U.S. ex rel. Doe v. Staples, Inc.,*
  773 F.3d 83 (D.C. Cir. 2014) ......................................................................... 26, 27

*U.S. ex rel. Doe v. Staples, Inc.,*
  932 F. Supp. 2d 34 (D.D.C. 2013) ........................................................... 26, 27, 28

*U.S. ex rel. Ebeid v. Lungwitz,*
  616 F.3d 993 (9th Cir. 2010) ............................................................................. 4, 8

*ePlus Tech., Inc. v. Aboud,*
  313 F.3d 166 (4th Cir. 2002) ............................................................................... 19

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

*U.S. ex rel. Found. Aiding the Elderly v. Horizon W., Inc.*,
  265 F.3d 1011 (9th Cir. 2001) .................................................................. 21, 27

*U.S. ex rel. Grubbs v. Kanneganti*,
  565 F.3d 180 (5th Cir. 2009) .......................................................................... 4

*U.S. ex rel. Hendow v. Univ. of Phoenix*,
  461 F.3d 1166 (9th Cir. 2006) ...................................................................... 14

*U.S. ex rel. Huangyan Imp. & Exp. Corp. v. Nature's Farm Prods., Inc.*,
  370 F. Supp. 2d 993 (N.D. Cal. 2005) ........................................................... 5

*U.S. ex rel. Integra Med Analytics LLC v. Providence Health & Servs*,
  No 17-1694-PSG, 2019 WL 3282619 (C.D. Cal. July 16, 2019) ............ 8, 25, 26

*Manfred v. Greenrock*,
  No. 06-6208, 2008 WL 11340337 (C.D. Cal. June 27, 2008) .......................... 22

*U.S. ex rel. Mateski v. Raytheon*,
  816 F.3d 565 (9th Cir. 2016) .............................................................. 20, 21, 23

*MCI Telecomm. Corp. v. AT&T Co.*,
  512 U.S. 218 (1994) ...................................................................................... 24

*Nat'l Ass'n of Afr. Am.-Owned Media v. Charter Commc'ns., Inc.*,
  915 F.3d 617 (9th Cir. 2019) ..................................................................... 3, 10

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) .......................................................................... 12

*U.S. ex rel. Oliver v. Parsons Co.*,
  195 F.3d 457 (9th Cir. 1999) ........................................................................ 6, 7

*U.S. ex rel. Paranich v. Sorgnard*,
  396 F.3d 326 (3d Cir. 2005) .......................................................................... 23

*U.S. ex rel. Phalp v. Lincare Holdings, Inc.*,
  857 F.3d 1148 (11th Cir. 2017) ..................................................................... 15

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

*Prather v. AT&T, Inc.,*
  847 F.3d 1097 (9th Cir. 2017) ............................................................. 19

*In re Propranolol Antitrust Litig.,*
  249 F. Supp. 3d 712 (S.D.N.Y. 2017) ...................................................7

*U.S. ex rel. Purcell v. MWI Corp.,*
  807 F.3d 281 (D.C. Cir. 2015)............................................................. 15

*Schindler Elevator Corp. v. U.S. ex rel. Kirk,*
  563 U.S. 401 (2011) ...................................................................... 20, 24

*U.S. ex rel. Silingo v. WellPoint, Inc.,*
  904 F.3d 667 (9th Cir. 2018) .......................................... 5, 10, 11, 18

*Soo Park v. Thompson,*
  851 F.3d 910 (9th Cir. 2017) ............................................................ 4, 17

*U.S. ex rel. Spay v. CVS Caremark Corp.,*
  913 F. Supp. 2d 125 (E.D. Pa. 2012)................................................... 23

*U.S. v. Corinthian Colleges,*
  655 F.3d 984 (9th Cir. 2011) ..................................................3, 4, 13, 14

*U.S. v. Omnicare, Inc.,*
  903 F.3d 78 (3d Cir. 2018) ....................................................21, 28, 29

*U.S. v. Strickland,*
  245 F.3d 368 (4th Cir. 2001) ............................................................. 18

*U.S. v. United Healthcare Ins. Co.,*
  848 F.3d 1161 (9th Cir. 2016)......................................................*passim*

*Universal Health Servs., Inc. v. U.S.,*
  136 S. Ct. 1989 (2016) ................................................................... 9, 12

*U.S. ex rel. Vatan v. QTC Med. Servs., Inc.,*
  721 F. App'x 662 (9th Cir. 2018)..................................................... 4, 8

*Ward v. Apple Inc.,*
  791 F.3d 1041 (9th Cir. 2015)........................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

**Statutes**

31 U.S.C. § 3729..................................................................................... 3, 15

31 U.S.C. § 3730.................................................................... 19, 20, 24, 29

**Other Authorities**

*Antidumping Duty Order and Amendment to the Final Determination*
*of Sales at Less Than Fair Value; Certain Carbon Steel Butt-Weld*
*Pipe Fittings From the People's Republic of China,*
57 Fed. Reg. 29702 (July 6, 1992) ............................................... *passim*

Federal Rules of Civil Procedure ...................................................... *passim*

## I.    **INTRODUCTION**

More than 25 years ago, the United States determined that Chinese steel manufacturers were selling carbon steel butt-weld pipe fittings in the United States at substantially less than fair value. *Antidumping Duty Order and Amendment to the Final Determination of Sales at Less Than Fair Value; Certain Carbon Steel Butt-Weld Pipe Fittings From the People's Republic of China*, 57 Fed. Reg. 29702 (July 6, 1992) ("Antidumping Duty Order"). To level the playing field for domestic manufacturers, such as Plaintiff-Relator Island Industries, Inc. ("Island") (*see* First Amended Complaint ("FAC") at ¶ 1, ECF No. 97), the Department of Commerce ("Commerce") imposed substantial antidumping duties (typically, 182.9%) on imports of covered products, including Chinese Welded Outlets, which remain in effect to this day. (*See id.* ¶¶ 2, 3, 20, 30.)

Concerned that Defendants were evading the Antidumping Duty Order to import Chinese Welded Outlets, Island launched an investigation. (*See id.* ¶ 27.) After speaking with confidential sources and obtaining non-public information regarding Defendants' current and historic pricing, Island concluded that the Defendants had been evading duties since at least 2004. (*See id.* ¶¶ 27-28.) Island reported this information to Customs and Border Protection ("CBP"), which encouraged it to file a *qui tam* action under the False Claims Act (the "Act"). Island did so, alleging that Defendants avoided and evaded the antidumping duties by falsely representing (or by causing their agents falsely to represent) on non-public CBP Form 7501s that their products were not subject to such duties. (*See id.* ¶¶ 75-76.) Island alleged that Defendants cheated the United States out of over $90 million in just the last five years. (*Id.* ¶ 5.)

The Justice Department began its own investigation. After the Defendants became aware it, several of them requested that Commerce issue scope rulings finding that Welded Outlets were outside the scope of the Antidumping Duty Order. (*Id.* ¶ 29.) Commerce ruled against each such request. (*Id.* ¶ 30.)

The scope ruling requests and Commerce's rulings confirmed Island's central (and pre-existing) allegation: that the Defendants have long imported Chinese Welded Outlets without paying the applicable antidumping duties. Nevertheless, Defendants now seek to dismiss the FAC, advancing two principal arguments.[1] First, claiming that Island has not adequately pleaded that Defendants made false statements with scienter, they seek dismissal under Rules 8 and 9(b) of the Federal Rules of Civil Procedure. Second, three of the Defendants argue that the complaint must be dismissed under the "public disclosure bar," a provision of the Act designed to prevent parasitic lawsuits by relators who rely entirely on certain public records.

A fair reading of the FAC shows that both arguments are without merit. Over the course of more than 20 pages, the FAC lays out numerous, detailed factual allegations—capable of being proven or disproven in due course—that, taken together, support a plausible (even compelling) cause of action that Defendants have violated the Act's "reverse false claims" provision. Similarly, the FAC makes clear that Island's extensive investigation revealed a range of non-public information that was critical to detecting the fraud. Indeed, Defendants fail to identify a public, pre-complaint document that discloses the truth: that they regularly evaded the antidumping duties applicable to their products. For these reasons, as explained more fully below, the motions to dismiss should be denied.

## II.   ARGUMENT

### A.   The FAC Pleads Violations of the False Claims Act.

The FAC plausibly alleges that Defendants all knowingly participated in a long-running scheme to import Chinese Welded Outlets and to make or cause to be

---

[1] (*See* Sigma Motion to Dismiss ("Sigma Mtn."), ECF No. 103; Smith Cooper Motion to Dismiss ("SCI Mtn."), ECF No. 105; Anvil Motion to Dismiss ("Anvil Mtn."), ECF No. 107; Vandewater and Ruebens Motion to Dismiss ("Vandewater Mtn."), ECF No. 108-1.)

made false statements to government authorities to avoid the applicable antidumping duties, thus depriving the United States of millions of dollars.

### 1.   Legal Standard

To assert a "reverse false claim," a relator must allege: "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *U.S. ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 902 (9th Cir. 2017); *U.S. ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242, 253-56 (3rd Cir. 2016). To show scienter, a relator must allege that a defendant acted with either actual knowledge, deliberate ignorance, or reckless disregard of the truth. *See* 31 U.S.C. § 3729(b).

Under Rule 8, a complaint ordinarily needs to include only enough "factual content [to] allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The standard is one of "facial plausibility." *Id.*

Several presumptions weigh in favor of plaintiffs. First, the Court is required to proceed "on the assumption that all the allegations in the complaint are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Second, the Court must construe all of the factual allegations "in the light most favorable to the Relators." *U.S. v. Corinthian Colleges*, 655 F.3d 984, 991 (9th Cir. 2011) (brackets omitted). Third, and relatedly, the Court may not "weigh evidence" or determine which side has the more persuasive explanation. Instead, "if there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6). Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *im*plausible." *Nat'l Ass'n of Afr. Am.-Owned Media v. Charter Commc'ns., Inc.*, 915 F.3d 617, 627 (9th Cir. 2019) (cleaned up).

These presumptions require the Court to set aside doubts as to ultimate proof, for "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." *Twombly*, 550 U.S. at 556. A "well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the] facts [alleged] is improbable, and that a recovery is very remote and unlikely." *Id*.

Rule 9(b) requires "only that the *circumstances of fraud* be stated with particularity; other facts may be plead generally, or in accordance with Rule 8." *Corinthian Colleges*, 655 F.3d at 992. While that imposes certain particularity requirements, it "does not supplant Rule 8(a)'s notice pleading." *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 186 (5th Cir. 2009). It does not demand that a pleading canvas every nook and cranny of an alleged fraud—particularly one, as here, that is alleged to have lasted many years and involving several international corporations. *Id.* at 190 (rejecting inflexible "time, place, contents, and identity" pleading standard in FCA cases). Requiring such details would be "one small step shy of requiring production of actual documentation with the complaint, a level of proof not demanded to win at trial and significantly more than any federal pleading rule contemplates." *Id*.; *see also U.S. ex rel. Ebeid v. Lungwitz*, 616 F.3d 993, 998– 99 (9th Cir. 2010) ("it is sufficient to allege particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted") (quoting *Kanneganti*).

In short, Rule 9(b) does not demand "absolute particularity or a recital of the evidence." *U.S. v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016). When "the relevant information is within the defendant's exclusive possession and control," it is sufficient, under Rule 9(b), to plead details pursuant to information and belief with a factual basis for that belief. *U.S. ex rel. Vatan v. QTC Med. Servs., Inc.*, 721 F. App'x 662, 663 (9th Cir. 2018) (citing cases). To demand otherwise "would vitiate the False Claims Act" by hindering relators who "allege insider knowledge of wrongdoing that few others would be positioned to reveal" simply

because they lack corporate documents with more specifics. *Id.; see also Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017).

### 2.   The FAC Alleges False Statements and Fraudulent Conduct.

Defendants claim either that they are not alleged to have made any specific false statement (SCI, Sigma, and Anvil) or that the underlying Antidumping Duty Order is too ambiguous to support a false statement as a matter of law (SCI and Vandewater). Defendants' arguments distort the governing pleading standard. More fundamentally, they ignore that the FAC directly alleges that each Defendant is knowingly responsible for false statements on CBP Form 7501. (FAC ¶¶ 21, 75–76.) On that Form, Defendants falsely stated (or knowingly allowed their agents to state) that their imports were not subject to an antidumping duty when, in fact, they were. These are factual allegations, not legal assertions, and must be accepted as true at this stage. *See U.S. ex rel. Huangyan Imp. & Exp. Corp. v. Nature's Farm Prods., Inc.*, 370 F. Supp. 2d 993, 999 (N.D. Cal. 2005) (denying motion to dismiss FCA antidumping duty claim based on false statements on Form 7501).

Moreover, under the Act's reverse false claims provision, a defendant is liable if it "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." § 3729(a)(1)(G). This provision was "designed to cover Government money or property that is knowingly retained by a person even though they have no right to it." *U.S. ex rel. Silingo v. WellPoint, Inc.*, 904 F.3d 667, 676 (9th Cir. 2018) (quoting S. Rep. No. 111-10, at 13-14 (2009)). Accordingly, a defendant can be liable for a reverse false claim even when it does not itself make a false statement. *Victaulic Co.*, 839 F.3d at 253-56 ("A false statement is no longer a required element, since the post-FERA FCA specifies that mere knowledge and avoidance of an obligation is sufficient, without the submission of a false record, to give rise to liability."). Defendants' arguments to the contrary misstate the law. (SCI Mtn. 13–14; Sigma Mtn. 12–14.)

Viewed as a whole, the FAC's allegations of false statements and fraudulent conduct are damning. The FAC provides myriad factual allegations of the relevant antidumping framework, industry experience with the antidumping duty, and the Defendants' specific conduct, relationships, and history related to evading the duty. In short, the allegation that Defendants engaged in a course of fraudulent conduct, including submitting false Form 7501s, is rendered plausible by the numerous, detailed factual allegations included in the FAC.

Specifically, the FAC details how each Defendant sells Welded Outlets that are sourced to China. Indeed, after Island filed the original complaint, Sigma, SCI, and Vandewater all admitted to Commerce that they import Chinese Welded Outlets. (FAC ¶ 29; Exhibits K, L, and M, ECF Nos. 97-11, 97-12, 97-13.) In addition, the FAC persuasively alleges that Defendants have established business relationships with Chinese manufacturers of Welded Outlets. (FAC ¶¶ 32, 34, 38-40, 43, 46-48, 52, 54, 56, 58, 59-61, 63, 65, 68-69.)

The FAC directly alleges that the imports at issue fell within the scope of the Antidumping Duty Order. In its initial complaint, Island's allegations regarding the history of that order, including Commerce's prior scope rulings, and descriptions of Defendants' products provided a plausible basis to conclude Defendants were required to pay the duty. (Complaint at ¶¶ 15-24, ECF No. 1.) Commerce has concluded that Sigma's, SCI's, and Vandewater's imports are within the scope of the duty. (FAC ¶¶ 29-30.) Given Commerce's ruling, there can be no doubt that the FAC adequately alleges false statements and fraudulent conduct. *See U.S. ex rel. Oliver v. Parsons Co*., 195 F.3d 457, 463 (9th Cir. 1999) ("[W]hile the reasonableness of [defendant's] interpretation of the applicable accounting standards may be relevant to whether it knowingly submitted a false claim, the question of 'falsity' itself is determined by whether [defendant's] representations were accurate in light of applicable law").

SCI and Vandewater suggest that the Antidumping Duty Order was too ambiguous to support false statement allegations. (SCI Mtn. 14; Vandewater Mtn. 10-11.) That is wrong. While defendants may argue that the Antidumping Duty Order is complex or technical, it is not discretionary and its meaning can be determined. *Parsons*, 195 F.3d at 463. The question of falsity is determined by evaluating the accuracy of those statements "in light of applicable law." *Id*. Here, Commerce has confirmed that Defendants products are subject to the duty. If, as Island alleges, Defendants said otherwise to Customs, such statements are false.[2]

Island's factual pricing allegations support the plausible claim that Defendants fraudulently avoided the antidumping duties. The FAC explains how Island, using both its own privately-held information as a market participant as well as confidential pricing information that it obtained through its investigation, discovered that Defendants' actual pricing of their Chinese Welded Outlets was "far too low to permit payment of the antidumping duties." (FAC ¶¶ 27–28; *see also id.* at ¶¶ 41–42, 44, 53, 58, 60, 67, 73.) Again, these are factual allegations that must be accepted as true at this stage. *See, e.g., In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 720 n.8 (S.D.N.Y. 2017).

The FAC also complies with Rule 9(b). Defendants attempt to move the goalposts by demanding evidence sufficient to prove—not merely allege— violations of the Act, but the Rule does not demand such precision. *United Healthcare*, 848 F.3d at 1180. A complaint "need not allege 'a precise time frame,' 'describe in detail a single specific transaction' or identify the 'precise method' used to carry out the fraud." *Id*. (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)). Rather, "it is sufficient to allege particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims

---

[2] At the summary judgment stage, Defendants will be free to argue that they actually misunderstood the regulation when they avoided the antidumping duties, but those factual arguments relate to scienter. At this stage, as shown below, the FAC plausibly alleges scienter given, among other things, the Defendants' pattern of concealment and evasion that is reflective of their knowledge.

7

were actually submitted." *Id*. (internal quotation marks omitted). This guidance reflects the dual purposes of Rule 9(b): to give defendants notice of the particular misconduct alleged to constitute fraud and to deter baseless complaints. *Id*. (noting that the Rule "require[es] *some* factual basis for the claims" (emphasis added)).

The FAC more than satisfies the Ninth Circuit's requirements. *Ebeid*, 616 F.3d at 998 (considering "the who, what, when, where, and how of the misconduct charged"). With both common and individualized factual allegations, the FAC describes how Defendants, along with certain named Chinese manufacturers (together, the "who"), submitted and conspired to submit false Customs declarations regarding applicable antidumping duties (the "what," *i.e.*, the false statements) repeatedly over a span of at least the last five years (the "when") through the Ports of Long Beach and Los Angeles (the "where") by not self-disclosing that the imports were subject to antidumping duties and by engaging in various deceptive practices—alleged in detail—to disguise the true nature of their imports of Chinese Welded Outlets (the "how"). (*See generally* FAC ¶¶ 2, 4, 7–10, 14, 16, 19–22, 31–69, 75–76.) These allegations are more than enough to alert Defendants to the "particular misconduct" alleged to constitute their fraud. *United Healthcare*, 848 F.3d at 1180–82.[3]

So, too, do the FAC's actual allegations constitute "particular details of a scheme" combined with "reliable indicia that lead to a strong inference" that false statements were actually submitted to the Government. *Ebeid*, 616 F.3d at 998–99. The FAC provides details of Defendants' long-running scheme. The allegations of

---

[3] Anvil quibbles that the FAC does not name the actual individuals who submitted the false statements (Anvil Mtn. 11), but that is unnecessary as Defendants can readily determine who signed the confidential Customs declarations. *See U.S. ex rel. Integra Med Analytics LLC v. Providence Health & Servs,* No 17-1694-PSG, 2019 WL 3282619, at \*21 (C.D. Cal. July 16, 2019) (citing *U.S. ex rel. Mei Ling v. City of L.A.*, No. 11-974-PSG, 2018 WL 3814498, at \*11 (C.D. Cal. July 25, 2018) ("The individuals who signed the claims and statements can be divined by [Defendants]; the Government need not include them in its complaint when its allegations already provide Defendants with the notice required by Rule 9(b)." (cleaned up))); *see also Vatan*, 721 F. App'x at 663 (Rule 9(b) requirements are relaxed as to matters within opposing party's knowledge).

Defendants' efforts to conceal their imports—combined with conditions that create the opportunity for fraud (FAC ¶ 22) and Defendants' more recent admissions to Commerce in their unsuccessful efforts to obtain a scope ruling that the Antidumping Duty Order does not apply to them—provide reliable indicia supporting a strong inference that false statements were actually submitted.

Overall, the FAC depicts a compelling narrative that satisfies applicable pleading standards by providing ample factual allegations that, viewed in the light most favorable to Island, state a plausible cause of action under the False Claims Act. Resisting this, many of the Defendants' individual arguments simply contradict the governing standard for a motion to dismiss.

*Sigma:* Sigma does not acknowledge the FAC's allegations that Defendants submitted false statements in CBP Form 7501. Instead, Sigma contends that their descriptions of imports as "parts of pipe fittings" and "couplings" are not false. This argument is unavailing. First, these descriptions were, at best, half-truths— "representations that state the truth only so far as it goes, while omitting critical qualifying information"—here, that the goods were specifically covered by the Antidumping Duty Order. *Universal Health Servs., Inc. v. U.S.*, 136 S. Ct. 1989, 2000 (2016). Such half-truths can be actionable false statements for purposes of the Act. *Id*.

Second, and more fundamentally, Sigma ignores the FAC's direct allegations of false statements on the CBP Form 7501. (FAC ¶¶ 75–76, 79.) These false statements are at the core of the complaint. Sigma's misleading and incomplete descriptions simply bolster the plausibility of Island's allegations that Defendants actually submitted false statements and records in the Customs forms and that they did so with scienter.

Sigma also improperly tries to cast the allegations in the light most favorable to it, not Island. Sigma asks the Court to read the FAC as alleging that Sigma was merely a subsequent purchaser duped by Aegis into buying Chinese Welded Outlets

that Sigma thought were American made. (Sigma Mtn. 13–14.) That is plainly not what the FAC alleges. Instead, the FAC alleges that a former Sigma employee has informed Island that Sigma has previously relied on Chinese manufacturers and shippers (Beijing Bell and Wor-Biz Trading) for its welded outlets and that Sigma and Aegis were working *together*, with at least one common high-level employee, to import low cost welded outlets. (FAC ¶¶ 58–61.) Read in the light most favorable to Island, the FAC sufficiently alleges that Sigma is responsible for making false statements or engaging in a fraudulent course of conduct. *See Victaulic Co.*, 839 F.3d at 258 (concluding proposed amended complaint alleged "plausible course of conduct" giving rise to reverse false claims liability); *Nat'l Ass'n of Afr. Am.-Owned Media*, 915 F.3d at 627.

*SCI*: Unlike Sigma, SCI at least acknowledges that the FAC alleges that Defendants submitted false statements on the CBP Form 7501. (SCI Mtn. 6.) But it tries to write those allegations off as "unsupported, generic group pleading." (*Id.*) That is not an adequate ground to dismiss. Paragraphs 75 and 76 allege that all the Defendants submitted false Form 7501s because, based on Island's investigation detailed in the preceding paragraphs, there are reasons to believe each Defendant is in fact responsible for submitting false Form 7501s. As the Ninth Circuit has repeatedly explained, "[a] good claim against one defendant did not become inadequate simply because a co-defendant was alleged to have committed the same wrongful acts." *WellPoint, Inc.*, 904 F.3d at 677. In other words, "[t]here is no flaw in a pleading . . . where collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct." *United Healthcare Ins. Co.*, 848 F.3d at 1184.

The FAC alleges that each Defendant, including SCI, conspired with others—most notably, certain identified Chinese manufacturers—to import welded outlets while evading the applicable antidumping duty. The fraudulent scheme "resembles a wheel conspiracy," where the Chinese manufacturers (and others yet

to be identified) acted as a "hub," while the Defendants acted as "spokes." *WellPoint*, 904 F.3d at 678. As the spokes, Defendants' "parallel actions"—causing the submission of false customs forms—"can be addressed by collective allegations." *Id.*; *see infra* at 17–19 (discussing conspiracy allegations).

SCI's remaining arguments are similarly unpersuasive. SCI asks this Court, on a motion to dismiss, to conclude that Commerce "erred in its determination that Cooplets are covered by the Butt-Weld Order." (SCI Mtn. 13.) But as SCI and the other Defendants have contended in their stay motion, that is not a question for this Court. As Commerce's scope ruling explained, SCI's Cooplets are subject to the Antidumping Duty Order based on the plain language of the scope of that order, the descriptions of the Cooplets, the ITC's final determination from the most recent sunset review, and prior scope rulings (including the 1992 Sprink-Let scope ruling). (Ex. K to FAC at 17, ECF No. 97-11.) Commerce's conclusion that SCI's Cooplets are subject to the duty is consistent with Island's initial complaint and FAC, which alleges that they are "physically identical to" the Sprink-Let welded outlets. (FAC ¶ 25.) Moreover, as SCI acknowledges, the FAC details SCI's efforts to comingle and misdescribe its imports with misleading half-truths. (SCI Mtn. 15; FAC ¶ 65-66.) These factual allegations that SCI sought to import Cooplets under the description of steel pipe nipples bolster the allegations that SCI submitted false Form 7501s to avoid the applicable antidumping duty.

***Anvil***: Anvil argues that the FAC insufficiently alleges a false statement because CBP Form 7501 is a "confidential entry summar[y], prepared by the importer and submitted to CBP," and the FAC's allegations "appear to be based on" Anvil's misleading descriptions in public ship manifests. (Anvil Mtn. 8.) While Island agrees that the Defendants' completed CBP Form 7501s are confidential (a point to which we will return in connection with the public disclosure bar), Anvil confuses *proof* necessary to prevail at trial with *plausible allegations* sufficient to state a claim in the pleadings. (*See id.* at 10 (faulting the FAC for not

"establish[ing]" imports from China); *id*. at 11 (describing "shreds" of "purported actual evidence")). The FAC contains numerous allegations regarding Anvil's business and conduct from which the Court can find a strong, plausible inference that Anvil is responsible for actionable false statements. As with Sigma and SCI, the FAC's allegations regarding the misleading half-truths in manifest descriptions (FAC ¶ 49; *see Universal Health Services, Inc.*, 136 S. Ct. at 2000)—combined with factual allegations indicating that Anvil imports welded outlets from China (FAC ¶¶ 50–52) and sells its products at prices that would be economically infeasible "unless it was evading and avoiding the antidumping duties" (FAC ¶ 53)—render plausible the allegation that Anvil submitted false forms to Customs or otherwise sought fraudulently to avoid the antidumping duties.

Among those factual allegations, the FAC states that an Anvil representative confirmed that its internationally-sourced welded outlet is, in fact, made in China, imported to the United States, and threaded in Anvil's facilities here. (FAC ¶ 52.) While Anvil complains that the FAC does not identify the representative, that is not a defect in the pleading. The particularity requirements of Rule 9(b) do not require Island to disclose its investigative sources in its pleading. *See Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) (holding, in context of even more demanding PSLRA pleading standards, "where plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false.") It is instead sufficient to describe the particular details of the scheme so as to support the inference the false claims were submitted. *United Healthcare Ins. Co.*, 848 F.3d at 1180.

Anvil tries to portray the FAC's factual allegations in a different light—one more favorable to Anvil. (Anvil Mtn. 8-10.) Specifically, Anvil argues that the FAC's allegations could be read in a way to suggest Anvil did not import any products falling within the scope of the Antidumping Duty Order. But, again, that

defies the governing standard on a motion to dismiss and ignores direct, factual allegations that Anvil imports the alleged products from China. (FAC ¶ 52.) Moreover, Anvil's September 19, 2018 sales letter, attached as Exhibit O to the FAC, can—and at this stage, must—be read to say that Anvil's Welded Outlets originate in China. That letter announced that tariffs on imports "including the ones Anvil imports from China" necessitated price increases. (Ex. O to the FAC, ECF No. 97-15). The second paragraph of that letter states that, Anvil "will implement the increase on *the products affected* [by the tariff] Monday, October 8th." (*Id.* (emphasis added).) Anvil then proceeded to list its SPF Fire Protection O-Lets—the welded outlets at issue in the FAC. (*Id.; see* FAC ¶¶ 47, 50–53.) This letter reinforces Island's conversation with an Anvil representative and is another admission by Anvil that its Welded Outlets are sourced from China.

### 3.    The FAC Alleges Defendants Acted with Scienter.

Scienter is not subject to Rule 9(b)'s heightened pleading requirement. *United Healthcare Ins. Co*., 848 F.3d at 1180; *Corinthian Colleges* 655 F.3d at 996. The scienter element creates a dividing line between non-actionable "innocent mistakes, mere negligent misrepresentations and differences in interpretations," and misrepresentations that defendants made knowingly, with deliberate indifference, or reckless disregard of the truth. *Id.* (quoting *U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006)). In evaluating the FAC's allegations of scienter, the Court looks to whether the facts alleged "support a 'plausible' inference that the compan[ies] acted with fraudulent intent." *Id.* at 1000. In the context of the Act, it is sufficient for Island to plead facts creating a plausible inference that the Defendants acted with "reckless disregard" in submitting false declarations with respect to the antidumping duty requirements.

Here, the FAC exceeds that threshold by alleging that each Defendant took active measures to conceal the true nature of their imported goods. (*See* ¶ 36 (Vandewater); ¶ 49 (Anvil); ¶ 57 (Sigma); ¶¶ 65-66 (SCI).) Such factual allegations

that the Defendants used deceptive half-truths or flat out lies in describing their imports of Chinese Welded Outlets are inconsistent with "innocent mistakes" or simple negligence. *Corinthian Colleges*, 655 F.3d at 996. For instance, Vandewater is alleged to have repeatedly described imports of welded outlets as parts for motor vehicles, "BLK Steel Coupling Blanks," or "adaptors" so as not to trigger the duty (FAC ¶ 36.) The FAC also alleges that Vandewater would sometimes falsely claim that the imports were made in South Korea. (*Id.*) Anvil, Sigma, and SCI similarly would use inaccurate, incomplete, or false descriptions of their imports that would be subject to the duty. (*Id.* ¶¶ 49, 57, 61, 65-66.) Sigma's quantity of imports of what they described as "parts of pipe fittings"—a half-truth that would not alert Customs officials—is consistent with Sigma's share of the welded outlets market. (*Id.* ¶ 57). Anvil's import records indicate significant volumes of "merchant coupling blanks, pipe fittings, and pipe nipples," that fall outside the scope of the Antidumping Duty Order. Viewed in the light most favorable to Island, these misleading or deceptive descriptions were made "with the intent to deceive," and bolster the allegations that Defendants knew their Customs declarations were false. *Hendow*, 461 F.3d at 1175. In other words, Island alleges that Defendants "repeatedly took actions to hide [their] fraud," *Gilead Scis.*, 862 F.3d at 904, which is flatly inconsistent with innocent or unintentional violations. *Hendow*, 461 F.3d at 1175.

Several of the Defendants offer arguments that the FAC cannot adequately plead scienter because there are alternative interpretations of the governing antidumping duty order that render the order "ambiguous." (SCI Mtn. 17; Vandewater Mtn. 10-11.) That misstates the law. "Scienter is not determined by the ambiguity of a regulation, and can exist even if a defendant's interpretation is reasonable." *U.S. ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1155 (11th Cir. 2017). In other words, Defendants cannot escape liability "by relying on a 'reasonable' interpretation of an ambiguous regulation manufactured *post hoc*,

despite having actual knowledge of a different authoritative interpretation." *Id.* Here, Island offers explicit factual allegations that the Defendants *subjectively* had the requisite knowledge that their products were subject to the duty or at least that they acted in reckless disregard or deliberate indifference to that fact. *Id.* ("[A] court must determine whether the defendant *actually* knew or should have known that its conduct violated a regulation in light of any ambiguity at the time of the alleged violation." (emphasis added)).

In addition to the pattern of deceptive conduct described above, the FAC alleges that Commerce's Sprink-let ruling effectively "warned" Defendants "away from the view" they now purport to have taken. *U.S. ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 288 (D.C. Cir. 2015); *U.S. ex rel. Brown v. Celgene Corp.*, 226 F. Supp. 3d 1032, 1051 (C.D. Cal. 2016). The Sprink-Let ruling, as cited in the FAC, held that physically identical, beveled products that were permanently welded to piping systems, were butt-weld pipe fittings. (FAC ¶¶ 23-26; Ex. A, ECF No. 97-1.) Whether the Defendants were "warned away" from the interpretation of the Antidumping Duty Order they proffer here turns on disputed questions of fact. *MWI Corp.* 807 F.3d at 288 (noting that "question cannot readily be labeled as a 'purely legal' question").

The FAC alleges that Defendants had either actual notice of this ruling or that they recklessly disregarded it. (*E.g.*, FAC ¶ 34.) (Recall, under the Act, deliberate indifference and reckless disregard are sufficient to establish scienter. § 3729(b).) For instance, the FAC details how Island's confidential source assisted Defendants Ruebens and Vandewater and worked with Lloyd Perkins, who was personally involved in prior scope ruling requests that determined that physically identical welded outlets were subject to antidumping duties. (FAC ¶¶ 31-34.) Most clearly, the FAC states that Ruebens in February 2013 offered Island the opportunity to purchase Chinese Welded Outlets that could be imported and sold as domestic goods "because the Customs inspectors at the receiving ports were too

busy to check the incoming shipments"—an offer Island rejected. (*Id.* ¶ 40.) In essence, Vandewater and Ruebens ask this Court to conclude, without any discovery whatever, that they could not have acted with scienter notwithstanding specific factual allegations—which they do not dispute and, in any event, *must* be accepted as true—that they had actual knowledge. That is not the governing standard for a motion to dismiss.

Instead, Vandewater and Rueben's motion is loaded with hyperbole and false characterizations. Island, of course, has not alleged that "no decent person in good faith could believe" that the Antidumping Duty Order did not cover Defendants' products. (Vandewater Mtn. 7.) Rather the FAC alleges that Defendants actually knew, recklessly disregarded, or were deliberately indifferent to the fact that the duty applied to them as demonstrated by their pattern of deceptive conduct and connections to individuals with first-hand knowledge of the duties.

As for Sigma, the FAC alleges that Terry Clark, a long time Sigma manager, had extensive experience with Chinese Welded Outlets and connections with Chinese manufacturers such as Shanghai Vision. (FAC ¶¶ 56, 59-60). The complaint describes Shanghai Vision's attempts to solicit Island's business while being defensive about the subject of import duties. (*Id.* ¶ 72.) Sigma's relationships and dealings with these entities create a basis to infer knowledge, experience, and familiarity with the imports of the goods at issue as well as applicable duties. (*Id.* ¶ 58.)

Ultimately, of course, the best evidence of Defendants' knowledge of the applicable antidumping duties will be found in Defendants' possession. What matters at this stage is that Island has leveled factual allegations that Defendants acted with the requisite knowledge of their obligations under the Antidumping Duty Order. The FAC sufficiently alleges scienter.

## B. The FAC Pleads A Conspiracy to Violate the False Claims Act.

Defendants contend that Island has not adequately pleaded a conspiracy to violate the Act. (Sigma Mtn. 16-20; SCI Mtn. 18-19; Anvil Mtn. 13-14; Vandewater Mtn. 13-15.) But Defendants' arguments distort the nature of the conspiracy alleged and ignore the FAC's explicit allegations of agreement to violate the Act.

Island alleges that Defendants, together with Chinese manufacturers, conspired to avoid and evade the Antidumping Duty Order to sell Chinese Welded Outlets in the United States. As the FAC makes clear, Defendants' agreements with the Chinese manufacturers to import the products without paying the required duty was the animating purpose of their financial arrangements. (*See* FAC ¶¶ 32-34, 38-41, 43-44, 46, 48, 52-54, 56, 58-63, 65-69.) The FAC describes the relationships each Defendant has with various Chinese manufacturers and other importers. For example, the allegations describe the parties as so intertwined that when, as part of its investigation, Island e-mailed Beijing Bell, it was Ruebens from Vandewater who responded. (FAC ¶ 43.)   The FAC further alleges that Beijing Bell has relationships with Anvil (*id.* ¶ 49) and Sigma (*id.* ¶ 60). Based on the totality of the factual allegations, Island has plausibly alleged that each Defendant has entered into agreements with specified entities to violate the Act. (*Id.* ¶¶ 46, 54, 63, 69); *see Soo Park*, 851 F.3d at 928–29 (allegations regarding conspiracy's agreement survive motion to dismiss, when pleaded on information and belief, when facts are peculiarly in defendants' possession and other factual information makes inference of culpable agreement plausible). Moreover, it is unnecessary to name all conspirators as defendants. *Ward v. Apple Inc.*, 791 F.3d 1041, 1048–49 (9th Cir. 2015) (citing cases).

At minimum, Island has sufficiently pleaded a rimless wheel conspiracy,[4] which involves "a single member or group (the 'hub') separately agreeing with two or more other members or groups (the 'spokes')." *WellPoint,* 904 F.3d at 678. Here, the FAC sets out a hub—a group of Chinese manufacturers that have contracts and relationships with each of the Defendants. (FAC ¶¶ 2, 46, 54, 63, 69). As described in the FAC, the Defendants are the spokes and are "largely alleged to have engaged in precisely the same conduct"—that is, working with this hub of manufacturers to import Chinese Welded Outlets while evading the required antidumping duty. *WellPoint*, 904 F.3d at 678 (internal quotation marks omitted); *see also United Healthcare Ins. Co*., 848 F.3d at 1184 ("There is no flaw in a pleading . . . where collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct.").

Defendants' acknowledgements that they are alleged to have engaged in parallel conduct confirm, not defeat, Island's conspiracy claim. (*See* SCI Mtn. 19; Sigma Mtn. 17; Vandewater Mtn. 13). Spokes in a wheel conspiracy act in the same fashion. *WellPoint*, 904 F.3d at 678 ("[I]f a fraudulent scheme resembles a wheel conspiracy, then any parallel actions of the 'spokes' can be addressed by collective allegations."). These allegations are more than sufficient to survive a motion to dismiss. The plausibility standard "simply calls for enough fact to raise *a reasonable expectation* that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556 (emphasis added). The FAC details a sophisticated international scheme of shipping and import fraud that, by its nature, involves multiple entities with shared knowledge and incentives.[5] Viewing the FAC in the

---

[4] Island submits that the FAC's allegations also give rise to a plausible inference of agreement among the Defendants—the so-called "rim" of a wheel conspiracy. Given the allegations of substantial "overlap of key actors, methods, and goals," there is a reasonable expectation that discovery will uncover evidence of such an agreement. *See U.S. v. Strickland*, 245 F.3d 368, 385 (4th Cir. 2001).

[5] Vandewater and Ruebens' argument that they could not conspire ignores another exception to the intra-corporate conspiracy doctrine. (Vandewater Mtn. 13–14.) "[T]he intracorporate immunity doctrine does not apply where a corporate officer has an independent personal stake in achieving the corporation's illegal objectives."

light most favorable to Island, it creates a reasonable expectation that discovery will uncover evidence of Defendants' alleged conspiracy.

In addition to sufficient allegations of agreement to evade the Antidumping Duty Order, the FAC contains sufficient allegations of overt acts. Specifically, each Defendant is sufficiently alleged to have committed the underlying violations—*i.e.,* submitting or causing to submit false statements to Customs— which, if proved, will satisfy the overt act requirement. (FAC ¶ 88; *Cf. U.S. v. Chen Chiang Liu*, 631 F.3d 993, 1001 (9th Cir. 2011).)

### C.   The Public Disclosure Bar Does Not Apply.

Three of the Defendants argue that the FAC is based on publicly-available information. (*See* SCI Mtn. 12; Anvil Mtn. 16; Sigma Mtn. 7.) Not so. In fact, as detailed in the FAC and below, Island conducted an extensive investigation in which it developed confidential sources and obtained non-public pricing information (*e.g.*, historic and actual market prices, not publicly-available list prices). Island only obtained this closely-held information because it is a long-standing market participant and industry insider. Moreover, Defendants are unable to point to any pre-complaint document that so much as suggests—let alone, exposes—the truth: Defendants regularly imported Chinese Welded Outlets without ever paying the required antidumping duty. Far from "opportunistic," Island's efforts have revealed Defendants' fraud for the first time.

### 1.   Legal Standard

Anvil, Sigma, and SCI seek dismissal of the FAC on the grounds of the so-called "public disclosure bar" of the False Claims Act. *See* 31 U.S.C. § 3730(e)(4)(A). Under the 2010 Amendments to the Act, the public disclosure bar is not jurisdictional; rather, it is an affirmative defense to be asserted and proved by

---

*ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 179 (4th Cir. 2002). By his own admission, Ruebens "owns and manages Vandewater," so he is a high-ranking corporate officer. (Vandewater Mtn. 14.) Discovery is warranted to determine the nature of his individual incentives in participating in the conspiracy.

19

the defendant. *See Prather v. AT&T, Inc.*, 847 F.3d 1097, 1102 (9th Cir. 2017), *cert. denied,* 137 S. Ct. 2309 (2017).

The relevant provision states: "The court shall dismiss an action or claim under [the Act], unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed" in three statutorily provided categories of information. § 3730(e)(4)(A). The Ninth Circuit interprets "allegations" to refer to "direct claims of fraud," and the term "transaction" "refer[s] to facts from which fraud can be inferred." *Amphastar Pharm. Inc. v. Aventis Pharma SA*, 856 F.3d 696, 703 (9th Cir. 2017).

Significantly, when enacting the public disclosure bar, Congress did not bar suits that rely on "public" information. Instead, "[b]y its plain terms, the public disclosure bar applies to some methods of public disclosure and not to others." *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 414 (2011). The categories to which it applies includes disclosures (i) "in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;" (ii) "in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation;" or (iii) "from the news media." § 3730(e)(4)(A).

Application of the public disclosure bar turns on whether "a critical mass of the underlying facts or of the allegations in the *qui tam* complaint have been disclosed ***prior to the qui tam complaint being filed.***" *Amphastar*, 856 F.3d at 703 (citing *U.S. ex rel. Mateski v. Raytheon*, 816 F.3d 565, 571 (9th Cir. 2016)) (emphasis added).

The Ninth Circuit has adopted the widely-accepted "X + Y = Z" equation to guide the public disclosure bar analysis, although none of the Defendants mentions, let alone applies, that standard. *Mateski*, 816 F.3d at 571 (citing *U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 653–54 (D.C. Cir. 1994)). In this equation, "Z represents the allegation of fraud and X and Y represent its essential elements," the misrepresented state of facts and the true state of facts. *Id.*

(emphasis omitted) "In order to disclose the fraudulent transaction publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, *i.e.*, the conclusion that fraud has been committed." *U.S. ex rel. Found. Aiding the Elderly v. Horizon W., Inc.*, 265 F.3d 1011, 1015 (9th Cir. 2001).

The bar represents Congress' attempts to "strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits." *Mateski*, 816 F.3d at 570. Far from parasitic, this case is not one where the allegations of fraud were reported in the news or were the subject of prior lawsuits. *See U.S. v. Omnicare, Inc.*, 903 F.3d 78, 89–90 (3d Cir. 2018) (describing situations where "a particular concrete allegation of fraud has already been disclosed in whole or in part and the relator is merely extrapolating from or expanding on the allegation to include allegedly new fraudsters").

### 2.   There Was No Public Disclosure Under the Act.

The materials Sigma, SCI, and Anvil cobble together in an effort to show a qualifying public disclosure do not come close to disclosing the fraud. Instead, Island's own investigative efforts and non-public information are responsible for first uncovering the alleged fraud.  Moreover, many if not all of the materials relied on by the Defendants do not even constitute public disclosures within the Act's statutory sources.

### a.   2018 scope rulings

Sigma and SCI point to the recent scope ruling requests and final scope rulings in the Department of Commerce as qualifying public disclosures. (Sigma Mtn. 10; SCI Mtn. 10.) They are not. As the FAC explains, all of those proceedings began in 2018, well after Island initiated this *qui tam* lawsuit. (FAC ¶¶ 29-30.)  Materials cannot be prior public disclosures, triggering the bar, if they did not even exist at the time the fraud was first alleged. *Amphastar*, 856 F.3d at 703. The bar is instead concerned with disclosures that occur *before* the "relevant claims first appeared in the case." *U.S. ex rel. Beauchamp v. Academi Training Ctr., LLC*, 816

F.3d 37, 45 (4th Cir. 2016). Here, Island's original complaint pleaded the same fraudulent scheme against the same Defendants, well before the Defendants initiated scope ruling proceedings with the Commerce Department. (FAC ¶¶ 1-5, 17-74.) Since "the relevant fraud [was] first alleged before the public disclosure," Island's suit "is plainly not 'parasitic.'" *Beauchamp*, 816 F.3d at 46.

The fact that Island's FAC adds Defendants' more recent admissions that they import their products from China and that Commerce has determined those products fall within the scope of the Antidumping Duty Order does not retroactively bar Island's allegations of the same fraudulent scheme. In other words, the public disclosure bar does not kick earlier-to-file plaintiffs out of court when they amend their complaint to develop more allegations to establish the same causes of action. *Beauchamp*, 816 F.3d at 43 (finding no public disclosure where Relators filed an amended complaint that "re-alleged" same fraud "and added further detail about it gleaned from the article" written after prior complaint).

### b.   Shipping records

Defendants next point to references in the pleadings to shipping manifest records from sources such as Import Genius, a subscription-based database. (SCI Mtn. 11; Sigma Mtn. 7-9; Anvil Mtn. 16.) There are several flaws to Defendants' reliance on these materials. First, Defendants have not produced the documents they claim disclose Island's allegations. Under the 2010 Amendments to the Act, Defendants must prove the affirmative defense of the public disclosure bar. Their failure to specifically identify the materials they claim disclosed the alleged fraud is sufficient to defeat their motion. The limited statements in the FAC certainly do not establish a sufficient public disclosure, and, unlike the standard for Island to survive a motion to dismiss under Rule 12(b)(6), Defendants' motions to dismiss on the grounds of an affirmative defense require *proof*—not merely plausible allegations.[6]

---

[6] Nor can Defendants submit these materials on reply. *See Manfred v. Greenrock*, No. 06-6208, 2008 WL 11340337, at *1 (C.D. Cal. June 27, 2008) (striking as untimely, exhibits submitted with reply brief "to correct evidentiary inadequacies").

Second, none of the shipping records described by Defendants or quoted by the FAC discloses the constituent elements of the fraud. *Mateski*, 816 F.3d at 571. For the public disclosure bar to apply, the qualifying disclosures would need to disclose both that Defendants told Customs that their imports were not subject to the antidumping duty order (*i.e.*, the misrepresented state of facts) *and* that Defendants' imports actually *were* subject to the antidumping duty order (*i.e.*, the true state of facts). At most, the publicly-available shipping records contain hints that the Defendants misrepresented the facts, but they do not disclose the fraud. This is consistent with Island's arguments above regarding the sufficiency of the FAC.  As Anvil acknowledges, the actual alleged misrepresentations are contained in "confidential records only available to CBP and to the actual importer and its agents." (Anvil Mtn. 17; *see* FAC ¶¶ 75–76.) While the shipping records—and the half-truths and false statements they contain—are probative of Defendants' scienter, they do not establish Defendants' misrepresentations and they certainly do not disclose the true state of affairs—that the shipments contain imports subject to the Antidumping Duty Order.

Third, the shipping records Defendants cite do not even qualify as public disclosures, as they are neither "news media" nor "Federal reports" within the meaning of § 3070(e)(4)(A)(ii) and (iii).[7] The public disclosure bar does not extend to every imaginable piece of public information, but only to those disclosures that "(1) issue from a source or occur in a context specifically recognized by the Act, and (2) [are] sufficient to support the conclusion that the information contained therein is now public within the meaning of the Act." *U.S. ex rel. Paranich v. Sorgnard*, 396 F.3d 326, 332–33 (3d Cir. 2005).

Defendants' contention that the Act's definition of "Federal report" can include shipping records—found in a subscription database constructed from

---

[7] Defendants do not contend that these records could qualify under any of the Act's other categories.

Defendants' (or their agents') own submissions of allegedly false and deceptive information—defies common sense.  Defendants have not shown that the database records are produced by a federal agency.  And, as at least one court has noted, to accept their theory "would mean that by their very act of submitting their allegedly false claim . . . Defendants have effectively shielded themselves from FCA liability through the public disclosure bar. This clearly cannot be the correct result." *U.S. ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 183 (E.D. Pa. 2012). It cannot be the case that "everything the government has in its files is public information" within the scope of the Act. *Id*.

Sigma attempts to liken shipping records to a written response from the federal government to a Freedom of Information Act request. (Sigma Mtn. 8-9.) The analogy, according to Sigma, is that cargo declarations are available to certain members of the public by request in a way that is the "functional equivalent of a FOIA request." (*Id*.) The comparison does not hold water. For starters, the statutory question is not whether the public conceivably *could have* requested the information. The question is whether "substantially the same allegations or transactions as alleged in the action or claim *were* publicly disclosed" in an official report by the federal government. § 3730(e)(4)(A) (emphasis added). As the Supreme Court has explained, FOIA *responses* constitute federal reports under § 3730(e)(4)(A)(ii) because those responses have a "governmental nature" as FOIA requires a federal agency to prepare "official or formal statements" in response to requests it receives. *Schindler*, 563 U.S. at 410–11. Here, Defendants point to no comparable formal statement or response from a federal agency.

Defendants' reliance on the Act's provision regarding "news media" fares no better.[8] While some out-of-circuit decisions have found that certain shipping

---

[8] The FCA does not define "news media," so courts should apply the term's "ordinary meaning." *Schindler*, 563 U.S. at 407. In particular, courts must look to the term's ordinary meaning in 1986, when the "news media" element of the public disclosure bar was enacted. *See MCI Telecomm. Corp. v. AT&T Co.*, 512 U.S. 218, 228 (1994). Although the Supreme Court has held that the public disclosure bar has

records can constitute "news media," those decisions have done so without analysis and have stretched the statutory term beyond any reasonable definition. (*See* SCI Mtn. 11 (citing *U.S. ex rel. Doe v. Staples, Inc.*, 932 F. Supp. 2d 34 (D.D.C. 2013); *U.S. ex rel. Customs Fraud Investigations LLC v. Victaulic Co.*, 2014 WL 4375638 (E.D. Pa. Sept. 4, 2014)).)

Indeed, just last month, Judge Gutierrez of this Court issued an opinion with a comprehensive analysis of this issue, concluding that "applying the news media provision to anything ever published publicly on the internet is contrary to the ordinary meaning of the term 'news media' and has the potential to eviscerate the balance Congress struck." *Integra Med Analytics*, 2019 WL 3282619, at *12. Judge Gutierrez offers "useful guideposts" in determining whether information has been disclosed "from the news media," such as (1) the extent the information "would be considered newsworthy," (2) whether there is "editorial independence, or at least some separation, between the original source of information and the medium that conveys it" as opposed "to an entity that simply publishes information about itself," (3) intent to disseminate "widely, as opposed to only a few individuals," (4) the degree the source "functions like" a "traditional outlet," such as newspapers, radio, and television stations, and (5) "whether [the source] could reasonably be described as 'news media' as at least some people would [use] that term in everyday speech," which the court considered "the most important consideration." *Id*. at *14–15. Under all five of these guideposts, it is inconceivable that technical shipping records available on subscription online databases could be considered "news media."[9] Accordingly, these materials should not be considered for purposes of the public disclosure bar.

---

a broad scope, *Schindler*, 563 U.S. at 408, it has never construed the term "news media" to include materials unrelated to journalism.
[9] Sigma suggests that members of the press are able to examine manifests (but not Form 7501), but offers *no* indication that news outlets did so with respect to Defendants' imports. (Sigma Mtn. 8.)

### c.    Defendants' marketing materials

For the same reasons, the Court should reject SCI's and Anvil's suggestion that its own marketing materials published online qualify as "news media" for purposes of the public disclosure bar. (Anvil Mtn. 17; SCI Mtn. 10.) The careful analysis in *Integra Med Analytics* demonstrates that these materials cannot reasonably be considered "news media." 2019 WL 3282619, at *14–15. In no sense do they convey newsworthy information. They are published by the Defendants themselves, with no editorial review. Defendants' websites do not function like a traditional news media outlet. And no one in common parlance would describe these sources as the "news media." *Id*. Defendants' interpretation invites the Court "to jettison the actual text that Congress enacted." *Id.* at *14. The Court should decline the invitation to rewrite the statute.

### 3.    Defendants Rely on Inapposite Case Law.

Defendants try to compare Island's complaint to the one dismissed in the D.C. Circuit case, *U.S. ex rel. Doe v. Staples, Inc.,* 773 F.3d 83 (D.C. Cir. 2014). (Sigma Mtn. 9-10; SCI Mtn. 12; Anvil Mtn. 18.) *Doe* does not support the application of the public disclosure bar here.  In that case—which involved alleged false statements to Customs to evade antidumping duties on Chinese-made pencils—the D.C. Circuit applied the same X + Y = Z formulation described above. *Id*. at 85–87. There, the parties stipulated that "X" (the alleged misrepresentation) was "defendants' declarations to Customs that their imported pencils were made somewhere other than China." *Id*. at 86. The *Doe* relator "concede[d] that this information was publicly disclosed in the PIERS database," which was labeled, without analysis, as "a form of 'news media.'" *Id*. at 85, 86. Turning to the "Y" (the alleged true state that the pencils were made in China) the *Doe* Court considered "two public reports *produced by the United States International Trade Commission*" that "describe the physical characteristics of Chinese pencils,

1   *including many of the telltale characteristics that form the basis of Relator's charge*
2   that the pencils were made in China." *Id.* at 87 (emphases added).

3          Island's action is readily distinguishable from *Doe*. First, for the reasons
4   described above, Island—unlike the *Doe* relator—disputes that shipping records
5   cited in its complaint could qualify as "news media" under § 3730(e)(4)(A)(iii) or
6   that they even adequately disclose the alleged misrepresentation. Second,
7   Defendants have not pointed to any public disclosure of the alleged true state of
8   affairs—that their imported Welded Outlets came from China and are subject to the
9   Antidumping Duty Order. As alleged in the FAC and described in the previous
10  sections (*see supra* at 13–14), Defendants were careful *not* to describe their imports
11  as Chinese Welded Outlets in their shipping records. (FAC ¶ 16.)  Defendants point
12  to nothing comparable to the ITC Reports at issue in *Doe*. Those reports were
13  critical to the holding in *Doe* and application of the public disclosure bar, as the
14  reports alerted the public (and the Government that produced them) of the "telltale
15  characteristics" of Chinese pencils subject to the duty order. Indeed, the reports in
16  *Doe* even "identified three of the four defendants . . . as 'possible' importers of
17  Chinese pencils." 773 F.3d at 88. As the D.C. Circuit explained, the reports'
18  identifications of possible defendants and telltale signs of Chinese products were
19  sufficient (along with the import database records) to alert the Government to
20  possible wrongdoing. *Id*. Here, there is no comparable qualifying report disclosing
21  telltale signs of *Chinese* welded outlets or identifying Defendants as potential
22  importers of the same.

23         At bottom, none of the sources Defendants point to qualifies as a statutory
24  public disclosure, but even if they all did, they still do not disclose both elements of
25  the fraud Island has alleged. The most that can be said about those sources is that
26  they *imply* the facts that Defendants misrepresented. But that is only a hint toward
27  one-half of the fraud equation. In other words, "readers" of the public shipping
28  records and marketing information that Defendants invoke could not reasonably

infer that Defendants submitted false Customs declarations that their imports were not subject to the Antidumping Duty Order when, in fact, they were. *Found. Aiding*, 265 F.3d at 1016.

Instead of disclosing the fraud, these sources only help bolster the plausibility of Island's allegations that are rooted in its investigative efforts and private information. The FAC spells out many of these sources, which include but are not limited to (1) individuals who worked for or with Defendants and provided private information to Island regarding the Defendants' scheme and the true source of their welded outlets (FAC ¶¶ 27, 41, 52), (2) Island's private information "based on its historic experience in the Welded Outlet market," most notably, pricing information and the cost basis for comparable products (FAC ¶ 27), and (3) Island's review of *private* import data (FAC ¶ 27).

Given Island's insider, non-public information, this case is far more comparable to the Third Circuit's recent *Omnicare* decision than the D.C. Circuit's decision in *Doe*. In *Omnicare*, the Third Circuit held that the public disclosure bar did not apply where a key aspect to uncovering the alleged fraud involved non-public information relevant to the defendant's financial statements. 903 F.3d at 88. The court reached this conclusion even though the publicly disclosed information disclosed a general risk that this sort of fraud "was a potential problem in the nursing home industry," as it agreed with the Ninth Circuit that the FCA does not bar suits on the basis of generalized disclosures of fraud. *Id.* at 89 (citing *Mateski*, 816 F.3d at 577 ("Allowing a public document describing 'problems'—or even some generalized fraud . . . across a swath of an industry—to bar all FCA suits identifying specific instances of [such] fraud . . . would deprive the Government of information that could lead to recovery of misspent Government funds and prevention of further fraud.")).

Here, Defendants point to *no* public disclosures that indicated a risk of fraud in the context of evading the Antidumping Duty Order. Instead, Island "relies on

non-public information to make sense of publicly available information" which "standing alone . . . could not have reasonably or plausibly supported an inference that the fraud was in fact occurring." *Omnicare*, 903 F.3d at 89. Without Island's non-public information—including confidential sources and industry insider information—the shipping records and marketing information Defendants cite do not disclose the fraud.

### 4.     Island Is an Original Source.

Even if the Court were to find that the Defendants met their burden of establishing there was a prior public disclosure under the terms of § 3730(e)(4)(A), the Court should still deny the motions to dismiss because Island is an original source of the information. The public disclosure bar does not permit dismissal of an action if "the person bringing the action is an original source of the information." § 3730(e)(4)(A).  Under the operative amendments, the statute defines an "original source" as "an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section."  § 3730(e)(4)(B).

Island qualifies as an original source under at least subsection (B)(2). As detailed in the FAC and above, Island's allegations are based on material, non-public information that goes beyond any public shipping records or marketing information. Specifically, as a market participant, Island knew market pricing information—different from publicly available list prices—that provided a strong indication of Defendants' fraudulent practices. (*See* Declaration of Glenn Sanders, ECF No. 117-1 at ¶ 2.)[10]  As in the *Omnicare* decision discussed above, this non-

---

[10] Island submits the declaration of Glenn Sanders only in response to Defendants' assertion of the affirmative defense of the public disclosure bar. The declaration is not being submitted in connection with the arguments regarding the sufficiency of

public financial information was critical to understanding that Defendants' sales could only be economically feasible if they were evading the applicable antidumping duty. 903 F.3d at 89. Prior to filing this action, Island's president, Glenn Sanders, voluntarily provided this material information to the Government in a telephone conversation with an international trade specialist at the U.S. Customs and Border Patrol. (Sanders Decl. ¶¶ 3–6.) This disclosure of information satisfies § 3730(e)(4)(B). *See U.S. ex rel. Antoon v. Cleveland Clinic Found.*, 788 F.3d 605, 617 (6th Cir. 2015) (holding original source exception applies if relator "discloses the information to the *federal* government," even if not to Department of Justice). Because Island's complaint relies on knowledge that was voluntarily disclosed to the Government and is independent of and materially adds to information disclosed in the FCA's statutory categories of public disclosures, the FAC cannot be dismissed on the grounds of the public disclosure bar.

## III.   CONCLUSION

For all the foregoing reasons, the Court should deny Defendants' motions to dismiss.[11]

Dated: August 5, 2019                MAYER BROWN LLP


                                     */s/Matthew H. Marmolejo*
                                     Kelly B. Kramer
                                     Matthew H. Marmolejo
                                     C. Mitchell Hendy
                                     Attorneys for Plaintiff-Relator
                                     ISLAND INDUSTRIES, INC.

---

the First Amended Complaint under Rules 8, 9(b), and 12(b)(6). Island objects to converting those portions of the motions to dismiss into motions for summary judgment. *See U.S. ex rel. Compton v. Circle B Enterps., Inc.*, No. 07-32, 2010 WL 942293, at *3-4 (M.D. Ga. March 11, 2010) (considering Relator's declaration submitted in response to Defendants' public disclosure arguments, but not for evaluating sufficiency of the pleadings).

[11] To the extent, if any, the Court grants Defendants' Motions, Island requests leave to file a Second Amended Complaint addressing any deficiencies either with respect to the sufficiency of the pleading or to Island's status as an original source. *See United Healthcare*, 848 F.3d at 1167 (reversing denial of leave to file fourth amended complaint where it was Plaintiff's first attempt to cure deficiencies).

30