1   Carmen Lo (SBN 280441)
    Email: carmen.lo@whitecase.com
2   WHITE & CASE LLP
    555 South Flower Street, Suite 2700
3   Los Angeles, CA  90071-2433
    Telephone:   (213) 620-7700
4   Facsimile:    (213) 452-2329

5   Lucius B. Lau (*pro hac vice*)
    Email: alau@whitecase.com
6   James P. Gagen (*pro hac vice*)
    Email: jgagen@whitecase.com
7   WHITE & CASE LLP
    701 13th Street, N.W.
8   Washington, DC 20005-3807
    Telephone:   (202) 626-3600
9   Facsimile:    (202) 639-9355

10  Attorneys for Defendant,
    SIGMA CORPORATION
11

12              UNITED STATES DISTRICT COURT

13             CENTRAL DISTRICT OF CALIFORNIA

14

15  UNITED STATES OF AMERICA *ex*        Case No. 2:17-cv-04393-RGK-
    *rel.* ISLAND INDUSTRIES, INC.,      KS
16
                   Plaintiffs,           **DEFENDANT SIGMA**
17                                       **CORPORATION'S**
                                         **MOTION FOR SUMMARY**
18        v.                             **JUDGMENT**

19  VANDEWATER INTERNATIONAL             Date:  May 18, 2020
    INC., et al.,                        Time: 9:00
20                                       Courtroom: 850
                   Defendant.            Judge: Hon. R. Gary Klausner
21

22

23

24

25

26

27

28

**TO THE CLERK AND ALL INTERESTED PARTIES:**

PLEASE TAKE NOTICE that on May 18, 2020, or as soon thereafter as counsel may be heard in Courtroom 850 of the United States District Court, Central District of California, located at 255 East Temple Street, Los Angeles, CA 90012, Defendant Sigma Corporation will respectfully request that the Court grant summary judgment pursuant to Federal Rule of Civil Procedure 56.

Pursuant to Local Rule 7-3, Sigma certifies that this motion is made following the conference with counsel for Plaintiff-Relator Island Industries, Inc. that took place on April 1, 2020.

This motion is based on this notice of motion, the memorandum of points and authorities attached hereto, the pleadings and records on file with this Court, and on such oral and documentary evidence as may be presented at the hearing of this motion.

Dated:  April 8, 2020

WHITE & CASE LLP

By:  */s/  Lucius B. Lau*
Lucius B. Lau
James P. Gagen
Carmen Lo

Attorneys for Defendant
SIGMA CORPORATION

# **TABLE OF CONTENTS**

I.     INTRODUCTION..................................................................................1

II.    STATEMENT OF UNCONTROVERTED FACTS ......................................1

III.   THE RELEVANT STATUTES AND REGULATIONS
       CONCERNING THE IMPOSITION OF ANTIDUMPING DUTIES ...........2

IV.    THE STANDARD OF REVIEW...........................................................4

V.     ARGUMENT ....................................................................................4

       A.    Sigma Did Not Make False Claims .......................................4

       B.    Even If Sigma Made False Claims, Sigma Did Not Act With
             Knowledge That It Was Making False Claims ......................7

             1.   There Is No Evidence That Sigma Had Actual
                  Knowledge That Antidumping Duties Would Be Owed
                  On Its Unilet, Safelet, And Imported Grooved Welded
                  Outlets..................................................................7

             2.   There Is No Evidence That Sigma Acted With Deliberate
                  Ignorance As To Whether Antidumping Duties Would
                  Be Owed On Its Unilet, Safelet, And Imported Grooved
                  Welded Outlets ......................................................8

             3.   There Is No Evidence That Sigma Acted With Reckless
                  Disregard As To Whether Antidumping Duties Would Be
                  Owed On Its Unilet, Safelet, And Imported Grooved
                  Welded Outlets ....................................................12

             4.   Even If There Were Evidence That Sigma Acted With
                  The Requisite Knowledge, Sigma's Position That No
                  Antidumping Duties Are Owed Is Objectively
                  Reasonable ..........................................................15

       C.    Even If Sigma Acted With The Requisite Knowledge, The
             Government's Damages Are Limited To Entry Numbers
             75439348 And 75449719.................................................17

       D.    Because Entry Numbers 75439348 And 75449719 Have Been
             Liquidated, The Government Has Not Suffered Damages
             Because Of Sigma's Claims.............................................19

VI.    CONCLUSION ...............................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Arcelormittal Stainless Belg. N.V. v. United States*,
694 F.3d 82 (Fed. Cir. 2012) ........................................................................ 5, 16

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ................................................................................................ 4

*Daniels v. United States*,
2009 U.S. Dist. LEXIS 140372 (C.D. Cal. July 16, 2009) ............................... 20

*Fedmet Res. Corp. v. United States*,
755 F.3d 912 (Fed. Cir. 2014) ............................................................................. 14

*Godecke ex rel. United States v. Kinetic Concepts, Inc.*,
937 F.3d 1201 (9th Cir. 2019) ................................................................................ 9

*Hancock v. AT&T Co.*,
701 F.3d 1248 (10th Cir. 2012) ........................................................................... 11

*Mid Continent Nail Corp. v. United States*,
725 F.3d 1295 (Fed. Cir. 2013) ..................................................................... 16, 17

*Phx. Trading, Inc. v. Loops, LLC*,
732 F.3d 936 (9th Cir. 2013) ............................................................................... 12

*Safeco Ins. Co. of Am. v. Burr*,
551 U.S. 47 (2007) ......................................................................................... 15, 16

*Shandong Huarong Mach. Co. v. United States*,
32 C.I.T. 1316 (2008) ........................................................................................... 20

*Siebert v. Gene Sec. Network, Inc.*,
75 F. Supp. 3d 1108 (N.D. Cal. 2014).................................................................. 12

*Sierra Med. Servs. All. v. Kent*,
883 F.3d 1216 (9th Cir. 2018) ................................................................................ 4

*Tianjin Mac. Imp. & Exp. Corp. v. United States*,
394 F. Supp. 2d 1369 (CIT 2005) ........................................................................ 14

*United States ex rel. Anderson v. Northern Telecom, Inc.*,
52 F.3d 810 (9th Cir. 1995) .................................................................................... 7

*United States ex rel. Burlbaw v. Orenduff*,
548 F.3d 931 (10th Cir. 2008) .............................................................................. 12

*United States ex rel. Hagood v. Sonoma County Water Agency*,
929 F.2d 1416 (9th Cir. 1991) ................................................................................ 7

*United States ex rel. Hochman v. Nackman,*
    145 F.3d 1069 (9th Cir. 1998) ................................................................ 7

*United States ex rel. McGrath v. Microsemi Corp.,*
    690 Fed. Appx. 551 (9th Cir. 2017) ................................................. 15, 16

*United States ex rel. Scott v. Actus Lend Lease, LLC,*
    CV 08-07940-RGK (SSx), 2011 U.S. Dist. LEXIS 165969 (C.D.
    Cal. Apr. 22, 2011) ................................................................................ 4

*United States v. Bourseau,*
    531 F.3d 1159 (9th Cir. 2008) ............................................................ 8, 9

*United States v. Krizek,*
    111 F.3d 934 (D.C. Cir. 1997) .............................................................. 12

*United States v. Luce,*
    873 F.3d 999 (7th Cir. 2017) ................................................................. 19

*United States v. Vandewater Int'l Inc.,*
    Case No. 2:17-cv-04393-RGK-KS, 2019 U.S. Dist. LEXIS 222655
    (C.D. Cal. Sept. 3, 2019) ..................................................................... 5, 6

*United Steel & Fasteners, Inc. v. United States,*
    947 F.3d 794 (Fed. Cir. 2020) ......................................................... 17, 18

*Universal Health Servs. v. United States ex rel. Escobar,*
    136 S. Ct. 1989 (2016) .......................................................................... 19

**RULES AND REGULATIONS**

19 C.F.R. § 142.3(a) (2017) ............................................................................ 2

19 C.F.R. § 159.1 (2011) ................................................................................ 2

19 C.F.R. § 351.211(1997) ............................................................................. 3

19 C.F.R. § 351.225 (1997) ................................................................... passim

22 C.F.R. § 120.17 (2020) ............................................................................ 15

19 U.S.C. § 1484 ............................................................................................ 2

19 U.S.C. § 1485(a) ........................................................................................ 2

19 U.S.C. § 1500(b), (d) ................................................................................ 2

19 U.S.C. § 1504(a)(1) .............................................................................. 2, 18

19 U.S.C. § 1514(a) ................................................................................... 3, 20

19 U.S.C. § 1673 ............................................................................................ 3

19 U.S.C. § 1673e ........................................................................................... 3

31 U.S.C. § 3729(b)(1) ................................................................................... 7

Federal Rules of Civil Procedure Rule 56(a) ............................................................. 4

Federal Rules of Evidence Rule 406 ................................................................. 10, 11

## MISCELLANEOUS

*Antidumping Duty Order and Amendment to the Final Determination of Sales at Less Than Fair Value; Certain Carbon Steel Butt-Weld Fittings From the People's Republic of China*, 57 Fed. Reg. 29702 (July 6, 1992) ...................................................................................................... 16, 17

Complaint, *Sigma Corporation v. United States,* No. 1:19-cv-00003 (Ct. Int'l Trade Jan. 3, 2019) ................................................. 4

H.R. Rep. No. 103-361 (1993), *reprinted in* 1993 U.S.C.C.A.N. 2552 .................. 11

S. Rep. No. 99-345 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266 ......................... 8

2 *Weinstein's Federal Evidence* § 406.3 ................................................................. 11

## I.     INTRODUCTION

In denying Sigma's motion to dismiss Count One of Island's amended complaint (violation of the False Claims Act), the Court read the allegations of that pleading in the light most favorable to Island.  Discovery, however, has disproven key allegations made by Island that were relied upon by the Court.  At his deposition, Terry Clark made clear that **all** of the grooved outlets sold by Aegis Technologies ("Aegis") to Sigma were produced in Aegis's own manufacturing plant in Pottstown, Pennsylvania.  And at her deposition, Island's own purported expert, Kelli Thompson, conceded that importers may utilize the standard definitions from U.S. Customs and Border Protection's ("CBP") Harmonized Tariff Schedule ("HTS") database when filling out Form 7501 (one of the documents that an importer must present to CBP).  That is exactly what Sigma has done.  Discovery has also revealed a **lack** of evidence to support Island's allegation that Sigma "knowingly" made false claims to the government concerning the applicability of antidumping duties to its imports.

Sigma is an experienced importer that has a standard, consistent practice of consulting with its broker as to whether antidumping duties are due (unless Sigma is "100 percent" sure of the answer).  Sigma was also successfully audited by CBP in 2013, during which CBP reviewed Sigma's internal controls for complying with the antidumping duty law.  CBP gave Sigma an "acceptable risk" rating, the highest rating awarded by that agency.

As demonstrated below, there are no material facts in dispute and Sigma is entitled to judgment in its favor as a matter of law.

## II.    STATEMENT OF UNCONTROVERTED FACTS

Sigma has separately filed its statement of uncontroverted facts, which it incorporates herein.

1   **III.   THE RELEVANT STATUTES AND REGULATIONS CONCERNING**
2   **THE IMPOSITION OF ANTIDUMPING DUTIES**

3   In relevant part, the statute requires "importers of record" to use "reasonable
4   care" in entering merchandise into the United States by, among other things,
5   providing CBP with information to allow that agency to "properly assess duties on
6   the merchandise."  19 U.S.C. § 1484.  In so doing, importers must provide CBP
7   with a declaration under oath that attests that the statements provided by the
8   importer in its entry documentation "are true and correct."  19 U.S.C. § 1485(a).
9   By regulation, CBP has specified that the documents required at time of
10  importation includes documents such as Form 7501, a commercial invoice, a
11  packing list, and other documentation, including "[o]ther documents which may be
12  required by CBP or other Federal, State, or local agencies for a particular
13  shipment."  19 C.F.R. § 142.3(a), (a)(5) (Jan. 17, 2017).

14  The statute further directs CBP to "fix the final classification and rate of duty
15  applicable to such merchandise" and to "*liquidate* the entry and reconciliation, if
16  any, of such merchandise."  19 U.S.C. § 1500(b), (d) (emphasis added).
17  "Liquidation means the final computation or ascertainment of duties on entries for
18  consumption or drawback entries."  19 C.F.R. § 159.1(Jan. 14, 2011).

19  "Unless an entry of merchandise for consumption is extended" by CBP "or
20  suspended as required by statute or court order .  .  . an entry of merchandise for
21  consumption not liquidated within 1 year from .  .  . the date of entry of such
22  merchandise [or several other events not applicable here] .  .  . shall be *deemed*
23  *liquidated* at the rate of duty, value, quantity, and amount of duties asserted by the
24  importer of record."  19 U.S.C. § 1504(a)(1) (emphasis added).

25  With limited exceptions not applicable here, "any clerical error, mistake of
26  fact, or other inadvertence, whether or not resulting from or contained in an
27  electronic transmission, adverse to the importer, in any entry, liquidation, or
28  reliquidation, and, decisions of the Customs Service, including the legality of all

1   orders and findings entering into the same, as to . . . the **_liquidation_** or

2   reliquidation of an entry . . . shall be **_final and conclusive_** upon all persons

3   (**_including the United States and any officer thereof_**) unless a protest is filed in

4   accordance with this section, or unless a civil action contesting the denial of a

5   protest, in whole or in part, is commenced in the United States Court of

6   International Trade . . . ." 19 U.S.C. § 1514(a) (emphasis added).

7      Separately, the statute provides for the imposition of "an antidumping duty,

8   in addition to any other duty imposed" if the U.S. Department of Commerce

9   ("Commerce") and the U.S. International Trade Commission make certain

10  affirmative determinations. 19 U.S.C. § 1673. If these affirmative determinations

11  are made, Commerce will publish an "antidumping duty order" that "directs

12  customs officers to assess an antidumping duty equal to the amount by which the

13  normal value of the merchandise exceeds the export price (or the constructed export

14  price) of the merchandise . . . ." 19 U.S.C. § 1673e.

15     By regulation, Commerce has indicated that, upon publication of an

16  antidumping duty order, it will instruct CBP to (1) assess antidumping duties in

17  accordance with Commerce's instructions; and (2) collect cash deposits of

18  estimated antidumping duties. 19 C.F.R. § 351.211 (June 18, 1997).

19     By regulation, Commerce has also indicated that issues sometimes arise "as

20  to whether a **_particular_** product is included with the scope" of an antidumping duty

21  order. 19 C.F.R. § 351.225(a) (emphasis added). "When such issues arise,

22  [Commerce] issues 'scope rulings' that clarify the scope of an order . . . with

23  respect to **_particular_** products." *Id.* (emphasis added). Interested parties can

24  request such a scope ruling. "Within 45 days of the date of receipt of an application

25  for a scope ruling, [Commerce] will issue a final ruling under paragraph (d) of this

26  section or will initiate a scope inquiry under paragraph (e) of this section." 19

27  C.F.R. § 351.225(c)(2).

28

## IV.   THE STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

"Where, as here, the party moving for summary judgment is not the party that bears the burden of proof at trial, it may secure summary judgment by 'showing — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case.'" *Sierra Med. Servs. All. v. Kent*, 883 F.3d 1216, 1222 (9th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## V.   ARGUMENT

"To establish an explicitly false claim under the [False Claims Act], the plaintiff bears the burden of proving that: (1) the defendant presented . . . for payment or approval a claim; (2) the claim was false or fraudulent; and (3) the defendant did so knowingly."  *United States ex rel. Scott v. Actus Lend Lease, LLC*, CV 08-07940-RGK (SSx), 2011 U.S. Dist. LEXIS 165969, at *12 (C.D. Cal. Apr. 22, 2011) (citing 31 U.S.C. § 3729(a)(1)).  Here, Island is unable to meet its burden with respect to all three of these factors.

### A.   Sigma Did Not Make False Claims

As explained below, Island has uncovered no evidence of knowingly false claims made by Sigma in connection with that company's importations of Unilet, Safelet, or grooved outlets.  Indeed, Sigma did not make any false claims whatsoever.  Sigma did not indicate on its entry documentation (either Form 7501 or otherwise) that antidumping duties were owed because this merchandise is not subject to any antidumping duty orders.  Sigma acknowledges Commerce's ruling to the contrary, but that ruling is currently on appeal at the U.S. Court of International Trade ("CIT") in *Sigma v. United States*, Court No. 19-00003.

The United States Court of Appeals for the Federal Circuit (which hears

- 4 -

1    appeals from the Court of International Trade) has held that "antidumping orders

2    should not be interpreted in a vacuum devoid of any consideration of the way the

3    language of the order is used in the relevant industry." *Arcelormittal Stainless*

4    *Belg. N.V. v. United States*, 694 F.3d 82, 88 (Fed. Cir. 2012).  "Because the primary

5    purpose of an antidumping order is to place foreign exporters on notice of what

6    merchandise is subject to duties, the terms of an order should be consistent, to the

7    extent possible, with trade usage." *Id.*

8         Walter Sperko, P.E., a mechanical engineer who has worked in the piping

9    industry since 1969, opines that there are specific industry standards that define

10   what a butt-weld fitting is, most notably ASME B16.9.  SUF ¶ 50; Sperko Rpt. at 4

11   (Dkt. 167-7).  Other standards define what an outlet fitting is, specifically MSS

12   Standard SP-97.  SUF ¶ 53; Sperko Rpt. at 5 (Dkt. 167-7).  Mr. Sperko further

13   opines that there is a standard issued by the American Welding Society ("AWS"),

14   A3.0, that defines both "butt weld" and "butt joint."  SUF ¶ 51; Sperko Rpt. at 7

15   (Dkt. 167-7).  Per AWS A3.0, a "butt weld" is a "nonstandard term for a weld in a

16   butt joint" and a "butt joint" is a "joint type formed in which the butting ends of one

17   or more workpieces are aligned in approximately the same plane." *Id.*  Applying

18   these standards, Mr. Sperko explains that "[t]he standards for buttweld fittings

19   distinguish them from other types of fittings," such as outlet fittings.  SUF ¶ 52;

20   Sperko Rpt. at 9 (Dkt. 167-7).  Further applying these standards, Mr. Sperko opines

21   that "Sigma's Unilet, Safelet and grooved outlets . . . are outlet fittings, not

22   buttweld fittings because they attach to the outer surface of a run pipe using a

23   corner joint weld rather than a butt joint weld."  SUF ¶ 54; Sperko Rpt. at 15 (Dkt.

24   167-7).

25        On the question of whether Sigma made false claims, it is worth mentioning

26   that Island's allegation that "Aegis supplied SIGMA with Chinese-made grooved

27   outlets" (Amended Compl. ¶ 61 (Dkt. 97)), which was relied upon by the Court in

28   denying Sigma's motion to dismiss Count One of the Amended Complaint (*United*

- 5 -

1  *States v. Vandewater Int'l Inc.*, Case No. 2:17-cv-04393-RGK-KS, 2019 U.S. Dist.

2  LEXIS 222655, at *9 (C.D. Cal. Sept. 3, 2019) (Dkt. 128)), has been disproven in

3  discovery.  Terry Clark has testified that ***all*** of the grooved outlets sold by Aegis to

4  Sigma were manufactured in the United States at Aegis's manufacturing facility in

5  Pottstown, Pennsylvania.  SUF ¶ 37; Clark Dep. at 52:2-11, 60:22-25, 61:3-7,

6  80:18-21, 153:19-23, 154:5-7 (Dkt. 167-12).  Other than one shipment of grooved

7  outlets that Sigma imported from China in 2011 or 2012, Mr. Clark is unaware of

8  Sigma importing any grooved outlets from China.  SUF ¶ 20; Clark Dep. at 60:13-

9  17 (Dkt. 167-12).

10      It is also worth mentioning that Island's allegation that Sigma "has

11  repeatedly and falsely described the grooved outlets as steel 'couplings' so as to

12  avoid the antidumping duties" (Amended Compl. ¶ 61 (Dkt. 97)), which was also

13  relied upon by the Court in denying Sigma's motion to dismiss (2019 U.S. Dist.

14  LEXIS 222655, at *9) has also been disproven in discovery.  Form 7501 (one of the

15  documents required to be presented to CBP upon importation) has a column 28

16  entitled "Description of Merchandise."  SUF ¶ 34, Form 7501 (Dkt. 167-22).  Form

17  7501 also has instructions.  The instructions for column 28 specifies that "[a]

18  description of the articles in sufficient detail to permit the classification thereof

19  under the proper statistical reporting number in the HTS should be reported at the

20  top of column 28.  The standard definitions from the CBP HTS database are

21  acceptable for this requirement."  *Id.*  Kelli Thompson (Island's purported expert)

22  agrees that it is acceptable to utilize the standard definitions from the HTS database

23  for purposes of filling out column 28 (Thompson Dep. at 253:18-254:6 (Dkt. 167-

24  13)) and further states that "standard definitions" in this context is a reference to the

25  "descriptions that are associated with the tariff code in the Harmonized Tariff

26  Schedule of the United States."  *Id.* at 254:22-255:5.  These are precisely the

27  descriptions used by Sigma when filling out its Form 7501's, including use of the

28  term "coupling."  SUF ¶ 31, 32; Velazquez Dep. at 82:1-11 (Dkt. 167-10).

- 6 -

1    In this manner, Sigma's imports of Unilet, Safelet, and grooved outlets are

2    not subject to the antidumping duty order on butt-weld fittings from the People's

3    Republic of China.  Thus, Sigma never made any false statements.

4        **B.      Even If Sigma Made False Claims, Sigma Did Not Act With**

5                  **Knowledge That It Was Making False Claims**

6        The False Claims Act defines the terms "knowing" and "knowingly" to mean

7    that a person, with respect to information, (1) "has actual knowledge of the

8    information"; (2) "acts in deliberate ignorance of the truth or falsity of the

9    information"; or (3) "acts in reckless disregard of the truth or falsity of the

10   information."  31 U.S.C. § 3729(b)(1), (b)(1)(A)(i) – (iii).  Even if Sigma made

11   false claims, Sigma did not act with knowledge that it was making false claims.

12       **1.      There Is No Evidence That Sigma Had Actual Knowledge**

13               **That Antidumping Duties Would Be Owed On Its Unilet,**

14               **Safelet, And Imported Grooved Welded Outlets**

15       There is no evidence that Sigma had actual knowledge that antidumping

16   duties would be owed on its Unilet, Safelet, and imported grooved welded outlets.

17       The scienter requirement is "critical" to the operation of the False Claims

18   Act.  *United States ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1073 (9th Cir.

19   1998).  Congress included the definition of "actual knowledge" to make "firm . . .

20   its intention that the act not punish honest mistakes or incorrect claims submitted

21   through mere negligence."  *Id.* (quoting S. Rep. No. 99-345, at 7 (1986), *reprinted*

22   *in* 1986 U.S.C.C.A.N. 5266, 5272) (internal quotation marks omitted).  "Actual

23   knowledge" means "what is known to be false."  *Id.* (quoting *United States ex rel.*

24   *Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991))

25   (internal quotation marks omitted).  It means "a lie."  *Id.* (quoting *United States ex*

26   *rel. Anderson v. Northern Telecom, Inc.*, 52 F.3d 810, 815-16 (9th Cir. 1995)).

27       Sigma first became aware of the antidumping duty order on butt-weld pipe

28   fittings from China in late 2017, when the existence of that order arose in the

1   context of an antidumping duty investigation concerning forged fittings from

2   China.  SUF ¶ 38; Bhattacharji Dep. at 57:18-58:6 (Dkt. 167-9).  At that time,

3   Sigma did not believe that its Unilet and Safelet products might be subject to the

4   antidumping duty order on butt-weld fittings from China.  SUF ¶ 39; Bhattacharji

5   Dep. at 107:11-21 (Dkt. 167-9).  The first time that Sigma understood that its Unilet

6   and Safelet products might be subject to antidumping duties was when Sigma

7   received a Civil Investigative Demand ("CID") from the U.S. Department of Justice

8   in the Spring of 2018.  SUF ¶ 40, 42; Bhattacharji Dep. at 104:22-24, 113:19-22

9   (Dkt. 167-9).  After receipt of the CID, Sigma filed a scope ruling request with

10  Commerce, to seek a determination whether its Unilet and Safelet products were

11  subject to the antidumping duty order on butt-weld fittings from China.  SUF ¶ 44;

12  Scope Ruling at 1 (Dkt. 167-20).

13       The Spring of 2018 was also the first time that Sigma became aware of the

14  Sprink-Let scope ruling.  SUF ¶ 41; Bhattacharji Dep. at 104:15-21 (Dkt. 167-9).

15  (The CID issued by the Department of Justice made reference to that ruling).  *Id.*

16              **2.      There Is No Evidence That Sigma Acted With Deliberate**

17                       **Ignorance As To Whether Antidumping Duties Would Be**

18                       **Owed On Its Unilet, Safelet, And Imported Grooved Welded**

19                       **Outlets**

20       There is no evidence that Sigma acted with deliberate ignorance as to

21  whether antidumping duties would be owed on its Unilet, Safelet, and imported

22  grooved welded outlets.

23       Congress defined "knowingly" to include "deliberate ignorance" "to reach

24  what has become known as the 'ostrich' type situation where an individual has

25  'buried his head in the sand' and failed to make simple inquiries which would alert

26  him that false claims are being submitted."  *United States v. Bourseau*, 531 F.3d

27  1159, 1168 (9th Cir. 2008) (quoting S. Rep. No. 99-345, at 21 (1986), *reprinted in*

28  1986 U.S.C.C.A.N. 5266, 5286) (internal quotation marks omitted); *see also*

- 8 -

1   *Godecke ex rel. United States v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1211 (9th

2   Cir. 2019) (same).  "Congress adopted 'the concept that . . . contractors receiving

3   public funds have some duty to make a limited inquiry so as to be reasonably

4   certain they are entitled to the money they seek.'"  *Bourseau*, 531 F.3d at 1168

5   (quoting S. Rep. No. 99-345, at 7).  Congress further indicated that "the inquiry

6   need only be 'reasonable and prudent' under the circumstances.'"  *Id.* (quoting S.

7   Rep. No. 99-345, at 21).

8        Sigma has long been aware of the antidumping duty law.  Sigma was first

9   exposed to the antidumping law concerning its importations of manhole covers

10   from Brazil.  SUF ¶ 2, Bhattacharji Dep. at 45:8-16 (Dkt. 167-9).  Then, in the mid-

11   1990's, there was an antidumping duty action against Sigma's main product line

12   (pipe fittings, pressure pipe fittings, and ductile pipe iron pipe fittings).  *Id.* at

13   45:20-24.  Because of this experience with the antidumping law, Sigma was aware

14   of the "pitfalls" of that law, and set into motion a practice to ensure compliance

15   with the import laws of the United States generally, as well as compliance with the

16   antidumping law specifically.  Sigma wanted "to make sure that we do things

17   right." *Id.* at 46:2-4.

18        If Sigma wanted to import a product that was entirely new to Sigma, the

19   company would adhere to the following practice.  Sigma would first attempt to

20   educate itself about the product, gathering information from both the manufacturer

21   and the customer about where the product is used and how it is used, looking at

22   drawings and other technical information, as well as speaking to engineers (internal

23   as well as external).  With this information in hand, Sigma would make an initial

24   assessment on classification (*i.e.*, what HTS code should apply to the merchandise).

25   Sigma would also make its own independent assessment as to whether the

26   merchandise is covered by an antidumping duty order.  Sigma would then provide

27   all of the information it gathered about the merchandise to its broker, asking the

28   broker to conduct a "blind check" on two questions:  (1) what is the correct

- 9 -

1   classification for the merchandise; and (2) is the merchandise subject to

2   antidumping duties?  In addition, Sigma requires its broker to inform Sigma if

3   antidumping duties are associated with the HTS code used for each entry made into

4   the United States.  SUF ¶¶ 6-11.

5       If Sigma wanted to import a product that was the same or similar to a product

6   already imported by Sigma, the company would adhere to the following practice.

7   This practice is the same as the practice for new products.  Sigma would review the

8   merchandise in question.  If Sigma concluded that the merchandise was the same or

9   similar to an existing product imported by Sigma, the company would rely on the

10  same HTS code used for the existing product, but the company would still check to

11  see if the product in question is subject to an antidumping order.  If Sigma had a

12  "hundred percent" understanding of the product's use, its origin, and its

13  classification, Sigma would file the entry by itself.  But if Sigma had any doubt, it

14  would reach out to its broker for a "blind check."  Sigma imports products "all the

15  time" that are similar to existing imported products.  Thus, consultation with

16  Sigma's broker occurs the "minority" of the time.  SUF ¶ 12-17.

17      This import compliance practice — for both new products and products that

18  are the same or similar to existing products — was consistently followed by Sigma

19  from 2010 to the present.  SUF ¶ 18.

20      Sigma first began importing Unilet in 2010;  this product was entirely new to

21  Sigma.  Sigma imported one (and only one) shipment of grooved outlets;  this

22  product was also entirely new to Sigma.  Sigma first began importing Safelet in

23  2016;  this product was considered "exactly the same as the UNILET for the

24  purpose of its HTS US code and for the purpose of . . . having any concern about

25  antidumping."  SUF ¶ 19-20, 28-29.

26      Rule 406 of the Federal Rules of Evidence ("Habit; Routine Practice")

27  provides as follows:  "Evidence of a person's habit or an organization's routine

28  practice may be admitted to prove that on a particular occasion the person or

- 10 -

organization acted in accordance with the habit or routine practice.  The court may admit this evidence regardless of whether it is corroborated or whether there was an eyewitness."  "Courts may accept Rule 406 evidence at the summary judgment stage as providing an inference that a routine practice was actually carried out." *Hancock v. AT&T Co.*, 701 F.3d 1248, 1261-62 (10th Cir. 2012);  *see also* 2 *Weinstein's Federal Evidence* § 406.3 ("Evidence of a routine practice is particularly persuasive in the business context because of the profit-driven need for regularity.") (citation omitted).

In this manner, the Court may (and should) infer that Sigma followed its routine practice for determining whether its imports of merchandise (whether new to Sigma or the same or similar to existing products) are subject to antidumping duty orders.   Specifically, the Court should infer that Sigma followed its consistent practice of determining whether antidumping duties were owed with respect to that company's imports of Unilet, Safelet, and grooved outlets.

CBP has issued a publication entitled, "What Every Member Of The Trade Community Should Know:  Reasonable Care (An Informed Compliance Publication).   SUF ¶ 4; Reasonable Care (Dkt. 167-17).  In this publication, CBP notes that asking several questions may be helpful in assisting importers in the exercise of reasonable care, including the following question:  "If you use an expert to assist you in complying with customs requirements, have you discussed your importations in advance with that person and have you provided that person with full, complete and accurate information about the import transactions?"  *Id*. at 8; *see also* H.R. Rep. No. 103-361 (1993), at 120, *reprinted in* 1993 U.S.C.C.A.N. 2552, 2670 ("In meeting the 'reasonable care' standard, the Committee believes that an importer should consider utilization of one or more of the following aids to establish evidence of proper compliance:  . . . consulting with a Customs broker . . . .").  Kelli Thompson, Island's purported expert, agrees that an importer exercises reasonable care by providing accurate information to its broker and asking the

- 11 -

1    broker to advise the importer as to whether antidumping duties are due.  SUF ¶ 5;

2    Thompson Dep. at 179:19-180:17 (Dkt. 167-13).

3          It cannot be said that Sigma "buried its head in the sand" with respect to

4    compliance with the antidumping duty law.  Sigma has long understood the

5    importance of this law and took regular, consistent steps to ensure compliance with

6    this law, including consultation with its customs broker.

7                 **3.      There Is No Evidence That Sigma Acted With Reckless**

8                           **Disregard As To Whether Antidumping Duties Would Be**

9                           **Owed On Its Unilet, Safelet, And Imported Grooved Welded**

10                          **Outlets**

11         There is no evidence that Sigma acted with reckless disregard as to whether

12   antidumping duties would be owed on its Unilet, Safelet, and imported grooved

13   welded outlets.

14         It does not appear that the U.S. Court of Appeals for the Ninth Circuit has

15   specifically opined on the meaning of "reckless disregard" in the context of the

16   False Claims Act.  However, "[t]he Ninth Circuit has defined 'reckless disregard' in

17   other circumstances to require proof of (1) a high degree of awareness of probable

18   falsity or that (2) the defendant in fact entertained serious doubts as to a statement's

19   truth."  *Siebert v. Gene Sec. Network, Inc.*, 75 F. Supp. 3d 1108, 1117 (N.D. Cal.

20   2014) (addressing standard of "reckless disregard" to apply in False Claims Act

21   case)(citing *Phx. Trading, Inc. v. Loops, LLC*, 732 F.3d 936, 944 (9th Cir. 2013));

22   *see also United States v. Krizek*, 111 F.3d 934, 942 (D.C. Cir. 1997) ("the best

23   reading of the [False Claims] Act defines reckless disregard as an extension of

24   gross negligence"); *United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 945

25   n.12 (10th Cir. 2008) ("an aggravated form of gross negligence (i.e., reckless

26   disregard) will satisfy the scienter requirement for an FCA violation").

27         The best indication of the reasonableness of Sigma's import compliance

28   practices is the Focused Assessment of Sigma conducted by CBP in 2013.  The

- 12 -

1    Focused Assessment program "fulfills critical components of CBP's risk

2    management strategies." SUF ¶ 22; FA Pre-Survey at 2 (Dkt. 167-18). "[O]ne of

3    the primary goals of the FA program is to ensure importers are using ***reasonable***

4    ***care*** to maximize voluntary compliance through maintenance of a system of

5    internal control." *Id*. (emphasis added). A Focused Assessment results in one of

6    two conclusions: "acceptable risk" or "unacceptable risk." SUF ¶ 23; FA Pre-

7    Survey at 12 (Dkt. 167-18). "An acceptable risk conclusion is generally

8    appropriate when the auditors determine that the risk of material noncompliances is

9    not significant (e.g., material noncompliances were not detected or detected

10   noncompliances were not systemic or material in nature; significant international

11   control deficiencies were not identified)." *Id*. Island's own purported expert, Kelli

12   Thompson, agrees with all of these statements. SUF ¶ 24; Thompson Dep. at

13   282:22-283:15; 284:24-285:14 (Dkt. 167-13).

14           CBP completed its Focused Assessment of Sigma on July 22, 2013. SUF ¶

15   21; Sigma FA at SIGMA-0003636 (Dkt. 167-5). CBP "determined that Sigma's

16   import activities represent an acceptable risk to CBP in the review areas of

17   Transaction Value, Classification, and Generalized System of Preferences." SUF ¶

18   26; Sigma FA at SIGMA-0003638 (Dkt. 167-5). Concerning Classification, CBP

19   reviewed 26 sample transactions. SUF ¶ 25; Sigma FA at SIGMA-0003637 (Dkt.

20   167-5). CBP "[a]nalyzed tariff numbers for merchandise potentially subject to

21   Anti-Dumping Duty (ADD)." *Id*. CBP "[a]nalyzed the sample items above and

22   assessed each item's compliance with applicable laws and regulations, including:  .

23   . . Title 19 of the CFR, 351 – Antidumping and Countervailing Duties . . . ." *Id*.

24   Concerning the Classification portion of its audit, CBP made this specific finding:

25   "Our audit disclosed that Sigma's internal controls over compliance with applicable

26   laws and regulations related to classification represent an acceptable risk to CBP."

27   SUF ¶ 27; Sigma FA at SIMGA-00003638 (Dkt. 167-5).

28           Given that one of the primary goals of the Focused Assessment program is to

- 13 -

1    ensure that importers are using "reasonable care" to maximize voluntary

2    compliance through maintenance of a system of internal control — and in light of

3    CBP's assessment that Sigma's import activities represent an "acceptable risk" to

4    CBP — it cannot be said that Sigma's import activities somehow amount to an

5    "aggravated form of gross negligence."  The importance of CBP's Focused

6    Assessment has particular meaning to Sigma's practices (internal controls)

7    concerning the possible imposition of antidumping duties because CBP reviewed

8    Sigma's compliance with the antidumping duty law as part of its audit.  CBP found

9    no flaw in the manner by which Sigma was determining whether the antidumping

10   duty law applied to its imports.  The Court should not reach a different conclusion

11   here.

12        In its amended complaint, Island alleged that, "[n]otwithstanding the [Sprink-

13   Let] ruling, Chinese welded outlets have come to dominate the market."  Amended

14   Compl. at ¶ 26 (Dkt. 97).  Island allegations and arguments concerning the 1992

15   Sprink-Let scope ruling can be readily dismissed.  Per Commerce's own regulation,

16   the purpose of a scope ruling is to clarify the scope of an order "with respect to

17   **particular** products."  19 C.F.R. § 351.225(a) (emphasis added);  *see also Fedmet*

18   *Res. Corp. v. United States*, 755 F.3d 912, 918 (Fed. Cir. 2014) ("scope

19   determinations are 'highly fact-intensive and **case-specific**") (emphasis added)

20   (citation omitted).  By its allegations and arguments, Island appears to suggest that

21   Sigma had some sort of duty to search for the Sprink-Let decision.  But that is not

22   so.  Commerce itself stated in its Sigma scope ruling that it was "not bound by the

23   agency's analysis in the Sprink Scope Ruling."  SUF ¶ 48; Scope Ruling at 16 (Dkt.

24   167-20).  This statement by Commerce accords with the manner in which the Court

25   of International Trade views the issue.  In *Tianjin Mac. Imp. & Exp. Corp. v.*

26   *United States*, 394 F. Supp. 2d 1369, 1377-78 (CIT 2005), the Court stated as

27   follows:  "A prior scope ruling on a particular product, even if falling within the

28   ambit of the 'prior scope determinations' identified in § 351.225(k)(1) as sources to

- 14 -

1   be consulted by Commerce, is **not** designated by that regulation as ***controlling or***

2   ***precedential*** in a scope ruling on a different product" (emphasis added).  The fact

3   that the Sprink-Let decision was not controlling or precedential (a fact confirmed

4   by Commerce here) means that Sigma had no duty to search for and adhere to the

5   Sprink-Let decision before importing its products into the United States.

6       **4.**    **Even If There Were Evidence That Sigma Acted With The**

7           **Requisite Knowledge, Sigma's Position That No**

8           **Antidumping Duties Are Owed Is Objectively Reasonable**

9       Even if there were evidence that Sigma acted with the requisite knowledge,

10   Sigma's position that no antidumping duties are owed is objectively reasonable.

11       In *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 n. 20 (2007), a case

12   construing the Fair Credit Reporting Act, the Supreme Court stated that, "[w]here,

13   as here, the statutory text and relevant court and agency guidance allow for more

14   than one reasonable interpretation, it would defy history and current thinking to

15   treat a defendant who merely adopts one such interpretation as a knowing or

16   reckless violator."  This statement by the Supreme Court has come to be known as

17   the "objectively reasonable" standard:  that is, even if there were evidence of

18   subjective intent on the part of the defendant, Congress could not have intended

19   liability "for those who followed an interpretation that could reasonably have found

20   support in the courts, whatever their subjective intent may have been."  *Id.*

21       The "objectively reasonable" standard has been followed by the Ninth

22   Circuit for purposes of the False Claims Act.  In *United States ex rel. McGrath v.*

23   *Microsemi Corp.*, 690 Fed. Appx. 551, 552 (9th Cir. 2017) (unpublished), a case

24   arising out of the False Claims Act, the Ninth Circuit held that "the complaint

25   cannot plead facts sufficient to support an inference that Microsemi knew it had

26   failed to comply with ITAR at the time of the representation because Microsemi's

27   good faith interpretation of the term 'disclose' in 22 C.F.R. § 120.17 at that time

28   was reasonable."  In support of this holding, the Ninth Circuit cited to *Safeco*, 551

- 15 -

1    U.S. at 70 n.20.

2         Because the purpose of an antidumping duty order is to place foreign

3    exporters on notice as to what merchandise might be subject to duties, the terms of

4    such an order should be construed, to the extent possible, with trade usage.

5    *Arcelormittal*, 694 F.3d at 88.  The butt-weld order plainly states:  "The products

6    covered by this order are carbon steel ***butt-weld*** pipe fittings, having an inside

7    diameter of less than 14 inches, imported in either finished or unfinished form."

8    *Antidumping Duty Order and Amendment to the Final Determination of Sales at*

9    *Less Than Fair Value; Certain Carbon Steel Butt-Weld Fittings From the People's*

10   *Republic of China*, 57 Fed. Reg. 29702 (July 6, 1992) ("*China Butt-Weld*

11   *Order*")(emphasis added).  There are industry standards governing what a butt-weld

12   fitting is and Walter Sperko, a mechanical engineer with decades of experience in

13   the piping industry, opines that Sigma's Unilet, Safelet, and grooved outlets are not

14   butt-weld fittings within the meaning of those industry standards.  SUF ¶ 54;

15   Sperko Rpt. at 15 (Dkt. 167-7).

16        Reasonable minds can certainly disagree about the reach of the butt-weld

17   order.  Commerce itself understood this fact.  That agency did not conclude that

18   Sigma's products were unambiguously included within the scope of the *China Butt-*

19   *Weld Order*.  Rather, Commerce concluded "that the *China Butt-Weld Order* can be

20   ***reasonably*** interpreted to include SIGMA's fire-protection weld outlets."  SUF ¶

21   47; Scope Ruling at 17 (Dkt. 167-20) (emphasis added).  Commerce made its ruling

22   applying the "(k)(1)" analysis embodied in its scope regulation, 19 C.F.R. §

23   351.225(k)(1).  SUF ¶ 46; Scope Ruling at 12 (Dkt. 167-20).  The Federal Circuit

24   has explained that, in conducting a scope analysis, "Commerce must first examine

25   the language of the final order."  *Mid Continent Nail Corp. v. United States*, 725

26   F.3d 1295, 1302 (Fed. Cir. 2013).  "If the language is ***ambiguous***, Commerce must

27   next consider the regulatory history, as contained in the so-called "(k)(1) materials.""

28   *Id.* (citing 19 C.F.R. § 351.225(k)(1)) (emphasis added).  Commerce's reliance on

- 16 -

1    the (k)(1) factors to determine whether Sigma's products are covered by the *China*

2    *Butt-Weld Order* means that, as a matter of law, the written scope of the order was

3    ambiguous as to whether it covered Sigma's products.

4        The *China Butt-Weld Order* is susceptible to more than one reasonable

5    interpretation.  Thus, Sigma's belief that no antidumping duties were owed on its

6    merchandise was (and is) objectively reasonable.

7    **C.    Even If Sigma Acted With The Requisite Knowledge, The**

8            **Government's Damages Are Limited To Entry Numbers 75439348**

9            **And 75449719**

10       Even if Sigma acted with the requisite knowledge, the government's

11   damages are limited to entry numbers 75439348 and 75449719.

12       When Commerce issues an affirmative scope ruling (as it did here with

13   respect to Sigma), that determination has limited retroactive applicability.  By

14   regulation, Commerce has stated that when it initiates a formal scope inquiry,

15   "Commerce may retroactively suspend liquidation for all unliquidated entries

16   entered on or after the initiation date of the scope inquiry." *United Steel &*

17   *Fasteners, Inc. v. United States*, 947 F.3d 794, 800 (Fed. Cir. 2020) (citing 19

18   C.F.R. § 351.225(l)(3)).  Commerce's scope regulation, however, "is silent as to

19   how far back suspension of liquidation can go when there has been no scope

20   inquiry." *Id.*  In the case under review in *United Steel*, "Commerce did not initiate

21   a scope inquiry and yet issued instructions to CBP to retroactively suspend

22   liquidation to October 19, 1993, the issuance date of the *ADD Order*." *Id.* at 802.

23   The Federal Circuit vacated these instructions, finding that "the regulatory history

24   of § 351.225(l)(3) indicates that Commerce intended to limit the reach of

25   retroactive suspension of liquidation." *Id.*

26       The CIT in *United Steel* reached the same conclusion;  it remanded the case

27   to Commerce and, "[o]n remand, Commerce issued new instructions to suspend

28   liquidation on or after July 8, 2013, the date when Commerce issued the final scope

- 17 -

ruling regarding US&F's washers."  *Id.* at 798.  "The CIT determined that Commerce's new suspension instructions complied with its remand order and entered judgment."  *Id.*  In affirming the judgment of the CIT, the Federal Circuit relied upon the regulatory history of Commerce's scope regulation, in which Commerce "explained that 'when liquidation has not been suspended, Customs, at least, and perhaps the Department as well, have viewed the merchandise as not being within the scope of an order, importers are justified in relying upon that view, at least *until the Department rules otherwise*.'"  *Id.* at 802 (emphasis in original) (citation omitted).

This case is exactly like *United Steel*.  Commerce did not initiate a formal scope inquiry.  Commerce ruled that the merchandise in question is covered by the relevant antidumping duty order.  And then Commerce issued suspension of liquidation instructions to CBP with an effective date of December 11, 2018, the date of its final scope ruling.  SUF ¶ 57-58; Suspension Instructions (Dkt. 167-21).  Based on the binding precedent of *United Steel*, antidumping duties may only be owed on Sigma's entries of Unilet and Safelet that remain suspended on-or-after December 11, 2018.  Pursuant to 19 U.S.C. § 1504(a)(1), entries of merchandise are deemed liquidated one year after entry is made, unless the entries are otherwise suspended.  Applying this provision, Commerce's scope ruling for Sigma's products should only apply to (1) entries that were made one year before December 11, 2018 (and that remain suspended as of December 11, 2018); and (2) entries made on-or-after December 11, 2018.  Only two entries meet these criteria:  entry numbers 75439348 and 75449719.  SUF ¶ 59; Bhattacharji Decl. at ¶ 3 (Dkt. 167-2).  Thus, any damages awarded to the government in this case should be limited to these two entries.

1    **D.    Because Entry Numbers 75439348 And 75449719 Have Been**

2    **Liquidated, The Government Has Not Suffered Damages Because**

3    **Of Sigma's Claims**

4    Because entry numbers 75439348 and 75449719 have been liquidated, the

5    government has not suffered damages because of Sigma's claims.

6    On January 31, 2019, Commerce directed CBP to "[c]ontinue to suspend

7    liquidation of entries of carbon steel butt-weld pipe fittings from the People's

8    Republic of China, including SIGMA Corporation's SAFELET and UNILET fire-

9    protection weld outlets," based on the December 11, 2018 scope ruling.  SUF ¶ 58;

10   Suspension Instructions at 2 (Dkt. 167-21).  Subsequently, for reasons unknown to

11   Sigma, CBP liquidated entries 75439348 and 75449719 on March 1, 2019 and

12   April 5, 2019, respectively, contrary to Commerce's instructions.  SUF ¶ 61; Entry

13   75439348 (Dkt. 167-14), Entry 75449719 (Dkt. 167-15).

14   CBP's actions broke the chain of causation.  The Supreme Court has held

15   that the False Claim Act is presumed to retain "all other elements of common-law

16   fraud that are consistent with the statutory text," except scienter.  *Universal Health*

17   *Servs. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1999 n.2 (2016).  The

18   Court then applied the Restatement (Second) of Torts to the False Claims Act.  *Id.*

19   at 1999-2000.  As a result of *Escobar*, the Seventh Circuit held that the FCA

20   incorporates the common-law understanding of causation in fraud cases, including

21   proximate cause.  *United States v. Luce*, 873 F.3d 999, 1012 (7th Cir. 2017).

22   The common-law principles applicable to the FCA thus include causation

23   and the sub-category superseding cause, which is "an act of a third person or other

24   force which by its intervention prevents the actor from being liable for harm to

25   another which his antecedent negligence is a substantial factor in bringing about."

26   Restat. 2d of Torts § 440.  "A superseding cause relieves the actor from liability,

27   irrespective of whether his antecedent negligence was or was not a substantial

28   factor in bringing about the harm."  *Id.* at cmt. b.  Courts in this district have

1   followed this rule, stating that "[t]he chain of consequences can be broken when a
2   third party commits an act that is a superseding cause of the damage at issue," and
3   as a result "'there is no liability for the original actor.'" *Daniels v. United States*,
4   2009 U.S. Dist. LEXIS 140372 *6 (C.D. Cal. July 16, 2009) (citation omitted).
5   CBP's unforeseeable failure to follow Commerce's direct instructions broke this
6   chain of causation. *Id.* at *6-7 (plaintiff's termination after a tax levy was an
7   unforeseeable violation of federal law, so the government issuing the levy did not
8   proximately cause the termination.)

9       The liquidation of entry numbers 7439348 and 75339719 prevents the
10   government from assessing antidumping duties on these entries. Liquidations are
11   "final and conclusive," barring certain exceptions not relevant here. 19 U.S.C. §
12   1514(a). Normally, "following an affirmative unfair trade finding, liquidation is
13   suspended to preserve the entries for liquidation" based on the final determination.
14   *Shandong Huarong Mach. Co. v. United States*, 32 C.I.T. 1316, 1319-20 (2008).
15   Because liquidations are final, "[i]n the context of an unfair trade case, Courts have
16   generally found that once entries have been liquidated, there is no case or
17   controversy with respect to the duty rate . . . ." *Id.* at 1321. Thus, "once entries
18   have been liquidated, any question relating to the amount of duties to be applied to
19   those entries is rendered moot." *Id.* at 1319.

20       CBP's failure to follow Commerce's instructions was an unforeseeable
21   superseding cause that prevents duties from being applied. CBP's failure absolves
22   Sigma of any False Claims Act liability.

23   **VI.   CONCLUSION**

24       For these reasons, the Court should grant this motion and dismiss this action
25   with respect to Sigma, with prejudice.

26

27

28

1

2

3

4   Dated:  April 8, 2020                              Respectfully submitted,

5                                                       WHITE & CASE LLP

6                                                       By: */s/ Lucius B. Lau*
                                                        Lucius B. Lau (*pro hac vice*)
7                                                       James P. Gagen (*pro hac vice*)
                                                        701 13th Street NW
8                                                       Washington, DC 20005
                                                        alau@whitecase.com
9                                                       jgagen@whitecase.com

10                                                      Carmen Lo (SBN 280441)
                                                        555 South Flower Street, Suite 2700
11                                                      Los Angeles, CA 90071-2433
                                                        Telephone: (213) 620-7700
12                                                      Facsimile: (213) 452-2329
                                                        carmen.lo@whitecase.com

13                                                      Attorneys for Defendant
                                                        SIGMA CORPORATION
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 21 -

# CERTIFICATE OF SERVICE

I hereby certify that on April 8, 2020, I caused a copy of Sigma's motion for summary judgment (and associated papers) to be served on Siy Belfi, Director of Allied Rubber & Gasket Company at 3145 Tiger Run Ct., Suite 105, Carlsbad, CA 92010.

Dated:  April 8, 2020

WHITE & CASE LLP

By: _/s/ Lucius B. Lau_
Lucius B. Lau (*pro hac vice*)
James P. Gagen (*pro hac vice*)
701 13th Street NW
Washington, DC 20005
alau@whitecase.com
jgagen@whitecase.com

Carmen Lo (SBN 280441)
555 South Flower Street, Suite 2700
Los Angeles, CA 90071-2433
Telephone: (213) 620-7700
Facsimile: (213) 452-2329
carmen.lo@whitecase.com

Attorneys for Defendant
SIGMA CORPORATION