MAYER BROWN LLP
MATTHEW H. MARMOLEJO (SBN 242964)
*mmarmolejo@mayerbrown.com*
C. MITCHELL HENDY (SBN 282036)
*mhendy@mayerbrown.com*
350 South Grand Avenue, 25th Floor
Los Angeles, CA 90071-1503
Tel: (213) 229-9500
Fax: (213) 576-8185

MAYER BROWN LLP
KELLY B. KRAMER (*pro hac vice*)
*kkramer@mayerbrown.com*
1999 K Street, NW
Washington, D.C. 20006
Tel: (202) 263-3007
Fax: (202) 263-5207
Attorneys for Relator
ISLAND INDUSTRIES, INC.

**PUBLIC VERSION**

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* ISLAND INDUSTRIES, INC., <br><br> Plaintiff, <br><br> vs. <br><br> VANDEWATER INTERNATIONAL INC.; NEIL RUEBENS; ANVIL INTERNATIONAL, LLC; SIGMA CORPORATION; SMITH COOPER INTERNATIONAL; ALLIED RUBBER & GASKET COMPANY, and JOHN DOES Nos. 1-10., <br><br> Defendants. | Case No. 2:17-cv-04393-RGK-KS <br><br> **ISLAND INDUSTRIES, INC.'S OPPOSITION TO SMITH COOPER INTERNATIONAL'S MOTION FOR SUMMARY JUDGMENT** <br><br> Date: May 18, 2020 <br> Time: 9:00 a.m. <br> Courtroom: 850 <br> Judge: Hon. R. Gary Klausner |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................... II

I.      INTRODUCTION ..................................................................... 1

II.     THE ADMINISTRATIVE RECORD ............................................ 3

III.    LEGAL STANDARDS ............................................................. 4

IV.     TRIABLE ISSUES OF FACT PRECLUDE SUMMARY
        JUDGMENT. ........................................................................ 6

        A.      SCI Made False Certifications With Reckless Disregard. ................... 6

        B.      SCI Made False Certifications With Actual Knowledge or
                Deliberate Ignorance. .......................................................... 10

        C.      SCI Did Not Adopt an Objectively Reasonable View of the
                China Order. .................................................................... 13

V.      SCOPE RULING REQUESTS CANNOT DEFEAT FCA CLAIMS. .......... 17

VI.     THE STATUTE OF LIMITATIONS IS TEN YEARS. ............................ 18

VII.    THE PUBLIC DISCLOSURE BAR DOES NOT APPLY. ........................ 18

VIII.   CONCLUSION .................................................................... 20

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

*United States ex rel. Ali v. Daniel, Mann, Johnson & Mendenhall,*
  355 F.3d 1140 (9th Cir. 2004) .................................................................. 6

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ................................................................................ 12

*United States ex rel. Anderson v. N. Telecom, Inc.,*
  52 F.3d 810 (9th Cir. 1995) ...................................................................... 4

*United States ex rel. Burlbaw v. Orenduff,*
  548 F.3d 931 (10th Cir. 2008) .................................................................. 5

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
  511 U.S. 164 (1994) ................................................................................ 14

*Cochise Consultancy, Inc. v. United States ex rel. Hunt,*
  139 S. Ct. 1507 (2019) ...................................................................... 17, 18

*Customs & Intern. Trade Newsletter v. U.S. Customs and Border
  Protection,*
  588 F. Supp. 2d 51 (D.D.C. 2008) .......................................................... 19

*Darrig, ex. rel. United States v. Med. Consultants Network, Inc.,* 303
  F. App'x 429 (9th Cir. 2008) ................................................................... 6

*Edwards v. Toys "R" Us,*
  527 F. Supp. 2d 1197 (C.D. Cal. 2007) ................................................... 13

*United States ex rel. Fadlalla v. DynCorp Int'l,*
  402 F. Supp. 3d 162 (D. Md. 2019) ........................................................ 17

*United States ex rel. Hartpence v. Kinetic Concepts, Inc.,*
  2019 WL 3291582 (C.D. Cal. June 14, 2019) .......................................... 4

*United States ex rel. Hochman v. Nackman,*
  145 F.3d 1069 (9th Cir. 1998) ........................................................... 12, 13

*United States ex rel. Hopper v. Anton,*
  91 F.3d 1261 (9th Cir. 1996) ................................................................... 13

*United States ex rel. Integra Med Analytics LLC v. Providence Health
  & Services,*
  2019 WL 3282619 (C.D. Cal. July 16, 2019) ......................................... 19

ii

*United States ex rel. Mateski v. Raytheon Co.*,
    816 F.3d 565 (9th Cir. 2016) ................................................................. 19

*Novosteel SA v. United States*,
    284 F.3d 1261 (Fed. Cir. 2002) ............................................................... 8

*United States ex rel. Oliver v. Parsons Co.*,
    195 F.3d 457 (9th Cir. 1999) ......................................................... 4, 6, 13

*United States ex rel. Plumbers & Steamfitters Local Union No. 38 v.
    C.W. Roen Const. Co.*,
    183 F.3d 1088 (9th Cir. 1999) ............................................................ 6, 8

*Prather v. AT&T, Inc.*,
    847 F.3d 1097 (9th Cir. 2017) .............................................................. 18

*United States ex rel. Purcell v. MWI Corp.*,
    807 F.3d 281 (D.C. Cir. 2015) ............................................................. 15

*Safeco Ins. Co. of Am. v. Burr*,
    551 U.S. 47 (2007) ......................................................................... 12, 13

*Schindler Elevator Corp. v. United States ex rel. Kirk*,
    563 U.S. 401 (2011) .............................................................................. 18

*Siebert v. Gene Sec. Network, Inc.*,
    75 F. Supp. 3d 1108 (N.D. Cal. 2014) ................................................. 13

*United States ex rel. Spay v. CVS Caremark Corp.*,
    913 F. Supp. 2d 125 (E.D. Pa. 2012) ................................................... 19

*TMB 440AE, Inc. v. United States*,
    399 F. Supp. 3d 1314 (C.I.T. 2019) ..................................................... 13

*United States v. Bourseau*,
    531 F.3d 1159 (9th Cir. 2008) ............................................................... 5

*United States v. Celgene Corp.*,
    226 F. Supp. 3d 1032 (C.D. Cal. 2016) ............................................... 15

*United States v. Coloplast Corp.*,
    327 F. Supp. 3d 300 (D. Mass. 2018) ............................................... 5, 14

*United States v. Great Neck Saw Mfrs, Inc.*,
    311 F. Supp. 3d 1337 (C.I.T. 2018) ..................................................... 17

*United States v. King-Vassel*,
    728 F.3d 707 (7th Cir. 2013) ................................................................. 5

*United States v. Krizek,*
   111 F.3d 934 (D.C. Cir. 1997) ................................................................. 5

*United States v. Mackby,*
   261 F.3d 821 (9th Cir. 2001) ..........................................................*passim*

*United States v. Mass. Hous. Fin. Agency,*
   530 F.3d 980 (D.C. Cir. 2008) ............................................................... 5

*United States v. United Healthcare Ins. Co.,*
   848 F.3d 1161 (9th Cir. 2016) .......................................................... 5, 10

*United Steel and Fasteners, Inc. v. United States,*
   947 F.3d 794 (Fed. Cir. 2020) ............................................................. 16

*Universal Health Services, Inc. v. United States,*
   136 S. Ct. 1989 (2016) .......................................................................... 4

*United States ex rel. Westmoreland v. Amgen, Inc.,*
   812 F. Supp. 2d 39 (D. Mass. 2011) .............................................. 14, 16

*United States ex rel. Winter v. Gardens Regional Hosp. and Med. Ctr.,*
   *Inc.,*
   953 F.3d 1108 (9th Cir. 2020) .............................................................. 4

**Statutes, Rules, and Regulations**

19 C.F.R. § 351.225(k) ............................................................................ 13

19 C.F.R. § 351.225(l)(3) ........................................................................ 16

19 U.S.C. § 1484(a)(1) .............................................................................. 6

19 U.S.C. § 1592(a) ................................................................................. 17

31 U.S.C. § 3729(b) ............................................................................ 4, 13

31 U.S.C. § 3729(b)(1) .............................................................................. 4

31 U.S.C. § 3730(e)(4)(A) ....................................................................... 18

31 U.S.C. § 3731(b)(2) ............................................................................ 17

57 Fed. Reg. 19602, 19603(May 7, 1992) ................................................. 4

**Other Authorities**

S. Rep. No. 99-345 (1986) .................................................................. 5, 10

# I.      INTRODUCTION

Disregarding the legal standard for summary judgment, Smith Cooper International (SCI) makes a slew of fact-bound arguments about scienter, floats a baseless claim that importers of record can defeat False Claims Act (FCA) liability by requesting after-the-fact scope rulings, and renews a previously rejected affirmative defense under the FCA's public disclosure bar.   None of these arguments has merit.

SCI claims that it adopted an objectively reasonable reading of the antidumping duty (ADD) order on butt-weld pipe fittings from China (the China Order).[1]  Not so.  Because SCI did not read the China Order, law and logic dictate that it could not have formed a good-faith, objectively reasonable belief as to its scope or meaning.  Indeed, SCI's Cooplet-branded Welded Outlet falls within the China Order's plain language, as the Department of Commerce's (DOC) scope ruling confirms.  Had SCI taken even basic steps to fulfill its obligation to determine whether the China Order reached its product, SCI would have found—as Relator did in just hours—that the DOC has long viewed Welded Outlets to be butt-weld pipe fittings.

SCI claims that there is insufficient evidence to establish scienter.  The record shows the opposite.  SCI's business is virtually exclusively focused on importing iron and steel products from China.  No class of products is subject to more ADD orders than iron and steel products from China.  Yet no one at SCI read the China Order. Even if someone had, they would not have understood its scope; indeed, discovery revealed that no one at SCI was versed in reading ADD orders.  The undisputed facts show that SCI did not provide import compliance training and did not maintain any written import compliance policies or procedures.  Having no employees with the knowledge or experience to satisfy its obligation to take reasonable care, SCI might

---

[1] 57 Fed. Reg. 29702, 29703 (July 6, 1992).

have looked to third-party experts for guidance.  But it did not.  Instead, it rejected a consultant's proposal to assist with ADD compliance, and it refused to consult with third-party experts about the China Order's reach.

Still worse, the evidence amply demonstrates SCI's fraudulent intent. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ That practice stopped, however, when SCI learned it was under investigation in this case.  Only then did SCI read the China Order and the DOC's 1992 ruling finding that the Sprink-let (another Welded Outlet) was a butt-weld pipe fitting.  Immediately recognizing that SCI's Cooplet was ██████████████ as the Sprink-let, Mr. Tripp wrote ██████████████████████████ ██████████████████████████ SCI then instructed its supplier to delete ████████████████████████████████. ████████████████████████████████████████████████████████████████████████████████████████████████

In short, between SCI's failure to take even basic steps to assess whether its products were subject to the China Order and its decision to label its products "butt weld" outlets when it perceived an advantage to doing so, a jury easily could find that SCI knowingly and falsely certified that Welded Outlets were not subject to ADDs.  SCI's remaining legal arguments are equally flawed.  An importer of record cannot avoid liability under the FCA by seeking to hedge its obligations through a an after-the-fact scope ruling request.  Finally, there is no basis for applying the public disclosure bar in this case.  For these reasons, as detailed below, SCI's motion must be denied.

2

## II.     THE ADMINISTRATIVE RECORD

In 1986, the International Trade Commission (ITC) began investigating whether butt-weld pipe fittings were being unlawfully dumped in the United States. The ITC's reports on butt-weld pipe fittings from Taiwan and China used identical language to describe the products. Both reports state that butt-weld pipe fittings are "used to connect pipe where conditions require permanent, welded connections." Both reports continue: *"The beveled edges of butt-weld pipe fittings distinguish them from other types of pipe fittings...."* Island's Statement of Genuine Disputes (SDF) ¶¶ 153–154 (emphasis added).

Relying on the ITC's investigation, the DOC imposed ADD orders against carbon-steel butt weld pipe fittings from Brazil, China, Japan, Taiwan, and Thailand. SDF ¶ 155 (recounting the history of these ADD orders and reproducing scope of each).Because the orders involved the same products, the same industries, and the same distribution channels, the ITC has reviewed and renewed them on a "cumulated" basis. SDF ¶ 156.

As the ITC has repeatedly observed, the scope of the ADD orders is "essentially the same for all five countries." SDF ¶ 157. The scope covers carbon-steel butt-weld pipe fittings having an inside diameter of less than 14 inches, imported in either finished or unfinished form. *Id.*[2] They all reference an Harmonized Tariff Schedule (HTS) code, but caution that it "is provided for convenience and for customs purposes. The written product description remains dispositive." SDF ¶ 158. The scope descriptions do not reference, let alone incorporate, any industry standards or specifications. SDF ¶ 159.

---

[2] The China Order incorporates language from the ITC's report stating that butt-weld fittings "used to join sections in piping systems where conditions require permanent, welded connections, as distinguished from fittings based on other fastening methods (e.g., threaded, grooved, or bolted fittings)." SDF ¶¶ 153-155. SCI argues that this excludes Welded Outlets. In fact, the DOC applied this same standard when finding that the Sprink-Let was a butt-weld pipe fitting. SDF ¶ 160.

3

The DOC has issued a handful of scope rulings under these ADD orders.  Four involve Welded Outlets.  The first dates to the 1990s, when Lloyd "Skip" Perkins, who later worked to build Vandewater's Welded Outlet business, requested a scope ruling for the "Sprink-let" Welded Outlet.  Citing the language of the ITC's Product Description, the DOC ruled that the Sprink-let was a butt-weld pipe fitting:  "a pipe fitting with *beveled edges* that is *permanently joined through welding* falls within the scope of the order on carbon-steel butt weld pipe fittings from Taiwan."  SDF ¶ 160 (Sprink-Let Ruling) (emphasis added); 57 Fed. Reg. 19602, 19603 (May 7, 1992) (providing notice of the ruling).[3]

In 2018, the DOC issued three rulings concluding that Defendants' Welded Outlets were within the scope of the China Order.  *See* SDF ¶¶ 161, 163.  These rulings reasoned, like the ITC reports and the Sprink-Let Ruling before them, that Welded Outlets were butt-weld pipe fittings because they feature "a beveled end that is permanently joined by welding."  SDF ¶ 164.

## III.   LEGAL STANDARDS

When considering a motion for summary judgment, the Court views the evidence in the light most favorable to the non-movant (here, Island), and "must not weigh the evidence or determine the truth of the matter."  *United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 461 (9th Cir. 1999).  The Court should draw all reasonable inferences in Island's favor.  *United States ex rel. Hartpence v. Kinetic Concepts, Inc.*, 2019 WL 3291582, at *11 (C.D. Cal. June 14, 2019).

In an FCA case, "to survive summary judgment, the relator must produce sufficient evidence to support an inference of knowing fraud."  *United States ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir. 1995).  Unlike in common law fraud claims, however, the relator "need not prove a 'specific intent to defraud'

---

[3] As described below, the Sprink-Let Ruling is a public document available upon request and can be found online.  SDF ¶ 167, 200.  It has been referenced repeatedly in the administrative record.

1    under the FCA—the Act imposes liability on any person acting 'knowingly,' which
2    includes acting with 'actual knowledge,' as well as acting 'in deliberate ignorance,'
3    or 'in reckless disregard of the truth or falsity of the information[.]' 31 U.S.C.
4    § 3729(b)(1)." *United States ex rel. Winter v. Gardens Regional Hosp. and Med.*
5    *Ctr., Inc.*, 953 F.3d 1108, 1114 (9th Cir. 2020); *see also Universal Health Services,*
6    *Inc. v. United States*, 136 S. Ct. 1989, 1996 (2016).

7         The Ninth Circuit has not elaborated on what "reckless disregard" means under
8    the FCA, but there is consensus that it amounts to "an extreme version of ordinary
9    negligence." *United States v. Mass. Hous. Fin. Agency*, 530 F.3d 980, 983 (D.C. Cir.
10   2008); *United States v. Krizek*, 111 F.3d 934, 942 (D.C. Cir. 1997) ("[T]he best
11   reading of the Act defines reckless disregard as an extension of gross negligence,"
12   which is "not a 'lesser form of intent'"); *see also United States v. King-Vassel*, 728
13   F.3d 707, 712–13 (7th Cir. 2013); *United States ex rel. Burlbaw v. Orenduff*, 548
14   F.3d 931, 945 n.12 (10th Cir. 2008).

15        This standard reflects Congress's intent that the FCA require parties "to make
16   a limited inquiry so as to be reasonably certain" their statements to the Government
17   are truthful. *United States v. Bourseau*, 531 F.3d 1159, 1168 (9th Cir. 2008) (quoting
18   S. Rep. No. 99-345, at 20 (1986)). While that inquiry must only be "reasonable and
19   prudent under the circumstances," Congress and the Ninth Circuit have confirmed
20   that "***at least some inquiry [must] be made***." *United States v. United Healthcare Ins.*
21   *Co.*, 848 F.3d 1161, 1174 (9th Cir. 2016) (quoting S. Rep. No. 99-345, at 21)
22   (emphasis added); *Bourseau*, 531 F.3d at 1168 (same). And where a defendant is
23   under an independent "obligation to be familiar with the legal requirements," a jury
24   can conclude he acted with reckless disregard by "failing to inform himself of those
25   requirements." *United States v. Mackby*, 261 F.3d 821, 828 (9th Cir. 2001).

26        Because determining whether SCI made an inquiry "reasonable and prudent
27   under the circumstances" is necessarily fact- and context-specific, summary
28   judgment is inappropriate as the jury can reasonably weigh the evidence in different

ways. *United Healthcare Ins. Co.*, 848 F.3d at 1174 (quoting S. Rep. No. 99-345, at 21); *King-Vassel*, 728 F.3d at 713; *United States v. Coloplast Corp.*, 327 F. Supp. 3d 300, 309 (D. Mass. 2018) (noting in FCA context "it is unusual to grant summary judgment on scienter, given the fact-intensive nature of the inquiry" (cleaned up)). Indeed, the Ninth Circuit has repeatedly reversed grants of summary judgment based on the FCA's scienter requirement where a jury could conclude that defendants' deficient investigation constituted at least reckless disregard.[4]

## IV.   TRIABLE ISSUES OF FACT PRECLUDE SUMMARY JUDGMENT.

A reasonable jury could find that SCI made knowing false certifications that its Welded Outlets were not subject to the China Order. That same jury could find that SCI never formed a good-faith, objectively reasonable view of the China Order's scope; that the Order was not ambiguous; and/or that the whole administrative record warned SCI away from its purported *post hoc* conclusions.

### A.   SCI Made False Certifications With Reckless Disregard.

In the context of importing products into the United States, the "reasonable and prudent" inquiry required is demanding. Under the Modernization Act of 1993 (Mod Act), importers of record are required to use "reasonable care" to ensure that they enter their goods in compliance with law, including by providing CBP with the "rate of duty applicable to the merchandise." 19 U.S.C. § 1484(a)(1). Island's expert, Kelli Thompson—a licensed customs broker and former supervisory import specialist with CBP—explains these regulatory requirements. SDF ¶ 175.

---

[4] *E.g.*, *Darrig, ex rel. United States v. Med. Consultants Network, Inc.*, 303 F. App'x 429, 430–31 (9th Cir. 2008) (holding jury could reasonably conclude defendant acted "at least in reckless disregard"); *United States ex rel. Ali v. Daniel, Mann, Johnson & Mendenhall*, 355 F.3d 1140, 1150 (9th Cir. 2004) (reversing summary judgment for defendants who made false statements without investigating truth of the claim); *Parsons Co.*, 195 F.3d at 465; *United States ex rel. Plumbers & Steamfitters Local Union No. 38 v. C.W. Roen Const. Co.*, 183 F.3d 1088, 1094-95 (9th Cir. 1999) ("knowingly" element can be satisfied where defendant made no effort to obtain clarification).

To help the jury determine what a reasonable inquiry entails in the Customs context, Ms. Thompson will explain how the Customs concepts of "reasonable care" and "informed compliance" require importers such as SCI to exercise diligence in determining applicable ADDs. SDF ¶¶ 176, 177. She will explain that importers must establish internal compliance procedures to determine whether goods are subject to ADDs. SDF ¶ 178. She will describe why importers must provide sufficient training to their employees, particularly on Priority Trade Issues such as ADDs.[5] SDF ¶¶ 179–181. She will discuss how certain goods and certain countries are more at risk of being subject to ADD—most notably, Chinese steel products. SDF ¶¶ 182–183. When importing such goods, a prudent importer will review all potentially relevant ADD orders and scope rulings and seek guidance from CBP or DOC about whether they are subject to ADDs. SDF ¶¶ 184–187.

Here, the record reflects that SCI failed to conduct even a basic inquiry into whether the China Order reached its products. SCI's business model hinges on importing Chinese steel piping products. SDF ¶ 188. SCI imports between █ of steel product from China each year. SDF ¶ 189. Between 2011 and 2018, SCI imported more than $21.5 million in Chinese Welded Outlets. SDF ¶ 190. By falsely claiming that Welded Outlets were not subject to any ADDs—despite having not checked to see if they were—SCI avoided the 182.9% ADD, costing the government more than $39 million.

No class of products is subject to more ADD orders than iron and steel products from China. SDF ¶¶ 182–183. Despite importing millions of dollars of these risky Chinese steel products, ███████ SDF ¶ 191. This was a conscious choice; in 2015, the company solicited—and then rejected—proposals from a reputable trade consulting company, Tradewin, ███████

---

[5] Priority trade issues are CBP's highest enforcement priorities and are covered in many CBP publications. SDF ¶ 179.

7

███████████████████████████████████████████████████

███████████████████████████████████████ SDF

¶ 196.[6]  SCI never consulted with industry experts or legal counsel to determine whether its Welded Outlets were subject to any ADD order.  SDF ¶ 198.

A jury reasonably could conclude that SCI's failure to conduct any inquiry to determine whether SCI's Welded Outlets were subject to ADDs was, at minimum, reckless.  Indisputably, Mr. Tripp never read the China Order until he learned that his company was under investigation.  SDF ¶ 195.  Mr. Tripp was not alone; no one at SCI did.  *Id.*

The most generous interpretation of Mr. Tripp's testimony is that he failed to understand how ADD orders apply to products.  He believed that ADD orders only reached goods imported under the listed HTS codes.  SDF ¶ 199.  That is wrong; the scope of an ADD order is determined solely by the written description.  In fact, had Mr. Tripp read the China Order, it would have quickly disabused him of his misunderstanding.  SDF ¶ 158; *see also* SDF ¶ 158.1 ("A reference to a HTSUS number in an order should not be interpreted to exclude products classified under a HTSUS number not listed in the order but otherwise satisfy the scope's written description." (citing *Novosteel SA v. United States*, 284 F.3d 1261, 1270 (Fed. Cir. 2002))).

SCI did not provide any import compliance training to its employees; neither Mr. Tripp nor anyone else at SCI had any formal training or education in import compliance or ADD orders.[7]  SDF ¶ 192.  These deficiencies, at the very least, raise genuine issues of fact over whether SCI acted with reckless disregard when it falsely

---

[6]  The only project SCI hired Tradewin to undertake—an audit of HTS classifications—expressly excluded advice about ADD orders.  SDF ¶ 197.

[7]  Mr. Tripp was formally responsible for import compliance at SCI from 2003 to January 2015.  SDF ¶ 193.  After 2015, formal responsibility for import compliance shifted to Jeff Buxton and Lisa Vanlanduyt, although Mr. Tripp remained involved because of his product knowledge.  *Id.*  SCI's corporate representative could not say if either Buxton or Vanlanduyt received any formal training or certifications in trade compliance.  SDF ¶ 194.

8

certified that its Welded Outlets were not subject to any ADDs without having taken even basic steps to familiarize itself with the regulatory scheme. *Mackby*, 261 F.3d at 828; SDF ¶ 224.

Had SCI complied with its obligation to take reasonable care, it would have quickly determined that the DOC and the ITC viewed Welded Outlets to be butt-weld pipe fittings. Island's own experience proves the point. In May 2016, Island tasked its new sales manager, Mark Woehrel, with looking into whether Welded Outlets might be subject to any existing trade cases. At the time, Mr. Woehrel had no experience with Welded Outlets, and he had never imported products into the United States. SDF ¶ 200, at 27:23–28:1; 223:14–16.Yet within just hours, Mr. Woehrel managed to find all the publicly available authorities needed to conclude that Defendants' Welded Outlets were subject to the China Order.

Mr. Woehrel's research began on Google. *Id.* at 36:8–10; 37:11–21. There, he found pipe trade cases and "immediately recognized" the relevance of the butt-weld pipe fittings order. *Id.* at 38:24–39:11. Upon reading the scope of the China Order, Mr. Woehrel thought "it seemed to describe the product that is a welded outlet" based on the physical similarities to Island's product. *Id.* at 41:11–19. From there, he found the relevant sunset review, which described the five countries subject to similar orders along with their scope rulings, including the Sprink-Let Ruling. *Id.* at 41:20–42:21, 72:17-73:12. And although he could not find the Sprink-Let Ruling online, he obtained a copy by simply calling the DOC (using the contact information found in the sunset review).[8] *Id.* at 45:25–46:24.

Island quickly deduced that Chinese Welded Outlets were subject to ADDs:

> So we had a lot of questions that just revolved around the terminology. But at the base of it . . . if the sprink-let is the same product, the exact same product as Island's groove welded

---

[8] In fact, the Sprink-Let Ruling is available on a government website that catalogs scope rulings worldwide. SDF ¶ 167.

9

1    outlet . . . and the sprink-let was ruled to be within the scope of

2    the law for Taiwan, does it follow that it's also within the scope

3    of the . . . ruling for China.[9]  (SDF ¶ 201 at 48:11–18.)

4    Armed only with Google, a telephone, and a modicum of curiosity, Mr. Woehrel

5    was quickly able to determine that Welded Outlets fell within the scope of the

6    China Order.  SDF ¶ 201 at 189:20-190:1.

7        This experience puts the lie to SCI's protest that it had no way to determine

8    the truth or to learn of the Sprink-Let Ruling.  (SCI MSJ 15–16.)  Given how easy it

9    was for an untrained sales manager with no experience with import laws or Welded

10   Outlets to recognize that Defendants' products were within scope, a reasonable jury

11   could conclude that SCI certified that its products were not subject to ADDs despite

12   having failed to conduct the "reasonable and prudent" inquiry the law demands.

13   *United Healthcare Ins. Co.*, 848 F.3d at 1174 (quoting S. Rep. No. 99-345, at 21);

14   *Mackby*, 261 F.3d at 828; SDF ¶ 224.[10]

15       **B.    SCI Made False Certifications With Actual Knowledge or**

16             **Deliberate Ignorance.**

17       It gets worse for SCI:  the evidence also proves that its Chinese supplier

18   repeatedly told it that its Welded Outlets were butt-weld pipe fittings.  In 2017, SCI

19   and its Chinese manufacturer, ███████████ learned of a pending antidumping

20   petition on forged fittings.  SDF ¶ 202.  SCI ████████████ were concerned that

21   the petition might reach SCI's Welded Outlets.  SDF ¶¶ 203–204.  ██████████

22

23   [9] Unsurprisingly, when Sigma's Bhattacharji reviewed the Sprink-Let Ruling, he also
     concluded that it was "pretty obvious" that Sigma would need to pay ADDs on its
24   Chinese Welded Outlets.  SDF ¶ 171.

25   [10] SCI criticizes Island's expert for saying that she did not know how an importer
     would have known that Welded Outlets were within the scope of the ADD order.
     In fact, she described the process that a reasonable importer would take to determine
26   whether a particular product was subject to an ADD order.  SDF ¶¶ 175–187. (A
     process that SCI indisputably did not undertake.  SDF ¶¶ 191, 195–199.)  Because
27   the DOC already authoritatively ruled that Welded Outlets were within the scope
     of the China Order, Ms. Thompson did not conduct a scope analysis as she was not
28   asked to do so as part of her engagement.  SDF ¶ 175.



SCI readily agreed that SCI's Welded Outlets were ███████████ SDF ¶ 210; *see also* ¶ 209 (SCI responding ████████████). It instructed ██████████ to use the term ████████ when shipping Welded Outlets to the United States.  SDF ¶ 210. ████████████████████████████████ SCI then began submitting import paperwork to CBP describing its products as █████ SDF ¶ 211.  In March 2018, SCI also revised its ADD Stationary to describe Cooplets as ██████████ and ██████████[11] SDF ¶ 212.

In April 2018, however, SCI received a civil investigative demand from the DOJ seeking information about whether the company had evaded the China Order. SDF ¶ 214.  Only then did Mr. Tripp review the Sprink-Let Ruling.  SDF ¶ 215.  In an email to ████████, he candidly admitted that the ████████████ ████████ adding, ████████████ SDF ¶ 162. He then instructed ████████ to undo the revisions from months earlier, deleting ██████████████. SDF ¶ 217.  Mr. Tripp similarly instructed another SCI employee to delete the word ████████

---

[11] SCI's "ADD Stationary" was a written explanation as to why ADDs did not apply to particular products.  SCI prepared the ADD Stationary so it would be able to respond quickly and consistently to inquiries by CBP or others.

11

1    ██████████████████████. SDF ¶ 216.

2    ████████████████████████████████████████

3    ████████████████████████████████████████

4    ████████████████████████ SDF ¶¶ 218–219.    Mr. Tripp responded in

5    ███████████████████ SDF ¶ 220.

6          This behavior bears all the indicia of fraud.  As Ms. Thompson has opined,

7    based on her experience as a CBP import specialist, that these emails reveal that SCI

8    knowingly aimed to evade CBP detection and applicable duties.  SDF ¶ 223.  In

9    Customs parlance, such actions constitute fraud under § 1592.  *Id*.  Moreover, these

10    emails fatally undermine SCI's after-the-fact arguments that their products were not

11    butt-weld pipe fittings.  In a footnote, SCI tries to whitewash all of this as an

12    "employee's error" about terminology.  (SCI MSJ 14 n.9.)  But on a motion for

13    summary judgment the Court cannot credit that innocent characterization, as choices

14    between conflicting interpretations of the facts are matters for the jury.  *Anderson v.*

15    *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Viewed in the light most favorable

16    to Island, the evidence shows that SCI believed that its Welded Outlets were butt-

17    weld pipe fittings—and that it said as much to CBP to avoid the forged fittings

18    petition.

19          In sum, the evidence here would readily support a jury finding that SCI's false

20    statements to CBP were neither negligent nor innocent mistakes.  *See United States*

21    *ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1073 (9th Cir. 1998).  On this record,

22    a jury could conclude not only that SCI's failure to meet its obligation to investigate

23    ADDs amounts to reckless disregard, but also that the company knew or deliberately

24    ignored that its Welded Outlets were butt-weld pipe fittings subject to the China

25    Order.  SDF ¶¶ 225–226.

26

27

28

### C.     SCI Did Not Adopt an Objectively Reasonable View of the China Order.

SCI suggests that none of these damning facts should matter because it can now articulate an "objectively reasonable" reading of the China Order that, in its view, excludes Welded Outlets. (SCI MSJ 8). To make this argument, SCI relies mostly on a footnote in a Supreme Court decision involving the meaning of the term "willful" in the Fair Credit Reporting Act. *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 n.20 (2007) (willfulness cannot be found "when the company's reading of the statute is objectively reasonable"). The argument fails for several reasons.

To start, SCI cannot make this argument. *Safeco* and the other cases SCI cites involved parties who actually studied and formed beliefs about the regulations at issue,[12] but the evidence here establishes that SCI neither read the China Order nor analyzed whether it covered Welded Outlets. SDF ¶ 195. This case thus fits the mold of *Siebert v. Gene Sec. Network, Inc.*, 75 F. Supp. 3d 1108, 1119–20 (N.D. Cal. 2014), which SCI failed to cite. In that FCA case, the court rejected the same kind of argument SCI advances here, finding that the defendant could not have formed a reasonable belief because it admittedly "never even read the regulations and had no knowledge of them." *Id*. at 1119. The court determined cases such as *Hagood* and *Hochman* did "not have any bearing" when the defendant never formed a belief about the regulation. So too here.[13]

---

[12] *See id.* (noting Safeco argued "good-faith reliance on legal advice" as defense); *United States ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1076 (9th Cir. 1998) ("Whitney's actions merely suggest that Mishra examined the issue and concluded that his interpretation of the Affiliation Agreement was correct . . ."); *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1268 (9th Cir. 1996) (noting no evidence of knowing fraud where defendant had "general policy to comply with all applicable state and federal laws and regulations and that it ha[d] an elaborate administrative structure to do so").

[13] Recall that the FCA reaches deliberate ignorance and reckless disregard. 31 U.S.C. § 3729(b). To grant SCI immunity as a matter of law based on an after-the-fact interpretation of an ADD Order that it never read would read these elements out of the statute whenever sophisticated legal counsel or retained experts come up with alternative interpretations of the regulation at issue. *Parsons Co.*, 195 F.3d at 460

13

1    *Safeco* is separately inapplicable here because SCI has shown no ambiguity in

2    the China Order.  *See Edwards v. Toys "R" Us*, 527 F. Supp. 2d 1197, 1209 (C.D.

3    Cal. 2007).  SCI argues that the DOC's consideration of the so-called (k)(1) factors

4    in its scope ruling establishes the China Order's ambiguity.  Not so.  As the regulation

5    SCI cites and case law make clear, the DOC had to consider those factors.  "Whether

6    the order is ambiguous or not, Commerce's regulations are unambiguous—it '***will***

7    take into account' the (k)(1) criteria in conducting a scope determination."  *TMB*

8    *440AE, Inc. v. United States*, 399 F. Supp. 3d 1314, 1320 (C.I.T. 2019) (quoting 19

9    C.F.R. § 351.225(k)) (emphasis added by *TMB 440AE*).  Here, the DOC found that

10   SCI's Welded Outlets fall within a "plain reading of the scope," and that the (k)(1)

11   factors "further support" that reading.  SDF ¶ 140.

12        SCI also unsuccessfully tries to inject ambiguity into the China Order through

13   its expert witness, who claims that a "butt-weld pipe fitting" is a pipe fitting meeting

14   the ASME B16.9 standard.  To note the obvious, SCI did not consult with its expert

15   before importing Welded Outlets; his report merely offers a *post hoc* justification for

16   SCI's failure to have read the China Order.  And the report fails on its own terms:

17   The China Order does not reference, let alone incorporate, ASME B16.9. SDF ¶ 165.

18   A jury will be free to find that it was not objectively reasonable for SCI to cabin the

19   scope of the China Order based on an industry standard that the DOC did not

20   incorporate.[14]  *Cf. Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver,*

21   *N.A.*, 511 U.S. 164, 177 (1994).

22        Even if the Court were to consider SCI's *post hoc* interpretation of the Order,

23   triable issues on scienter would remain, because determining whether an

24   interpretation is objectively reasonable involves "mixed questions of fact and law

25   best resolved by the jury." *Coloplast Corp.*, 327 F. Supp. 3d at 310; *United States ex*

26   (explaining defendant's "good faith interpretation" defeats scienter, not whether
27   that interpretation was "correct or 'reasonable'").

28   [14] When it wishes to do so, the DOC knows how to incorporate industry standards
     into scope language.  SDF ¶ 166.

14

1    *rel. Westmoreland v. Amgen, Inc.*, 812 F. Supp. 2d 39, 71 (D. Mass. 2011).  These

2    questions are for the jury because they require weighing the facts about both "the

3    reasonableness of defendant's interpretation of the regulation and suggestions of

4    government warnings away from that interpretation."  *Coloplast Corp.*, 327 F. Supp.

5    3d at 310 (citing cases denying summary judgment).

6         Here, a jury could readily reject SCI's claim that it reached an objectively

7    reasonable view that Welded Outlets were not butt-weld pipe fittings.  To repeat,

8    prior to this litigation, SCI agreed ███████ that the Cooplets were butt-welds, and it

9    used that term on import paperwork and its ADD Stationary for several months.  SDF

10   ¶¶ 208–212.  Given the damaging nature of the admission, SCI's attempt to call this

11   an employee "error" presents a quintessential fact dispute for the jury.  (SCI MSJ 14

12   n.9.)  A jury reasonably could conclude that SCI viewed Welded Outlets to be butt-

13   weld fittings when it perceived an advantage in doing so (*i.e.*, when it thought it could

14   use that characterization to avoid the forged fittings ADD), but that it fraudulently

15   and opportunistically reversed course when it realized that the CBP could assess ███

16   ███████████████   SDF ¶¶ 162, 215–217.

17        In addition, a reasonable jury could find that the entire administrative record

18   warned SCI away from its after-the-fact view.  *United States ex rel. Purcell v. MWI*

19   *Corp.*, 807 F.3d 281, 288 (D.C. Cir. 2015) (whether defendants had been warned

20   away "cannot readily be labeled as a "purely legal" question"); *United States v.*

21   *Celgene Corp.*, 226 F. Supp. 3d 1032, 1051 (C.D. Cal. 2016) (citing *Purcell*).  The

22   DOC's 2018 scope rulings were neither surprising nor unpredictable; they tracked

23   the whole administrative record.  As even SCI's expert admits, Welded Outlets

24   feature beveled edges, and they must be permanently welded to pipes to perform their

25   function.  SDF ¶ 170. These are the two characteristics that the ITC and DOC have

26   always used to distinguish butt-weld pipe fittings from other types of pipe fittings.

27   SDF ¶¶ 153, 154, 160, 164.

28

15

Moreover, the arguments SCI now makes to support its claim that Cooplets are not butt-weld pipe fittings have all been rejected before.  For example, SCI argues that Welded Outlets are not butt-weld pipe fittings because one end is threaded or grooved (SCI MSJ 5), but the Sprink-Let Ruling explicitly rejected that argument. SDF ¶ 168.  Similarly, SCI claims that Welded Outlets cannot be butt-weld pipe fittings because conditions in fire protection systems do not require permanent welded connections (SCI MSJ 4-5), but the Sprink-let Ruling applied the *same standard*.  SDF ¶¶ 169, 170 ("Butt-weld pipe … fittings are used … *where conditions requirement permanent, welded connections*") (emphasis added); *see also* SDF ¶ 28 (noting ITC considers "automatic fire sprinklers" an example of butt-weld pipe fittings "welded into permanent, fixed piping systems").  Finally, echoing Mr. Tripp's confusion, SCI claims that the HTS code for Welded Outlets is not included in the China Order (SCI MSJ 5), even though the China Order itself states that its scope is not determined by HTS codes.  SDF ¶ 158.

At bottom, SCI argues that it could not have been warned away from its view by the Sprink-Let Ruling because it was issued under the ADD order for butt-weld pipe fittings from Taiwan.  But the two orders are closely linked:  The ITC used identical language to describe butt-weld pipe fittings in its reports on China and Taiwan, it has since reviewed and renewed these orders on a "cumulated" basis, and it has remarked that the scopes of these orders are "essentially the same."  SDF ¶¶ 156–157.  Moreover, when SCI finally read the ruling, Mr. Tripp recognized that SCI was exposed to ███████████████  SCI stopped importing Welded Outlets from China, and SCI sought a scope ruling from the DOC.  SDF ¶¶ 137, 162, 221, 222.  Given these facts, and Island's own investigation, a jury could find that had SCI fulfilled its obligation "to take reasonable steps to ensure [its] compliance" with Customs laws, it would have known from the Sprink-Let Ruling and the administrative record that DOC has long viewed Welded Outlets to be butt-weld pipe fittings. *Amgen*, 812 F. Supp. 2d at 71; SDF ¶ 172.

## V.     SCOPE RULING REQUESTS CANNOT DEFEAT FCA CLAIMS.

SCI's liability is not limited under the reasoning of *United Steel and Fasteners, Inc. v. United States*, 947 F.3d 794 (Fed. Cir. 2020).  That case did not involve the FCA, but turned on an analysis of CBP regulations regarding liquidation—regulations that have no application here—and a determination that the regulations did not "allow suspension of liquidation before a scope inquiry."   *Id*. at 801 (discussing 19 C.F.R. § 351.225(l)(3)).

SCI points to *zero* authority for the proposition that liquidation is at all relevant in an FCA case.  And for good reason:  This case is not about second-guessing CBP's collection of duties, it is about Defendants' knowing submission of false statements that wrongfully deprived the Government of what it was owed.  The more apt analogy is to the Government's authority under the Customs laws to impose civil penalties and collect additional duties where importers "by fraud, gross negligence, or negligence" enter merchandise using "any document or electronically transmitted data or information . . . which is material and false."  19 U.S.C. § 1592(a).  As the Court of International Trade has held "neither liquidation nor the general concept of 'finality' bar the recovery of duties or a civil penalty under § 1592."  *United States v. Great Neck Saw Mfrs, Inc.*, 311 F. Supp. 3d 1337, 1345 (C.I.T. 2018).  There, the court held that liquidation was no barrier to subsequent collection of duties and penalties because "lawful duties" are those that the United States would have collected but for the importer's fraud, gross negligence, or negligence in submitting materially false statements.  *Id*.

The same logic applies here in the FCA context.  The Government was deprived of ADDs because SCI knowingly certified that no such duties applied.  CBP relied on SCI's false declarations, and liquidated the entries without collecting ADDs as a result of SCI's false statements.  Just as section 1592 ensures that importers cannot escape liability for their wrongful false statements simply because they at first go undetected, so too does the FCA permit full recovery.  If a jury finds against SCI,

17

1   CBP's liquidation regulations would not affect the amount of recoverable damages
2   as the verdict would establish that SCI contemporaneously knew or was reckless in
3   not knowing that Cooplets were subject to ADDs.

4   **VI.    THE STATUTE OF LIMITATIONS IS TEN YEARS.**

5        Last term, the Supreme Court held that the ten-year limitations period in
6   section 3731(b)(2) applies to private relators "so long as the action is brought within
7   three years of when certain Government officials knew or should have known the
8   relevant facts." *United States ex rel. Fadlalla v. DynCorp Int'l*, 402 F. Supp. 3d 162,
9   194 (D. Md. 2019) (discussing *Cochise Consultancy, Inc. v. United States ex rel.*
10  *Hunt*, 139 S. Ct. 1507 (2019)).  SCI bears the burden of establishing both the dates
11  of violation and when the Government was put on notice. *Id.*

12       SCI makes no effort to prove when the violations occurred; when, whether, or
13  how the government was put on notice of them; or the identity of the responsible
14  government official.  Instead, it generically suggests that its Customs forms alerted
15  CBP it was importing Welded Outlets—even though SCI's Form 7501s do not
16  disclose that it was importing Welded Outlets and CBP never requested to review
17  SCI's import paperwork.  SDF ¶ 173.  Because there are disputed questions of fact,
18  SCI is not entitled to the protections of a six-year statute of limitations.

19  **VII.   THE PUBLIC DISCLOSURE BAR DOES NOT APPLY.**

20       SCI's public disclosure bar argument fails now for the same reason that it
21  failed at the motion to dismiss stage:  the purported public disclosures did not disclose
22  the fraud.  *See* ECF #128 at 10–11.  SCI does not point to any new qualifying public
23  disclosures, choosing instead to critique Island's investigation.

24       The public disclosure bar is an affirmative defense that the defendant must
25  prove.  *Prather v. AT&T, Inc.*, 847 F.3d 1097, 1102 (9th Cir. 2017).  The top-line
26  question is whether "substantially the same allegations or transactions as alleged in
27  [Island's Complaint] were publicly disclosed." 31 U.S.C. § 3730(e)(4)(A).  But only
28  three sorts of public disclosures count:  those made "in a Federal criminal, civil, or

1   administrative hearing in which the Government or its agent is a party," "in a

2   congressional, Government Accountability Office, or other Federal report, hearing,

3   audit, or investigation," or "from the news media." *Id.*; *Schindler Elevator Corp. v.*

4   *United States ex rel. Kirk*, 563 U.S. 401, 414 (2011) ("By its plain terms, the public

5   disclosure bar applies to some methods of public disclosure but not to others."). As

6   the Court previously noted, the first step of the inquiry is to determine whether the

7   disclosures at issue occurred through one of these channels. ECF # 128 at 9.

8        Only after that filtering can the Court determine whether SCI publicly

9   disclosed its fraud. For that, the Ninth Circuit follows the "X + Y = Z" formulation,

10   where X is the misrepresentation, Y is the truth, and Z is the "allegation of fraud."

11   *United States ex rel. Mateski v. Raytheon Co.*, 816 F.3d 565, 571 (9th Cir. 2016). "In

12   order to disclose the fraudulent transaction publicly, the combination of X and Y

13   must be revealed," permitting the inference of Z. *Id.*

14        But SCI does not engage in this legal analysis, as it does not identify what

15   disclosures survive the statute's filtering.[15]  Instead, it adopts a lay definition of

16   "public." Nor does SCI identify any qualifying public disclosure of "X"—here, that

17   SCI falsely claimed to the Government that its Welded Outlets were not subject to

18   ADDs. While SCI argues this was an "obvious, uncontroversial fact, well known to

19   the government" (SCI MSJ 17), those adjectives are no substitute for disclosure to

20   the *public*. As discussed at the motion to dismiss stage, the Form 7501s containing

21   Defendants' false statements are confidential. *See Customs & Intern. Trade*

22   *Newsletter v. U.S. Customs and Border Protection*, 588 F. Supp. 2d 51, 57–58

23   (D.D.C. 2008) (holding CBP can withhold Form 7501 information under FOIA and

24   noting that this information is more detailed and reliable than publicly available

25

---

26   [15] As the sole exception, SCI briefly contends that pricing information on its website

27   qualifies as "news media." (SCI MSJ 18.) As Island once explained, SCI is wrong. *See* ECF #117 at 24–26; *United States ex rel. Integra Med Analytics LLC v.*

28   *Providence Health & Services*, 2019 WL 3282619, at *12–*15 (C.D. Cal. July 16, 2019).

1   shipping records); SDF ¶ 174.  Thus SCI cannot prove that their misrepresentations

2   were publicly disclosed.  The public disclosure bar is not triggered by information

3   disclosed only to the government.  For it cannot be the case that "everything the

4   government has in its files is public information" within the scope of the FCA, as

5   otherwise the "very act of submitting their allegedly false claim" could immunize

6   defendants from FCA liability.  *United States ex rel. Spay v. CVS Caremark Corp.*,

7   913 F. Supp. 2d 125, 183 (E.D. Pa. 2012).

8        Because SCI cannot establish that both components of its fraud were publicly

9   disclosed, its effort to cast doubt on the significance of Island's investigation is

10   irrelevant.  While Island agrees with SCI that the public disclosure bar is designed to

11   prevent "parasitic lawsuits," *United States ex rel. Mateski*, 816 F.3d at 570, this is

12   not such a lawsuit.  Far from latching on to news reports or other qualifying public

13   disclosures, Island was the first to uncover that SCI (and its co-defendants) falsely

14   claimed that it did not owe ADDs on Welded Outlets.

15   **VIII. CONCLUSION**

16        For all these reasons, SCI's motion for summary judgment should be denied.

17

18   Dated: April 27, 2020              MAYER BROWN LLP

19                                      */s/Matthew H. Marmolejo*
                                        Kelly B. Kramer
20                                      Matthew H. Marmolejo
                                        C. Mitchell Hendy
21                                      Attorneys for Relator
22                                      ISLAND INDUSTRIES, INC.

23

24

25

26

27

28