MAYER BROWN LLP
MATTHEW H. MARMOLEJO (SBN 242964)
 *mmarmolejo@mayerbrown.com*
C. MITCHELL HENDY (SBN 282036)
 *mhendy@mayerbrown.com*
350 South Grand Avenue, 25th Floor
Los Angeles, CA 90071-1503
Tel:  (213) 229-9500
Fax: (213) 576-8185

**PUBLIC VERSION**

MAYER BROWN LLP
KELLY B. KRAMER (*pro hac vice*)
 *kkramer@mayerbrown.com*
1999 K Street, NW
Washington, D.C. 20006
Tel:  (202) 263-3007
Fax: (202) 263-5207

Attorneys for Relator
ISLAND INDUSTRIES, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* ISLAND INDUSTRIES, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>VANDEWATER INTERNATIONAL INC.; NEIL RUEBENS; SIGMA CORPORATION; SMITH COOPER INTERNATIONAL; ALLIED RUBBER & GASKET COMPANY, and JOHN DOES Nos. 1-10.,<br><br>Defendants. | Case No. 2:17-cv-04393-RGK-KS<br><br>**ISLAND INDUSTRIES, INC.'S OPPOSITION TO DEFENDANT SIGMA CORPORATION'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date: May 18, 2020<br>Time:  9:00 a.m.<br>Courtroom:  850<br>Judge:  Hon. R. Gary Klausner |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................... 1

II.   THE ADMINISTRATIVE RECORD ............................... 2

III.  TRIABLE ISSUES OF FACT PRECLUDE SUMMARY
JUDGMENT ................................................................. 3

      A.    Sigma falsely claimed its Welded Outlets were not subject to
antidumping duties ..................................................... 4

      B.    There are triable issues of fact about Sigma's scienter ...................... 6

           1.    The failure to inquire establishes scienter .................................. 6

           2.    A jury could find that Sigma conduced a reckless
antidumping duty investigation ................................ 8

           3.    A jury could find that Sigma did not adopt an objectively
reasonable interpretation of the China Order .......................... 16

IV.  SCOPE RULING REQUESTS CANNOT DEFEAT FCA CLAIMS .......... 19

V.   CONCLUSION ........................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acme Furniture Indus., Inc. v. United States,*
   85 F. Supp. 2d 1353 (C.I.T. 2012) ......................................................... 5

*United States ex rel. Ali v. Daniel, Mann, Johnson & Mendenhall,*
   355 F.3d 1140 (9th Cir. 2004) ................................................................ 7

*United States ex rel. Anderson v. N. Telecom, Inc.,*
   52 F.3d 810 (9th Cir. 1995) .................................................................... 3

*United States ex rel. Burlbaw v. Orenduff,*
   548 F.3d 931 (10th Cir. 2008) ................................................................ 7

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
   511 U.S. 164 (1994) ............................................................................. 18

*Fort Hall Landowners Alliance, Inc. v. BIA,*
   407 F. Supp. 2d 1220 (D. Idaho 2006) ................................................. 12

*His and Her Corp. v. Shake-N-Go Fashion, Inc.,*
   572 F. App'x 517 (9th Cir. 2014) .......................................................... 12

*United States ex rel. Hochman v. Nackman,*
   145 F.3d 1069 (9th Cir. 1998) ........................................................ 15, 16

*INA Walzlager Schaeffler KG v. United States,*
   108 F.3d 301 (Fed. Cir. 1997) ................................................................ 4

*United States ex rel. McGrath v. Microsemi Corp.,*
   690 Fed. Appx. 551 (9th Cir. 2017) ...................................................... 16

*O'Connor v. Boeing N. Am. Inc.,*
   2005 U.S. Dist. LEXIS 46236 (C.D. Cal. Aug. 9, 2005) ...................... 12

*United States ex rel. Oliver v. Parsons Co.,*
   195 F.3d 457 (9th Cir. 1999) ..................................................... 3, 5, 7, 17

*United States ex rel. Plumbers & Steamfitters Local Union No. 38 v.*
   *C.W. Roen Const. Co.,*
   183 F.3d 1088 (9th Cir. 1999) ................................................................ 7

# TABLE OF AUTHORITIES

**Page(s)**

*United States ex rel. Purcell v. MWI Corp.*,
807 F.3d 281 (D.C. Cir. 2015) ....................................................... 18

*Safeco Ins. Company of Am. v. Burr*,
551 U.S. 47 (2007) ......................................................................... 16

*Siebert v. Gene Security Network, Inc.*,
75 F. Supp. 3d 1108 (N.D. Cal. 2014) ........................................... 16

*TMB 440AE, Inc. v. United States*,
399 F. Supp. 3d 1314 (C.I.T. 2019) ............................................... 17

*Darrig, ex rel. U.S. v. Med. Consultants Network, Inc.*,
303 F. App'x 429 (9th Cir. 2008) .................................................... 7

*United States v. Bourseau*,
531 F.3d 1159 (9th Cir. 2008) ................................................... 7, 15

*United States v. Celgene Corp.*,
226 F. Supp. 3d 1032 (C.D. Cal. 2016) ......................................... 18

*United States v. Coloplast Corp.*,
327 F. Supp. 3d 300 (D. Mass. 2018) ................................. 7, 17, 18

*United States v. Great Neck Saw Mfrs, Inc.*,
311 F. Supp. 3d 1337 (C.I.T. 2018) .......................................... 19, 20

*United States v. King-Vassel*,
728 F.3d 707 (7th Cir. 2013) ...................................................... 6, 7

*United States v. Krizek*,
111 F.3d 934 (D.C. Cir. 1997) .................................................... 6, 7

*United States v. Mackby*,
261 F.3d 821 (9th Cir. 2001) .......................................................... 7

*United States v. Mass. Hous. Fin. Agency*,
530 F.3d 980 (D.C. Cir. 2008) ........................................................ 6

*United Steel and Fasteners, Inc. v. United States*,
947 F.3d 794, 801 (Fed. Cir. 2020 ........................................... 18, 19

# TABLE OF AUTHORITIES

**Page(s)**

*Universal Health Services, Inc. v. United States* (*"Escobar"*),
   136 S. Ct. 1989 (2016) ........................................................................ 6

*United States ex rel. Westmoreland v. Amgen, Inc.*,
   812 F. Supp. 2d 39 (D. Mass. 2011) .................................................. 17

*United States ex rel. Winter v. Gardens Regional Hosp. and Med. Ctr.,
   Inc.*,
   953 F.3d 1108 (9th Cir. 2020) ............................................................ 6

**Statutes**

19 U.S.C. § 1484(a)(1) ................................................................. 8, 9, 10

19 U.S.C. § 1592(a) ............................................................................ 19

False Claims Act ........................................................... 1, 2, 3, 17, 19

31 U.S.C. § 3729(b)(1) ........................................................................ 4


**Other Authorities**

19 C.F.R. § 142.11 ............................................................................... 4

19 C.F.R. § 351.225(l)(3) ................................................................... 19

57 Fed. Reg. 19602, 19603 (May 7, 1992) ........................................ 3

57 Fed. Reg. 29702, 29703 (July 6, 1992) ........................................ 2

## I.    INTRODUCTION

Disregarding the relevant legal standard, Sigma makes a slew of fact-bound arguments in support of its motion for summary judgment.  None has merit.  To start, Sigma argues that it made no false statements, even though the Department of Commerce (DOC) has conclusively ruled otherwise.  Sigma alternatively claims that it adopted an objectively reasonable reading of the antidumping duty (ADD) order on butt-weld pipe fittings from China (China Order).  Law and logic dictate that Sigma could not have a formed a reasonable, good faith belief as to the scope of the China Order because it did not know of the order until late 2017.  Moreover, after learning of the China Order, Sigma buried its head in the sand by neither analyzing its scope nor considering whether it reached Welded Outlets.  If Sigma had spent just a few hours satisfying its obligation to take reasonable care, it would have found, as Relator's sales manager did, that the DOC publicly declared Welded Outlets to be butt-weld pipe fittings in 1992 through the Sprink-let Ruling.  As Sigma's co-founder and vice chairman admitted, that ruling made it "pretty obvious" that Chinese Welded Outlets were subject to ADDs, prompting him to discontinue Sigma's imports.

Stepping back, the central issue before the Court is whether the evidence would allow a reasonable jury to conclude that Sigma acted with scienter.  It would.  Importers of record have an affirmative legal obligation to take reasonable care to ensure that they pay applicable antidumping duties.  Here, a jury could find that Sigma certified that Welded Outlets were not subject to ADDs, despite having made no effort to determine if that was true.  Indeed, none of Sigma's witnesses could say what, if anything, Sigma did to determine whether its Welded Outlets were subject to an ADD.  A jury also could find that Sigma took affirmative steps to mislead Customs and Border Protection (CBP) about the true nature of their products, such as by falsely describing their products and switching Harmonized Tariff System (HTS) codes.  Either finding would suffice to establish scienter under

the False Claims Act (FCA).  Accordingly, as set out more fully below, Sigma's motion for summary judgment must be denied.

## II.    THE ADMINISTRATIVE RECORD

In 1986, the International Trade Commission (ITC) began investigating whether butt-weld pipe fittings were being unlawfully dumped in the United States. The ITC reports on butt-weld pipe fittings from Taiwan and China described the products using identical language.  Both reports state that butt-weld pipe fittings are "used to connect pipe where conditions require permanent, welded connections." Both reports continue:  *The beveled edges of butt-weld pipe fittings distinguish them from other types of pipe fittings*...."  SDF ¶¶ 62-63 (emphasis added).

Relying on the ITC's investigation, the DOC imposed ADD orders against carbon-steel butt-weld pipe fittings from five countries:  Brazil, China, Japan, Taiwan, and Thailand.  *See* SDF ¶ 64 (recounting the history of these ADD orders and reproducing scope of each).  Because the orders involved the same products, the same industries, and the same distribution channels, the ITC has elected to review and renew them on a "cumulated" basis.  SDF ¶ 65.

The scope of the ADD orders is "essentially same for all five countries." SDF ¶ 66.  They cover carbon-steel butt-weld pipe fittings having an inside diameter of less than 14 inches, imported in either finished or unfinished form.  *Id.*[1] They all reference an HTS code, but caution that it "is provided for convenience and for customs purposes.  The written product description remains dispositive."

---

[1] Sigma argues that the ADD for butt-weld pipe fittings from China (China Order) is somehow narrower than the order for butt-weld pipe fittings from Taiwan (Taiwan Order).  Not so.  As noted above, the ITC used identical language to describe butt-weld pipe fittings in the two investigations.  The China Order incorporates some of that language, but that did not narrow the Order's scope. Compare China Order, 57 Fed. Reg. 29702, 29703 (July 6, 1992) (butt-weld pipe fittings "are used to join sections in piping sections *where conditions require permanent welded connection*") (emphasis added) with USITC Pub. 1918 at A-3 (butt-weld pipe fittings "are used to connect pipe section, *where conditions require permanent, welded connections*") (emphasis added).  Indeed, the DOC decided the Sprink-let Ruling using the ITC's definition.  SDF ¶ 69.

2

SDF ¶ 67.  The scope descriptions do not reference, let alone incorporate, any industry standards or specifications.  SDF ¶ 68.

The DOC has issued a handful of scope rulings under these ADD orders; four involve Welded Outlets.  The first was issued in the 1990s for the "Sprink-let" Welded Outlet. SDF ¶ 69 (Sprink-let Ruling). Citing the language of the ITC's Product Description, the DOC ruled that the Sprink-let was a butt-weld pipe fitting: "a pipe fitting with *beveled edges* that is *permanently joined through welding* falls within the scope of the order on carbon-steel butt-weld pipe fittings from Taiwan." SDF ¶ 69 (emphasis added); 57 Fed. Reg. 19602, 19603 (May 7, 1992) (providing notice of the ruling).

More recently, in 2018, the DOC issued three rulings concluding that each of Defendants' Welded Outlets were within the scope of the China ADD Order.  *See* SDF ¶ 72-73.  These rulings recognized, like the ITC reports and the Spink-Let Ruling before them, that, because the Defendants' Welded Outlets each "feature a beveled end" that is permanently welded into a piping system, they are butt-weld pipe fittings.  SDF ¶ 72.

## III.   TRIABLE ISSUES OF FACT PRECLUDE SUMMARY JUDGMENT.

When considering a motion for summary judgment, the Court views the evidence in the light most favorable to the non-movant (here, Island), and "must not weigh the evidence or determine the truth of the matter."  *U.S. ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 461 (9th Cir. 1999).  The Court should draw all reasonable inferences from the evidence in Island's favor.  *U.S. ex rel. Hartpence v. Kinetic Concepts, Inc.*, 2019 WL 3291582, at *11 (C.D. Cal. June 14, 2019).

In an FCA case, "to survive summary judgment, the relator must produce sufficient evidence to support an inference of knowing fraud."  *U.S. ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir. 1995).  Unlike in common law fraud claims, however, the relator "need not prove a 'specific intent to defraud' under the FCA—the Act imposes liability on any person acting 'knowingly,' which

includes acting with 'actual knowledge,' as well as acting 'in deliberate ignorance,' or 'in reckless disregard of the truth or falsity of the information[.]' 31 U.S.C. § 3729(b)(1)." *U.S. ex rel. Winter v. Gardens Regional Hosp. and Med. Ctr., Inc.*, 953 F.3d 1108, 1114 (9th Cir. 2020); *see also Universal Health Services, Inc. v. United States*, 136 S. Ct. 1989, 1996 (2016).

## A.   Sigma misdescribed its Welded Outlets and falsely certified they were not subject to ADDs.

Sigma claims that it is entitled to summary judgment because it supposedly never made false statements (Sigma MSJ 4–7). The argument borders on risible for the simple reason that the DOC—the agency charged with interpreting the scope of ADD orders—has decisively resolved that question against Defendants. *See INA Walzlager Schaeffler KG v. United States,* 108 F.3d 301, 307 (Fed. Cir. 1997) (holding the DOC has "broad authority to interpret its own antidumping duty orders").

To be clear, Sigma made false statements in CBP Forms 7501, on which they had to disclose if any of their imported merchandise was subject to an ADD Order. SDF ¶ 96. In importing Chinese Welded Outlets, Sigma used an entry type that claimed the goods were not subject to any ADD order. *Id.*[2] In addition, in many of those same forms, Sigma falsely described its Welded Outlets as "Steel Couplings." Sigma SUF ¶ 31; SDF ¶ 129 (*see* p. 14, *infra*).

The record would easily permit a jury to find those statements were false. The DOC has authoritatively ruled that Sigma's Chinese Welded Outlets are within the China Order's scope. SDF ¶ 72. A jury could find the DOC's rulings

---

[2] In Block 2, importers provide an "entry type" describing the processing needed for the entry. An entry type of "03," for example, is used for consumption entries subject to antidumping/countervailing duty. SDF ¶ 95. Sigma, however, entered its welded outlets using entry type "01," meaning "free and dutiable." SDF ¶ 96. In addition, Sigma failed to state the applicable ADD case number and rate in Blocks 29 and 33, respectively. SDF ¶ 95.

4

dispositive.[3] *See Parsons Co.*, 195 F.3d at 457 ("[T]he question of 'falsity' itself is determined by whether [defendant's] representations were accurate in light of applicable law.").

A reasonable jury also could find that Sigma's statements were false because their own witness all but said so. Sigma's Co-Founder and Vice Chairman admitted that the Sprink-let Ruling made it "pretty obvious" that Sigma would "have to pay anti-dumping" on its Chinese Welded Outlets. SDF ¶ 80. He separately admitted that Welded Outlets and steel couplings are different products. SDF ¶ 131.

Sigma argues that before the 2018 scope ruling, there was no way for it to know that its products fell within the scope, but a reasonable jury could conclude otherwise. As early as 1992, the DOC announced in a public scope ruling that Welded Outlets were within the scope of nearly identical ADD order for butt-weld pipe fittings from Taiwan. SDF ¶¶ 69 & 71. And, as recounted below, Island's own experience shows not only how easily Sigma could have obtained the Sprink-let Ruling, but also how even a modest investigation would have led Defendants to discover it. *See infra* at 15.

The opinions of Sigma's proposed expert, Walter Sperko, do not somehow entitle them to summary judgment on falsity. While Mr. Sperko and Sigma suggest that Sigma's Welded Outlets are not butt-weld pipe fittings because they supposedly do not comply with an industry standard—ASME B16.9, *Factory Made Wrought Buttwelding Fittings*—the DOC considered and rejected that argument.

---

[3] Sigma notes that the DOC's scope rulings are under review in the Court of International Trade (CIT). It is exceedingly unlikely that the CIT will overturn the scope rulings. First, in ruling against Sigma, the DOC issued reasoned rulings that carefully analyzed the facts, the law, and Sigma's counter-arguments. Second, even if it had been a close case on the merits (and it was not), the CIT employs a highly-deferential standard of review when it comes to scope rulings. *See, e.g., Acme Furniture Indus., Inc. v. United States*, 85 F. Supp. 2d 1353, 1355-56 (C.I.T. 2012) (citations omitted) (sustaining the DOC's scope determination "in light of the significant deference to which Commerce is entitled in the interpretation of scope provisions").

*See* SDF ¶ 74. As the DOC noted, nothing in the scope language limits the scope to merchandise conforming to ASME B.16.9 standards. SDF ¶ 68. Moreover, there is at a minimum a genuine factual dispute as to the trade usage and industry standards. Prior to merging with SCI, Anvil International—perhaps the largest domestic producer of Welded Outlets—joined Island in opposing Sigma's scope request. SDF ¶ 136 ("Anvil agrees with, and affirms, all of Island's arguments.").

Sigma falsely certified that its Welded Outlets were not subject to any ADD orders as confirmed by an authoritative scope ruling. Because the evidence would permit a reasonable jury to agree with the DOC, Sigma is not entitled to summary judgment.

### B.    There are triable issues of fact about Sigma's scienter.

#### 1.    The failure to inquire establishes scienter.

A reasonable juror can and will find that Sigma "knowingly" and falsely stated that its Welded Outlets were not subject to ADDs. 31 U.S.C. § 3729(b)(1). Unlike in common law fraud claims, a relator "need not prove a 'specific intent to defraud' under the FCA—the Act imposes liability on any person acting 'knowingly,' which includes acting with 'actual knowledge,' as well as acting 'in deliberate ignorance,' or 'in reckless disregard of the truth or falsity of the information[.]' 31 U.S.C. § 3729(b)(1)." *U.S. ex rel. Winter v. Gardens Regional Hosp. and Med. Ctr., Inc.*, 953 F.3d 1108, 1114 (9th Cir. 2020); *see also Universal Health Services, Inc. v. United States*, 136 S. Ct. 1989, 1996 (2016).

The Ninth Circuit has not elaborated on what "reckless disregard" means under the FCA, but there is consensus that it amounts to "an extreme version of ordinary negligence." *United States v. Mass. Hous. Fin. Agency*, 530 F.3d 980, 983 (D.C. Cir. 2008); *United States v. Krizek*, 111 F.3d 934, 942 (D.C. Cir. 1997) ("[T]he best reading of the Act defines reckless disregard as an extension of gross negligence," which is "not a 'lesser form of intent'"); *see also United States v.*

6

1   *King-Vassel*, 728 F.3d 707, 712–13 (7th Cir. 2013); *U.S. ex rel. Burlbaw v.*
2   *Orenduff*, 548 F.3d 931, 945 n.12 (10th Cir. 2008).

3       This standard reflects Congress's intent that the FCA require parties "to
4   make a limited inquiry so as to be reasonably certain" their statements to the
5   Government are truthful. *United States v. Bourseau*, 531 F.3d 1159, 1168 (9th Cir.
6   2008) (quoting S. Rep. No. 99-345, at 20 (1986)). While that inquiry must only be
7   "reasonable and prudent under the circumstances," Congress and the Ninth Circuit
8   have confirmed that "***at least some inquiry [must] be made***." *United States v.*
9   *United Healthcare Ins. Co.*, 848 F.3d 1161, 1174 (9th Cir. 2016) (quoting S. Rep.
10  No. 99-345, at 21) (emphasis added); *Bourseau*, 531 F.3d at 1168 (same). And
11  where a defendant is under an independent "obligation to be familiar with the legal
12  requirements," a jury can conclude he acted with reckless disregard by "failing to
13  inform himself of those requirements." *United States v. Mackby*, 261 F.3d 821, 828
14  (9th Cir. 2001).

15      Because determining whether Sigma made an inquiry "reasonable and
16  prudent under the circumstances" is necessarily fact- and context-specific, summary
17  judgment is inappropriate where the jury can reasonably weigh the evidence in
18  different ways. *United Healthcare Ins. Co.*, 848 F.3d at 1174 (quoting S. Rep. No.
19  99-345, at 21); *King-Vassel*, 728 F.3d at 713; *United States v. Coloplast Corp.*, 327
20  F. Supp. 3d 300, 309 (D. Mass. 2018) (noting in FCA context "it is unusual to grant
21  summary judgment on scienter given the fact-intensive nature of the inquiry"
22  (cleaned up)). Indeed, the Ninth Circuit has repeatedly reversed grants of summary
23  judgment based on the FCA's scienter requirement where a jury could conclude
24  that defendants' deficient investigation constituted at least reckless disregard.[4]

25  _____
    [4] *E.g.*, *Darrig, ex rel. U.S. v. Med. Consultants Network, Inc.*, 303 F. App'x 429,
26  430–31 (9th Cir. 2008) (holding jury could reasonably conclude defendant acted
    "at least in reckless disregard"); *United States ex rel. Ali v. Daniel, Mann,*
27  *Johnson & Mendenhall*, 355 F.3d 1140, 1150 (9th Cir. 2004) (reversing
    summary judgment for defendants who made false statements without
28  investigating truth of the claim); *Parsons Co.*, 195 F.3d at 465; *United States ex*
    *rel. Plumbers & Steamfitters Local Union No. 38 v. C.W. Roen Const. Co.*, 183

7

### 2.    A jury could find that Sigma conduced a reckless ADD investigation.

Under these principles, there are triable issues of fact whether Sigma knowingly made false statements that their Welded Outlets are not subject to antidumping duties.  Of the three Defendants, Sigma is by far the most substantial importer, ███████████████████████████████.  SDF ¶ 97.  Between 2011 and 2018, Sigma imported roughly $3.5 million in Chinese Welded Outlets.  SDF ¶ 98.  By falsely claiming that Welded Outlets were not subject to any ADD orders, and by falsely describing the product as a steel coupling, SCI avoided the 182.9% ADD—costing the government more than $6.4 million.

***Sigma's Inquiry Duty.***  In the context of importing into the United States, the "reasonable and prudent" inquiry required is demanding.   Under governing Customs law, the Modernization Act of 1993 (Mod Act), importers of record are required to use "reasonable care" to ensure that they enter their goods in compliance with law, including by providing CBP with the "rate of duty applicable to the merchandise."  19 U.S.C. § 1484(a)(1).  Island's expert, Kelli Thompson—a licensed customs broker and former supervisory import specialist with CBP—explains these regulatory requirements.  SDF ¶ 82.

To help the jury determine what a reasonable inquiry entails in the Customs context, Ms. Thompson will explain how the Customs concepts of "reasonable care" and "informed compliance" require importers such as Sigma to exercise diligence in determining applicable antidumping duties.  SDF ¶¶ 83-84.  She will explain that importers must establish internal compliance procedures to determine whether goods are subject to ADDs.  SDF ¶ 85.  She will describe why importers must provide sufficient training to their employees, particularly on Priority Trade

---

F.3d 1088, 1094-95 (9th Cir. 1999) ("knowingly" element can be satisfied where defendant made no effort to obtain clarification).

ISLAND'S OPPOSITION TO SIGMA CORPORATION'S MOTION FOR SUMMARY JUDGMENT;
CASE NO. 2:17-CV-04393-RGK-KS

Issues such as antidumping duties.[5]  SDF ¶ 86.  She will also discuss how certain goods and certain countries are more at risk of being subject to ADDs—most notably, Chinese steel products.  SDF ¶¶ 89-90.  When importing such goods, a prudent importer will seek guidance from CBP or the DOC about whether they are subject to duty.  SDF ¶¶ 91 & 94.

**Sigma Failed to Review China ADD Order.**  Here, however, Sigma did not take any steps to inform itself of potential ADDs on Chinese Welded Outlets. Although the company began importing Welded Outlets in 2010,[6] by its own admission, no one at Sigma was even aware of the China ADD Order's existence until late 2017.  (Sigma MSJ 7–8; Sigma SUF ¶ 38.)  This is inexcusable under the Mod Act.  But it exemplifies Sigma's "head in the sand" approach to the ADD orders governing its Unilet and Safelet products.  There is no competent evidence that anyone researched the scope of any ADD orders as part of the company's import diligence with respect to either product.  SDF ¶¶ 3 & 99.  Indeed, Sigma's co-founder and Vice Chairman, Siddharth Bhattacharji, conceded that he never asked anyone to review ADD orders to determine whether they reached the company's Welded Outlets.[7] SDF ¶ 100.

This omission could be because no one at Sigma was particularly knowledgeable about ADD orders or import compliance.  Sigma did not employ any licensed customs brokers—which is surprising given the scale of its import operations.[8]  SDF ¶ 104.  Sigma's corporate representative could not identify any

---

[5] Priority trade issues are CBP's highest enforcement priorities and are covered in many CBP publications. SDF ¶¶ 87-88.

[6] Sigma brands its Welded Outlets under the trade names Unilet (which it acquired in 2010) and Safelet (which it launched in 2016).

[7] Given this testimony, it is somewhat curious that Sigma touts that it has "long been aware of the antidumping duty law" and is familiar with the "pitfalls" of that law. (Sigma MSJ at 9 (quoting Bhattacharji 46:2–4).)

[8] Some testimony suggests Sigma paid for a former employee to study to become a licensed customs broker, but she failed the licensing exam.  SDF ¶ 104.

9

Sigma employee as receiving any specific training on import compliance.[9] SDF ¶ 105.   And until 2013, Sigma employees could not consult any import compliance manual or written policies on the topic, as the company had none.  SDF ¶ 106.

*Sigma's Compliance Procedure was Inadequate*.  Interestingly, although Sigma did develop an import compliance manual in 2013, the company never mentions it in its summary judgment papers.  Perhaps that is because the testimony shows that Sigma employees did not consistently follow the manual.[10]  And at least for antidumping, the manual is inadequate. ███████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████ SDF ¶ 101. ████████████████████████████████ █████████████████████████████████████ *Id*. ██████████████████████████ ████████████████████████████████████████████████████████ And in any event, the manual was not in place when Sigma launched its Unilet product, and the policy therein was not followed when Sigma launched its Safelet product.

Tacitly recognizing that a jury could find its internal compliance procedures lacking, Sigma insists that on top of conducting its "own independent assessment" as to whether an ADD applied, it would ask a customs broker to conduct a "blind check" on that issue when it began importing new products.  (Sigma MSJ 9–10.)  But this process—if it was used at all—is wholly irrelevant to the actual process followed with respect to the Welded Outlets in question.

---

[9] Sigma claims that online training was available to some individuals, but there are no records of import compliance training or any other indication as to the nature, subject matter, or participants of any such training.  SDF ¶ 105.

[10] For example ████████████████████████████████████████████████ ███████████████████████████  SDF ¶ 107, Patricia Velazquez—an import logistics and compliance employee since 2019—testified she never received any formal training on import compliance. SDF ¶ 108.

10

First, none of the witnesses offered by Sigma is competent to testify about any such compliance procedure. Sigma's compliance functions during the relevant time period of 2010 to 2018 were managed by three employees—Pramodini "Pat" Thakur, Andy Prodner, and Inge Atkinson—none of whom was disclosed in Sigma's initial disclosures. SDF ¶¶ 111, 118, & 123. Although Sigma could identify no reason why those witnesses could not testify, Sigma did not offer their testimony nor even consult with them regarding the diligence performed with respect to the importation of the Safelet and Unilet products. Instead, Sigma hoped that the conclusory, unfounded, hearsay testimony of three people with no direct involvement in the process might substitute. SDF ¶¶ 3, 6, & 9. It does not.[11]

Second, the procedure Sigma describes was not applicable to either the Unilet or Safelet Welded Outlets. That procedure is one that was adopted by Sigma's OEM business, for new products being offered through that business. SDF ¶ 18. The Unilet product was part of a product line acquisition made by Sigma in 2010—the first acquisition ever conducted by Sigma. SDF ¶ 6. As part of that acquisition, Sigma "inherited" the HTS classification previously assigned by the predecessor company. *Id.* At that time, Sigma had no compliance manual, and it has produced no records showing it undertook any due diligence to analyze ADD orders. If any inquiry took place, none of Sigma's witnesses participated. SDF ¶¶ 112-14. As for the 2016 launch of the Safelet Welded Outlet, Sigma's corporate representative conceded that, to his knowledge, no investigation of antidumping duties was conducted because the Safelet was considered to be the same as the Unilet. SDF ¶ 116.

---

[11] Surprisingly, Sigma relies on the CBP publication suggesting that reasonable care requires not just consulting with an expert, but discussing your importations in advance with that person, and providing that person with full, complete and accurate information about the import transactions. (Sigma MSJ at 11.) Yet, Sigma has no witness who can testify at all about the information provided to its broker with respect to the Unilet product, let alone testify that the information was full, complete and accurate. SDF ¶¶ 3, 6, & 10.

ISLAND'S OPPOSITION TO SIGMA CORPORATION'S MOTION FOR SUMMARY JUDGMENT;
CASE NO. 2:17-CV-04393-RGK-KS

1    Third, the procedure described by Sigma—even if followed—is inadequate.

2  As evidenced by ███████████████ and Mr. Bhattacharji's own testimony, the

3  company's ADD "assessment" was driven exclusively by HTS classifications, not

4  the dispositive written scope description.  SDF ¶¶ 101-102. Further, Sigma admits

5  that it only consulted brokers when it had doubts about a product's classification.

6  SDF ¶ 109.   Testimony shows Sigma rarely reached out to its broker for HTS

7  classification or ADD advice.  *Id.* ("handful of times" in nine months).

8    Unable to show that it conducted ***any*** investigation (whether internally or

9  through a customs broker) into whether its Welded Outlets were subject to ADD

10  orders, Sigma asks the Court to "infer" that the company did.  (Sigma MSJ 11

11  (citing Fed. R. Evid. 406).)   The Court should decline the invitation to commit

12  black-letter, plain-as-day reversible error.  *His and Her Corp. v. Shake-N-Go*

13  *Fashion, Inc.*, 572 F. App'x 517, 518 (9th Cir. 2014) ("In resolving summary

14  judgment motions, a court must not . . . draw inferences from the facts adverse to

15  the non-moving party.") (citing *Anderson*, 477 U.S. at 255).  Such inference based

16  on routine practice is particularly inapt here because Sigma has failed to provide the

17  necessary evidence to bear its burden that the conduct qualified as a routine

18  practice, including the frequency of the practice, the similarity of circumstances,

19  and the uniformity of conduct.  *See, e.g., Fort Hall Landowners Alliance, Inc. v.*

20  *BIA,* 407 F. Supp. 2d 1220, 1226 (D. Idaho 2006) (disclosed examples related to

21  different practice and evidence of contrary practices existed); *O'Connor v. Boeing*

22  *N. Am. Inc.,* 2005 U.S. Dist. LEXIS 46236, *102 (C.D. Cal. Aug. 9, 2005) (conduct

23  that is at issue must be similar and specific, and show regularity over substantially

24  all occasions).

25    In fact, the evidence here compels the inference that Sigma ***never*** conducted

26  any meaningful diligence into whether it owed ADDs on its Welded Outlets.

27  ████████████████████████████████████████████████████

28  ████████████████████████████████████████████████ SDF

¶ 101.  The China Order does not reference the HTS code Sigma used for its Welded Outlets. SDF ¶ 117.  Thus, given the lack of any documented ADD diligence for its Welded Outlets, it is far more likely that all Sigma did was conclude its chosen HTS code would not hit on any ADD order.

**CBP's Focused Assessment Does Not Absolve Sigma.** Sigma places far too much stock in CBP's Focused Assessment Pre-Assessment Survey in 2013.  (Sigma MSJ 12–14.)  That Assessment did not review the Welded Outlet products at issue here, and examined Sigma's import compliance program several years after the Unilet was first imported, when the program was overseen by someone who was neither present in 2010 nor 2016. [12]  SDF ¶ 118.  Further, while the final assessment deemed Sigma an acceptable risk, this came only after Sigma promised to improve upon a number of areas identified by CBP, including developing a procedure manual and the providing training for its personnel. SDF ¶ 122.  A jury could easily conclude that Sigma's procedures and training were not adequate under the circumstances.

Although Sigma boasts that CBP "found no flaw" in how the company handled ADD compliance (Sigma MSJ 14), there is a genuine dispute over whether CBP even analyzed Sigma's ADD procedures.   In concluding the Focused Assessment, CBP wrote that it "determined that Sigma's import activities represent an acceptable risk to CBP *in the review areas of Transaction Value, Classification, and Generalized System of Preferences.*" SDF ¶ 119 (emphasis added).  CBP did not list ADD compliance in Sigma's Focused Assessment.  As CBP has explained, however, ADD compliance is a "distinct audit area," separate from topics such as value and classification. SDF ¶ 120   ("The scope [of the Focused Assessment] will include, at a minimum . . . [t]he subject matter of the [Pre-Assessment Survey], scoped into distinct audit areas (e.g., value, classification, Free Trade Agreements,

---

[12] The audit only reviewed 26 randomly selected products, which did not include Welded Outlets.  SDF ¶ 121.

13

AD/CVD, etc.).").  So while the report does mention antidumping duties, it's clear that was not the purpose of the audit.  In short, nothing about the Focused Assessment would entitle Sigma to summary judgment.

***Additional Evidence of Sigma's Intent.***  Finally, there are additional indications that Sigma acted more than recklessly in its imports.  For starters, upon learning of the forged fittings petition in late 2017, Sigma changed the HTS code for its Welded Outlets.  SDF ¶ 124.  Bhattacharji testified this was an isolated "mistake" by a former employee, but admitted that it occurred as a result of "correspondence on the forged steel case."[13]  SDF ¶¶ 125-26.  Also in response to the forged fittings petition, Sigma conducted research into whether it could invoke the butt-weld pipe fitting exemption.  SDF ¶ 127.   Yet, Sigma continued to import Chinese Welded Outlets after considering this argument without making any effort to determine if the China ADD Order reached its products.  SDF ¶¶ 128-30.

A jury could also conclude that Sigma intentionally misdescribed its Welded Outlets to CBP.  In its Form 7501s, Sigma frequently described its Welded Outlets as "Steel Couplings."  Sigma SUF ¶ 31. But they are not, as steel couplings and Welded Outlets are entirely different products.  SDF ¶ 131 ("a welded outlet is a welded outlet….I'm not saying it's a coupling.").  Sigma says this misdescription is fine because it comes from the "standard definitions" in the CBP HTS database. (Sigma MSJ 6.)  But the standard definition for the HTS code that Sigma selected (7307.99.5045) reads:  "Tube or pipe fittings (for example, couplings, elbows, sleeves), of iron or steel: Other: Other: Of iron or nonalloy steel: Other."  SDF ¶  132.  Sigma did not use this standard definition to describe its product; rather, it cherry-picked an inaccurate term ("coupling") for the product

---

[13] Sigma has offered no declaration from the former employee.  Nor did the company disclose her existence in its initial disclosures, preventing Island from taking her deposition.

description.  A jury would be free to infer that Sigma picked such an inaccurate term because steel couplings are not within the scope of an ADD order.

***Sigma failed to identify Sprink ruling.*** Sigma's lack of diligence is further highlighted by its failure to identify the Sprink-let Ruling.  Sigma contends that Island's "arguments concerning the 1992 Sprink-let scope ruling can be readily dismissed" because such rulings are case specific and not controlling on other products.  (Sigma MSJ 14-15.)  That is not how Sigma's Co-Founder and Vice Chairman saw it.  Mr. Bhattacharji admitted that based on the Sprink-let ruling it was "pretty obvious" that Sigma would "have to pay anti-dumping" on its Chinese Welded Outlets.  SDF ¶ 80.

 Nor would it have been difficult to find that Sprink-let Ruling.  Indeed, Island's new sales manager, Mark Woehrel, who had no experience with Welded Outlets or importing into the United States, was able to investigate the China Order within no more than a few days. SDF ¶ 134. Starting from Google, he was able to identify the Sprink-let Ruling, called up the DOC (using the contact information found in the sunset review), requested it, and received it.  *Id*.  And, like Mr. Bhattacharji, he was able to readily determine based on that ruling that Defendants' Welded Outlets fell within the scope of the China Order. SDF ¶ 135.

Given how easy it was for an untrained sales manager with no experience with import laws or Welded Outlets to recognize the indications that Sigma's products were within scope, a reasonable jury could conclude that Sigma failed to conduct the "reasonable and prudent" inquiry required.  *United Healthcare Ins. Co.*, 848 F.3d at 1174 (quoting S. Rep. No. 99-345, at 21); *Bourseau*, 531 F.3d at 1168.

In sum, the evidence here readily supports a jury finding that Sigma's false statements to CBP cannot be chalked up to simple negligence or innocent mistake. *United States ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1073 (9th Cir. 1998). On this record, a jury could conclude that Sigma had an obligation to investigate

antidumping duties and failed to do so despite well-known risks that Chinese steel imports are commonly subject to antidumping duties.

### 3. Sigma did not adopt an objectively reasonable interpretation of the China Order.

Despite the facts laid out above, Sigma claims it could not have the requisite scienter because (according to them) the scope of the China ADD Order was ambiguous and susceptible to multiple objectively reasonable interpretations. (Sigma MSJ 15). In support, Sigma primarily relies on a footnote in a Supreme Court decision involving the "willful" in the Fair Credit Reporting Act. *Safeco Ins. Company of Am. v. Burr*, 551 U.S. 47, 70 n.20 (2007) (stating that finding of willfulness is barred "when the company's reading of the statute is objectively reasonable"). The argument is meritless for several reasons.

As an initial matter, Sigma cannot benefit from this argument as a matter of law. *Safeco* and the Ninth Circuit cases Sigma and other Defendants cited involved companies who actually studied and formed beliefs about the regulations at issue,[14] whereas the testimony here shows that Sigma never read the China ADD Order or analyzed whether it applied to Welded Outlets. Instead this case fits the mold of *Siebert v. Gene Security Network, Inc.*, 75 F. Supp. 3d 1108, 1119–20 (N.D. Cal. 2014), which Sigma cites. In that FCA case, the court rejected the same kind of argument advanced by Sigma here because the company could not have formed a reasonable belief because it admittedly "never even read the regulations and had no knowledge of them." *Id*. at 1119. The court concluded cases such as *Hochman* did "not have any bearing" where the defendant never formed a belief about the

---

[14] *See id.* (noting Safeco argued "good-faith reliance on legal advice" as defense); *United States ex rel. McGrath v. Microsemi Corp.,* 690 Fed. Appx. 551, 552 (9th Cir. 2017) (noting a good faith interpretation of term "disclose" at the time of the representation); *Hochman*, 145 F.3d at 1076 ("Whitney's actions merely suggest that Mishra examined the issue and concluded that his interpretation of the Affiliation Agreement was correct . . . .").

regulation.  So too here.  Sigma was not aware of—let alone read or analyzed the Order—until late 2017. Sigma SUF ¶ 38.

Recall, the FCA is triggered by deliberate ignorance and reckless disregard. 31 U.S.C. § 3729(b).  To grant Defendants immunity as a matter of law based on *post hoc* interpretations would, in effect, read these elements out of the statute so long as sophisticated legal counsel and retained experts can come up with alternative interpretations of the regulation at issue.  *Parsons Co.*, 195 F.3d at 460 (explaining defendant's "good faith interpretation" defeats scienter, not whether that interpretation was "correct or 'reasonable'").

Furthermore, Sigma's attempts to inject ambiguity into the China ADD Order should fail.  Sigma argues that because the DOC considered the so-called (k)(1) factors when evaluating their scope ruling requests the China ADD Order is necessarily ambiguous.  Not true.  As the DOC's regulations and case law make clear, it had to consider those factors regardless.  "Whether the order is ambiguous or not, Commerce's regulations are unambiguous—it '*will* take into account' the (k)(1) criteria in conducting a scope determination."  *TMB 440AE, Inc. v. United States*, 399 F. Supp. 3d 1314, 1320 (C.I.T. 2019) (quoting 19 C.F.R. § 351.225(k)) (emphasis added by *TMB 440AE*).  And that is just what DOC did here.  DOC first found that under a "plain reading of the scope," the "scope language can be reasonably interpreted to include SIGMA's fire-protection welded outlets," but, as required by the regulations, went on to conclude the (k)(1) factors "***further support*** Commerce's interpretation of the scope."  SDF ¶ 75 (emphasis added).

Even if the Court chooses to consider the objective reasonableness of Sigma's proffered, after-the-fact interpretations of the China Order, there still remain triable issues of fact as to scienter, because that inquiry presents "mixed questions of fact and law best resolved by the jury." *Coloplast Corp.*, 327 F. Supp. 3d at 310; *United States ex rel. Westmoreland v. Amgen, Inc.*, 812 F. Supp. 2d 39, 71 (D. Mass. 2011).  These questions are for the jury because they require weighing

17

the facts with respect to both "the reasonableness of defendant's interpretation of the regulation and suggestions of government warnings away from that interpretation." *Coloplast Corp.*, 327 F. Supp. 3d at 310 (citing cases denying summary judgment).

On this record a jury could readily conclude that Sigma's proposed interpretation that Welded Outlets are not butt-weld pipe fittings is unreasonable. A jury will also be free to find that it is not objectively reasonable to rely on technical definitions based on industry standards the DOC chose not to incorporate into the China ADD Order. When the DOC wants the scope to be defined with reference to an industry standard, it knows how to do so. SDF ¶ 76. Had the DOC wanted to limit the China ADD Order to products under ASME B16.9, it would have done so expressly. *Cf. Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177 (1994).

Finally, a reasonable jury could find that the DOC warned Sigma away from its proffered interpretation nearly 30 years ago. *United States. ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 288 (D.C. Cir. 2015) (whether defendants had been warned away "cannot readily be labeled as a "purely legal" question"); *United States v. Celgene Corp.*, 226 F. Supp. 3d 1032, 1051 (C.D. Cal. 2016) (citing *Purcell*). In the Sprink-let Ruling, the DOC ruled that "a pipe fitting with *beveled edges* that is *permanently joined through welding* falls within the scope of the order on carbon-steel butt-weld pipe fittings from Taiwan." SDF ¶ 69. A jury can find that the Sprink-let Ruling warns Sigma away because it actually did: when Sigma finally read the Sprink-let Ruling, it immediately acknowledged (privately) that its products were subject to ADD and stopped importing. Sigma SUF 43; SDF ¶ 80.

## IV.   SCOPE RULING REQUESTS CANNOT DEFEAT FCA CLAIMS.

Sigma argues that damages are limited to two entries based on the DOC's 2018 scope rulings. The argument is meritless. Sigma based its claim on a recent Federal Circuit decision, *United Steel and Fasteners, Inc. v. United States*, 947 F.3d

18

794 (Fed. Cir. 2020), which was not a False Claims Act case.  Instead, it analyzed CBP's regulations regarding liquidation and determined that regulation did not "allow suspension of liquidation before a scope inquiry." *Id.* at 801 (discussing 19 C.F.R. § 351.225(l)(3)).

Sigma points to *zero* authority for the proposition that liquidation is at all relevant in an FCA case.  And for good reason:  This case is not about second-guessing CBP's collection of duties, it is about Sigma's knowing submission of false statements that wrongfully deprived the Government of what it was owed.

Thus, the more apt analogy is to the Government's authority under the Customs laws to impose civil penalties and collect additional duties where importers "by fraud, gross negligence, or negligence" enter merchandise using "any document or electronically transmitted data or information . . . which is material and false."  19 U.S.C. § 1592(a).  As the Court of International Trade has held "neither liquidation nor the general concept of 'finality' bar the recovery of duties or a civil penalty under § 1592."  *United States v. Great Neck Saw Mfrs, Inc.*, 311 F. Supp. 3d 1337, 1345 (C.I.T. 2018).  There, the court held that liquidation was no barrier to subsequent collection of duties and penalties because "lawful duties" are those that the United States would have collected but for the importer's fraud, gross negligence, or negligence in submitting materially false statements. *Id.*

The same logic applies here in the FCA context.  The Government was not deprived of antidumping duties because it liquidated Sigma's entries before collection.  Rather, it was deprived because Sigma knowingly claimed no such duties applied on CBP entry forms.  CBP relied on that false declaration, and the liquidated the entries without imposing ADDs as a result of Sigma's false statements.  Just as section 1592 ensures that importers cannot escape liability for their wrongful false statements simply because they at first go undetected, so too should the Court reject the notion that Sigma is only liable for its most recent false statements.  If a jury finds against Sigma, CBP's liquidation regulations would not

19

affect the amount of recoverable damages as the verdict would establish that Sigma contemporaneously knew or was reckless in not knowing that its Welded Outlets were subject to ADDs.

For similar reasons, the Court should reject Sigma's suggestion that liquidation of entries amounts to a superseding cause cutting off its liability. (Sigma MSJ 19–20).  Sigma has pointed to no court that has suggested the concept of superseding cause applies in FCA cases, let alone that customs liquidation qualifies as one.  Instead, as *Great Neck Saw Mfrs* explains, liquidation is not "final" or "conclusive" so as to prevent recovery of lawful duties deprived as a result of the importer's misconduct.   311 F. Supp. 3d at 1345.

## V.     CONCLUSION

For all these reasons, Sigma's motion for summary judgment should be denied.

Dated: April 27, 2020                                  MAYER BROWN LLP

/s/Matthew H. Marmolejo
Kelly B. Kramer
Matthew H. Marmolejo
C. Mitchell Hendy
Attorneys for Relator
ISLAND INDUSTRIES, INC.