Mark Gustafson (SBN 198902)
Email: mgustafson@whitecase.com
WHITE & CASE LLP
555 South Flower Street, Suite 2700
Los Angeles, CA  90071-2433
Telephone: (213) 620-7700
Facsimile: (213) 452-2329

Christopher M. Curran (*pro hac vice*)
Email: ccurran@whitecase.com
Lucius B. Lau (*pro hac vice*)
Email: alau@whitecase.com
Cristina Brayton-Lewis (*pro hac vice*)
Email: cbraytonlewis@whitecase.com
WHITE & CASE LLP
701 13th Street, N.W.
Washington, DC 20005-3807
Telephone:  (202) 626-3600
Facsimile:   (202) 639-9355

Attorneys for Defendant,
SIGMA CORPORATION

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* ISLAND INDUSTRIES, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>VANDEWATER INTERNATIONAL INC., et al.,<br><br>Defendants. | Case No. 2:17-cv-04393-RGK-KS<br><br>**DEFENDANT SIGMA CORPORATION'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND ALTERNATIVE MOTION FOR A NEW TRIAL UNDER RULES 50(b) AND 59 OF THE FEDERAL RULES OF CIVIL PROCEDURE**<br><br>Trial Date:  October 5, 2021<br>Hearing Date: November 8, 2021<br>Time: 9:00<br>Courtroom: 850<br>Judge: Hon. R. Gary Klausner |

## TO THE CLERK AND ALL INTERESTED PARTIES

PLEASE TAKE NOTICE that on November 8, 2021 or as soon thereafter as the matter may be heard in Courtroom 850 of the United States District Court, Central District of California, located at 255 East Temple Street, Los Angeles, CA 90012, Defendant Sigma Corporation ("Sigma") will respectfully request that the Court grant judgment as a matter of law to Sigma pursuant to Rule 50(b) of the Federal Rules of Civil Procedure or, in the alternative, a new trial under Rule 59 of the Federal Rules of Civil Procedure.

This motion is based on this notice of motion, the memorandum of points and authorities attached hereto, the pleadings and records on file with this Court, and on such oral and documentary evidence as presented at trial.

Dated:  October 12, 2021

Respectfully submitted,

WHITE & CASE LLP

By: */s/ Lucius B. Lau*
Christopher M. Curran
Lucius B. Lau
Cristina Brayton-Lewis
Mark Gustafson

Attorneys for Defendant
SIGMA CORPORATION

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................ 1

II.    STANDARD OF REVIEW ................................................................. 5

III.   ARGUMENT ...................................................................................... 5

       A.   The Remand Results Establish That Sigma Is Entitled to
            Judgment As A Matter Of Law ................................................. 5

            1.   As A Matter Of Law, Sigma Did Not Submit A False
                 Record Or Statement Material To An Obligation to Pay
                 Or Transmit Money Or Property To The Government ............. 8

            2.   As A Matter Of Law, The Government Did Not Sustain
                 Any Damages ................................................................... 10

            3.   The Full Legal Ramifications of the Remand Results
                 Have Not Been Previously Addressed Or Decided By
                 The Court ......................................................................... 11

       B.   The Undisputed Trial Evidence Established As A Matter Of
            Law That Sigma's Statements That No Antidumping Duties
            Were Owed Were Objectively Reasonable ............................ 13

       C.   The Undisputed Trial Evidence Failed As A Matter Of Law To
            Establish That Sigma Had The Requisite Knowledge ....................... 16

       D.   The Undisputed Trial Evidence Failed As A Matter Of Law To
            Establish That Sigma Made A False Statement ................................. 17

       E.   The Undisputed Trial Evidence Failed As A Matter Of Law To
            Establish That Sigma's Statements Were Material ............................ 19

       F.   In The Event That The Court Does Not Grant Sigma Judgment
            As A Matter Of Law, It Should Order A New Trial ........................... 20

IV.    CONCLUSION ................................................................................ 20

## TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*Am. Family Mut. Ins. Co. v. Dunn*,
   2005 U.S. Dist. LEXIS 58296 (D. Ariz. Aug. 23, 2005) .................................... 18

*AMS Associates, Inc. v. United States*,
   737 F.3d 1338 (Fed. Cir. 2013) ........................................................................ 6

*Chang v. Accelerate Diagnostics, Inc.*,
   2016 U.S. Dist. LEXIS 90150 (D. Ariz. Jan 28, 2016) ...................................... 18

*Finger v. Cty. of Riverside*, CV 15-01395,
   2018 U.S. Dist. LEXIS 229662 (C.D. Cal. Jan. 10, 2018) .................................. 5

*Goldman, Sachs & Co. v. City of Reno*,
   747 F.3d 733 (9th Cir. 2014) .......................................................................... 18

*Halo Elecs. v. Pulse Elecs., Inc.*,
   136 S. Ct. 1923 (2016) .................................................................................... 15

*Lesnik v. Se*,
   374 F. Supp. 3d 923 (N.D. Cal. 2019) ............................................................. 9

*Michaels Stores, Inc. v. United States*,
   766 F.3d 1388 (Fed. Cir. 2014) ........................................................................ 8

*Molski v. M.J. Cable, Inc.*,
   481 F.3d 724, 729 (9th Cir. 2007) .................................................................. 20

*OTR Wheel Eng'g, Inc. v. West Worldwide Servs.*,
   897 F.3d 1008 (9th Cir. 2018) .......................................................................... 5

*Reeves v. Sanderson Plumbing Prods., Inc.*,
   530 U.S. 133 (2000) .......................................................................................... 5

*Safeco Ins. Co. of Am. v. Burr*,
   551 U.S. 47 (2007) .............................................................................. 13, 14, 16

*Sunpreme Inc. v. United States*,
   946 F.3d 1300 (Fed. Cir. 2020) ........................................................................ 6

- iii -

*Tai-Ao Aluminum (Taishan) Co. v. United States*,
  983 F.3d 487 (Fed. Cir. 2020) ................................................................. 7

*Torrington Co. v. United States*,
  68 F.3d 1347 (Fed. Cir. 1995) ................................................................ 8

*United States ex rel. Huangyan Imp. & Exp. Corp. v. Nature's Farm Prods.*,
  370 F. Supp. 2d 993 (N.D. Cal. 2005).............................................. 9, 10

*United States ex rel. Morton v. A Plus Benefits, Inc.*,
  139 F. App'x 980 (10th Cir. 2005).......................................................... 19

*United States ex rel. Purcell v. MWI Corp.*,
  807 F.3d 281 (D.C. Cir. 2015)................................................................ 13

*United States ex rel. RBC Four Co., LLC v. Walt Disney Co.*,
  2013 U.S. Dist. LEXIS 206337 (C.D. Cal. Aug. 9, 2013) ....................... 9

*United States ex rel. Schutte v. SuperValu Inc.*,
  2021 U.S. App. LEXIS 24018 (7th Cir. Aug. 12, 2021)................... 14, 15

*United States v. Vandewater Int'l*,
  2020 U.S. Dist. LEXIS 138240 (C.D. Cal. June 23, 2020).............. 11, 16

*United Steel & Fasteners, Inc. v. United States*,
  947 F.3d 794 (Fed. Cir. 2020) ................................................................. 6

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
  136 S. Ct. 1989 (2016) .......................................................................... 16

*Vandewater Int'l, Inc. v. United States*,
  476 F. Supp. 3d 1357 (CIT 2020) ..................................................passim

## FEDERAL STATUTES

19 U.S.C. § 1514.................................................................................... 11

19 U.S.C. § 1516a.................................................................................... 6

31 U.S.C. § 3729.............................................................................passim

## FEDERAL RULES

Fed. R. Civ. P. 50 .................................................................................... 5

Fed. R. Civ. P. 59 .................................................................................. 20

- iv -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# FEDERAL REGULATIONS

19 C.F.R. § 351.225 ........................................................................... passim

## MISCELLANEOUS

9 Moore's Federal Practice - Civil § 50.63 (2021) ..................................... 5

Black's Law Dictionary (10th ed. 2014) ................................................. 3

*Merriam-Webster's Collegiate Dictionary* (10th ed. 1999) ...................... 3

*Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 85 Fed. Reg. 49472 (Aug. 13, 2020) ................... 7, 8

*Vandewater International, Inc. v. United States*, Court No. 18-00199, Slip Op. 20-146 (CIT Oct. 16, 2020), Trial Ex. 61 ............................................... passim

DEFENDANT SIGMA CORPORATION'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND ALTERNATIVE MOTION
FOR A NEW TRIAL UNDER RULES 50(b) AND 59 OF THE FEDERAL RULES OF CIVIL PROCEDURE (Case No  2:17-cv-04393-RGK-KS)

Pursuant to Rules 50(b) and 59 of the Federal Rules of Civil Procedure, Defendant Sigma Corporation hereby renews its motion for a judgment as a matter of law and, in the alternative, moves for a new trial.

## I.  **INTRODUCTION**

This Court has not yet addressed the full legal consequences of the Department of Commerce's July 23, 2021 Final Results of Redetermination Pursuant to Court Remand, *Vandewater International, Inc. v. United States*, Court No. 18-00199, Slip Op. 20-146 (CIT Oct. 16, 2020), Trial Ex. 61 ("Remand Results").  As explained below, those Remand Results preclude any False Claims Act claims against Sigma as a matter of law.

Commerce issued its Remand Results after the United States Court of International Trade held that Commerce's initial determination under 19 C.F.R. § 351.225(k)(1), finding welded outlets to be within the scope of the antidumping order on butt-weld fittings, was unreasonable and unsupported by substantial evidence. *Vandewater Int'l, Inc. v. United States*, 476 F. Supp. 3d 1357, 1360, 1362 (CIT 2020).  In so holding, the CIT held that the sources identified in subsection (k)(1) were not dispositive, as Commerce had dismissed the Sprink Scope Ruling as non-binding and the other (k)(1) sources "do not really tell the court anything about the inclusion of steel branch outlets within the scope." *Id.* The CIT directed Commerce to conduct a "scope inquiry" under 19 C.F.R. § 351.225(k)(2), which considers criteria far broader than those considered under subsection (k)(1). *Id.*

In its Remand Results, Commerce considered the various criteria under subsection (k)(2) and concluded again that welded outlets fall within the scope of the butt-weld order.  Critically, Commerce expressly determined that its conclusion would apply only prospectively from the date of the initiation of the scope inquiry after the CIT's remand (i.e., October 30, 2020).  As to entries pre-dating the initiation of the scope inquiry, Commerce determined that "consistent with 19 CFR

§ 351.225(l) and section 516A(c) and (e) of the [Tariff] Act" it would "instruct CBP to lift suspension of liquidation and liquidate such entries without regard to antidumping duties." Remand Results at 103; *see also* Remand Results at 62. In short, Commerce was applying the governing statute and regulations to determine that entries pre-dating October 30, 2020 would not be subject to antidumping duties under the Butt-Weld Order.

The governing statute and regulation do not apply (k)(2) rulings retroactively, based on the logic that an importer would not have fair notice that its entries would be subject to the order in question. In contrast, the governing statute and regulations *do apply* a scope determination under (k)(1) retroactively, based on the logic that an importer would have fair notice that its entries would be subject to the order in question. The distinction rests on the premise that a (k)(1) scope finding is readily foreseeable, while a (k)(2) scope finding is not.

Sigma stopped importing welded outlets in early 2018. Thus, its imports are not subject to the butt-weld order, under Commerce's application of the pertinent statute and regulations addressing (k)(2) rulings.

Commerce's Remand Results have direct ramifications for the viability of Island's False Claims Act claim, and not just as to damages. Under 31 U.S.C. § 3729(a)(1)(G), a violation requires a false statement "material to an obligation to pay or transmit money or property to the Government." Under 31 U.S.C. § 3729(b)(3), the term "obligation" is defined with reference to an applicable "statute or regulation." (Thus, contrary to Island's repeated argument that the statutes and regulations related to the non-retroactive application of duties are "irrelevant" or limited to "administrative remedies," in fact those statutes and regulations determine whether there is an "obligation" under the FCA.). Here, Commerce's Remand Results establish that Sigma did not and does not have any "obligation to pay or transmit" duties on its welded outlets under the butt-weld antidumping order. Indeed, beyond confirming the absence of the essential element of an

"obligation," Commerce's redetermination also undermines any suggestion that Sigma's statements to Customs were "false" or "material" or that the Government sustained any damages.  As this Court has stated, to prevail on its reverse False Claims Act ("FCA") claim, "Island must establish: (1) a fraudulent course of action or a false statement, (2) made with the requisite degree of knowledge, (3) that was material, (4) causing the government to forfeit moneys due." *United States v. Vandewater Int'l*, No. 2:17-cv-04393-RGK-KS, 2020 U.S. Dist. LEXIS 138240, at *11 (C.D. Cal. June 23, 2020) (citing *U.S. ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 902 (9th Cir. 2017)).

At trial, the Court instructed the jury as follows:  "The Department of Commerce has ruled that Chinese welded outlets are subject to antidumping duties and are within the scope of the 1992 antidumping duty order (the 'China order'). Accordingly, I instruct you that the Defendant's statements that its welded outlets were not subject to antidumping duties were false."  Jury Instrs. (Given) no. 12 (Dkt. 423).  That instruction must have been based on Commerce's Remand Results, because Commerce's initial determination (in 2018) was vacated by the CIT.  But an instruction requiring a finding of "falsity" without an accompanying instruction addressing non-retroactivity (and the absence of an "obligation") was erroneous and devastatingly prejudicial to Sigma.  Such a partial, selective invocation of Commerce's Remand Results tainted the jury verdict.

Indeed, the instruction as to "falsity" unavoidably tainted even the jury's finding as to "knowledge."  The word "false" commonly denotes and connotes intentional falsity.  *See* "False," Black's Law Dictionary (10th ed. 2014) (defining false as including "untrue" and "deceitful; lying"); *Merriam-Webster's Collegiate Dictionary* (10th ed. 1999) (defining false as including "not genuine," "intentionally untrue," and "intended or tending to mislead").  An instruction from the Court that Sigma's statements "were false" was tantamount to an instruction that Sigma knowingly made a false statement.  This interpretation was only

- 3 -

1    reinforced by the Court's additional instruction that "[a] statement is 'false' if it is

2    an assertion that is untrue when it is made."  Jury Instrs. (Given) no. 12 (Dkt

3    423).  This instruction, together with the instruction that Sigma's statements "were

4    false," was communicating to the jury that Sigma's statements from 2010 to 2018

5    were untruthful when made.  Given these instructions, it is no wonder the jury

6    found Sigma "knowingly" made false statements; the instructions seemingly left the

7    jury no alternative.

8         Furthermore, the Court's instruction on falsity unavoidably supported the

9    arguments by Island's counsel that Sigma's statements were "lies" and unavoidably

10   undermined the arguments by Sigma's counsel that the statements were not

11   knowingly false.

12        While instructing the jury on "falsity," the Court repeatedly prohibited Sigma

13   from developing evidence of Commerce's non-retroactivity determination in the

14   Remand Results.  Sigma was not permitted to introduce Commerce's Remand

15   Results on this point (page 103 of the Remand Results) and witnesses were

16   prohibited from testifying about Commerce's non-retroactivity determination, on

17   the stated basis (in the jury's earshot) of "relevancy."  Day 2 Trial Tr. at 129:9-21.

18        The Court's disparate treatment of "falsity" and retroactivity appears to have

19   been based on Island's arguments that the former issue was for the jury while the

20   latter issue was for the Court.  *See* Island Trial Br. at 7 (Dkt. 404).  If so, the time

21   has now come for the Court to address retroactivity, and Commerce's Remand

22   Results (based on the governing statute and regulations) establish that Sigma did

23   not and does not have any "obligation" to pay antidumping duties on its imports of

24   welded outlets.

25        All told, Commerce's Remand Results cannot be used selectively.  If the

26   Remand Results are used to support "falsity," as they were, they must also be used

27   to establish as a matter of law the absence of any "obligation" to pay duties in the

28   2010-2018 period, years before Commerce's (k)(2) determination that welded

- 4 -

outlets are within the scope of the butt-weld order.  For this reason (and others set forth below), Sigma is entitled to judgment as a matter of law.

## II.   <u>STANDARD OF REVIEW</u>

The Court may grant a motion for judgment as a matter of law when a "reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  Fed. R. Civ. P. 50(a)(1).  "The standard for reviewing the grant or denial of pre-verdict and post-verdict motions for judgment as a matter of law is identical."  9 Moore's Federal Practice - Civil § 50.63 (2021).  In deciding a motion for judgment as a matter of law, "the court should review all of the evidence in the record" but "must draw all reasonable inferences in favor of the nonmoving party."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  While the court "must disregard all evidence favorable to the moving party that the jury is not required to believe . . . . [T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'"  *Id.* at 151 (quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, pp. 299-300 (2d ed. 1995)); *see also OTR Wheel Eng'g, Inc. v. West Worldwide Servs.*, 897 F.3d 1008, 1019 (9th Cir. 2018) ("A jury's verdict must be upheld if it is supported by substantial evidence." (citation omitted)); *Finger v. Cty. of Riverside*, CV 15-01395, 2018 U.S. Dist. LEXIS 229662, at *10-12 (C.D. Cal. Jan. 10, 2018) (deciding that Rule 50(b) applies to purely legal questions that were not submitted to the jury).

## III.   <u>ARGUMENT</u>

### A.   **The Remand Results Establish That Sigma Is Entitled to Judgment As A Matter Of Law**

In the Remand Results, Commerce confronted and decided an issue that it did not confront or decide in the 2018 scope rulings:  that is, having determined that welded outlets are within the scope of the butt-weld order under subsection (k)(2),

- 5 -

1   what entries will be subject to antidumping duties?  In light of the CIT's remand

2   order, Commerce initiated and conducted a formal scope inquiry under (k)(2) and,

3   following the Tariff Act and 19 C.F.R. § 351.225(l), expressly stated that it will

4   instruct Customs to liquidate entries made prior to the date of the scope inquiry

5   initiation "without regard to antidumping duties."  Remand Results at 103.

6       Commerce's decision follows its regulation to the letter.  When Commerce

7   conducts a formal scope inquiry (as it did here), it "will issue a final ruling as to

8   whether the product which is the subject of the scope inquiry is included within the

9   order."  19 C.F.R. § 351.225(f)(4).  If Commerce "issues a final scope ruling, under

10  either paragraph (d) or (f)(4) of this section, to the effect that the product in

11  question is included within the scope of the order, any suspension of liquidation

12  under paragraph (l)(1) or (l)(2) will continue."  19 C.F.R. § 351.225(l)(3).  "Where

13  there has been no suspension of liquidation, [Commerce] will instruct the Customs

14  Service to suspend liquidation and to require a cash deposit of estimated duties, at

15  the applicable rate, for each unliquidated entry of the product entered, or withdrawn

16  from warehouse, for consumption on or after the date of initiation of the scope

17  inquiry."  *Id.*  In the Remand Results, Commerce specifically cited 19 C.F.R. §

18  351.225(l), as well as sections 516A(c) and (e) of the Tariff Act (19 U.S.C.

19  1516a(c) and (e)), in support of its decision not to assess antidumping duties before

20  the date of initiation.  Remand Results at 62, 103.

21      The Federal Circuit has sustained the approach taken by Commerce.  In

22  *Sunpreme Inc. v. United States*, 946 F.3d 1300, 1319 (Fed. Cir. 2020), the Federal

23  Circuit reviewed 19 C.F.R. § 351.225(l)(3), noting that, when Commerce rules that

24  a product falls within the scope of an order—but there has been no previous

25  suspension of liquidation—a new suspension may only begin on or after the date of

26  initiation of the scope inquiry.  The Federal Circuit then stated:  "Anything else

27  would be impermissibly retroactive, as we acknowledged in *AMS*."  *Id.* (discussing

28  *AMS Assocs. v. United States*, 737 F.3d 1338, 1344 (Fed. Cir. 2013)).  In *United*

- 6 -

1   *Steel & Fasteners, Inc. v. United States*, the Federal Circuit stated that "the

2   regulatory history of § 351.225(l)(3) indicates that Commerce intended to limit the

3   reach of retroactive suspension of liquidation."  947 F.3d 794, 802 (Fed. Cir. 2020).

4   "The public argued that 'the Department must view any merchandise that it

5   determines to be within the scope of an order as always having been within the

6   scope' since 'scope rulings only clarify, and do not expand, the scope of an order.'"

7   *Id.* (citation omitted).  "Commerce, however, did not do this."  *Id.*  Instead,

8   Commerce "tailored" its scope regulation to limit any new suspension of

9   liquidation to entries made on or after the date of initiation of a scope inquiry.  *Id.*

10        Recently, in *Tai-Ao Aluminum (Taishan) Co. v. United States*, 983 F.3d 487,

11   495 (Fed. Cir. 2020), the Federal Circuit emphasized that "adequate notice" must be

12   provided to the importer before the results of a Commerce scope inquiry may take

13   effect.  "The notice requirement reflects the broader due-process principle that

14   before an agency may enforce an order or regulation by means of a penalty or

15   monetary sanction, it must provide regulated parties fair warning of the conduct

16   [the order or regulation] prohibits or requires."  *Id.* (citation and internal quotation

17   marks omitted).

18        What Commerce makes clear in the Remand Results is that its statutory and

19   regulatory suspension-of-liquidation provisions determine whether antidumping

20   duties are owed.  This fact was not discussed in the 2018 scope rulings, but is

21   apparent from the language of 19 C.F.R. § 351.225.  Any doubt on this issue is

22   resolved by reference to statements made by Commerce in August of 2020.

23   *Regulations To Improve Administration and Enforcement of Antidumping and*

24   *Countervailing Duty Laws*, 85 Fed. Reg. 49472 (Aug. 13, 2020).  In that regulatory

25   proposal, Commerce discussed "the approach currently taken in rulings based on a

26   formal scope ruling."  *Id.* at 49483.  Commerce explained the current approach as

27   follows:  "all entries not already suspended prior to the date on which Commerce

28   initiates a scope inquiry *are essentially excused from AD/CVD duties*, even if

- 7 -

Commerce finds through the scope inquiry that such duties should have been applied." *Id.* (emphasis added).  That is precisely what Commerce has done in the Remand Results:  if those results are sustained on appeal, then Commerce intends to instruct Customs to liquidate pre-initiation entries "without regard to antidumping duties."  Remand Results at 103.

Commerce "is the 'master' of the antidumping laws." *Torrington Co. v. United States*, 68 F.3d 1347, 1351 (Fed. Cir. 1995).  The CIT and the Federal Circuit give "substantial deference to Commerce's interpretations of its own regulations unless they are plainly erroneous or inconsistent with the regulation . . . ." *Michaels Stores, Inc. v. United States*, 766 F.3d 1388, 1392 (Fed. Cir. 2014). Similarly, this Court must defer to Commerce's interpretation of 19 C.F.R. § 351.225, under which it concluded that no antidumping duties are owed on entries predating the initiation of the scope inquiry.

Sigma indisputably stopped importing welded outlets in late 2017 or early 2018.  Day 2 Trial Tr. at 135:11-15; Trial Ex. 65.  The 2018 scope ruling for Sigma did not involve a formal scope inquiry;  rather, Commerce made that decision on the basis of Sigma's scope request, the scope language, and the sources described in 19 C.F.R. § 351.225(k)(1).  *Vandewater Int'l, Inc. v. United States*, 476 F. Supp. 3d 1357, 1360 (CIT 2020).  If the Remand Results are sustained, the CIT will lift the stay in effect for *Sigma*, and remand *Sigma* to Commerce, which will conduct the same analysis and reach the same conclusions as it did in the Remand Results. Specifically, Commerce will initiate a formal scope inquiry and ultimately instruct Customs to liquidate Sigma's entries made prior to the date of initiation without regard to antidumping duties.  All of Sigma's entries will be pre-initiation entries.

**1.      As A Matter Of Law, Sigma Did Not Submit A False Record Or Statement Material To An Obligation to Pay Or Transmit Money Or Property To The Government**

Because no antidumping duties are owed pre-initiation—and because all of

Sigma's entries occurred pre-initiation—Sigma did not submit a "false record or statement material to an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G).  This conclusion is dictated by the plain language of the False Claims Act.  That Act has a specific definition for "obligation."  In relevant part, "the term 'obligation' means an *established duty,* whether or not fixed, arising . . . from statute or regulation . . . ."  31 U.S.C. § 3729(b)(3) (emphasis added).  In light of the Remand Results, there is no "established duty" for Sigma to pay antidumping duties.  In fact, statute and regulation establish the absence of any such duty.  Thus, as a matter of law, there is no False Claims Act liability for Sigma.

Courts that have construed the term "obligation" in the False Claims Act have concluded that the term refers to a "fixed sum that is immediately due," (*Lesnik v. Se*, 374 F. Supp. 3d 923, 940 (N.D. Cal. 2019) (citation omitted)), not to mere "potential liability" (*id.* (citation omitted)).  *See also United States ex rel. RBC Four Co., LLC v. Walt Disney Co.*, No. CV 12-08036, 2013 U.S. Dist. LEXIS 206337, at *10 (C.D. Cal. Aug. 9, 2013) (noting that the term "obligation" in the False Claims Act "does not extend to *potential* liability . . .") (emphasis in original).  These holdings are in accord with the plain meaning of the statute, which refers to an "established" duty, not some sort of inchoate duty that might arise in the future.  Sigma has never had an established duty to pay antidumping duties on its imports of welded outlets and any speculation about the future is insufficient to create any such duty.

The Ninth Circuit has never ruled on the question whether an "obligation" exists with respect to antidumping duties.  *See United States ex rel. Huangyan Imp. & Exp. Corp. v. Nature's Farm Prods.*, 370 F. Supp. 2d 993, 999 (N.D. Cal. 2005) (noting "no on-point authority from the Ninth Circuit" on this issue).  The *Huangyan* Court ultimately concluded that false statements made on entry documentation in order to evade antidumping duties were certain in nature (as

opposed to discretionary) and, thus, involved an "obligation" within the meaning of the False Claims Act. At the same time, the *Huangyan* Court acknowledged that there exists "reasonable grounds for disagreement" on this issue. *Id.* at 1004.

Even if the reasoning of *Huagnyan* is sound, it does not apply to the facts of this case. The merchandise at issue in *Huagnyan* (mushrooms) was unquestionably within the scope of an existing antidumping duty order. Here, in contrast, Sigma's welded outlets were found to be within the scope of the antidumping duty order on butt-weld pipe fittings from China only after Commerce issued a formal scope inquiry and only after Commerce followed the analysis contained in section 351.225(k)(2) of its regulations. Sigma has never had an established duty to pay antidumping duties on its imports of welded outlets and any speculation about the future is insufficient to create any such duty. Commerce understood that its scope finding with respect to welded outlets only has *prospective* effect given the regulations in effect at the time of its determination (*i.e.*, 19 C.F.R. § 351.225(l)). Thus, it is not the case that Commerce was simply "clarifying" that welded outlets were always within the scope of the butt-weld fitting order. Instead, Commerce was implementing a regulatory choice it had made years in the past to apply the results of its formal scope rulings on a prospective basis only. Given the prospective nature of the Remand Results, there was never any "established duty" for Sigma to pay or transmit antidumping duties between 2010 and early 2018.

## 2. As A Matter Of Law, The Government Did Not Sustain Any Damages

Even if the Court were to somehow conclude that a viable reverse-False Claims Act claim exists with respect to Sigma, it should still conclude that, as a matter of law, no damages should be awarded. Because no antidumping duties are owed on Sigma's entries, there can be no damages to the Government. *See* 31 U.S.C. § 3729(a)(1) (person violating the False Claims Act is liable to the Government for "3 times the amount of damages which the Government sustains

- 10 -

because of the act of that person").

**3.** **The Full Legal Ramifications of the Remand Results Have Not Been Previously Addressed Or Decided By The Court**

In its original motion for summary judgment, filed after Commerce's (k)(1) scope ruling and prior to the CIT's remand for a (k)(2) scope inquiry, Sigma raised two issues associated with liquidation and suspension of liquidation. *First*, Sigma cited *United Steel & Fasteners* for the proposition that when Commerce issues an affirmative scope ruling, that determination has limited retroactive applicability. Sigma's Mot. Summ. J. at 17 (Dkt. 167). Specifically, when Commerce issues an informal scope ruling and there is no suspension of liquidation, Commerce's ruling only applies to entries that remain suspended as of the date of that ruling. *Id.* at 18. *Second*, Sigma cited 19 U.S.C. § 1514(a) for the proposition that liquidations are "final and conclusive." *Id.* at 2-3. Because Sigma's post-ruling entries had been liquidated, Sigma argued that there could be no False Claims Act liability for those liquidated entries. *Id.* at 18.

The Court's ruling on the defendants' summary judgment motions contained an extensive discussion of falsity within the context of *United Steel* and liquidation. *Vandewater Int'l*, 2020 U.S. Dist. LEXIS 138240, at *12-24. In the Court's view, *United Steel* did not change the reality that the effect of a scope ruling is to confirm that a product is, and has been, the subject of an antidumping duty order. *Id.* at *20. "Additionally, *United Steel's* language regarding the 'nature' of scope rulings . . . must be read in the context of the case, which was about liquidation." *Id.* "In short, the Court does not find that *United Steel* stands for the proposition that scope rulings lack substantive retroactive effect." *Id.* The Court ultimately concluded that "based on currently applicable law" (*i.e.*, the butt-weld order and the 2018 scope rulings), the statements made by defendants on their customs entry forms that their outlets were not subject to antidumping duties were false. *Id.* at *21-22.

The Court's summary judgment decision did not address a formal scope

1   ruling under (k)(2) or the Remand Results, which now represents the "currently

2   applicable law."  The Court's decision also did not address the regulatory

3   provisions relied upon in the Remand Results as preventing retroactivity.

4          Commerce has now specifically stated that, although it considers welded

5   outlets to be within the scope of the butt-weld order, it will not instruct Customs to

6   assess antidumping duties prior to the date of initiation of the scope inquiry.

7   Remand Results at 62, 103.  In reaching this decision, Commerce specifically cited

8   not only the Tariff Act but 19 C.F.R. § 351.225(l) as well.  *Id*.  Thus, Commerce is

9   interpreting the meaning of its own regulations, as sustained by the CIT and the

10  Federal Circuit.  Consistent with its prior opinions and orders in this case, the Court

11  should accept Commerce's determination as the correct statement of the law.  *See*

12  Dkt. 256 at 2 ("It would appear that this Court has no authority to decide whether

13  Commerce erred in its 2018 Scope Rulings.").

14         The Court should rule on this issue now because it has not done so before.

15  When Sigma filed its initial motion for summary judgment, Commerce had not yet

16  issued the Remand Results.  Sigma promptly filed an *ex parte* application for

17  summary judgment within days after Commerce issued the Remand Results, but the

18  Court declined to entertain that application as untimely.  Order Re: *Ex Parte* Appl.

19  Summ. J. (Dkt. 409).  During trial, Sigma twice attempted to enter the relevant

20  portion of the Remand Results into evidence, but the Court declined to receive that

21  document into evidence.  Day 2 Trial Tr. at 90:1-5, 128:19-129:7; *see also* Day 3

22  Trial Tr. at 63:8-16.  Thus, this is the first opportunity for the Court to rule on this

23  issue.

24         In declining to let Sigma present evidence on this issue to the jury, the Court

25  may well have been influenced by Island's arguments in its trial brief.  In that brief,

26  Island noted that it was Sigma's intention to present arguments to the jury

27  concerning the meaning of the Remand Results.  Island's Trial Br. at 6 (Dkt. 404).

28  Island specifically stated that "whether liquidation principles have any effect on the

- 12 -

availability of damages is a question of law for the Court." *Id*. at 7.  Island

explained that "[t]his issue is reserved to the Court as a matter of law in part

because 'judges are better suited than are juries to understand and to interpret

agency decisions in light of the governing statutory and regulatory context.'" *Id*.

(citing *Merck Sharp & Sohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1680 (2019)).

Under Island's position that retroactivity is a question of law for the Court, now is

the appropriate time for the Court to determine, as a matter of law, that the Remand

Results preclude Island's FCA claim.

### B.   The Undisputed Trial Evidence Established As A Matter Of Law That Sigma's Statements That No Antidumping Duties Were Owed Were Objectively Reasonable

The uncontradicted facts presented at trial demonstrate that Sigma's belief

that its products were not butt-weld pipe fittings was objectively reasonable.  In

*Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 n.20 (2007), construing the Fair

Credit Reporting Act, the Supreme Court explained the "objectively reasonable"

standard: "Where, as here, the statutory text and relevant court and agency guidance

allow for more than one reasonable interpretation, it would defy history and current

thinking to treat a defendant who merely adopts one such interpretation as a

knowing or reckless violator."  *Safeco* fits within the FCA, as "[s]trict enforcement

of the FCA's knowledge requirement helps to ensure that innocent mistakes made

in the absence of binding interpretive guidance are not converted into FCA liability,

thereby avoiding the potential due process problems posed by 'penalizing a private

party for violating a rule without first providing adequate notice of the substance of

the rule.'"  *United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287 (D.C. Cir.

2015) (quoting *Satellite Broad. Co. v. Fed. Commc'ns Comm'n*, 824 F.2d 1, 3 (D.C.

Cir. 1987)).

The Ninth Circuit and other Circuit Courts of Appeals have applied *Safeco's*

objective reasonableness standard to the FCA.  In *United States ex rel. McGrath v.*

1   *Microsemi Corp.*, the Ninth Circuit ruled that the complaint failed to sufficiently

2   plead knowledge where the defendant held a good faith, objectively reasonable

3   interpretation of the regulation under *Safeco*.  690 Fed. Appx. 551, 552 (9th Cir.

4   2017) (unpublished).  The Seventh Circuit recently joined four other Circuits in

5   holding that *Safeco* could preclude liability under the FCA.  *United States ex rel.*

6   *Schutte v. SuperValu Inc.*, No. 20-2241, 2021 U.S. App. LEXIS 24018, at *2-4, 19-

7   20, 26 (7th Cir. Aug. 12, 2021) ("Indeed, we do not see how it would be possible

8   for defendants to actually know that they submitted a false claim if relators cannot

9   establish the *Safeco* scienter standard.").

10          There are two prongs to the *Safeco* analysis: whether the belief was

11  objectively reasonable and whether there was "authoritative guidance warning

12  against its erroneous view."  *Id.* at *27.  The CIT has already effectively determined

13  that Sigma's belief was objectively reasonable, as it was "not plainly apparent from

14  the language of the <u>Order</u> whether a steel carbon branch outlet qualifies as a butt-

15  weld fitting covered by the <u>Order</u> or not."  *Vandewater Int'l*, 476 F. Supp. 3d at

16  1360.  The additional "sources Commerce relied upon as dispositive (the King

17  Scope Ruling, the petition language, and the language from the ITC sunset review)

18  do not really tell the court anything about the inclusion of steel branch outlets

19  within the scope of the Order."  *Id.* at 1362.  Even Island's President, Glenn

20  Sanders, when asked in deposition testimony played at trial if he would agree that

21  "there's room for disagreement as to what constitutes a butt-weld fitting" testified

22  "[t]here can be disagreement on many topics. And that would be one," and that he

23  believed that "the Department of Commerce has said different things on that topic."

24  Sanders Dep. at 782:21-783:09; Day 2 Trial Tr. at 212:25-213:1.

25          In its order on summary judgment, this Court noted that there was a genuine

26  dispute of material fact, namely the Sprink-let Ruling, on whether Defendants were

27  "warned away."  *Vandewater Int'l*, 2020 U.S. Dist. LEXIS 138240, at *27.  The jury,

28  however, was not instructed on objective reasonableness and could not decide this

- 14 -

issue.  *See* Jury Instrs. (Given) (Dkt. 423).  The unrebutted evidence shows that the Sprink-let Ruling was not authoritative guidance as a matter of law.  Again, the CIT confirmed that "Commerce, however, for some reason, chose to dismiss its Sprink Scope Ruling as non-binding."  *Vandewater Int'l*, 476 F. Supp. 3d at 1361.  The non-binding Sprink-let Ruling certainly did not satisfy the transparency and due process concerns that animate the Commerce regulations.

The unrebutted evidence at trial demonstrated that there was nothing that warned Sigma that its welded outlets might be subject to antidumping duties.  Expert witness Walter Sperko responded "no" when asked if he believed "that a member of the industry could have foreseen that Commerce would treat welded outlets as a butt-weld pipe fitting."  Day 3 Trial Tr. at 16:22-17:8.  Island did not challenge Mr. Sperko's opinions on the industry's views.  Patricia Velazquez, Sigma's Imports Manager, testified that a search for "weld outlets" in Customs' database found only one result: the Star Pipe Ruling, not the Sprink-let Ruling.  *Id*. at 58:18-20.  The Star Pipe Ruling determined that forged steel threaded weld outlet fittings were classified under the same Harmonized Tariff Schedule ("HTS") code that Sigma used for its weld outlets, and not the HTS code for butt-weld fittings.  Trial Exs. 1007, 1009, 1068; Day 3 Trial Tr. 61:10-62:1.

Island, in its Trial Brief, mistakenly contended that Sigma needed to form a opinion of the butt-weld order itself when it imported welded outlets in order for *Safeco* to apply, rather than an opinion on the definition of a butt-weld fitting.  Island's Trial Br. at 9 (Dkt. 404).  First, Island cited no binding authority for this proposition; indeed, the patent case it primarily relies on, *Halo Elecs. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923 (2016), was deemed inapplicable to the FCA by the *Schutte* court because the Patent Act has different scienter standards.  *Schutte*, 2021 U.S. App. LEXIS 24018, at *22-24.  Island also offered no evidence contradicting the evidence that Sigma contemporaneously believed that its products were not butt-weld

pipe fittings.  *See* Day 2 Trial Tr. at 142:15-17 ("Q. From your perspective did you ever believe that a welded outlet is a butt-weld pipe fitting? [Bhattacharji]: Never.").

Here, "the statutory text and relevant court and agency guidance allow for more than one reasonable interpretation." *Safeco*, 551 U.S. at 70 n.20.  Congress could not have intended to label "those who followed an interpretation that could reasonably have found support in the courts, whatever their subjective intent may have been," as a knowing or reckless violator.  *Id*.  Both Commerce and the CIT have stated that the Sprink-let Ruling has been disregarded and is non-binding as to Sigma, and Customs issued a later ruling contrary to Sprink-let.  *Vandewater Int'l*, 476 F. Supp. 3d at 1361-62; Trial Ex. 1007. The Sprink-let Ruling cannot be authoritative guidance that could have warned Sigma away from its view when three key trade bodies have all said otherwise.  Sigma's understanding, based on industry standards, that its products were welded outlets and not butt-weld pipe fittings was objectively reasonable, and cannot meet the FCA's scienter element as a matter of law.

## C.    The Undisputed Trial Evidence Failed As A Matter Of Law To Establish That Sigma Had The Requisite Knowledge

The FCA's scienter requirement is "rigorous" and subject to "strict enforcement." *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016) (citing *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1270 (D.C. Cir. 2010)).  The FCA defines knowledge as "actual knowledge," "deliberate ignorance," or "reckless disregard." 31 U.S.C. § 3729(b)(1). Deliberate ignorance is the "ostrich type situation where an individual has buried his head in the sand." *Vandewater Int'l*, 2020 U.S. Dist. LEXIS 138240, at *25 (citing *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1176 (9th Cir. 2016)). Reckless disregard is defined as "an extreme version of negligence" that does not include "innocent mistakes and negligence." *Id*. at *25-26 (citations omitted).

Island presented no evidence that Sigma realized that the Unilet and Safelet could fall within the scope of the butt-weld order and did not challenge witnesses

1  testimony that Sigma did not view its products as butt-weld pipe fittings.  *See*, *e.g.*,
2  Day 2 Trial Tr. at 141:3-13.  It argued only that Sigma *should have known* its
3  products would be considered butt-weld pipe fittings.  Even when fully credited,
4  Island's evidence is insufficient.  The CIT determined as a matter of law that the
5  antidumping duty order and the other sources Commerce relied on in its 2018
6  ruling "do not really tell the court anything about the inclusion of steel branch
7  outlets within the scope of the Order."  *Vandewater Int'l*, 476 F. Supp. 3d at 1362.
8  Island's sole evidence that Sigma should have found the Sprink Ruling (which
9  undisputedly is not available outside Commerce's physical records) was a single
10  Island employee with no evidence of *Sigma's* knowledge and who did not notify
11  Sigma about the Sprink Ruling.  Day 2 Trial Tr. at 144:8-12.

12    Island's scienter theory rested on the assumption that Sigma's failure to find
13  and document the butt-weld pipe fitting order and understand that it potentially
14  applied to its products is *de facto* proof that Sigma was reckless and did no
15  diligence or research on its welded outlets.  Yet Island offered no affirmative
16  evidence on whether Sigma conducted due diligence on welded outlets or if
17  Sigma's practices were lacking, and instead attempted to use absence of
18  documentation and attacks on witnesses' knowledge as a substitute for affirmative
19  evidence.  *See*, *e.g.*, *id.* at 19:4-9, 67:4-22.  The attack on lack of documentation
20  from 2010 in particular fails as a matter of law; Island's own expert witness
21  testified that Customs guidance only required records to be kept for five years.  *Id.*
22  at 201:15-20.  Lack of actual knowledge, as a separate type of scienter, cannot
23  constitute reckless disregard under the FCA; much more is needed.  Island's attacks
24  cannot meet its burden of proof as a matter of law–in the light most favorable to
25  Island, they show there is no evidence one way or the other.

**D.    The Undisputed Trial Evidence Failed As A Matter Of Law To
        Establish That Sigma Made A False Statement**

28  Island argued at trial that Sigma's use of the heading "steel coupling" on

- 17 -

Form 7501 of its import entry packets was a false statement. *See*, *e.g.*, Day 1 Trial Tr. at 82:1-7. When read beyond these two cherry-picked words, the entry packets themselves flatly contradict Island's assertion that Sigma described its products solely as "steel couplings." *See*, *e.g.*, Trial Exs. 1009, 1010. Island disregarded not only the product descriptions in the rest of the entry packet submitted to Customs but also the rest of the "Description of Merchandise" box the phrase "steel couplings" is included in, contrary to the general legal principle that documents must be read as a whole to be properly understood. *See*, *e.g.*, *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 753 (9th Cir. 2014) ("In interpreting a contract, the document must be read as a whole to determine the parties' purpose and intent.") (citations and quotation marks omitted)); *Chang v. Accelerate Diagnostics, Inc.*, No. CV-15-00504-PHX-SPL, 2016 U.S. Dist. LEXIS 90150, at *23 (D. Ariz. Jan 28, 2016) (evaluating allegedly false statements in the securities context and warning against interpretations that "require[] the reader to look at one statement on the slide and ignore the remainder of the slide and the presentation."); *Am. Family Mut. Ins. Co. v. Dunn*, No. CV 03-1277-PHX-SRB, 2005 U.S. Dist. LEXIS 58296, at *24 (D. Ariz. Aug. 23, 2005) (sections of an insurance letter "cannot be read in isolation."). The phrase "steel couplings," taken from the HTS heading, must also be read in light of Customs' instructions for the form which state that "[t]he standard definitions from the CBP HTS database are acceptable" for the description of the articles of merchandise. Trial Ex. 1047 at 13. No reasonable jury could have found, in light of the controlling law, that "steel couplings" was a false statement.

Furthermore, while the Remand Results constitute the currently applicable law, Sigma maintains that no antidumping duties were owed in connection with the company's importation of Unilet and Safelet between 2010 and 2018. Indeed, Sigma intends to appeal Commerce's decision, and expects to prevail. Thus, Sigma preserves for appeal its argument that it did not make any false claims because whether Sigma's products were subject to antidumping duties is a disputed issue of

law.  Island has the burden of proving that Sigma's statements were false by a preponderance of the evidence.  Legal contentions resulting from inherently ambiguous issues of fact and law are not a proper basis for a FCA claim.  *See United States ex rel. Morton v. A Plus Benefits, Inc.*, 139 F. App'x 980, 983-84 (10th Cir. 2005) (dismissing Plaintiff's claim because "[e]xpression of a legal opinion . . . depending, as it does, on the resolution of two sets of inherently ambiguous determinations by defendant[], cannot form the basis for an FCA claim.").

If antidumping duties were owed on Sigma's products as a matter of law, that outcome was unforeseeable to Sigma.  Island has demonstrated at most only that there is widespread confusion about whether a welded outlet can be a butt weld fitting.  This is insufficient to establish that Sigma's legal contention that no antidumping duties applied to its products was false.

**E.  The Undisputed Trial Evidence Failed As A Matter Of Law To Establish That Sigma's Statements Were Material**

The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).  Island, however, failed to establish that Sigma's use of the term "steel coupling" was material to Customs' decision not to impose antidumping duties. Island repeatedly insisted at trial that Sigma should have described its products on its entry packets as "welded outlets" rather than "steel couplings."  *See, e.g.*, Day 3 Trial Tr. at 121:13-17.  At no point, however, did Island argue that Sigma should have labeled its products as "butt-weld outlets."  The Star Pipe ruling undisputedly showed that Customs considered welded outlets to fall under HTS code 7307.99.5045, the code Sigma used, and not the HTS code for butt-weld fittings. Trial Exs. 1007, 1009, 1068.  Beyond assuming as much in its closing argument, Day 3 Trial Tr. at 101:5-23, Island presented no evidence that, had Sigma used the term "welded outlet" on the form 7501 in addition to using it on the commercial

- 19 -

1   invoice, Customs would assessed antidumping duties.

2       **F.**    **In The Event That The Court Does Not Grant Sigma Judgment As**

3            **A Matter Of Law, It Should Order A New Trial**

4       Rule 59 of the Federal Rules of Civil Procedure enables the court to grant a

5   new trial "for any reason for which a new trial has heretofore been granted in an

6   action at law in federal court."  Grounds for a new trial "include, but are not limited

7   to, claims 'that the verdict is against the weight of the evidence, that the damages

8   are excessive, or that, for other reasons, the trial was not fair to the party moving.'"

9   *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Montgomery*

10  *Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)).  The Court can "set aside the

11  verdict of the jury, even though supported by substantial evidence, where . . . the

12  verdict is contrary to the clear weight of the evidence."  *Id.*  (quoting *Murphy v.*

13  *City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990)).  The jury's verdict was

14  against the clear weight of the evidence on all four required FCA elements for

15  reasons set forth above.  More importantly, the jury did not have the opportunity to

16  consider the Remand Results' determination that antidumping duties are not owed

17  because the Court declined to allow Sigma to examine witnesses on the Results or

18  present that portion of the Results to the jury.  The jury similarly did not have the

19  opportunity to consider whether Sigma's view was objectively reasonable.

20  Accordingly, in the event that the Court does not grant Sigma judgment as a matter

21  of law, it should order a new trial.

22  **IV.**   **CONCLUSION**

23       For these reasons, the Court should enter judgment as a matter of law in

24  Sigma's favor.  In the alternative, the Court should grant a new trial.

25

26                       \*     \*     \*

27

28

- 20 -

1

2

Dated:  October 12, 2021

Respectfully submitted,

WHITE & CASE LLP

3

4

By: */s/ Lucius B. Lau*
Christopher M. Curran (*pro hac vice*)
Lucius B. Lau (*pro hac vice*)
Cristina Brayton-Lewis (*pro hac vice*)
701 13th Street NW
Washington, DC 20005
ccurran@whitecase.com
alau@whitecase.com
cbraytonlewis@whitecase.com

5

6

7

8

9

Mark Gustafson (SBN 198902)
555 South Flower Street, Suite 2700
Los Angeles, CA  90071-2433
mgustafson@whitecase.com

10

11

Attorneys for Defendant
SIGMA CORPORATION

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 21 -