MAYER BROWN LLP
MATTHEW H. MARMOLEJO (SBN 242964)
*mmarmolejo@mayerbrown.com*
C. MITCHELL HENDY (SBN 282036)
*mhendy@mayerbrown.com*
350 South Grand Avenue, 25th Floor
Los Angeles, CA 90071-1503
Tel:  (213) 229-9500
Fax: (213) 576-8185

MAYER BROWN LLP
KELLY B. KRAMER (*pro hac vice*)
*kkramer@mayerbrown.com*
1999 K Street, NW
Washington, D.C. 20006
Tel:  (202) 263-3007
Fax: (202) 263-5207
Attorneys for Relator
ISLAND INDUSTRIES, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* ISLAND INDUSTRIES, INC.,<br><br>                Plaintiff,<br><br>        vs.<br><br>VANDEWATER INTERNATIONAL INC.; NEIL RUEBENS; ANVIL INTERNATIONAL, LLC; SIGMA CORPORATION; SMITH COOPER INTERNATIONAL; ALLIED RUBBER & GASKET COMPANY, and JOHN DOES Nos. 1-10.,<br><br>                Defendants. | Case No. 2:17-cv-04393-RGK-KS<br><br>**ISLAND INDUSTRIES, INC.'S CONSOLIDATED OPPOSITION TO SIGMA CORPORATION'S MOTION FOR JUDGMENT AS A MATTER OF LAW; RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW; AND ALTERNATIVE MOTION FOR NEW TRIAL [FED. R. CIV. PROC. 50 AND 59]**<br><br>Trial Date: October 5, 2021<br>Hearing:  November 15, 2021<br>Time:  9:00am<br>Courtroom:  850<br>Judge:  Hon. R. Gary Klausner |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................... 1

   I.    STANDARD OF REVIEW ............................................................ 2

   II.   SIGMA IS PROCEDURALLY BARRED FROM RAISING NEW GROUNDS TO CHALLENGE THE JURY'S VERDICT ........ 2

   III.  THE REMAND RESULTS DO NOT UNDERMINE THE JURY'S VERDICT ................................................................... 4

   IV.  SIGMA'S "OBJECTIVELY REASONABLE" DEFENSE IS BARRED AND FAILS AS A MATTER OF BOTH FACT AND LAW ................................................................................ 9

   V.   THE TRIAL EVIDENCE SUPPORTS THE JURY'S VERDICT ................................................................................. 13

       1.   Falsity ................................................................... 13

       2.   Damages ............................................................... 14

       3.   Scienter ................................................................ 15

       4.   Materiality ............................................................ 17

   VI.  NO NEW TRIAL IS WARRANTED ......................................... 17

CONCLUSION ........................................................................................ 18

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Duferco Steel, Inc. v. United States*,
  296 F.3d 1087 (Fed. Cir. 2002) .......................................................... 5

*E.E.O.C. v. GoDaddy Software, Inc.*,
  581 F.3d 951 (9th Cir. 2009) .............................................................. 3

*Freund v. Nycomed Amersham*,
  347 F.3d 752 (9th Cir. 2003) .............................................................. 3

*United States ex rel. Huangyan Imp. & Exp. Corp. v. Nature's Farm Prods., Inc.*,
  370 F. Supp. 2d 993 (N.D. Cal. 2005) ................................................ 6

*Janes v. Wal-Mart Stores, Inc.*,
  279 F.3d 883 (9th Cir. 2002) .............................................................. 4

*Pet Food Express Ltd. v. Royal Canin USA, Inc.*,
  2011 WL 6140874 (N.D. Cal. Dec. 8, 2011) ...................................... 3

*United States ex rel. Purcell v. MWI Corp.*,
  807 F.3d 281 (D.C. Cir. 2015) ........................................................... 9

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133 (2000) ........................................................................... 2

*Safeco Ins. Co. of Am. v. Burr*,
  551 U.S. 47 (2007) .....................................................................*passim*

*Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*,
  961 F. Supp. 2d 1291 (Ct. Int'l Trade 2014) ..................................... 5

*Tai-Ao Aluminum (Taishan) Co. v. United States*,
  983 F.3d 487 (Fed. Cir. 2020) ............................................................ 6

*Tortu v. Las Vegas Metro. Police Dept.*,
  556 F.3d 1075 (9th Cir. 2009) ................................................... 3, 4, 17

*Union Oil Co. of Cal. v. Terrible Herbst, Inc.*,
  331 F.3d 735 (9th Cir. 2003) ............................................................ 17

*United States v. Bourseau*,
  531 F.3d 1159 (9th Cir. 2008) .......................................................... 13

ii

*United States v. Great Neck Saw Mfrs., Inc.*,
   311 F. Supp. 3d 1337 (Ct. Int'l Trade 2018)......................................................7

*United States v. Mackby*,
   261 F.3d 821 (9th Cir. 2001) ................................................................12

*United States v. United Healthcare Ins. Co.*,
   848 F.3d 1161 (9th Cir. 2016)...........................................11, 13, 15

*United Steel & Fasteners v. United States*,
   947 F.3d 794 (Fed. Cir. 2020) ...........................................................7

**Statutes, Rules and Regulations**

19 C.F.R. § 351.225(*l*) ........................................................................5

19 U.S.C. § 1592 ..............................................................................7

Fed. R. Civ. P. 50..............................................................*passim*

Fed. R. Civ. P. 59 ............................................................................17

**Other Authorities**

*Antidumping Duty Order and Amendment to the Final Determination
   of Sales at Less than Fair Value; Certain Carbon Steel Butt-Weld
   Pipe Fittings from the People's Republic of China*, 57 Fed. Reg.
   29702 (July 6, 1992)........................................................................1

*Carbon Steel Butt-Weld Pipe Fittings from Brazil, Japan, Taiwan,
   Thailand, and the People's Republic of China: Final Results of the
   Expedited Sunset Reviews of the Antidumping Duty Orders*, 81 Fed.
   Reg. 44270 (July 7, 2016) ..............................................................8

*Regulations to Improve Administration and Enforcement of
   Antidumping and Countervailing Duty Laws*, 85 Fed. Reg. 49472,
   49483 (Aug. 13, 2020)....................................................................8

S. Rep. No. 99-345 (1986)................................................................12

U.S. Constitution Seventh Amendment................................................3, 4, 5

## INTRODUCTION

Sigma's renewed motion for judgment as a matter of law under Rule 50(b) is framed as though the Court now writes on a clean slate.  It does not:  a unanimous jury has now found that Sigma "violated the False Claims Act by knowingly making false statements to avoid an obligation to pay money to the Government."  Jury Verdict, ECF # 421.  Island is entitled to every reasonable inference supported by the record, and Sigma cannot ignore evidence and testimony supporting Island's arguments.  Among those reasonable inferences is that the jury concluded that Sigma made knowing, material false statements of fact by repeatedly describing its products as "steel couplings"—a distinct product that is undisputedly *not* subject to the China Order.[1]  Thus, to prevail on its motion, Sigma must not only overcome the jury's verdict as it relates to its false claims that no antidumping duty applied to its products, it must also overcome the jury's verdict as it relates to its false product descriptions.  Sigma can do neither.

Moreover, as much as Sigma might wish otherwise, this Court has already thoroughly considered—and rejected—Sigma's legal arguments about the effect of Commerce's liquidation regulations and the effect of scope rulings for purposes of FCA liability.  As the Court held in denying the Defendants' motions for summary judgment, the timing of scope rulings do not affect FCA liability, and "neither liquidation nor the general concept of finality bars the recovery of damages under the FCA."  Order Denying Defendants' Motions for Summary Judgment (MSJ Order), ECF #270, at 11–12.  Sigma struggles to explain how exactly its current arguments are different from those the Court previously rejected—apparently contending that Commerce's recitation of liquidation principles contains a second, hidden meaning.  *See* Rule 50(a) Mot. at 5 ("While Commerce used the term 'liquidation' in its

---

[1]    Trial Ex. 8 (*Antidumping Duty Order and Amendment to the Final Determination of Sales at Less than Fair Value; Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China*, 57 Fed. Reg. 29702 (July 6, 1992)) (China Order).

1

instructions, this is not the same liquidation issue that this Court decided in 2020."). The arguments amount to little more than rhetorical sleight of hand.  At bottom, established legal principles confirm that Sigma's obligation to pay antidumping duties was fixed in the 1992 China Order, and the company's nine-year streak of avoiding those duties with affirmative false statements is not immune from this FCA verdict simply because Sigma waited until learning of this investigation to request the confirmatory scope ruling.

Because a Rule 50(b) motion may only rely on the same grounds raised in the pre-deliberations Rule 50(a) motion, Island concentrates this consolidated opposition on Sigma's more recent filing.  ECF #430 ("Mot.").  Keeping the above two points in focus, Island submits that the Court can make quick work in denying Sigma's motions.

## I.    STANDARD OF REVIEW

Before granting a Rule 50 motion for judgment as a matter of law, a court must determine that "there is no legally sufficient evidentiary basis for a reasonable jury to find for" the non-movant.  Fed. R. Civ. Proc. 50(a); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000).  "[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe."  *Id*.  In other words, the Court should credit all the evidence in favor of Island, draw all reasonable inferences in Island's favor, and may consider evidence supporting Sigma only so far as that evidence "comes from disinterested witnesses" and was "uncontradicted and unimpeached."  *Id*. (quotation marks and citation omitted).

## II.   SIGMA IS PROCEDURALLY BARRED FROM RAISING NEW GROUNDS TO CHALLENGE THE JURY'S VERDICT.

Before the jury's deliberations, Sigma filed a Rule 50(a) motion for judgment as a matter of law.  ECF #418.  In that motion, Sigma contended that no reasonable jury could (1) "find that Sigma made a false statement"; (2) "find that Sigma has an

2

obligation to pay the Government"; or (3) "find that Sigma acted with scienter." *Id.* at 2, 5.  The respective grounds for those contentions were that (1) Commerce's scope ruling remains under appeal, (2) Commerce's anticipated liquidation instructions found at page 103 of the "Remand Results" suggest—according to Sigma—that no retroactive antidumping duties are owed, and (3) Island failed to present evidence of knowing false statements because of testimony from Sigma witnesses that the company did not view its welded outlets as butt-weld pipe fittings and that the phrase "steel couplings" was not a mis-description of the product.  *Id.*

After deliberating for about an hour (Day 3 Tr., 139:6), the jury returned a unanimous verdict against Sigma.

Sigma's Rule 50(b) motion now seeks to dramatically expand the grounds on which the company challenges the jury's verdict.  Specifically, Sigma asserts a defense based on "objective reasonableness" (and the Supreme Court's *Safeco* decision), and argues that its statements were not material.  Rule 50(b) Mot. at 13, 19. Sigma may not make these post-verdict arguments because it failed to make these arguments in its Rule 50(a) motion.

"Because it is a renewed motion, a proper post-verdict Rule 50(b) motion is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion.  Thus, a party cannot properly raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its preverdict Rule 50(a) motion." *E.E.O.C. v. GoDaddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) (internal quotation marks and citation omitted).  The Ninth Circuit "strictly construe[s]" this important procedural requirement, *Tortu v. Las Vegas Metro. Police Dept.*, 556 F.3d 1075, 1082 (9th Cir. 2009), because "allowing trial courts to set aside jury verdicts on grounds not presented in pre-verdict motions" would "constitute an impermissible re-examination of jury verdicts in violation of the Seventh Amendment." *Pet Food Express Ltd. v. Royal Canin USA, Inc.*, 2011 WL 6140874, at *2 (N.D. Cal. Dec. 8, 2011) (citing *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003)).

Thus, to preserve an argument for a Rule 50(b) motion, the Ninth Circuit has repeatedly confirmed that it is "insufficient" for a party to raise a defense in its motions for summary judgment and trial brief. *Tortu*, 556 F.3d at 1082 (citing *Janes v. Wal-Mart Stores, Inc.*, 279 F.3d 883, 887 (9th Cir. 2002)).

Sigma's Rule 50(b) motion runs afoul of this established Ninth Circuit law. Its pre-verdict motion omits any mention of materiality and "objective reasonableness"—along with the inapposite case law, such as *Safeco Insurance Co. of America v. Burr*, 551 U.S. 47, 70 n.20 (2007), that Sigma relies on in its Rule 50(b) motion. And Sigma's Rule 50(a) motion cannot be fairly construed as subsuming either of those issues. Had Sigma wished to preserve its *Safeco* defense, it was required to make that argument in the 50(a) motion. For as the Court ruled at summary judgment, the *Safeco* issue did not present a pure question of law because at least the "warned away" component involved a genuine dispute of material fact. MSJ Order at 14. Nor can it be said that Sigma made an ambiguous or inartful pre-verdict motion: Sigma's team of lawyers chose to file a seven-page written pre-verdict motion, presumably targeting what it saw as the best chances to avoid an unwelcome jury verdict. Now that the jury has spoken, Rule 50(b), the Ninth Circuit, and the Seventh Amendment to the U.S. Constitution all foreclose Sigma's attempt to supplement its challenges with different grounds.

## III.   THE REMAND RESULTS DO NOT UNDERMINE THE JURY'S VERDICT.

As relevant to Sigma's motion, Commerce's final remand report accomplishes three things. First, Commerce reaffirmed that it "*continue*[*s*] to find that Vandewater's outlets are within the scope of" the China Order. Remand Results at 2, 104 (emphasis added). Second, Commerce confirmed the importance of the 1992 Sprink-Let scope ruling under the Taiwan Order, noting that the ruling was both "relevant" and "informative because it was a prior scope ruling that considered whether outlets nearly identical to the outlets imported by Vandewater are 'butt-weld

4

pipe fittings,'" under the antidumping orders. *Id*. at 6 & n.33. Commerce explained that its rulings on the Defendants' welded outlets "ensured that its interpretation of 'butt-weld pipe fittings' for purposes of the China BWPFs Order was consistent with Commerce's *longstanding interpretation of that exact same term* in the Sprink Scope Ruling as it relates to the Taiwan BWPFs Order." *Id*. (emphasis added). Third, Commerce applied its liquidation regulations under 19 C.F.R. § 351.225(*l*), which govern when and how antidumping duties may be suspended, imposed and collected during administrative liquidation proceedings.

None of these three aspects of the Remand Results works the seismic shift that Sigma portrays. To be sure, Commerce has **never** said a word to suggest that it believes there was "never . . . an established duty to pay antidumping duties on its imports of welded outlets." Mot. 10. Quite the opposite: Commerce highlighted the "consistent" through-line that welded outlets have been considered subject to the ADD Orders on butt-weld pipe fittings since 1992. Results at 6.

Importantly, the Remand Results confirm that Chinese Welded Outlets have been subject to the China Order since 1992. As the Court thoroughly explained in denying the motions for summary judgment, scope rulings cannot expand the scope of an antidumping duty order; rather, they "*confirm* that a product is, and *has been*, the subject of an antidumping duty order." MSJ Order at 11 (quoting *Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*, 961 F. Supp. 2d 1291, 1304 (Ct. Int'l Trade 2014) (cleaned up)). Sigma's contention that Commerce's discussion of liquidation regulations in the Remand Results amounts to a "non-retroactivity determination" defies the baseline proposition that Commerce's scope rulings— whether conducted under (k)(1) or (k)(2) of the scope ruling regulations—cannot change an ADD Order "in a way contrary to its terms." MSJ Order at 11 (quoting *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1097 (Fed. Cir. 2002)). Because Commerce's scope ruling does not change the underlying state of the law—instead, merely confirms that the China Order *always* reached welded outlets—even the term

5

"retroactive" overstates the significance of Commerce's remand results.  Sigma *always* had the legal obligation to pay the antidumping duties, and nothing about Commerce's liquidation regulations vitiates that preexisting obligation.[2]

Citing no authority, Sigma claims that the distinction between (k)(1) and (k)(2) scope rulings somehow completely vindicates Sigma, despite the jury's verdict.  Mot. at 2.  Not so.  In an apparent reversal of its 2020 arguments related to summary judgment, Sigma now argues that only (k)(1) scope rulings are retroactive as, to use Sigma's terms, "readily foreseeable," while (k)(2) rulings are not.  *Id*.  But Sigma cites nothing to support such a contrived distinction.

Instead, Sigma resorts to a familiar bait-and-switch tactic:  In relying on court decisions, regulations, and agency comments that solely concern liquidation, Sigma again tries to equate two completely different concepts and contexts.  All Commerce determined was that welded outlets *remain* within the scope of the China Order and that liquidation regulations govern the administrative process for collecting those duties in the ordinary course.  As the Court has explained, "[l]iquidation is a different animal" because liquidation is "unconcerned with the intent of the importer."  MSJ Order at 11; *see also* United States' Statement of Interest, ECF #254, at 9; Island's Supp. to MSJ Brief, ECF #261, at 3-5; Island's Ex Parte Opp'n, ECF #395 at 2-7.  The False Claims Act, of course, does require proof that the defendant acted with actual knowledge, in deliberate ignorance, or in reckless disregard of the truth—a finding that the jury unanimously found satisfied after deliberating for roughly an hour.

This distinction eviscerates Sigma's reliance on cases such as *Tai-Ao Aluminum (Taishan) Co. v. United States*, 983 F.3d 487 (Fed. Cir. 2020), because the

---

[2]   Its protestations notwithstanding, Sigma concedes that case law has already established that it is the imposition of the antidumping duty order itself—not any scope ruling—that is "the source of an obligation to pay duties."  *United States ex rel. Huangyan Imp. & Exp. Corp. v. Nature's Farm Prods., Inc.*, 370 F. Supp. 2d 993, 1000 (N.D. Cal. 2005); *see* Mot. at 9–10.

jury found that Sigma acted with the requisite knowledge that its statements were false.  Unlike in the liquidation context, this FCA case poses no legitimate due process concern about "adequate notice" because the jury found Sigma acted with the necessary scienter.  Similarly, as the Court noted, Customs remains empowered to go after such knowing misconduct under 19 U.S.C. § 1592.  MSJ Order at 12 (citing *United States v. Great Neck Saw Mfrs., Inc.*, 311 F. Supp. 3d 1337, 1345 (Ct. Int'l Trade 2018)).

Sigma's liquidation-based arguments are particularly hollow because the jury heard—and credited—extensive evidence and testimony showing that Sigma affirmatively and repeatedly misdescribed its welded outlets as steel couplings throughout its Customs paperwork.  The liquidation cases can provide no shelter to an importer of record that falsely describes the merchandise that it imports.  For instance, in *United Steel & Fasteners v. United States*, a case on which Sigma continues to rely, the Federal Circuit found it particularly notable in its retroactivity analysis that CBP's failure to suspend liquidation or assess antidumping duties earlier reflected Customs (and perhaps Commerce's) view that "the merchandise" was not "within the scope of an order."  947 F.3d 794, 802 (Fed. Cir. 2020).  But that inference presumes an importer fully and truthfully described "the merchandise" to Customs— something that the jury found did not happen here.  Indeed, in rejecting Sigma's affirmative defense, the jury necessarily concluded that the Government did not know and reasonably should not have known that Sigma was actually importing Chinese welded outlets.  ECF #421.

The jury's findings in this regard—which again, must be construed in Island's favor—render Sigma's liquidation theory untenable.  The record evidence establishes that Sigma not only falsely declared that its welded outlets were not subject to antidumping duties, but also affirmatively misdescribed its merchandise using the name of a different product—one that is not only undisputedly beyond the scope of the China Order but also expressly carved out of the abbreviated scope definition

7

common to all five countries subject to ADD orders on butt-weld pipe fittings.  Trial
Ex. 1033, at 20 (Sigma's scope ruling request) (citing *Carbon Steel Butt-Weld Pipe
Fittings from Brazil, Japan, Taiwan, Thailand, and the People's Republic of China:
Final Results of the Expedited Sunset Reviews of the Antidumping Duty Orders*, 81
Fed. Reg. 44270 (July 7, 2016)).

Viewing the evidence in the light most favorable to Island, the jury's verdict
confirms that Sigma was not merely a hapless importer caught unaware of a 30-year
old antidumping order.  Instead, this case involves a defendant who for nearly a
decade lied to Customs about what it was importing and, at the very least, recklessly
disregarded or deliberately ignored longstanding antidumping duty orders and scope
rulings—of which, as the uncontroverted testimony of Kelli Thompson confirms, an
importer needs to be aware.

It is therefore curious that Sigma again relies on an out-of-context quotation in
Commerce's statements about potential reform of liquidation regulations.  As Island
explained, Commerce's proposal to toughen liquidation regulations—to capture
earlier imports—reflects the agency's desire to discourage importers from
"import[ing] as much as possible" before requesting a scope ruling, and "then
eliminate AD/CVD duty liability [via liquidation] for such imports by requesting a
scope inquiry.  Such manipulation of AD/CVD duty liability would undermine the
effectiveness and remedial purpose of the AD/CVD laws." *Regulations to Improve
Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 85
Fed. Reg. 49472, 49483 (Aug. 13, 2020); *see* Island Ex Parte Opp'n, ECF #395 at 4-
5.  In these comments about the need to toughen liquidation procedures, Commerce
is reinforcing this Court's prior determinations that (1) scope rulings have
"retroactive effect for purposes of FCA liability" and (2) the FCA's "broad mandate"
of deterring knowing false statements to the Government is not constrained by
liquidation principles.  MSJ Order at 11, 13.

At bottom, *nothing* in Commerce's Remand Results or Sigma's case law supports the notion that the jury's finding that for nearly a decade Sigma made knowing false statements costing the Government over $8 million in antidumping duties must be disregarded because of the administrative liquidation regime. In light of the jury's verdict and this Court's previous holdings, had Sigma truthfully declared—from the start in 2010—that it was importing Chinese welded outlets within the scope of the China Order, the United States would have assessed the 182.9% antidumping duty.

Sigma's legal obligation to pay the antidumping duties was fixed with the enactment of the China Order in 1992. Sigma's decade-long practice of submitting multiple knowing false statements caused the Government to suffer more than $8 million in damages. Nothing in the Remand Results gives this Court any grounds to nullify the jury's verdict seeking to right those wrongs.

## IV. SIGMA'S "OBJECTIVELY REASONABLE" DEFENSE IS BARRED AND FAILS AS A MATTER OF BOTH FACT AND LAW.

Sigma's reliance on a footnote in *Safeco* is unavailing for multiple reasons. To begin with, as described above, that argument is procedurally barred because Sigma chose not to raise it in its Rule 50(a) motion. But beyond that unmistakable forfeiture, Sigma's contentions are legally flawed and factually incorrect.

*Safeco* does nothing to undermine Sigma's FCA liability because that case does not reach misrepresentations of fact and thus cannot excuse Sigma for falsely describing its welded outlets as steel couplings. Even if the "objectively reasonable" defense had purchase in the FCA context (and it does not because of the different statutory text), it only could become relevant when a defendant's false statements turn on a "good-faith mistake about the meaning of an applicable ***rule or regulation***." *United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287-88 (D.C. Cir. 2015) (emphasis added). The trial evidence amply supports a finding that Sigma knowingly used the false description of steel couplings. Mr. Bhattacharji admitted on the stand

9

that welded outlets and steel couplings are different products.  Day 2 Tr. at 97:3-5.
Sigma marketed the products as welded outlets (as required to use the Underwriters
Laboratories marks).  Day 1 Tr. at 110:3-114:19, 192:2-5, 192:20-193:1.  But Sigma,
as the responsible importer of record, consistently chose to tell Customs that the
products were steel couplings.   As Ms. Thompson testified, that was a choice:
Nothing prevented Sigma from truthfully describing its products as welded outlets.
Day 2 Tr. at 174:2-175:19.  Sigma's insistence that the false description was required
is contradicted by the only Customs expert in the trial.  Day 2 Tr. at 175:3-19.
Moreover, Sigma's internal and contemporaneous business records revealed what
amounts to two sets of books:  a description for Customs and a description for
Sigma's marketing.  That document—combined with Sigma's own scope submission
quoting the abbreviated scope definition as expressly excluding couplings—supports
a jury finding that Sigma knowingly submitted those false statements.  *See* Trial Ex.
42; Day 2 Tr. at 10:13-12:18.

The trial record thus supports the jury's verdict in a manner unrelated to the
reasonableness of any interpretation of the China Order—and thus necessarily
outside the scope of any *Safeco*-based legal defense.  For nearly a decade, Sigma
knowingly told Customs it was importing steel couplings—a product that
undisputedly was not subject to the China Order—when it was in fact importing
welded outlets.   As Ms. Thompson testified, that false description was material,
because Customs relies on importers to truthfully describe its products.  Day 2 Tr. at
159:13-17, 175:20-176:6.   Naturally, if an importer falsely tells CBP that it is
importing a product that is plainly beyond the scope of an antidumping duty, CBP
will be less likely to collect the antidumping duty that was owed.  Sigma's efforts to
rely on a second invoice with a different product description—a circumstance that
Ms. Thompson explained has no innocent explanation, *see* Day 2 Tr. at 203:25-
205:1—cannot be credited.  As reflected in the jury's rejection of Sigma's statute of
limitations defense, the Government cannot reasonably be expected to sift through

10

entry packets full of repeated false descriptions in order to identify the one instance when the product was truthfully disclosed.  Put simply, an importer cannot bury one truthful disclosure under a stack of falsehoods.

Any extended discussion of *Safeco* or "objective reasonableness" would therefore be superfluous given the actual record.  But even if the Court is inclined to consider the procedurally barred and factually inapposite defense, it should not justify overturning the jury's verdict.

Sigma acknowledges that the purpose of the "objectively reasonable" defense is to protect a defendant "who merely adopts" or "followed" a reasonable interpretation of an unclear statutory text.  Mot. at 13, 16 (quoting *Safeco*, 551 U.S. at 70 n.20).  Sigma did no such thing.  As the company never even saw the China Order until December 2017, Sigma had no contemporaneous view of whether welded outlets were inside or outside the scope.  Day 2 Tr. at 14:25-15:10.  Indeed, Sigma never even looked for any antidumping duty orders.  *Id*. at 15:11-20.  Instead, the only contemporaneous views that Sigma held can be seen in the internal records mentioned above, describing welded outlets as steel couplings only for Customs purposes.  On a Rule 50 standard, there is simply no credible evidence that a jury must have accepted that supports Sigma's self-serving view that welded outlets are not butt-weld pipe fittings.  Instead, trial testimony showed that the defining characteristic of a butt-weld pipe fitting is the presence of a weld bevel—a feature of welded outlets but not steel couplings.  Day 1 Tr. at 114:7-19 (Mark Woehrel).  Thus, Sigma's invocation of *Safeco* turns on an after-the-fact offering, crafted with help from litigation counsel after learning of this case.

Sigma asks the Court to ignore the fact that the company's proffered interpretation is divorced from what the company actually thought when it made the false statements for nine years.  But that salient fact highlights why *Safeco* has no relevance in the FCA context.  Congress has made clear that the FCA's scienter requirements reflect the legislative purpose of requiring those who do business with

11

the Government to make a "reasonable and prudent" inquiry. *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1174 (9th Cir. 2016) (quoting S. Rep. No. 99-345, at 21 (1986)).  As the Ninth Circuit has explained, the failure to make that inquiry—particularly where independent legal obligations such as the Mod Act also demand it—gives rise to FCA liability. *Id.* ("[A]t least some inquiry [must] be made."); *United States v. Mackby*, 261 F.3d 821, 828 (9th Cir. 2001).  Here, the jury was free to conclude that Sigma made no inquiry whatsoever.  Day 1 Tr. at 176:3-177-1, 179:20-25 (Rona testifying not a single record of any inquiry exists and Sigma consulted no one).

Moreover, even if *Safeco* applied, and even if Sigma were entitled to invoke it, the record establishes that Commerce's Sprink-Let ruling warned Sigma away from the view that welded outlets were beyond the scope of the China Order.  The proof is in Sigma's own reaction to learning of the Sprink-Let ruling.  Mr. Bhattacharji testified that he knew from reading that order that Sigma should not be importing Chinese welded outlets.  Day 2 Tr. at 108:15-21, 109:2-12.  That reaction is understandable.  The Sprink-Let ruling represents an authoritative decision by Commerce that products essentially identical to Sigma's welded outlets fall within the written scope of an antidumping order defined in materially indistinguishable terms.  Day 1 Tr. at 129:10-20; Trial Ex. 5.  Sigma's failure to look for the Sprink-Let ruling provides no defense but only serves as a testament to the company's failure to comply with its Customs obligations to conduct a diligent inquiry.  As Ms. Thompson testified, responsible importers would have found the Sprink-Let scope ruling during ordinary research.  Day 2 Tr. at 169:22-25, 172:4-11.  And Mr. Woehrel's personal experience of obtaining the Sprink-Let ruling within 24 hours of running simple Google searches and making a telephone call establishes that an importer interested in learning the truth could have found it with little effort.  Day 1 Tr. at 117:14-119:20, 122:8-126:7.  The undisputed evidence shows that Sigma undertook no such effort.  Had Sigma exerted that minimal effort, it would have been

12

warned away of its post hoc interpretation. *Cf.* MSJ Order at 13 (defining "deliberate ignorance" as a defendant burying his head in the sand and "fail[ing] to make simple inquiries which would alert him that false claims are being submitted" (quoting *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1176 (9th Cir. 2016)).

And again, Sigma's reliance on a stray observation from the Court of International Trade to suggest that Commerce has somehow disavowed the 1992 decision is wrong. This July, in its final report, Commerce unequivocally reaffirmed the "informative" value of the "relevant" Sprink-Let ruling because it concerned materially indistinguishable products evaluated under the same scope language. Remand Results at 6 & n.33.

## V.     THE TRIAL EVIDENCE SUPPORTS THE JURY'S VERDICT.

Sigma's remaining arguments about the sufficiency of the evidence are uniformly meritless. The trial record viewed in the light most favorable to Island fully supports the jury's verdict as to each element of a FCA violation.

### 1.     Falsity

The Court has repeatedly held that Sigma's statements that no antidumping duties were owed were false. MSJ Order at 12; Jury Instruction No. 12, ECF #423 at 13. That instruction is plainly correct considering Commerce's determination that it continues to view welded outlets as within the scope of the China Order. Remand Results at 104. As falsity turns on "whether a defendant's representations are accurate in light of applicable law," Commerce's consistent determination conclusively resolves that issue. MSJ Order at 7 (quoting *United States v. Bourseau*, 531 F.3d 1159, 1164 (9th Cir. 2008)).

Nor can there be any doubt that the jury heard sufficient evidence to determine that Sigma's representations that it was importing "steel couplings" was false. Mr. Woehrel testified that welded outlets and steel couplings were distinct products with distinct physical characteristics (e.g., welded outlets are beveled, but steel couplings are not). *See, e.g.*, Day 1 Tr. at 113:9-19. Mr. Bhattacharji likewise admitted that

13

welded outlets and steel couplings are distinct products.  Day 2 Tr. at 97:3-5.  Ms. Thompson testified that nothing prevented Sigma from truthfully describing the products as welded outlets.  Day 2 Tr. at 174:2-175:19.  Moreover, Ms. Thompson discredited Sigma's proffered explanation that Customs (via HTS classifications) required the descriptor "steel couplings" or that such terminology constituted a permissible standard definition for purposes of the Form 7501.  *Id*.

Sigma asks the Court to write off these repeated misrepresentations as mere nit picking.  Mot. 18.  But the jury's verdict is entitled to much greater deference than that.  For instance, Sigma oddly accuses Island of "disregard[ing]" the product descriptions in the rest of the entry packet.  Not so.  The trial testimony and exhibits made clear that Sigma consistently used the description "steel coupling" on its Form 7501s, Form 3461s, commercial invoices, bills of lading, and packing lists.  Day 1 Tr. at 201:9-205:20.  And the jury's rejection of Sigma's affirmative defense underscores that it rejected Sigma's argument that the entry packets, when read together, reasonably should have alerted Customs to the fact that Sigma was actually importing welded outlets.

**2.    Damages**

Sigma's brief argument about damages fails for the same reason its liquidation defense is unavailing.  Mot. at 10.  In fact, elsewhere in the motion Sigma gives away the game.  While preserving its falsity argument, Sigma acknowledges that although "the Remand Results constitute the currently applicable law, Sigma maintains that no antidumping duties were owed in connection with the company's importation of Unilet and Safelet [welded outlets] between 2010 and 2018."  Mot. at 18.  In other words, here Sigma tacitly concedes that Commerce has determined that the duties were in fact owed all along.

Island's summary damages exhibit (which was admitted into evidence as Trial Exhibit 65A) and the trial testimony of Mr. Callahan are more than enough to establish that Sigma's false statements caused the Government to incur damages in

14

the amount of $8,085,546.03.  The trial evidence shows that had Sigma truthfully described its products and truthfully declared that its imports were subject to antidumping duties, Customs would have assessed the applicable antidumping duty.

### 3.     Scienter

The jury was offered three ways to find that Sigma acted with the required knowledge of its false statements.  Although the verdict must be upheld if any one of the three options is supported by sufficient evidence, here the trial record supports all three.

As described above, the jury readily could have concluded that Sigma had actual knowledge that it falsely told Customs it was importing "steel couplings." Witnesses from both Island and Sigma testified that steel couplings are a different product.  Sigma markets welded outlets not as steel couplings but as welded outlets, in part because that is the standard of identity.  Day 1 Tr. at 110:3-114:19.  And, again, Sigma's internal records—some of the very few Sigma documents introduced at trial, which were produced under oath to the Justice Department—showed that Sigma maintained two separate descriptions:  a truthful description for marketing purposes, and a false description for Customs.   Trial Ex. 42, at SIGMA2888. Although Sigma's witnesses tried to explain away why the company called welded outlets something different only for Customs purposes, that testimony was discredited by Ms. Thompson.  *Compare* Day 2 Tr. at 98:4 (Bhattacharji contending that "ST" on Form 7501 stands for "steel coupling"), with *id*. 174:20-175:19 (Thompson rejecting Bhattacharji's explanation).  The jury was free to disregard Sigma's witnesses' testimony as no more than attempts to dissemble.

As the Court explained at summary judgment, the FCA's "deliberate ignorance" prong is satisfied when a defendant failed to undertake a simple inquiry that would have alerted him to the truth.  MSJ Order at 13; *United Healthcare*, 848 F.3d at 1176.  Given Mark Woehrel's testimony showing the ease by which someone uninitiated could quickly obtain the China Order, the relevant sunset reviews, and the

15

Sprink-Let scope ruling, a jury would be well justified to conclude that Sigma acted in deliberate ignorance of the truth. Day 1 Tr. at 117:14-119:20, 122:12-126:7.  Mr. Woehrel's testimony—combined with the straightforward processes that Ms. Thompson explained responsible importers routinely practice—shows that Sigma's failure to undertake any such inquiry is tantamount to the company sticking its head in the sand.

The jury's verdict is also supported by evidence that Sigma acted in reckless disregard of the truth—that is, in an extremely negligent fashion.  The unrebutted testimony shows that the scope of an antidumping duty order is determined by the written description and not by HTS classification.  That principle is unequivocally confirmed in the text of the China Order (Trial Ex. 8); in Customs' authoritative guidance on antidumping compliance (Trial Ex. 58); and Ms. Thompson's unrebutted testimony that it is widely known in the industry (Day 2 Tr. at 178:12-179:22).  Sigma insists that someone—though not any trial witness—would have called a broker and asked about antidumping duties on welded outlets, but Sigma offered no credible evidence that any such consultation occurred.  And to be clear, this is not as Sigma contends merely an "absence of evidence" argument:   The contemporaneous evidence and Sigma's own sworn representations confirm that no such consultation occurred.  *See* Day 1 Tr. at 178:13-16, 179:20-25 (Rona confirming it is "always" in the company's interest to maintain such documents, but not one record exists); Day 2 Tr. at 178:25-179:22 (Thompson explaining manual never directed Sigma employees to consult antidumping orders or consult brokers on antidumping duties); Day 1 Tr, at 176:5-21 (Rona confirming verified interrogatory response that Sigma consulted no one about antidumping duties on welded outlets).

At bottom, Sigma's motion brushes aside the trial evidence related to scienter.  At trial, Sigma argued it would have needed a crystal ball to determine that it owed antidumping duties, but that is simply not true.  *See also* Mot. at 19 (claiming Commerce's determination was "unforeseeable").  Had Sigma made the simplest of

16

inquiries, such as the Google searches performed by Mr. Woehrel, or employed the most basic, fundamental practices related to antidumping compliance, as explained by Ms. Thompson, Sigma would have easily learned the truth. It chose not to do so. Instead, the company offered the jury excuses and stories founded not on personal knowledge but on self-serving descriptions of practices that contradict the company's compliance manual and sworn representations. None of those discredited excuses can justify overturning the jury's verdict.

### 4. Materiality

Although Sigma has forfeited any argument on materiality by failing to raise it in its Rule 50(a) motion, the merits of that argument can be summarily rejected. Ms. Thompson testified unequivocally that Customs relies on importers not only to truthfully declare whether antidumping duties are owed but also to truthfully describe the imported merchandise. Day 2 Tr. at 159:13-17, 175:20-176:6, 176:22-24. Sigma is plain wrong to say that Island did not present evidence that the description "steel coupling" was capable of influencing Customs' decision not to collect antidumping duties. Ms. Thompson—an experienced Customs employee—testified to that exact point. Day 2 Tr. at 176:2-6. Sigma cannot rely on the Star Pipe CROSS ruling, which only perpetuates the company's extremely deficient antidumping processes: The Star Pipe ruling never mentions antidumping because it is concerned only with the proper HTS classification for welded outlets. Trial Ex. 1007; Day 2 Tr. at 192:10-18. Island never contended that Sigma used the wrong HTS code. Instead, Sigma continues to ignore that HTS classifications do not control the applicability of antidumping duties—as confirmed by every reputable source introduced at trial, including Ms. Thompson's expert testimony and Customs' own Frequently Asked Questions. Trial Ex. 58, at 2.

## VI.   NO NEW TRIAL IS WARRANTED.

A Rule 59 motion for a new trial may be granted "only if the jury's verdict was against the clear weight of the evidence." *Tortu*, 556 F.3d at 1083 (quoting *Union*

17

1  |  *Oil Co. of Cal. v. Terrible Herbst, Inc.*, 331 F.3d 735, 742 (9th Cir. 2003)).  In its
2  |  one-paragraph argument, Sigma has made no such showing here.  Mot. at 20.

3  |       Nor could it.  On one side of the ledger, Island has shown that Sigma's few
4  |  contemporaneous documents confirm that Sigma never even looked for antidumping
5  |  duty orders nor consulted a broker or any other expert on the subject, but instead
6  |  knowingly provided Customs a false description of its merchandise on virtually all
7  |  of its required import paperwork.  On the other side, Sigma offered the jury nothing
8  |  but a host of uncorroborated excuses—many contradicted by Ms. Thompson's
9  |  unrebutted expert testimony—and strained, meritless smears of Island's investigative
10 |  efforts in pursuit of leveling the competitive playing field consistent with the entire
11 |  purpose of the antidumping duty framework.

12 |       The jury has rendered its verdict, which is in harmony with the record
13 |  evidence.  No new trial is justified.

## CONCLUSION

15 |       For these reasons, Island requests that the Court deny Sigma's motions in full
16 |  and enter judgment in accord with the proposed judgment.

Dated: October 14, 2021       Respectfully submitted,

MAYER BROWN LLP

*/s/C. Mitchell Hendy*
Kelly B. Kramer
Matthew H. Marmolejo
C. Mitchell Hendy
Attorneys for Relator

18