MAYER BROWN LLP
MATTHEW H. MARMOLEJO (SBN 242964)
*mmarmolejo@mayerbrown.com*
C. MITCHELL HENDY (SBN 282036)
*mhendy@mayerbrown.com*
350 South Grand Avenue, 25th Floor
Los Angeles , CA 90071-1503
Tel: (213) 229-9500
Fax: (213) 576-8185

MAYER BROWN LLP
KELLY B. KRAMER (*pro hac vice*)
*kkramer@mayerbrown.com*
1999 K Street, NW
Washington, D.C. 20006
Tel: (202) 263-3007
Fax: (202) 263-5207
Attorneys for Relator
ISLAND INDUSTRIES, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* ISLAND INDUSTRIES, INC., <br><br> Plaintiff, <br><br> vs. <br><br> VANDEWATER INTERNATIONAL INC.; NEIL RUEBENS; ANVIL INTERNATIONAL, LLC; SIGMA CORPORATION; SMITH COOPER INTERNATIONAL; ALLIED RUBBER & GASKET COMPANY, and JOHN DOES Nos. 1-10., <br><br> Defendants. | Case No. 2:17-cv-04393-RGK-KS <br><br> **DECLARATION OF KELLY B. KRAMER IN SUPPORT OF ISLAND INDUSTRIES, INC.'S MOTION FOR AN AWARD OF ATTORNEYS' FEES, COSTS, AND EXPENSES UNDER 31 U.S.C. § 3730(d)(2)** <br><br> Hearing: April 4, 2022 <br> Time: 9:00am <br> Courtroom: 850 <br> Judge: Hon. R. Gary Klausner |

# INTRODUCTION

I, Kelly B. Kramer, declare as follows:

1.      I am an attorney at law duly admitted to practice in the State of New York and the District of Columbia; before the United States Courts of Appeal for the Fourth, Seventh, Ninth, District of Columbia, and Federal Circuits; and before the United States District Courts for the Southern District of New York and the District of Columbia.  I received a B.A, *cum laude*, from The College of William and Mary in 1994 and a J.D., *cum laude*, from The University of Pennsylvania in 1997.  Since then, I have continually practiced law in Washington, D.C., with Ropes & Gray LLP (1997-2004), Nixon Peabody LLP (2004-2011), and Mayer Brown LLP ("Mayer Brown") (2011-present).  I have served as co-leader of Mayer Brown's White Collar Defense & Compliance Group since 2012.

2.      I am one of the attorneys of record for Relator Island Industries, Inc. ("Island"), admitted *pro hac vice*.  I have supervised the case since its inception in 2016.  Among other things, I assessed the viability of the possible claims, developed the overall strategy for the litigation, drafted the complaint, interacted extensively with the Department of Justice ("DOJ"), oversaw and conducted offensive and defensive discovery, drafted or supervised the drafting of pleadings, prepared for and participated in multiple mediation sessions, negotiated settlements with two defendants (Smith Cooper International ("SCI") and Allied Rubber & Gasket Company ("ARGCO")), and prepared for and conducted the trial against the Sigma Corporation ("Sigma").

3.      I make this declaration in support of Island's Motion for an Award of Attorneys' Fees, Costs, and Expenses Under 31 U.S.C. §3730(d)(2).  I am more than 18 years of age.  I have personal knowledge of the matters stated herein and, if called as a witness at the hearing on this matter, could and would competently testify to those matters.

744833477

1

**BACKGROUND INFORMATION**

4.      Mayer Brown is an international law firm consisting of approximately 1,800 lawyers located in over 20 cities in North America, South America, Europe, and Asia.  It has been in business continually for approximately 140 years and is regularly ranked among the world's leading law firms in the Americas, Asia, and Europe by the profession's leading ranking bodies.  Mayer Brown serves many of the world's largest companies, including a significant portion of the Fortune 100, FTSE 100, DAX, and Hang Seng Index companies, and more than half of the world's largest banks.

5.      During my 24 years of law practice, I principally have been engaged in the investigation, defense, and litigation of complex white collar criminal actions and related commercial litigation.  During that period, I have represented clients in numerous litigated cases, including at least ten trials, sentencings, disciplinary litigations, or contested evidentiary hearings.  These fully litigated matters have been particularly complex and time consuming, and have caused me to spend, to the best of my knowledge, in excess of 100 days in contested proceedings, almost exclusively in federal court.  Among other matters, I co-led the six week trial defense of former Congressman Richard Renzi against public corruption, tax, money laundering and racketeering charges (United States District Court for the District of Arizona) and I led the three week trial defense of the former president of one of the Nation's largest local unions against embezzlement, fraud and tax charges (United States District Court for the Central District of California).  During my career, I have also prosecuted and defended multiple actions and investigations under the False Claims Act ("FCA"), including at least three different FCA cases premised on possible violations of the Customs laws.  All told, I would estimate that I have played active roles in more than 25 matters in the federal judicial system; the first of which was tried in 1998 before the United States District Court for the Eastern District of Texas and the most recent of which was tried before this Court in October 2021.

6.      I personally have been involved in reviewing law firm fee billing materials since approximately 1999 and, once I became a partner in 2006, personally have reviewed billing materials and determined the amounts to bill clients, generally on a monthly basis.  Over that period, I estimate that I have reviewed, analyzed, and/or approved client billings totaling well over $50 million.  As the co-head of Mayer Brown's White Collar Defense & Compliance Group, I have also been involved in reviewing hourly rates for the Group's members, who are located around the globe, including in Los Angeles, California.

## HISTORY OF THE LITIGATION

7.      In or around October 2016, Island approached Mayer Brown with information about possible violations of the anti-dumping duty order against certain butt-weld pipe fittings from the People's Republic of China ("China Order").  Mayer Brown worked with Island to develop an understanding of the underlying allegations against various potential defendants and to identify potentially applicable legal theories and causes of action.  Island retained Mayer Brown to file an FCA action on its behalf on a contingent basis.

8.      On June 13, 2017, Mayer Brown filed, *ex parte* and under seal, an FCA complaint against Vandewater International, Inc. and Neil Reubens (together, "Vandewater"); Anvil International, LLC ("Anvil"); Sigma; SCI; and ARGCO alleging that defendants made false statements to import welded outlets from China without paying the applicable ADDs under the China Order.  (ECF #1.)  Mayer Brown simultaneously provided the DOJ with a copy of the complaint and a memorandum summarizing the supporting evidence, as required by law.

9.      During and after the DOJ's investigation period, Island and Mayer Brown worked together to help the DOJ to understand the allegations and the relevant legal issues.  Among other things, Island and Mayer Brown participated in at least two face-to-face meetings with the responsible DOJ attorneys, provided real-time reports to DOJ on developments relating to the defendants' statements to the market

744833477

3

and import practices, identified possible witnesses, and drafted suggested language for document requests.  As part of the investigation, DOJ issued Civil Investigative Demands ("CIDs") to most of the defendants, including Sigma.  Following receipt of the CID, Sigma informed the DOJ that it would ask the Department of Commerce ("DOC") to issue a scope ruling finding that welded outlets were not butt-weld pipe fittings within the meaning of the China Order, which it did shortly thereafter.[1]

10.     All parties (including the DOJ) understood that the DOC's scope rulings would be critical to the FCA litigation.   A ruling that welded outlets were within the scope of the China Order would establish that the defendants made false statements to Customs and Border Protection ("CBP").  A contrary ruling would establish that the defendants had not made false statements to CBP, at least as it related to whether the products were subject to ADDs.  Given the importance of this litigation, Island also retained Mayer Brown to represent it before the DOC.  As such, Island and Mayer Brown actively participated in the scope ruling proceedings, which resulted in the DOC's December 2018 rulings that Sigma's, Vandewater's and SCI's welded outlets were subject to the China Order.[2]

11.     In the meantime, having been denied the latest of its several motions to extend its election period, the DOJ advised the Court that it did not have sufficient information to make an informed decision as to whether to proceed with the action against Sigma, Vandewater, SCI and ARGCO, and that it was therefore not electing to intervene as of that time.  (The DOJ advised the Court that it had declined to

---

[1] Vandewater and SCI similarly requested scope rulings from the DOC.

[2] In January 2019, Sigma challenged the DOC's scope ruling in the Court of International Trade ("CIT").  Mayer Brown also represents Island in those proceedings, which are ongoing.  In 2021, the DOC responded to a CIT remand by finding, again, that defendants' welded outlets are subject to the China Order.  The defendants are currently challenging the DOC's 2021 decision before the CIT.  Island reserves the right to file a supplemental fee request in this action upon the conclusion of the CIT litigation should it affirm the DOC's conclusion that welded outlets are within the scope of the China Order.

744833477

4

intervene as regards the claims against Anvil.)    The DOJ also requested, and the Court so ordered, that Island's original complaint be unsealed. (ECF ## 33 & 34.)

12.    In April 2019, Mayer Brown timely served the complaint on all defendants.  Thereafter, Island filed a First Amended Complaint, which referenced and attached the DOC's scope rulings.  (ECF # 97.)  All defendants except ARGCO thereafter moved to:  (a) dismiss the claims in the First Amended Complaint; and (b) stay this action pending the resolution of all proceedings before the CIT.[3]  After full briefing, the Court:  (a) denied defendants' motions to dismiss the substantive FCA claims while granting the motions to dismiss the conspiracy count (ECF #128); and (b) denied the defendants' motions to stay all proceedings without prejudice (ECF #126).

13.    Discovery commenced.  Mayer Brown developed and served at least two rounds of interrogatories and document requests on SCI, Sigma, and Vandewater.[4]  It also developed and served document requests on various third parties.  Mayer Brown deposed multiple officials at all three of these companies.  Ultimately, with respect to Sigma, Mayer Brown deposed three executives, as well as its corporate representative.  In addition, Mayer Brown and Island responded to multiple requests for written discovery, produced thousands of pages of documents to defendants, and defended the depositions of Island's owner and national sales manager (which collectively lasted three full days).

14.    Expert discovery took place primarily in March 2020.  Island's retained expert, Kelli Thompson, prepared and submitted an initial report, which was later amended to include her observations as they related to Sigma given the tight

---

[3] Rather than file a motion to dismiss, ARGCO initiated settlement discussions with Island, which eventually led to a court-approved settlement agreement. (ECF #338.)

[4] As a result of discussions with Anvil's counsel and Anvil's preliminary document production, Island undertook extraordinary targeted, attorneys'-eyes-only discovery as it related to Anvil.  As a result of this targeted approach, Island determined that it was unlikely to obtain sufficient evidence to prove its claims against Anvil.  Accordingly, it stipulated to Anvil's dismissal.

744833477

5

discovery schedule. Mayer Brown defended Ms. Thompson's deposition, which took place over the course of two days. Sigma's retained expert, Walter Sperko, prepared and submitted three expert reports (one in DOC scope ruling action, another in the subsequent CIT proceedings, and the third in the FCA case). Mayer Brown took Mr. Sperko's deposition in March 2020. Mr. Sperko and Ms. Thompson respectively billed $350/hour and $375/hour for their work in this case.

15.    After the close of discovery, Sigma, SCI, and Vandewater each moved for summary judgment in April 2020.[5] Because the defendants' summary judgment motions involved several common questions of law (e.g., whether the defendants acted with scienter as a matter of law under *Safeco*), Mayer Brown proposed to file a consolidated opposition. Sigma objected, forcing Mayer Brown to spend additional attorney and paralegal time to prepare and file three distinct (but often repetitive) briefs. The Court then *sua sponte* requested supplemental briefing regarding the interplay between the DOC scope rulings and the FCA. After full briefing (including supplemental briefing and the DOJ's Statement of Interest), this Court denied nearly all aspects of the defendants' summary judgment motions—and all aspects of Sigma's motion—in June 2020. (ECF #270, 16 (denying summary judgment on the claim that "Defendants falsely stated that their products were duty-free" as well as on the claim that "Sigma falsely described products as steel couplings.").)

16.    Also in April 2020, while defendants' summary judgment and stay motions were still pending, the parties participated in a mediation before the Hon. Edward A. Infante (Ret.). As part of the mediation process, the parties prepared and served mediation briefs along with confidential side letters (which side letters were disclosed only to the mediator). The mediation process was not initially successful; however, after this Court denied the defendants motions for summary judgment and

---

[5] SCI and Vandewater also renewed their motion to stay proceedings pending the outcome of the collateral litigation before the CIT. In June 2020, this Court denied that motion. (ECF #269.)

DECLARATION OF KELLY B. KRAMER;
CASE NO. 2:17-CV-04393-RGK-KS

to stay proceedings, Island and SCI renewed the mediation, which led to a court-approved, confidential settlement agreement.  (ECF #370.)

17.    Notwithstanding uncertainties created by the COVID pandemic, Mayer Brown prepared to try the case against all defendants in the summer of 2020.[6]  Among other things, Mayer Brown prepared and filed a series of motions *in limine*, a memorandum of contentions of fact and law, a joint exhibit list, a joint witness list, a pretrial conference order, and jury instructions.  Mayer Brown also prepared and filed oppositions to defendants' motions *in limine* and jury instructions.  On July 29, 2020, however, the Court advised the parties that, in light of the COVID pandemic, it would be unable to conduct a jury trial due to the unavailability of jurors.  The Court continued the trial until February 2021, absent agreement by the parties to proceed with a bench trial during August 2020.  Island solicited the defendants' views as to a possible bench trial, but none of them agreed to proceed in that fashion.

18.    In November 2020, Vandewater filed, and Sigma joined, a motion asking this Court to reconsider its decisions to deny defendants' motions to stay proceedings and Vandewater's motion to dismiss for lack of subject matter jurisdiction in light of the CIT's decision to remand the scope ruling decision to DOC. Mayer Brown prepared and filed opposition papers.  By order dated December 14, 2020, this Court denied Vandewater's and Sigma's request.  *See* ECF #352 at 3 ("With regard to falsity, CIT's order did not conclude that Defendants' product was excluded from the China Order as a matter of law.") and 4 ([Defendants'] scienter arguments are also unavailing…. [Defendants] made this same argument in their motion for summary judgment. The Court rejected that argument then, and it rejects that argument now.").

---

[6] After the court's summary judgment ruling, Sigma filed a motion to sever Island's claims, which this Court initially denied (ECF #343) but, upon renewal, ultimately granted in January 2021.  (ECF #359.)  Mayer Brown nevertheless prepared to try the case against all defendants, including Sigma, in July, as scheduled.

7

19.   The CIT's remand order and the ongoing COVID pandemic forced additional delays of the trial, which was reset for August 17, 2021.  (ECF #361.) During this delay, Mayer Brown prepared and filed periodic reports on the status of the DOC's decision on remand, which concluded in late July with the DOC again finding that Sigma's products were within the scope of the China Order.[7]  Seizing on language in the DOC's ruling regarding CBP's liquidation regulations, Sigma filed an *Ex Parte* Application for Summary Judgment, which required Island to prepare a response in a single day.  On August 2, 2021, the Court orally advised the party that it would be denying that motion, noting that the Federal and Local Rules precluded a second motion for summary judgment.  (ECF #409.)

20.   In anticipation of the August 17, 2021 trial date, Mayer Brown again prepared to try the case, this time against Sigma alone.  Among other things, Mayer Brown prepared and filed an additional motion *in limine*, a second memorandum of contentions of fact and law, a new joint exhibit list, a new joint witness list, a new pretrial conference order, new jury instructions, a trial brief, and a statement of the case.  On August 13, however, the Court advised the parties that it would be unable to conduct a jury trial due an ongoing criminal trial.  The Court thus continued the trial date to September 28, 2021.  (ECF #406.)

21.   In anticipation of the September 28, 2021 trial date, Mayer Brown again prepared to try the case against Sigma.  Mayer Brown attorneys were present in the courthouse and prepared to begin trial as scheduled, but the trial was delayed by a conflicting criminal matter, this time until October 5, 2021.  (ECF #415.)

22.   Finally, on October 5, 2021, the trial began, and it proceeded expeditiously.  On October 7, a unanimous jury returned a verdict in favor of Island, finding that Sigma violated the FCA by making false statements to avoid its obligation to pay money to the Government.  (ECF #421.)  The jury found that these

---

[7] Also during this delay, Vandewater and Reubens filed for bankruptcy, and the Court ordered the case stayed as to these defendants.  (ECF ##373 & 374.)

8

false statements caused the United States $8,085,546.03 in damages United States (the full amount sought by Island, to the penny). *See id.*

23.    On October 12, Sigma filed post-trial motions seeking judgment as a matter of law, once again claiming that CBP's liquidation regulations precluded judgment under the FCA.  Mayer Brown prepared opposition papers.  On December 10, 2021, this Court denied Sigma's motion, referencing and quoting from its Order denying Sigma's motion for Summary Judgment. (ECF #441 at 4 ("'Liquidation is a different animal—one which is unconcerned with the intent of the importer.' (Order re Summ. J. at 11, ECF No. 270.)").)

24.    On February 8, 2022, the Court entered judgment against Sigma. (Judgment, ECF #454).  The judgment found Sigma liable to the United States for treble damages under the FCA in the amount of $24,256,638.09, for civil monetary penalties in the amount of $1,824,145, and for post-judgment interest.  The judgment further stated that Sigma was liable for the costs of suit, including reasonable attorneys' fees, and that the Court would retain jurisdiction to resolve any motion for statutory expenses, reasonable attorneys' fees, and costs filed within 28 days of the judgment.

\*          \*          \*

25.    As this summary reflects, Mayer Brown and Island have spent more than five years investigating, researching, and litigating this case—not just in this Court, but also in before the CIT and the DOC.  Mayer Brown and Island will spend still more time defending against both Sigma's appeal and its ongoing efforts before the CIT.  Mayer Brown and Island reserve their rights to file a supplemental fee petition to recover reimbursement for these ongoing efforts.

26.    As this summary also reflects, the litigation has been, and no doubt will continue to be, hard fought.  Sigma retained White & Case LLP—one of the world's most prestigious law firms—to defend itself in this action and to pursue collateral litigation in the CIT.  Those services did not come cheap; indeed, in the days before

trial, Sigma advised Island, in writing, that the cost of defending itself through trial would approach or exceed $6 million.   Attached hereto as Exhibit A is a true and correct copy of Sigma's September 29, 2021 correspondence in this regard.   As explained herein, Island now seeks to recover $2,944,771.66—*less than half of Sigma's claimed and anticipated defense costs*—for the fees and costs it incurred to successfully litigate this matter to judgment.

## **STAFFING**

27.   The core team for the FCA litigation consisted of Matthew Marmolejo, Mitchell Hendy, Sasha Keck, Alexus Payton and me.  Matthew McConkey, a partner in our Global Trade practice, handled the related litigation before the CIT and the DOC.  Messrs. Marmolejo, McConkey and I were partners throughout the matter. Mr. Hendy, Ms. Keck, and Ms. Payton were associates.[8]

28.   Mr. Marmolejo, the Office Practice Leader of Mayer Brown's Los Angeles Litigation Group, graduated from Stanford Law School in 2005.  Mr. Marmolejo has spent the bulk of his career litigating complex commercial and regulatory matters, including numerous matters in the United States District Court for the Central District of California.   Mr. Marmolejo handled many case management tasks in this matter, including most communications with opposing counsel and other discovery-related tasks.   He also participated extensively in mediation proceedings and settlement discussions, including all of the settlement discussions with Sigma.   He also reviewed and approved for filing most of the substantive pleadings.

29.   Mr. Hendy graduated from Columbia Law School in 2011.  Mr. Hendy is a senior associate in Mayer Brown's Los Angeles Litigation Group who previously served as an Assistant U.S. Attorney in the Southern District of Ohio, as an associate

---

[8] Attached as Exhibit B are the professional profiles of the attorneys associated with Mayer Brown in any capacity at any time in this case and who billed in excess of 25 hours on this matter.

at a prestigious Los Angeles-based litigation boutique, and as a law clerk for the Hon. Amalya Kearse of the United States Court of Appeals for the Second Circuit.  Mr. Hendy second-chaired the trial; drafted all or nearly all of the contested pleadings; researched substantial questions of law; and prepared, examined, and otherwise coordinated with Island's Customs-law expert.

30.   Ms. Keck graduated from the University of Michigan Law School in 2017.  While Ms. Keck is currently an associate in Mayer Brown's Los Angeles Litigation Group, she began her legal career in Mayer Brown's Washington, D.C., office.  Ms. Keck second-chaired the Sigma and Island depositions, analyzed key documents, researched questions of law, managed substantial aspects of the discovery process, oversaw the work of the staff attorneys, and participated in drafting pleadings and discovery requests.

31.   Ms. Payton graduated from the University of California, Berkley Law School in 2017.  Ms. Payton was an associate in Mayer Brown's Los Angeles Litigation Group until 2020, when she joined White & Case's Los Angeles office.  Ms. Payton managed substantial aspects of the discovery process, researched questions of law, and assisted in drafting pleadings and discovery requests.

32.   Several other partners and associates worked on the case for shorter periods of time, typically in connection with specific issues where they had specialized knowledge and experience or because of specific needs given the status of the case.  Their roles and contributions are described below.

33.   Richard Ben-Veniste is a litigation partner in Mayer Brown's Washington, D.C., office.  A graduate of Columbia Law School, Mr. Ben-Veniste has had a long and distinguished career in private practice.  In addition, he served as a Commissioner on the National Commission on Terrorist Attacks on the United States (commonly referred to as the 9/11 Commission), as chief of the Watergate Special Prosecutor's Watergate Task Force, and as an Assistant U.S. Attorney in the Southern District of New York.  Mr. Ben-Veniste provided strategic guidance at key

11

points in the litigation (including advice regarding settlement possibilities, opposing the motions for summary judgment, and trial strategy) and actively participated in the final mediation with Sigma during the summer of 2021.

34.     Reginald Goeke is the co-leader of Mayer Brown's Litigation and Dispute Resolution and Commercial Litigation practices. A graduate of Harvard Law School, Mr. Goeke is based in Mayer Brown's Washington, D.C., office. Mr. Goeke first-chaired the depositions of all Sigma executives, including its corporate representative. He provided insight, feedback, and assistance with respect to Sigma's conduct in connection with Island's opposition to Sigma's motion for summary judgment, both mediations, and the trial.

35.     Sandor Callahan was a litigation associate in Mayer Brown's Los Angeles, California, office until his recent appointment as an Assistant U.S. Attorney in the Southern District of California. He graduated from Georgetown University Law Center in 2017. Mr. Callahan oversaw final production of Island's summary chart, which was admitted into evidence through his trial testimony. He assisted with trial logistics, expert and witness preparation, closing argument, and the post-trial motions.

36.     Several staff attorneys worked on the case, primarily during the discovery phase. The work delegated to the staff attorneys included first-level review of documents (including documents produced by defendants and documents from Island that were potentially subject to production), creating production sets and privilege logs, and creating charts summarizing key information regarding defendants imports of welded outlets (e.g., information contained on each Form 7501, commercial invoice, and bill of lading). Their historical rates ranged from $400 to $440.

37.     Several paralegals at Mayer Brown worked on the case. The work delegated to the paralegals included cite-checking, filing, reviewing, and organizing

electronic documents, assisting with processing and reviewing billing statements, and organization of information in Excel. Their rates ranged from $295 to $405.

## BILLING PRACTICES

38. At all relevant times, Mayer Brown maintained a sophisticated electronic and computerized timekeeping and billing system for the purpose of billing clients for individual matters. In addition, Mayer Brown had in place a series of procedures and practices that relate to the timekeeping and billing system in order to ensure the recording of prompt, timely, and accurate time entries worked by all Mayer Brown timekeepers. I have personal knowledge of those billing procedures and practices generally and in particular in connection with this case, and I am informed and believe that all timekeepers involved in this case also have such knowledge. I understand that those practices and procedures were applied to this matter.

39. Under those practices and procedures, all timekeepers are directed to record their time on the electronic timekeeping system on a daily basis and, in no event later than three business days after the time was incurred and the services were performed, in order to ensure accurate timekeeping that is substantially contemporaneous with the performance of services. All time for a month is due by noon Central Time on the first business day of the next month. Under Mayer Brown practices and procedures, and in order to ensure accurate recording of time, repeated failures of timekeepers to adhere to the "one-day/three-day rule" can, and on occasion do, result in the imposition of financial costs on non-complying timekeepers.

40. In the month following the rendition and recording of services in any open matter, the billing partners are provided with a document referred to as a "pre-bill." The pre-bill is a multi-page document whose length varies with the number of timekeepers and hours billed to the particular matter during the preceding month. The pre-bill reports by timekeeper chronologically and on an alphabetical basis within any day, the date, the amount of time, a description of the particular services

744833477                                                                 13

that the timekeeper has billed to the matter in the previous month and the associated fee. It therefore reports for example, the time spent and services performed by John Doe on July 1, then by James Roe on July 1, then by Judy Moe on July 1 and so on, and after all of the time and services spent and performed on July 1 are reported, then lists any time spent and services rendered by John Doe on July 2, and so on. It also totals the time recorded during the month and the fees incurred at each timekeeper's assigned hourly rate. It then separately lists each disbursement (amounts paid to third parties for certain expenses) and any other charges related to the matter (internal charges for administrative services provided by Mayer Brown personnel; for example, photocopies, large printing jobs, and computerized legal research).

41.    I am the billing partner in this matter. The billing partner reviews all entries and makes any necessary corrections or adjustments to ensure accuracy and to exercise professional judgment as to the amounts contained on the ultimate bill and I personally performed that function on all prebills in this case. The corrections and adjustments can include deleting time entries and the accompanying fee cost and/or reducing billed time and adjusting the accompanying fee cost (collectively known as write-offs or write downs). In the exercise of my professional judgment, I made the decisions discussed below to adjust or correct any particular pre-bill before it was used to generate the fee petition in this case.

## **SERVICES RENDERED**

42.    Attached as Exhibits C & D are spreadsheets, prepared at my direction and under my supervision, detailing the services for which we now request compensation. Exhibit C identifies the services rendered directly in the FCA litigation before this Court (the "FCA Matter"), while Exhibit D identifies the services rendered by Mayer Brown on behalf of Island before the DOC and the CIT (the "Scope Ruling Matter"). The services reflected in Exhibits C & D were documented by the relevant Mayer Brown timekeepers using the timekeeping system, and subject to the timekeeping policies, described above. Among other

things, the spreadsheet identifies: the date the services were performed; the timekeeper who performed the services; a detailed narrative of the services provided on that date; the time billed by the timekeeper for those services (expressed in terms of hours); the timekeeper's hourly billing rate being applied to that time; and the value of the timekeeper's work, which is a mathematical product of the timekeeper's hourly billing rate and the billed time for that entry.

43.     The rates reflected on Exhibits C & D are Mayer Brown's standard rates (*i.e.*, the rates Mayer Brown customarily charged its clients) as of January 2022. These are the same rates the Firm is charging to another client in an ongoing DOJ FCA Customs fraud investigation for which I am the Supervising Partner.

## **METHODOLOGY FOR ALLOCATING TIME**

44.     Each time entry in Exhibits C & D also contains a percentage allocation of the particular billing entry to Sigma.  This is represented in the column under the heading "Sigma Allocation."   This allocation was applied to each time entry to account for two aspects of how work was done on this matter.

### **"Common" Time and Costs**

45.     First, certain time entries contained time involved in work commonly allocable to all defendants in the matter.

46.     **"Common" Time in the District Court Proceedings**.  Island's FCA claims against the various defendants obviously involved common questions of fact and law.  Mayer Brown devoted substantial time and resources to research and develop common arguments to support Island's claims against each defendant.  For example, to pursue this case, Mayer Brown determined:  (i) the standard of care applicable to importers of record; (ii) whether welded outlets were subject to the China Order; (iii) whether the administrative record (including the Sprink-let ruling) adequately established a predicate for alleging, and for a jury finding, that the defendants' acted with scienter; (iv) whether misstatements about the applicability of the China Order were material; and (v) whether Island's claims might be subject to

the public disclosure bar. The time spent on resolving these threshold questions benefitted Island's case against all of the defendants.

47. Accordingly, for this fee petition, we carefully reviewed each and every time entry to identify not only work that was specific to Sigma (for example, litigating the trial or responding to a Sigma-specific motion), but also to identify "common" time and costs that were applicable to all defendants. The time and costs we identified as "common" time and costs (a) had application to all of the defendants, and (b) would have been required even if the case had involved only Sigma. As explained below, during the initial stages of this case, 25% of all such "common" time and costs was fairly attributable to Sigma and, following the settlement with SCI, 80% of such time was fairly attributable to Sigma.

48. Reflecting on the circumstances of this matter, and based on my experience of litigating cases for nearly 25 years, I believe that allocating 25% of the early-stage time logged as general or common time to Sigma is conservative. First, as a prospective matter, Island's claims primarily targeted four defendants: SCI, Sigma, Vandewater, and Anvil. (Island did not believe that ARGCO was a substantial importer, which proved correct.) Second, as a practical matter, Island's discovery efforts targeted only three defendants: Sigma, SCI, and Vandewater.[9] Third, with the benefit of hindsight, Sigma stands to pay far more than any other defendant, which would support a substantially greater allocation. Indeed, an objective, damages-based allocation of the common time would support an allocation of well more than 50% to Sigma.

49. Allocating 80% of the later-stage general or common time to Sigma is also conservative. Between October 5, 2020 (when Island and SCI entered into a settlement agreement) and April 29, 2021 (when Vandewater filed a notice of

---

[9] As noted above, Island undertook extraordinarily targeted discovery as regards to Anvil. Mayer Brown received only a handful of documents from Anvil during discovery, and did not seek to depose any Anvil executive or employee.

bankruptcy), Island was focused virtually exclusively on preparing for a trial against Sigma (who, during that time period, successfully moved for a severance). This focus was motivated in large part by Island's belief that Vandewater would not be able to satisfy any adverse judgment. Nevertheless, some of the trial preparation tasks during that time period may have incidentally related to Island's claims against Vandewater (in addition to relating to the claims against Sigma). For such entries, Island has allocated 80% of the value to Sigma.

50. **"Common" Time in the Scope Ruling Matter.** Island also incurred fees on common time spent on tasks involved with those aspects of the case pending before the DOC and CIT. *See* Exhibit D. Similar to the proceedings before this Court, Sigma, Vandewater, and SCI were active participants in these scope ruling-related proceedings, and took positions contrary to Island's positions with respect to the ADDs at issue in this case. In the same way that Mayer Brown's work in the proceedings before this Court involved certain issues that were common to all defendants, the work performed by Mayer Brown on behalf of Island on these scope ruling issues applied commonly to the parties involved in the DOC and CIT scope ruling proceedings. Indeed, our experience in these proceedings indicates that all time expended by Mayer Brown timekeepers was commonly allocable. That is because the issues and briefing before the DOC and the CIT centered almost entirely on issues applicable to all of the petitioners. This is unlike the FCA proceedings before this court, where some of the time incurred by Mayer Brown timekeepers could be attributed to particular defendants—for example, in discovery matters, where discovery was propounded, and responded to, on an individual defendant basis. I discuss our effort to allocate defendant-specific time in the FCA matter below.

51. While Mayer Brown's time expended in the Scope Ruling Matter accounts for a low percentage of the time encompassed in this fee petition, consistent

with the my explanation above, Island has allocated to Sigma 25% of all time through October 5, 2020, when Island and SCI entered into a settlement agreement.

52.     Following the resolution of Island's claims against SCI, Mayer Brown's work in the DOC/CIT scope proceedings could only benefit its FCA cases against Sigma and Vandewater.  Again, however, knowing that Vandewater would not be able to satisfy any adverse judgment, Island's decision to continue its participation in those proceedings was intended primarily to buttress its case against Sigma. In light of Island's focus on Sigma, Island has allocated 80% of all time in the scope ruling matter incurred after October 5, 2020.

### Time Allocable Only to Other Defendants

53.     Some of the time entries included in Exhibit C also reflect time allocable only to other defendants, for which Island does not seek compensation in this fee petition.  As with the review for common time in the billing records, we also have carefully reviewed each and every time entry to identify and exclude work and tasks solely attributable to another defendant.  Where applicable, those further reductions were identified by reference in the particular entries to particular defendants, issues associated only with those defendants, or deponents associated with those defendants.  When those instances were identified, the Sigma allocation was further reduced to reflect that time allocable to those other defendants.  Those reductions are indicated in strikethrough text (*i.e.*, we are not seeking compensation for tasks shown in this ~~font~~).  The amount of the allocation was based on a consideration of the nature of the particular non-Sigma task in relation to the amounts billed in the particular entry as a whole.   Time entries and fees incurred in connection with services attributable solely to non-Sigma defendants are not included in Exhibit C.

54.     The allocation values shown in the third column from the right in Exhibit C reflect both categories of allocations described above: (1) allocation of "common" time; and (2) allocation of time to remove time attributable only to other defendants.

18

55.    As set forth on the last page of Exhibit C, Mayer Brown timekeepers billed 2809.77 hours attributable to Sigma in the FCA Matter, with a resulting value of $2,584,789.71.    As set forth on the last page of Exhibit D, Mayer Brown timekeepers billed 126.69 hours attributable to Sigma in the Scope Ruling Matter, with a resulting value of $125,037.81. The combined total of $2,709,827.52 is the amount of fees Island seeks through this fee petition.

## APPLICATION OF BILLING JUDGMENT

56.    We made a number of adjustments to the pre-bills to ensure that we sought compensation only for services that were fairly attributable to establishing Sigma's violations of the FCA, damages, and our entitlement to a fee award.

57.    First, as discussed above, we eliminated time spent on matters that could be viewed as unrelated to establish Sigma's liability, including, of course, time spent on work relating to the other defendants.  Moreover, we also eliminated time spent on work that related to Sigma, but which did not contribute directly the success of the FCA litigation (e.g., meetings with members of Congress or their staffs to discuss the unfair trade practices at issue in this case).

58.    Second, we removed all non-legal work based on my professional judgment. Specifically, we removed all time billed by administrative staff (including internal electronic discovery staff, docket clerks, librarians, and research assistants) and summer associates regardless of the hours billed, even though Mayer Brown customarily bills clients for these sorts of services.  While we believe this work is compensable under the relevant legal authorities, we removed it in an abundance of caution and to minimize possible areas of dispute. This reduction included about 222 hours of recorded time for which the firm would customarily bill to paying clients. Those services were worth approximately $50,174 at current rates.

59.    Third, we reduced to zero all time incurred by timekeepers who billed fewer than 25 hours attributable to Sigma. This was done in an excess of caution to eliminate "ramp up" or otherwise unproductive time spent that may have been less

critical, even though I have no doubt that the time was necessary and that it significantly contributed to the result. This reduction removed the time of 24 different timekeepers who worked a cumulative total of approximately 212.5 hours. Those services would normally be charged to paying clients and would be worth $131,915.00 at the firm's current rates.

## USE OF 2022 BILLING RATES

60. Because this matter has taken more than five years to litigate thus far, an award based on Mayer Brown's historic billing rates would not adequately compensate it for, among other things, the decrease in the value of money over time. Taking just a standard measure of inflation in the United States, $100 paid in fees in 2017 is the equivalent of $114.70 today.[10] Put differently, $100 reimbursed to Island today is the equivalent of only 87% of the $100 it would have paid to Mayer Brown in 2017. As discussed in our accompanying memorandum, the Ninth Circuit and the United States Supreme Court both have approved the same cure for this problem: to award fees based on hourly rates in effect at the time of the motion/petition for fees, *i.e.*, based on current hourly rates. The use of current rates is obviously an economic proxy for an inflation adjustment without the difficult administrative issues posed by adjusting hundreds of bills issued at various times for varying inflation numbers. Furthermore, in contingency-fee litigation, the use of current rates better ensures full compensation, particularly in light of the risky nature of such cases. Finally, in light of Sigma's pending appeal, it seems probable that Island and Mayer Brown will not receive this compensation for many more months.

61. Island and Mayer Brown have spent more than five years investigating, prosecuting, and trying this case. Both entities fronted hundreds of thousands of dollars in significant litigation expenses. Mayer Brown paid the wages of lawyers and other legal staff over the course of several years to fund the prosecution of this

---

[10] *See* www.usinflationcalculator.com (last visited March 8, 2022).

case. The time and labor required for this matter precluded the Firm from productive work on other cases.

62.     Consistent with Supreme Court and Ninth Circuit precedent, Island's fee request—and in particular the rates used in deriving the ultimate value calculations in Exhibits C & D—are the standard billing rates charged by Mayer Brown for the relevant timekeeper effective January 1, 2022. For those timekeepers that are no longer employed by Mayer Brown at the time of this fee petition, Island has used the last applicable standard billing rate for that timekeeper.

63.     For the Court's reference, Island attaches as Exhibit E hereto a chart showing the historical, standard billing rate for every Mayer Brown timekeeper encompassed in this fee request, dating back to October 2016, the earliest month for which Island is seeking reimbursement for Mayer Brown's time.

## COSTS AND EXPENSES

64.     A number of necessary non-fee costs and expenses were incurred during the course of the litigation.   Certain of these costs and expenses were incurred by Island, while others were incurred by Mayer Brown on Island's behalf.

65.     As with the attorneys' fees incurred by Mayer Brown in conjunction with this motion, certain of the costs and expenses incurred by Island and Mayer Brown related to issues or tasks that were commonly allocable to the defendants in the case at that time. For that reason, in seeking reimbursement of costs and expenses in this matter, Island is applying the allocations described in Paragraphs 44 through 52, above, to costs that are commonly allocable among all defendants.

66.     Island and Mayer Brown incurred a number of third-party expenses during the course of the FCA Matter. Those categories of expenses include:

(a)     <u>Expert Fees.</u> Island retained the services of Kelli Thompson in this matter.   One of the country's leading experts in the complicated area of international trade and compliance, and a licensed customs broker, Ms. Thompson provided an expert opinion in this matter on how importers of record such as Sigma

1   must diligently investigate whether their imported merchandise is subject to duties,

2   including antidumping duties. She was deposed on that opinion and testified at trial

3   in this matter. True and correct copies of the invoices issued by Ms. Thompson in

4   connection with her services in this matter are attached hereto as Exhibit F.

5        (b)   <u>Document Reproduction.</u>   This category represents charges for

6   photocopying done during the course of this litigation. This includes black and white

7   and color copy document reproduction, as well as oversize copying utilized in

8   preparing trial binders.

9        (c)   <u>E-discovery Expenses.</u>   This category includes amounts incurred

10  by Island in retaining Liquid Litigation Management ("LLM") to provide e-discovery

11  services in this matter. Engagement of LLM was necessary given the scope of

12  discovery, the need to comprehensively manage Island's documents in connection

13  with discovery requests propounded on it, and to review and analyze documents

14  produced to Island by the defendants in this matter. This also includes small amounts

15  for Mayer Brown's hosting of Island documents and information in an internal e-

16  discovery database featuring the Relativity platform. Hosting this information on

17  internal Mayer Brown resources enabled Mayer Brown timekeepers to quickly and

18  efficiently access and search this information. Mayer Brown frequently bills clients

19  for hosting this sort of information on internal assets, and did so in this matter on a

20  $23 per gigabyte basis.

21       (d)   <u>Computerized Research.</u>   Expenses in this category include

22  charges incurred by Mayer Brown personnel for online research using Westlaw,

23  LexisNexis and PACER. This also includes expenses generated by Island for use of

24  ImportGenius, a well-known database of global import/export customs records, as

25  part of its investigation into the underling facts of this case. For purposes of this fee

26  petition, Island is only seeking expenses associated with ImportGenius through April

27  2020.

28

(e)    <u>Travel-Related Expenses for Island Employees.</u>  Island incurred travel-related expenses throughout the course of this litigation, including airfare lodging, travel-related meals and parking.  These expenses include travels costs incurred by Island employees during their initial meetings investigating and preparing the case, as well as the costs incurred by Island employees Glenn Sanders and Mark Woehrel to attend trial.  Neither Mr. Sanders nor Mr. Woehrel live in California.  Due to the Court's continuance of the trial date, Mr. Sanders and Mr. Woehrel made multiple trips to California in anticipation of, and to attend, trial. Upon information and belief, Mr. Sanders and Mr. Woehrel purchased economy tickets for their travel.

(f)    <u>Court Costs (including mediation expenses).</u>  Island incurred a number of court- and mediation-related costs over the course of this litigation.  Island and Sigma attended several mediation sessions before Hon. Edward A. Infante (Ret.) of JAMS.  The first mediation session took place in April 2020 and involved all defendants in the matter.  A subsequent mediation session, solely between Island and Sigma, took place in August 2021.  Island incurred costs for the professional services rendered by Judge Infante throughout the course of the mediation.

(g)    <u>Travel, including business meals, for Mayer Brown timekeepers.</u> From time to time throughout the course of this matter, Mayer Brown lawyers incurred expenses related to necessary travel.  Expenses in this category include airfare, train fare, car rental, taxi and rideshare fees, parking and toll fees, lodging and meals purchased while travelling for work on this matter, as well as minor amounts for the travel agency that administers flight and travel arrangements for Mayer Brown timekeepers.  Travel expenses were incurred by Mayer Brown lawyers in connection with Sigma-related depositions and during trial.  Island also purchased airfare for Kelli Thompson in connection with her appearance and testimony at trial. All airfare purchased in connection with this litigation  was for economy-class travel.

(h)  <u>Mailing, Shipping, and Courier Fees.</u>  Island also incurred expenses for mailing and other shipping.  Expenses in this category encompass standard postage, overnight mail expenses, courier fees and other document delivery expenses, including service of subpoenas and delivery of materials and courtesy copies to the Court.

(i)  <u>Filing Fees.</u>  Island incurred standard schedule filing fees in connection with the filing of the Complaint in this matter, and the filing of *pro hac vice* applications.

(j)  <u>Telephone charges.</u>  Mayer Brown timekeepers incurred minimal telephone charges in connection with this matter.

(k)  <u>Transcripts.</u>  Island purchased deposition and trial transcripts in connection with the prosecution of this matter against Sigma.  This encompassed depositions related to Sigma witnesses, including Mitchell Rona, Siddharth Bhattacharji, Patricia Velasquez, and Terry Clark, and transcripts of depositions with relevance to all defendants, including Glenn Sanders, Mark Woehrel, Kelli Thompson, and Walter Sperko.  Island also purchased transcripts of the pre-trial conference and the trial proceedings in this matter.

67.  Based on a review of the cost and expense records in this matter, Mayer Brown has prepared a table to summarize, for each category described above, the total amounts incurred by Island and/or Mayer Brown on Island's behalf.  Using the allocation methodology described in Paragraphs 44 through 49, and 53-54 above, the table also includes the compensation that Island seeks from Sigma for each category of expense incurred in the FCA Matter.

| Expense/Cost | Total | Sigma Allocated Total |
|---|---|---|
| Experts (Kelli Thompson) | $125,430.43 | $91,953.81 |
| Copying (incl. trial binders) | $22,345.80 | $13,760.53 |
| E-Discovery (LLM/Data Hosting) | $57,756.81 | $26,595.13 |
| Research (Westlaw/PACER/ImportGenius) | $122,976.31 | $36,309.01 |
| Island Travel (investigation/pre-trial) | $48,469.81 | $12,117.45 |
| Island Travel (trial) | $10,695.87 | $10,695.87 |
| Court Costs (incl. mediation) | $9,563.00 | $7,148.00 |
| Travel & Business Meals | $12,276.14 | $11,374.68 |
| Mailing/Shipping/Couriers | $8,464.53 | $3,901.67 |
| Filing Fees | $1,294.00 | $323.50 |
| Telephone Charges | $73.86 | $23.98 |
| Transcripts (depositions) | $14,336.90 | $9,769.44 |
| Transcripts (trial) | $10,374.98 | $10,374.98 |
| Total | $444,058.44 | **$234,348.05** |

68.    Mayer Brown also incurred $1,004.86 in expenses in connection with the Scope Ruling Matter.  The bulk of those expenses involved electronic research using the Westlaw database, but other amounts were incurred for business meals, shipping and mailing charges, copy charges, and local transportation charges.  Using the  allocation methodology for the Scope Ruling Matter described in Paragraphs 50 through 52 above, Island seeks reimbursement of **$596.09** for costs and expenses incurred in connection with the Scope Ruling Matter.

69.   The total amount of reimbursement sought by Island for costs and expenses incurred in both the FCA Matter ($234,348.05) and the Scope Ruling Matter ($596.09) is **$234,944.14**.

## EXPERT ANALYSIS

70.   Island has retained Robert K. Sall, Esq. of Sall Spencer Callas & Krueger in Laguna Beach, California, to render an opinion with respect to the instant motion.   Mr. Sall is widely respected as an expert in the fields of attorneys' fees, legal ethics, and legal malpractice.   Mr. Sall's credentials are contained in his accompanying declaration (the "Sall Declaration").   I arranged for Mr. Sall to be given access to the pleading and discovery materials in this case.   The Sall Declaration contains a detailed description of many of the events in this case that, based on my understanding, was derived from his office's review of the docket, as well as pleading and discovery records from this case, and from his discussions with Mayer Brown attorneys who worked on the case.   Island and I are aware of the burden that necessarily voluminous motions such as this one place on the Court, and we will not increase that burden by repeating in this Declaration information contained in Mr. Sall's Declaration.

71.   As set out above, I have been actively involved in all aspects of this matter since its inception in 2016.   I also have reviewed the Sall Declaration and agree that his description of the significant events this litigation is accurate, and I incorporate by reference into this Declaration the facts contained in Sections 10(A) through 10(L) of the Sall Declaration.

72.   The Sall Declaration contains Sections 9(A) through 9(J) Mr. Sall's opinions of the reasonableness of Mayer Brown's rates, as supported by rate surveys, an analysis of the rates charged by White & Case LLP, and an extended discussion concerning the reasonableness of the rates charged by Mayer Brown during this case. I have reviewed those same paragraphs and state that, based on my knowledge and

744833477

26

experience, I join in and adopt Mr. Sall's opinions as to the reasonableness of the rates charged to Island in this matter.

73.   The Sall Declaration contains in Section 11(A) concerning the reasonableness of the number of hours billed to Island during this case and the number of hours and related fees for which Island now seeks reimbursement. I have reviewed those paragraphs and state that, based on my knowledge and experience, I join in and adopt Mr. Sall's opinions as to the reasonableness of the number of hours for which Island seeks reimbursement in this motion and the related fees costs.

74.   Island's total request for fees, costs and expenses in this matter is:

Attorneys' Fees (per Paragraph 55 above):   $2,709,827.52

Costs/Expenses (per Paragraph 69 above):   $234,944.14

**TOTAL**                                  **$2,944,771.66**

I declare under penalty of perjury that the foregoing is true and correct.

March 8, 2022                              _____

                                          Kelly B. Kramer

744833477