MAYER BROWN LLP
MATTHEW H. MARMOLEJO
mmarmolejo@mayerbrown.com
C. MITCHELL HENDY (SBN 282036)
mhendy@mayerbrown.com
350 S. Grand Avenue, 25th Floor
Los Angeles, CA  90071-1503
Telephone:  (213) 229-9500
Facsimile:  (213) 625-0248

MAYER BROWN LLP
KELLY B. KRAMER
kkramer@mayerbrown.com
1999 K Street, NW
Washington, D.C. 20006
Telephone: (202) 263-3007
Facsimile:      (202) 263-5207

Attorneys for Relator
ISLAND INDUSTRIES, INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* ISLAND INDUSTRIES, INC., <br><br> Plaintiff, <br><br> vs. <br><br> VANDEWATER INTERNATIONAL INC., *et al.*, <br><br> Defendants. | Case No. 2:17-cv-04393-RGK-KS <br><br> **DECLARATION OF ROBERT K. SALL IN SUPPORT OF PLAINTIFF-RELATOR ISLAND INDUSTRIES, INC.'S MOTION FOR THE AWARD OF ATTORNEYS' FEES AND LEGAL EXPENSES** <br><br> Hearing Date: April 4, 2022 <br> Time: 9:00 a.m. <br> Courtroom: 850 <br><br> Judge: Hon. R. Gary Klausner |

I, ROBERT K. SALL, declare:

1.      I am an attorney admitted to practice law before all Courts of the State of California.  I provide this declaration pursuant to my consulting engagement as an expert witness through the law firm of Mayer Brown LLP ("Mayer Brown"), in the matter entitled *United States of America, ex rel. Island Industries, Inc. vs. Vandewater International, Inc. et al.,* United States District Court for the Central District of California Case No. 2:17-cv-04393-RGK-KS (the "FCA Action"). I was initially engaged in November 2021 by counsel for Plaintiff Island Industries, Inc. ("Island"), Matthew Marmolejo of Mayer Brown, to consult and evaluate the rates and charges of Island's counsel in this matter, with a view toward potentially offering my opinions on the reasonableness of rates charged by Mayer Brown in connection with Island's motion for attorney's fees pursuant to. 31 U.S.C. § 3730(d)(2).

2.      **Personal Knowledge**. I have personal knowledge of the facts stated in this declaration and if called as a witness, I could testify competently thereto. The conclusions that I reach in this declaration are my opinions based upon my background, knowledge and expertise, and the review of the materials described below.

3.      **Education and Admission**.  I am employed with Sall Spencer Callas & Krueger, A Law Corporation in Laguna Beach, California. I am an attorney admitted to practice law in all Courts of the State of California, and the United States District Court for the Northern, Eastern and Central Districts of California. My California State Bar membership number is 83782. I have practiced as an attorney in California for over 42 years, and am a Certified Specialist in Legal Malpractice Law, approved by the State Bar of California's Board of Legal Specialization. I obtained my Bachelor of Arts degree from the University of California at Los Angeles, where I graduated *magna cum laude* in 1975.  I obtained my Juris Doctorate degree at the University of California, Hastings College of the Law, in 1978.  A copy of my current professional resume is attached hereto as **Exhibit A**.

4.      **Practice Experience**. I have experience over many years in business litigation, tax and corporate work, and real estate transactions. For the past 35 years, my practice consists

primarily of prosecuting and defending cases involving attorney conduct and professional responsibility, legal malpractice, attorney-client fee disputes and business litigation. My practice includes counseling lawyers and law firms on professional responsibility matters. I have handled hundreds of legal malpractice cases and fee disputes and served as an arbitrator of attorney-client fee disputes for the State Bar of California and the Orange County Bar Association. Additional background and my qualifications as an expert witness in the field of attorneys' fees are set forth at paragraph 12, *infra*, of this declaration.

5. **Foundation for Opinions**.

(A)    In formulating my opinions, I and members of my team consisting of paralegal Julia Bernaldo and attorney Lara Callas, who is Of Counsel to my firm, have reviewed and considered the pleadings and materials described in the Index of Documents Reviewed, which is attached hereto as **Exhibit B**, which were made available to us by Mayer Brown and via our own downloads in the FCA Action through PACER. Ms. Callas is a graduate of the University of California, Berkeley Law, admitted to practice in California in 1994. Ms. Callas also has decades of experience in lawyer conduct, professional responsibility matters, and fee disputes. Ms. Bernaldo is a certified paralegal with my firm who has more than a decade of experience in reviewing billing records of law firms.

(B)    Between November 2021 and the present, I and members of my team received from Mayer Brown and reviewed a list of timekeepers and rates charged by year as well as spreadsheets of billing entries for this matter from inception and the biographical information for each timekeeper for whom compensation is sought in this motion.

(C)  In my evaluation of the rates and fees that are sought in this motion to be recovered by Mayer Brown as attorneys for Island as the prevailing party, I took into consideration the experience and education of the professionals who performed the services for Island and the fact that Mayer Brown is a well-established, major international law firm that has consistently been ranked among the top law firms in the country. I reviewed attorney profiles, with biographical information regarding each of the Mayer Brown attorneys who performed the services for which

DECLARATION OF ROBERT K. SALL

a recovery of fees is sought in this motion. I also took into consideration for comparative purposes available information about law firm rates in the relevant communities, rate surveys and a filing in another matter about rates charged by the law firm of White & Case who has represented Defendant Sigma Corporation in this matter. My rate analysis is addressed in paragraph 9 below.

(D)     In forming my opinions, I have also relied upon my research and general knowledge of the requirements of state and federal law, the California Rules of Professional Conduct, the ABA Model Rules of Professional Conduct, and various case authorities, my knowledge regarding rates generally charged by experienced litigation counsel in the Los Angeles area, and my business litigation experience and practice experience in the field of litigation and the arbitration of attorney's fee matters, attorney-client fee disputes, determining the reasonableness of attorney's fees, and professional responsibility matters.

6.     **Compensation.** I am being compensated at my regular hourly rate of $725 per hour for my time in the evaluation and formulation of my opinions, and to prepare this declaration. The regular hourly rate for Ms. Callas' assistance in the matter is $495 per hour, and my firm is being compensated for her time.

7.     **Scope of Assignment.**

Along with Lara Callas and paralegal Julia Bernaldo, I have engaged in the following work in preparing to offer opinions in this matter:

(1) a review and analysis of spreadsheets of time entries between 2016 and 2022 for fees which are included in this motion relating to Sigma, in two matters, (a) this litigation in the Central District of California entitled *U.S. ex rel. Island Industries, Inc. v. Vandewater International Inc. et al.*, Mayer Brown Client Matter Number 187134/1653042 (the "FCA Action"), and (b) the related ancillary proceedings relating to the relevant scope order in the Department of Commerce and Court of International Trade, Mayer Brown Client Matter Number 187134/18593649 (the "Scope Matter"),which are attached as Exhibits C and D to the Declaration of Kelly Kramer ("Kramer Decl.").  Attached hereto as **Exhibits C and D** are charts

summarizing the services on a monthly basis in the FCA Action and SRM Matter which were prepared by my office based on our review of the above-described spreadsheet and the pleadings and documents identified in **Exhibit B**;

(2) a review of the attorney profiles for the attorneys who performed more than 25 hours of legal services for Island allocated to Sigma related work, and for whose services recovery is sought in this motion; and

(3) an assessment of the reasonable hourly rates for the legal services provided to Island by Mayer Brown, and a review of hourly rates of comparable firms in the legal community as well as available evidence regarding the hourly rates charged by White & Case LLP, the law firm that represented Defendant Sigma Corporation.

8.     **Basic Legal Principles.** In forming my opinions, I rely upon certain basic principles relating to fee awards to the prevailing party in litigation matters. I understand that the Final Judgment entered on February 8, 2022 in this matter provides that Island is entitled to recover its reasonable attorney's fees and costs pursuant to 31 U.S.C. § 3730(d)(2).  In federal fee-shifting cases, including qui tam actions under § 3730, a reasonable fee is calculated based on the "'lodestar figure,' which multiplies the number of hours reasonably expended on the litigation by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *Morales v. City of San Rafael*, 96 F.3d 359, 363 (9th Cir. 1996); *United States ex. rel. Rafter H Construction, LLC v. Big-D Construction Corp.*  350 F.Supp.3d 938, 940 (D. Idaho 2018), *on reconsideration* 358 F.Supp.3d 1096 (D. Idaho 2019). The reasonable hourly rate is that prevailing in the relevant community for "similar services by lawyers of reasonably comparable skill, experience and reputation." *Camacho v. Bridgeport Financial, Inc.* 523 F.3d 973, 979 (9th Cir. 2008).  It is proper for a court to apply the current hourly rate as compensation for the delay in payment. *Missouri v. Jenkins*, 491 U.S. 274, 283 (1989); *Blackwell v. Foley*, 724 F. Supp. 2d 1068, 1078 (N.D. Cal. 2010). As stated in *Brown v. City of Pittsburgh* (W.D. Pa., May 27, 2010, No. CIV.A 06-393) 2010 WL 2207935, at *15–16: "The Court of Appeals for the Third Circuit has explained that in granting compensation for delay, two methods may be used: (1) basing the

fee award on current market rates; or, (2) adjusting the fee based on historical rates to reflect its present value." (quoting *Keenan v. City of Philadelphia,* 983 F.2d 459, 476 (3rd Cir.1991)). The rationale for using current rates is that "using current market rates to calculate the lodestar figure may counterbalance the delay in payment as well as simplify the tasks of the district court." *Blum v. Witco Chem Corp.* 888 F. 2d 875, 984, fn. 4 (3rd Cir. 1989).

The relevant community is generally the forum in which the district court sits. *Camacho, supra*, at 979.  While the lodestar is "presumptively reasonable," if circumstances warrant, a court "may adjust the lodestar based on twelve factors set out in *Kerr v. Screen Extras Guild, Inc.*, 526 F. 2d 67, 70 (9th Cir. 1975) (abrogated on other grounds), "that are not already subsumed in the initial lodestar calculation." *Morales*, *supra*, at 363-64.  The twelve *Kerr* factors are:  (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill required to perform the legal service properly; (4) whether by accepting the case the attorney was precluded from other employment; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." *Kerr*, *supra* at 70.  The fact that a losing party used particularly tenacious litigation tactics is properly considered as an element in determining the amount of an award of fees to the prevailing party. *Copeland v. Marshall,* 641 F. 2d 880, 904 (D.C. Cir. 1980) (a losing party "*cannot litigate tenaciously and then be heard to complain about the time necessarily spent… in response.*"); *Cataphora Inc. v. Parker*, 848 F. Supp. 2d 1064, 1070 (N. D. Cal 2012).

"Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified." *Hensley v. Eckerhart, supra,* 461 U.S. 424, 435.  In order for a court to reduce the number of hours, it must be shown by the challenging party that "time claimed is obviously and convincingly

excessive under the circumstances." *Blackwell v. Foley*, *supra*, at 1081 (quoting *Perkins v. Mobile Housing Bd.,* 847 F. 2d 725, 738 (11th Cir. 1988)). Furthermore, compensable time may include hours expended outside "the four corners of the litigation," as long as the "time was expended in pursuit of a successful resolution of the case in which the fees are claimed." *National Ass'n of Concerned Veterans v. Secretary of Defense*, 675 F.2d 1319, 1335 (D.C. Cir. 1982); *Kulkarni v. Alexander*, 662 F.2d 758, 765-66 (D.C. Cir. 1978) (fee award should cover all work "reasonably appropriate to the end-result," including "legal services rendered at the administrative level.").

**Opinions Regarding the Reasonableness of Hourly Rates Charged By Mayer Brown**

9. **The Hourly Rates Charged by Mayer Brown in This Action Are Well Within the Ranges Charged by Comparable Firms in this District**

(A) The process that my team and I used to engage in analysis of the reasonable value of the services performed by Mayer Brown for Island included (1) reviewing the spreadsheets of time entries and rates actually charged by Mayer Brown during the relevant years of their work for two matters, the FCA Action and the SRM Matter; (2) comparing those rates to rates charged by the attorneys who represented Defendant Sigma Corporation (to the extent that information was available to me), and (3) evaluation of rate surveys of similar firms in the Los Angeles and Washington DC regions, where most of the work for the FCA Action and SRM Matter was performed, and also for the purpose of comparing the rates of Mayer Brown attorneys to those being charged by similar firms in the relevant communities. Mayer Brown is a global law firm with over 26 offices all over the world, including Los Angeles where the Mayer Brown litigation team in this action was primarily based, and Washington D.C. where the legal team was located that worked on the Scope Matter involving proceedings with the Department of Commerce and in the Court of International Trade. Mayer Brown employs over 1800 attorneys, with over 500 attorneys in the litigation department worldwide.

(B) Based on my experience and analysis of rate surveys and compilations of industry data for litigation, the rates charged by Mayer Brown in the FCA Action and the Scope Matter,

DECLARATION OF ROBERT K. SALL

and throughout the representation, were consistent with what similar firms charge for comparable services in the Los Angeles and Washington D.C. areas. In reaching this opinion, I relied on the 2020 and 2021 "Real Rate Reports" from Wolters Kluwer and Thomson Reuter's "Legal Billing Reports"[1] as well as my experience in reviewing millions of dollars in legal fees as an expert witness and in working on fee disputes as an advocate. This opinion is also based upon my review of information relevant to my comparison of the Mayer Brown rates to the hourly rates charged by White & Case.

(C)    <u>Timekeepers for which Fee Award is Sought</u>. These are identified, in alphabetic order, as follows:

| Name | Capacity | Current Rate | Sigma-Related Hours | Sigma Related Fees |
|------|----------|--------------|---------------------|--------------------|
| Nicoleta C. Barac | Staff Attorney | $440 | 109.53 | $48,193.75 |
| Peter C. Bennett | Paralegal | $405 | 45.56 | $18,452.81 |
| Richard Ben-Veniste | Partner (1967)[2] | $1480 | 26.94 | $39,867.50 |
| Sandor A. Callahan | Associate (2017) | $740[3] | 143.50 | $106,190.00 |
| Marcia M. Dillon | Staff Attorney | $425[4] | 34.41 | $14,523.19 |
| Gretel Echarte Morales | Associate (2013) | $950 | 70.40 | $66,880.00 |
| Reginald R. Goeke | Partner (1994) | $1280 | 123.98 | $158,696.00 |
| Mitchell Hendy | Associate (2011) | $990 | 666.32 | $659,641.18 |
| Sasha L. Keck | Associate (2017) | $795 | 257.79 | $204,145.07 |
| Lindsay Kops | Paralegal | $330 | 196.20 | $66,726.00 |
| Kelly B. Kramer | Partner (1997) | $1245 | 789.42 | $992,133.37 |

---

[1] The Real Rate Reports for 2020 and 2021 and Legal Billing Reports for May 2018 and December 2018, by Region, By Firm and By Billing Rate are attached hereto as **Exhibits F-K**.
[2] The year in parenthetical refers to the year of graduation from law school.
[3] Rate reflected is for 2021 which is last year Mr. Callahan worked for the firm.
[4] Rate reflected is for 2021 which is last year Ms. Dillon worked for the firm.

| Matthew H. Marmolejo | Partner (2005) | $1095 | 134.07 | $146,803.91 |
| Matthew McConkey | Partner (1991) | $1105 | 56.73 | $58,189.14 |
| Stephen Neilsen | Trial Graphics Analyst | $250 | 105.00 | $26,250.00 |
| Alexus B. Payton | Associate (2017) | $640[5] | 176.62 | $113,035.60 |
| **TOTALS** | | | 2,936.46 | $2,709,827.52 |

(D)     Qualifications of the Personnel for which an Award is Sought.  I have reviewed
the qualifications of the lawyers who performed legal services for Island. Their qualifications are
summarized as follows:

- Kelly Kramer, a University of Pennsylvania law school graduate, admitted in
  New York in 1998 and the District of Columbia in 1999, is a Partner with Mayer
  Brown and co-leader of the firm's White Collar Defense & Compliance practice.
  Mr. Kramer is lead counsel in the FCA Action.

- Richard Ben-Veniste, a Columbia Law School graduate admitted in the District of
  Columbia in 1975 and in New York in 1968, is a Partner with Mayer Brown.
  Notably Mr. Ben-Veniste was one of the litigators in the Watergate Special
  Prosecution Force and served as chief counsel (Minority) of the Senate
  Whitewater Committee in 1995-96.

- Matthew Marmolejo, a Stanford Law graduate admitted in California in 2006 is a
  Partner with Mayer Brown.

- Matthew McConkey, a graduate of the American University Washington College
  of Law, admitted in Michigan in 1991, and in the District of Columbia in 1998, is
  a Partner with Mayer Brown who performed services primarily relating to the
  Scope Matter.

- Reginald R. Goeke, a Harvard Law School graduate admitted in in New York in

---

[5] Rate reflected is for 2020 which is last year Ms. Payton worked for the firm.

1995 and the District of Columbia in 1997, is a Partner with Mayer Brown. Mr. Goeke is the co-leader of Mayer Brown's Litigation & Dispute Resolution and Commercial Litigation practices.

- C. Mitchell Hendy, a Columbia Law School graduate admitted in California in 2011, is a Senior Associate with Mayer Brown. Mr. Hendy spent over two years as an Assistant U.S. Attorney and has participated in four jury trials while with Mayer Brown.

- Sandor A. Callahan, a Georgetown Law graduate admitted in California in 2017, was an Associate with Mayer Brown until December 2021.

- Gretel Echarte Morales, a Nova Southeastern University graduate admitted in the District of Columbia in 2018, and in Florida in 2013, is an Associate with Mayer Brown, who performed services primarily relating to the Scope Matter.

- Sasha Keck, a University of Michigan Law School graduate admitted in New York in 2018 and in California in 2021, is an Associate with Mayer Brown.

- Alexus B. Payton, a University of California Berkeley Law School graduate admitted in California in 2017, was an Associate with Mayer Brown until October 2020.[6]

(E)     The following is a summary of the historical and current rates for timekeepers working on the FCA Action and the Scope Matter by category of personnel:[7]

| Year | Partner | Associate | Staff Attorney | Paralegal |
|------|---------|-----------|----------------|-----------|
| 2022 | $1,095-1,480 | $795-990 | $440 | $330-405 |
| 2021 | $1,015-1,395 | $740-925 | $425 | $320-395 |
| 2020 | $930-1,295 | $640-855 | $400 | $305-385 |
| 2019 | $870-995 | $570-785 | N/A | $295 |
| 2018 | $835-940 | N/A | N/A | N/A |
| 2017 | $795-895 | N/A | N/A | N/A |
| 2016 | $865[8] | N/A | N/A | N/A |

(F)     For rate comparison purposes to rates being charged by Defendant Sigma's

---

[6] The relevant biographies of these personnel are attached as Exhibit B to the Kramer Declaration.
[7] See Exhibit E in the Kramer Declaration, which sets forth the historical, standard billing rates.
[8] For 2016, Kelly Kramer was the only timekeeper whose fees are included in this motion.

counsel, White & Case, I reviewed the recently filed Tenth Application of White & Case LLP For Allowance of Compensation and Reimbursement of Expenses, filed on October 22, 2021 in *In re Boy Scouts of America, et al.*, United States Bankruptcy Court for the District of Delaware Case No 20-10343, a copy of which is attached hereto as **Exhibit E**. In the White & Case Tenth Application, commercial litigation partner hourly rates ranged from $1,285 to $1,725, and commercial litigation associates hourly rates ranged from $730 (admission year 2020) to $1,065 (admission year 2013).  See **Exhibit E**, pp. 3-4**.**  Based upon the review of the White & Case Tenth Application, the rates incurred by Island with Mayer Brown are comparable to rates that Defendant's own lawyers were charging during the same periods of time, with the reported White & Case partner rates typically running higher than those of the Mayer Brown partners and associates who performed the lion's share of work in the FCA Action and Scope Matter.  This satisfies one test of reasonableness because the rates charged by Island's counsel are not materially higher than rates being charged by Defendant's counsel, and in some instances, were significantly lower on a per hour basis.

(G)     I have also compared these rates actually charged by Mayer Brown and the ranges for Mayer Brown partners to those disclosed in two rate surveys commonly used in the legal profession, consisting of the *Real Rate Report* and *Legal Billing Reports*. The Real Rate Report is generated by Wolters Kluwer's ELM Solutions, and commonly used in rate analysis and as a tool by law firms for setting rates and by experts for rate analysis. A copy of this report is attached hereto as **Exhibit F**. The report is derived "from the actual rates charged by law firm professionals as recorded on invoices submitted and approved for payment." **Exhibit F**, *Real Rate Report*, p. 5. The published rates in this exhibit were derived from invoices collected through third quarter 2021.  **Exhibit F**, p. 9. I have excerpted from the *Real Rate Report* the reported median hourly rates as well as the hourly rates for the third quartile in various applicable categories that are surveyed.  Because Mayer Brown is a highly respected law firm, I believe the rates from the third quartile are the best basis for comparison.  The third quartile represents the median between the overall median and the top of the data set.  Because the FCA

Action and the Scope Matter could be considered Commercial, Corporate: Regulatory and Compliance and/or general litigation, and the relevant geographic areas are Los Angeles and Washington D.C, those parts of report covering those areas have been summarized and excerpted below.

(1)     In the Commercial practice area, for litigation partners in 2021 the median hourly rate was $637 and the third quartile rate was $885.  For associates the median rate was $440 and the third quartile rate was $660.  For paralegals the median hourly rate was $256 and the third quartile rate was $331.  **Exhibit F**, *Real Rate Report*, p. 45.

(2)     For partners in the category "Corporate: Regulatory and Compliance" in Litigation in 2021, the median hourly rate for partners was $858 and the third quartile rate was $1,050, for associates the median hourly rate was $550 the third quartile rate was $739. For litigation paralegals in this practice area, the median hourly rate was $275 and the third quartile rate was $349. **Exhibit F**, *Real Rate Report*, p. 47;

(3)     For partners in the category "General Liability: Other" in Litigation, the 2021 median hourly rate for partners was $700 and the third quartile rate was $950, for associates the median hourly rate was $565 the third quartile rate was $695. For litigation paralegals in this category, the media rate was $235 and the third quartile rate was also $235. **Exhibit F**, *Real Rate Report*, p. 54, excerpted below;

# Section I: High-Level Data Cuts

## Detailed Practice Area
By Matter Type

| 2021 - Real Rates for Associate and Partner | | | | | | | Trend Analysis - Mean | | |
|---|---|---|---|---|---|---|---|---|---|
| Practice Area | Matter Type | Role | n | First Quartile | Median | Third Quartile | 2021 | 2020 | 2019 |

DECLARATION OF ROBERT K. SALL

| | | | n | First Quartile | Median | Third Quartile | 2021 | 2020 | 2019 |
|---|---|---|---|---|---|---|---|---|---|
| **Commercial** | Litigation | Partner | 855 | $438 | $637 | $885 | $696 | $662 | $634 |
| | | Associate | 793 | $325 | $440 | $660 | $516 | $452 | $431 |
| | | Paralegal | 397 | $194 | $256 | $331 | $270 | $253 | $239 |
| **Corporate: Regulatory and Compliance** | Litigation | Partner | 279 | $638 | $858 | $1,050 | $868 | $819 | $807 |
| | | Associate | 261 | $433 | $550 | $739 | $591 | $572 | $526 |
| | | Paralegal | 122 | $213 | $275 | $349 | $284 | $278 | $255 |
| **General Liability: Other** | Litigation | Partner | 120 | $229 | $700 | $950 | $687 | $628 | $607 |
| | | Associate | 115 | $393 | $565 | $695 | $531 | $495 | $430 |
| | | Paralegal | 77 | $95 | $235 | $235 | $208 | $192 | $218 |

(4)     In Los Angeles (not differentiated by matter type), the median hourly rate of partners was $822 and the third quartile rate was $1,101, while the median rate of associates was $653 and the third quartile rate was $860.  In Washington D.C., where the team working on the Scope Matter was based, the median hourly rate of partners was $855 and the third quartile rate was $1,039, while the median rate of associates was $595 and the third quartile rate was $700.  **Exhibit F,** Real Rate Report, p. 40, 44, chart excerpt below:

# Section I: High-Level Data Cuts

## Cities
By Role

| **2021 - Real Rates for Associate and Partner** | | | | | | **Trend Analysis - Mean** | | |
|---|---|---|---|---|---|---|---|---|
| City | Role | n | First Quartile | Median | Third Quartile | 2021 | 2020 | 2019 |

DECLARATION OF ROBERT K. SALL

| | | | n | First Quartile | Median | Third Quartile | 2021 | 2020 | 2019 |
|---|---|---|---|---|---|---|---|---|---|
| **Los Angeles CA** | | Partner | 786 | $536 | $822 | $1,101 | $843 | $808 | $766 |
| | | Associate | 1,110 | $450 | $653 | $860 | $664 | $636 | $587 |
| **Washington DC** | | Partner | 1,442 | $658 | $855 | $1,039 | $880 | $860 | $825 |
| | | Associate | 1,270 | $453 | $595 | $700 | $605 | $576 | $535 |

(5)     For Los Angeles litigators, the median hourly rate of partners was $715 and the third quartile rate was $1,042, while the median rate of associates was $602 and the third quartile rate was $806. For Washington D.C. litigators, the median hourly rate of partners was $898 and the third quartile rate was $1,025, while the median rate of associates was $625 and the third quartile rate was $695. **Exhibit F**, Real Rate Report, p. 17, 23, chart excerpt below:

# Section I: High-Level Data Cuts

## Cities
By Matter Type

**2021 - Real Rates for Associate and Partner** — Trend Analysis - Mean

| City | Matter Type | Role | n | First Quartile | Median | Third Quartile | 2021 | 2020 | 2019 |
|---|---|---|---|---|---|---|---|---|---|
| **Los Angeles CA** | Litigation | Partner | 342 | $475 | $715 | $1,042 | $759 | $708 | $694 |
| | | Associate | 433 | $402 | $602 | $806 | $610 | $583 | $535 |
| **Washington DC** | Litigation | Partner | 572 | $735 | $898 | $1,025 | $899 | $857 | $825 |
| | | Associate | 476 | $489 | $625 | $695 | $610 | $573 | $529 |

(6)     In Los Angeles, for partners with less than 21 years' experience, the

DECLARATION OF ROBERT K. SALL

median hourly rate was $855 and third quartile rate was $1,065 while for partners with more than 21 years' experience the median hourly rate in 2021was $725 and the third quartile rate was $1,145. In Washington D.C., for partners with less than 21 years' experience, the median hourly rate was $814 and third quartile rate was $950, while for partners with more than 21 years' experience the median hourly rate in 2021 was $875 and the third quartile rate was $1,059. **Exhibit F**, *Real Rate Report*, p. 32, 35, chart excerpt below:

## Section I: High-Level Data Cuts

### Cities
By Years of Experience

| City | Years of Experience | n | First Quartile | Median | Third Quartile | 2021 | 2020 | 2019 |
|---|---|---|---|---|---|---|---|---|
| **Los Angeles CA** | Fewer Than 21 Years | 173 | $550 | $855 | $1,065 | $815 | $724 | $703 |
| | 21 or More Years | 332 | $527 | $725 | $1,145 | $844 | $818 | $758 |
| **Washington DC** | Fewer Than 21 Years | 422 | $625 | $814 | $950 | $818 | $793 | $756 |
| | 21 or More Years | 705 | $665 | $875 | $1,059 | $902 | $886 | $844 |

*2021 - Real Rates for Partner* — *Trend Analysis - Mean*

(7)     In Los Angeles, for associates with 7 or more years' experience the median hourly rate in 2021 was $565 and the third quartile rate as $841, for associates with 3 to 6 years' experience, the median hourly rate was $709 and the third quartile rate was $821, and for associates with less than 3 years' experience the median hourly rate was $533 and the third quartile rate was $622.  In Washington D.C., for associates with 7 or more years' experience the median hourly rate was $650 and the third quartile rate as $818, for associates with 3 to 6 years' experience, the median hourly rate was $550 and the third quartile rate was $695, and for associates with less than 3 years' experience the median hourly rate was $478 and the third quartile rate was $620. **Exhibit F**, *Real Rate Report*, p. 26, 28, chart excerpt below:

DECLARATION OF ROBERT K. SALL

# Section I: High-Level Data Cuts

## Cities
By Years of Experience

| 2021 - Real Rates for Associate | | | | | | Trend Analysis - Mean | | |
|---|---|---|---|---|---|---|---|---|
| City | Years of Experience | n | First Quartile | Median | Third Quartile | 2021 | 2020 | 2019 |
| Los Angeles CA | Fewer Than 3 Years | 70 | $494 | $533 | $622 | $543 | $511 | $413 |
| | 3 to Fewer Than 7 Years | 128 | $533 | $709 | $821 | $673 | $582 | $510 |
| | 7 or More Years | 164 | $412 | $565 | $841 | $629 | $604 | $576 |
| Washington DC | Fewer Than 3 Years | 59 | $412 | $478 | $620 | $499 | $460 | $408 |
| | 3 to Fewer Than 7 Years | 190 | $405 | $550 | $695 | $554 | $520 | $479 |
| | 7 or More Years | 235 | $517 | $650 | $818 | $678 | $645 | $597 |

(8)   In the Commercial practice area for firms of more than 1,000 lawyers, the median hourly rate in 2021 for litigation partners was $1,044 and the third quartile rate was $1,194 and for litigation associates the median hourly rate was $718 and the third quartile rate was $886.   **Exhibit F**, *Real Rate Report*, p. 97, chart excerpt below:

DECLARATION OF ROBERT K. SALL

# Section III: Practice Area Analysis

## Commercial
By Firm Size and Matter Type

| 2021 - Real Rates for Associate and Partner | | | | | | | Trend Analysis - Mean | | |
| Firm Size | Matter Type | Role | n | First Quartile | Median | Third Quartile | 2021 | 2020 | 2019 |
|---|---|---|---|---|---|---|---|---|---|
| More Than 1,000 Lawyers | Litigation | Partner | 171 | $809 | $1,044 | $1,194 | $1,037 | $1,003 | $955 |
| | Litigation | Associate | 210 | $550 | $718 | $886 | $719 | $650 | $628 |

(9)    For the General Liability – Litigation Only practice area for firms over 1.000 attorneys, the median hourly rate for partners in 2021 was $895 and the third quartile rate was $1,051. For associates in this category, the median hourly rate was $565 and the third quartile rate was $719. **Exhibit F**, *Real Rate Report*, p. 143, chart excerpt below:

# Section III: Practice Area Analysis

## General Liability - Litigation Only
By Firm Size and Matter Type

| 2021 - Real Rates for Associate and Partner | | | | | | | Trend Analysis - Mean | | |
| Firm Size | Matter Type | Role | n | First Quartile | Median | Third Quartile | 2021 | 2020 | 2019 |
|---|---|---|---|---|---|---|---|---|---|
| More Than 1,000 Lawyers | Litigation | Partner | 105 | $743 | $895 | $1,051 | $918 | $847 | $839 |
| | Litigation | Associate | 129 | $430 | $565 | $719 | $579 | $581 | $542 |

(H)    To test whether Mayer Brown's historical rates billed during the pendency of this matter were reasonable we consulted the 2020 Real Rate Report from Wolters Kluwer which surveyed rates for firms in 2019.  A true and correct copy of the 2020 Real Rate Report is attached hereto as **Exhibit G.**  To perform this test, we compared the rate ranges for Mayer Brown in 2019 for the attorneys who worked on the matters with the comparable applicable categories contained in the 2020 Rate Report.  The Mayer Brown partner range for these attorneys of $870-995 and the associate range of $570-785 were consistent with the third quartile

DECLARATION OF ROBERT K. SALL

rates in the following categories: Commercial Litigation (nationwide) – partners $830, associates $537; Corporate: Regulatory and Compliance Litigation (nationwide) – partners $973, associates $660; General Liability Litigation (nationwide)  - partners $880, associates $568; Los Angeles partners > 21 years $1,015, < 21 years $925; Washington D.C.  partners > 21 years  $1,000, < 21 years $915; Los Angeles associates > 7 years, $789, 3-7 years, $665, < 3 years, $550; Washington D.C. associates > 7 years, $721, 3-7 years, $590, < 3 years, 520; Commercial Litigation, firm > 1000 lawyers, partners $1,164, associates $785; General Liability Litigation, firm > 1000 lawyers, partners $1,015, associates $714.  See **Exhibit G,** pp. 11, 16, 34, 36, 38, 39, 63, 88.  This analysis confirms that the rates charged by Mayer Brown in 2019 when the FCA Action entered its active phase were consistent with what similar firms charged for comparable services in 2019 in the Los Angeles and Washington D.C. areas.

(I)    The other rate survey I relied on, known as *Legal Billing Reports*, is another commonly used tool that publishes rates summarized from fee applications presented in Chapter 11 fee requests to the Bankruptcy Courts in different regions for specific time periods. *See* **Exhibits H through K,** attached hereto.  The fact that rates have appreciated in the three years since the Legal Billing Reports were published should be taken into account.  In the Legal Billing Reports for fee applications submitted in 2017 and 2018 for firms in the California region in excess of 1000 attorneys, the following rates were reported:

- Latham & Watkins partner hourly rates ranged from $1,125-1,175, and associate rates ranged from $725-795. **Exhibit H**, *Legal Billing Report*, By Region, By Firm, May 2018, p. 1;

- Morrison & Foerster, partner rates ranged from $875-990, of counsel rates ranged from $795-825, and associate rates ranged from $435-660. **Exhibit H**, *Legal Billing Report*, By Region, By Firm, May 2018, p. 1; and

- Kirkland & Ellis partner rates ranged from $965-1,395 for partners and $555-905 for associates. **Exhibit H**, *Legal Billing Report*, By Region, By Firm, May 2018, p.  4.

- Paul Hastings, with a reported firm size of 881, partner rates ranged from $1,025-1,275,

and the associate rate was $585 for an associate admitted in 2016.  **Exhibit H**, *Legal Billing Report*, By Region, By Firm, May 2018, p. 3.

- Orrick Herrington, the reported averaged Counsel hourly rate was $850. **Exhibit H**, *Legal Billing Report*, By Region, By Firm, May 2018, p. 2.

- For all firms in the California region, regardless of size, for the May 2018 *Legal Billing Reports*, By Billing Rate, partner rates ranged from $660-$1,395, of counsel rates ranged from $695-850, and associate rates ranged from $435-950. **Exhibit I**, *Legal Billing Report* by Billing Rate, May 2018, pp. 1-2.

In the *Legal Billing Reports* for fee applications in 2018 for firms in the California region in excess of 1000 attorneys, the following rates were reported:

- At Gibson Dunn & Crutcher, partner rates reported in 2018 ranged from $995 to $1,210, and associate rates ranged from $525-875. **Exhibit J**, *Legal Billing Report*, By Region, By Firm, December 2018, p. 2;

- For Jones Day, associate rates reported in 2018 ranged from $450-700. **Exhibit J**, *Legal Billing Report*, By Region, By Firm, December 2018, p. 3; and

- At Kirkland & Ellis, partner rates reported in 2018 ranged from $1,045-1,445, and associate rates ranged from $875-950. **Exhibit J**, *Legal Billing Report*, By Region, By Firm, December 2018, pp. 6-7.

In the *Legal Billing Reports* for fee applications submitted in 2017 and 2018 for firms in the District of Columbia region in excess of 1000 attorneys, the following rates were reported:

- For Jones Day, partner rates reported in 2017-2018 ranged from $925-1,025, and associate rates ranged from $475-725. **Exhibit J**, *Legal Billing Report*, By Region, By Firm, December 2018, p. 15.

- At Kirkland & Ellis, partner rates reported in 2018 ranged from $1,095-1,295, and the reported associate rate was $885. **Exhibit J**, *Legal Billing Report*, By Region, By Firm, December 2018, p. 17.

- At Weil Gotshal & Manges, a partner reported a rate of $1,250 in 2018.  **Exhibit**

DECLARATION OF ROBERT K. SALL

**J**, *Legal Billing Report*, By Region, By Firm, December 2018, p. 16.
For all firms in the California region, regardless of size, for the December 2018 *Legal Billing Reports*, By Billing Rate, partner rates ranged from $750-$1,475, of counsel rates ranged from $725-$1,065, and associate rates ranged from $375-995. **Exhibit K**, *Legal Billing Report* by Billing Rate, December 2018, pp. 1-2.  For all firms in the DC region, regardless of size, for the December 2018 *Legal Billing Reports*, By Billing Rate, partner rates ranged from $835-$1,465 and associate rates ranged from $475-995. **Exhibit K**, *Legal Billing Report* by Billing Rate, December 2018, p. 6.

(J)     Based upon these rate surveys, it is my opinion that the rates charged by Mayer Brown in the FCA Action and the Scope Matter are reasonably within the ranges charged by other large national firms having 1,000 or more lawyers, and commensurate with lawyers in comparable practice areas in similar firms in the Los Angeles and Washington D.C. areas. Based upon the above rate comparisons, evaluation of the rate surveys, and my review of the case history, complexity and the qualifications of the attorneys involved, in my opinion, the rates charged by the Mayer Brown attorneys and the 2022 rates sought in this fee application are reasonable and consistent with rates charged by lawyers of comparable skill, experience and reputation in the Los Angeles and Washington D.C. legal communities for the time periods involved in Mayer Brown's representation of Island Industries.

**Opinions Regarding the Legal Services and Reasonable Fees**

10.     **Summary of Review and History of Litigation.**

(A)     To gain an understanding of the significance of the work performed, and the nature of the proceedings in the FCA Action and the Scope Matter, my staff and I reviewed many of the relevant pleadings, discovery, orders and submissions. I evaluated the complexity of the case and the volume of work necessitated by the aggressive defense in our review of the pleadings, discovery and briefing of the related Scope Matter. I have taken the level of difficulty and tenacious defense into consideration in my review, including the defenses asserted, the extent of discovery, motions, trial preparation, trial continuances, and tactics initiated by

DECLARATION OF ROBERT K. SALL

Defendant's counsel to which the Island's  counsel had to respond. Here, in my opinion, the
Defendant's litigation tactics increased the level of work required and generated additional legal
expense for Island. An abbreviated summary of the case derived from our review of pleadings
and the record is as follows:

(B)    **Initiation of Action.** Mayer Brown filed the complaint in this matter for Relator
Island Industries, Inc. ("Island") on June 13, 2017 asserting two causes of action, Violation of
the False Claims Act, 31 U.S.C. 3729 (a)(10)(G) and Conspiracy to Violate the False Claims
Act, 31 U.S.C. § 3729(a)(1)(C) (the "FCA Action") against Defendants Vandewater
International, Inc. ("Vandewater"), Neil Reubens ("NR"), Anvil International, LLC ("Anvil"),
Sigma Corporation ("Sigma"), Smith Cooper International ("SCI"), and Allied Rubber & Gasket
Company (Allied) (collectively "Defendants").  In the Complaint, Island, an American
manufacturer of fire protection and steel piping system supplies, including grooved welded
outlets, alleged that Defendants imported Chinese welded outlets without paying the applicable
182.9 percent antidumping duty imposed on imports of Butt Weld Pipe Fittings ("BWPF") by
the U.S. Department of Commerce under the China Butt Weld Order, 57 Fed. Reg. 29,702 (July
6, 1992) (the "China Order").

(C)    **Government Declines to Intervene.** The government began analysis of its
intention to intervene and extended its election period, with Court approval, four times, finally
filing its Notice of its intention not to intervene on December 3, 2018. When the Court denied a
further extension, the government filed a notice on December 3, 2018 that it was declining
intervention with respect to Anvil but was continuing to investigate as to Vandewater, NR,
Sigma and SCI.  The government has not subsequently intervened in the case.

(D)    **Scope Ruling Requests.**  In May 2018, Sigma and Vandewater both submitted
scope ruling requests pursuant to 19 CFR § 351.225 to the Department of Commerce ("DOC")
seeking a determination that their products were not BWPFs and did not fall within the scope of
the China Order.  These proceedings were integral to the FCA Action because if the DOC
determined that Sigma's and Vandewater's products were outside the scope of the China Order,

then there could be no violation of the FCA for the failure to pay antidumping duties.  In essence, both Sigma and Vandewater contended that their steel branch outlets, small pipes with one end welded into the middle of another steel pipe and the other end being threaded or grooved to fasten on to a fire sprinkler head, were not BWPFs because BWPFs are intended to connect end-to-end to other pipes and did not utilize a "butt weld."  Both Sigma and Vandewater asserted that a prior scope Sprink-let ruling, which found that a similar branch outlet product was within the scope of an antidumping order applicable to BWPFs imported from Taiwan, did not govern their products.

Sigma's and Vandewater's submissions included hundreds of pages of briefing and exhibits.  Island submitted a letter brief plus exhibits in opposition to both Sigma's and Vandewater's scope ruling requests on June 12, 2018.  One of the defendants, Anvil (also a domestic manufacturer/supplier of BWPFs), opposed Sigma's and Vandewater's scope ruling requests, filing its opposition brief on July 17, 2018.  Thereafter, Island, accompanied by Mayer Brown, jointly with Anvil, met with the DOC on July 25, 2018 to discuss the scope ruling requests and review product samples, and Island and Anvil submitted joint briefs. SCI filed its own scope ruling request on August 13, 2018.  There was extensive briefing by all parties submitted to the DOC, including an expert opinion from Walter Sperko, the same expert being utilized by Defendants in the FCA Action, and the expert that Sigma ultimately used at trial.

On September 12, 2018, the DOC placed on the record its Final Scope Ruling dated September 10, 2018 relating to Vandewater and invited comments by Island and the other interested parties, including Sigma and SCI.  The DOC found that under 351.225 (k)(1) the language of the China Order, as interpreted by the appropriate sources listed under (k)(1), was dispositive of the issue that Vandewater's products fell within the scope of the order.  That same day, Vandewater filed a complaint with the Court of International Trade ("CIT") challenging the DOC's Final Scope Ruling.  The "defendant" in the CIT proceeding was the U.S. Government, however, on October 5, 2018, Island moved to intervene.  In December 2018, the DOC issued similar Final Scope Rulings as to Sigma and SCI, and both these parties also filed proceedings

with the CIT challenging the DOC's rulings.  In May of 2019, the CIT issued an order declining to consolidate the three similar proceedings initiated by Vandewater, Sigma and SCI, but allowing the three actions to proceed in parallel with a coordinated briefing schedule.  Since all three actions involved similar products and the same China Order, the issues addressed in all three CIT proceedings were also substantially similar.

(E)    **Initial Pleading Stage.**  Meanwhile, as the ancillary actions with the DOC and CIT proceeded, in the FCA Action, Island effected service on the Defendants in early May 2019. Sigma moved to dismiss the Complaint on June 19, 2019 alleging that (i) that Island's claims were foreclosed by the public disclosure bar because they purportedly relied on publicly disclosed information to assert its claims and (ii) that Island had failed to allege its claims with requisite specificity.  SCI joined in Sigma's motion and both SCI and Anvil filed their own motions to dismiss.  In response, Island filed a First Amended Complaint on July 10, 2019, asserting the same claims but adding significant additional detail concerning its investigation of the Defendants and further specific facts to support the claims.

In mid-July 2019, Sigma, and the other defendants, moved to stay the action pending resolution of the concurrent CIT proceedings.  On July 24, 2019, Sigma filed another Motion to Dismiss the First Amended Complaint on substantially the same grounds as the earlier motion, the public disclosure bar and the failure to state a claim.   The other defendants filed similar Motions to Dismiss on the same bases in the same time frame.

On August 5, 2019, Island opposed the Motions to Dismiss on a consolidated basis, approved by order of the Court, filing a 30-page brief which amongst other things, identified specific non-public information that emerged from their investigation that rendered the public disclosure bar inapplicable, and meticulously explained the factual allegations that supported both the False Claims Act and conspiracy claims.  Sigma filed an individualized reply in response to Island's opposition to the motion to dismiss.

The Court took the Motion to Stay under submission, without need for oral argument, ultimately denying the Motion to Stay as to all Defendants, without prejudice, on August 26,

2019.  The Court's order adopted Island's argument that the stay would prejudice Island and cause undue delay, with only hypothetical hardship to Defendants, and that the primary jurisdiction doctrine did not apply.  Similarly, the Court took the Motion to Dismiss under submission, without need for oral argument.  The Court's Order dated September 3, 2019 denied the motion to dismiss the First Claim for Violation of the False Claims Act, finding that the allegations satisfied the heightened pleading standards of Rule 9(b), but granted the motion as to the second claim for Conspiracy, giving Island leave to amend the claim.  The Order also rejected Defendants' argument that the public disclosure bar applied to Island's claims.

Island elected not to amend the conspiracy claim in the First Amended Complaint thus leaving the False Claims Act Cause of Action as the only claim.   Sigma filed its Answer to the First Amended Complaint on September 17, 2019.  Sigma's Answer denied the vast majority of the allegations of the complaint and asserted that Island's claim was barred by the statute of limitations.

(F)     **Discovery Stage.**  The case then moved on to the discovery phase.  The Joint Rule 26 Report was filed on September 30, 2019.  The Joint Report proposed the following: March 5, 2021 for the close of discovery; March 19, 2021 as the deadline for discovery motions; no phasing of discovery; the filing of a protective order; discovery in accordance with the Fed. R. Civ. Proc and local rules, except permitting Island to take up to 30 depositions; dispositive motion deadline of August 27, 2021; expert discovery to close August 6, 2021; and a mediation. The Joint Report proposed a four-week jury trial to commence November 8, 2021.   The Court rejected the parties' proposed timeline instead issuing an order dated October 7, 2019 setting a jury trial date of June 23, 2020, a pretrial conference on Jun 8, 2020, a Motion cut-off of April 8, 2020, and a discovery cut-off of March 25, 2020.    The Court also ordered that a mediation be conducted with a private mediator no later than April 24, 2020.   The Court later set the date for expert disclosures for March 2, 2020, allowing for supplementation by Island for depositions scheduled for the week of March 2, 2020.   This was a far more expedited time frame than counsel for Island had expected, requiring compressed and focused discovery and trial

preparation.

In the time frame of October 2019 through March 2020, the following discovery was completed by Island in relation to Sigma:

- Island 1st Set of RFP to all Defendants (4 requests), served October 9, 2019;
- Island 1st Set of Interrogatories to Sigma (6 interrogatories), served October 22, 2019;
- Island 2nd Set of RFPs to Sigma (12 requests), served November 1, 2019;
- Island 3rd Set of RFPs to Sigma (19 requests), served February 7, 2020;
- Island Amended 4th Set of RFPS (1 request), served February 24, 2020;
- Island Responses to Sigma's 1st Set of RFPs (16 requests) served November 25, 2019;
- Island Responses to Sigma's 1st Set of Interrogatories (5 interrogatories), served November 25, 2019;
- Island Amended Responses to Sigma's 1st set of Interrogatories, served December 23, 2019;
- Island Second Amended Responses to Sigma's 1st set of Interrogatories, served January 17, 2020;
- Island Responses to Sigma's 2nd Set of RFPs (11 requests) served January 23, 2020;
- Island Responses to Sigma's 2nd Set of Interrogatories (4 interrogatories), served January 23, 2020;
- Island Responses to Sigma's 3rd Set of Interrogatories (6 interrogatories), served February 21, 2020;
- Island Responses to Sigma's 1st Set of Requests for Admissions (7 requests) served February 21, 2020;
- Island Responses to Sigma's 3rd Set of RFPs (1 request) served February 21,2020;
- Island Responses to Sigma's 4th Set of RFPS (1 request), served March 25, 2020;
- Island Amended Responses to Sigma's 1st set of Interrogatories, served March 25, 2020;
- Island Amended Responses to Sigma's 2nd set of Interrogatories, served March 25, 2020;
- Island Amended Responses to Sigma's 3rd set of Interrogatories, served March 25, 2020.

DECLARATION OF ROBERT K. SALL

Further, the defendants took the depositions of two representatives of Island, Glenn Sanders, Island President and CEO (3 volumes – 899 pages), Mark Woehrel, Island Sales Mgr. (1 volume- 254 pages) and Island's expert, Kelli Thompson (2 volumes – 403 pages). Island took the depositions of the Sigma representatives Siddharth Bhattacharji, Sigma CEO (1 volume – 163 pages) Mitchell Rona, Sigma VP, in both his individual capacity (1 volume- 145 pages) and as a 30(b)(6) witness (1 volume – 294 pages), and Patty Velasquez (1 volume – 93 pages).   The Sigma related deposition testimony comprised approximately 2,251 pages of deposition transcripts.  In addition, Island produced at least 19,936 pages of documents approximately 8,000 pages of which were responsive to Sigma Requests for Production.  Sigma produced approximately 3,713 pages in response to Island Requests for Production.

Pursuant to a settlement reached in October 2019, defendant Anvil was dismissed per stipulation on March 21, 2020.

(G)    **Sigma and Other Defendants File Motions for Summary Judgment.**   On April 8, 2020, Sigma filed its Motion for Summary Judgment. The Summary Judgment asserted that Island could not satisfy the falsity and scienter elements of the False Claims Act claim.  In particular, Sigma argued that its products did not fall within the scope rulings issued by the DOC in 2018, which determined that Sigma's products (as well as to Vandewater's and SCI's) fell within the scope of the China Order issued in 1992, and that Sigma did not knowingly, recklessly disregard or act in deliberate ignorance that antidumping duties would be owed on its products. The motion made numerous legal and factual arguments related to scienter. SCI and Vandewater also filed summary judgment motions asserting similar arguments.  Island filed its opposition to Sigma's summary judgment motion on April 27, 2020, including 39 exhibits applicable to Sigma, many of which had to be redacted with unredacted versions submitted under seal, and a redacted and unredacted separate statement, pursuant to an application to file under seal.  Sigma filed its reply in support of summary judgment on May 4, 2020, including its own application to file certain supporting documents and its separate statement under seal and evidentiary objections seeking to exclude Island's international customs and trade expert Kelli Thompson.

DECLARATION OF ROBERT K. SALL

On May 6, 2020, Island filed an ex parte seeking leave to file a response to the evidentiary objections and additional evidence to cure the purported issues identified in Sigma's objections. The ex parte application was granted by the Court on May 7, 2020.   The Court took Sigma's Motion for Summary Judgment under submission on May 12, 2020, and thereafter continued the trial date to August 18, 2020.  Further, on May 29, 2020, the United States filed a Statement of Interest opposing the Motion for Summary Judgment which resulted in additional briefing by Sigma and Island

On June 23, 2020, the Court issued its order denying in part Defendants' Motions for Summary Judgment.  The Court found that the 2018 Scope Rulings did apply retroactively and that "the 2018 Scope Rulings conclusively establish that Defendants' statement on customs entry forms are false within the meaning of the FCA."  (MSJ Order, ECF # 270, p. 11).  As to Sigma's Motion, the motion was denied in its entirety with the Court finding that Island had established that Sigma's statements were false and that genuine issues of disputed fact existed as to whether Sigma made those false statements with actual knowledge or acted in deliberate ignorance or reckless disregard of the truth or falsity of its representations.  Island's opposition to the summary judgment motion was an unmitigated success.

(H)   **Trial Preparation Phase.**   While the summary judgment was pending, the parties participated in an unsuccessful mediation with Hon. Edward A. Infante (Ret.) on April 20, 2020.  Also, the parties were required to file their motions in limine based on the June 23, 2020 trial date.  On May 8, 2020, Island and Sigma each filed five motions in limine.  Island's motions sought to exclude Sigma's engineering expert, to preclude argument regarding objective reasonableness, to preclude evidence of non-intervention of the government, to preclude evidence of the additional recoveries of treble damages, penalties or attorney's fees available to Island, and to preclude evidence of inability to satisfy the judgment by any defendant.  Sigma's motions sought to exclude evidence of its net worth and total importations, to exclude subsequent remedial measures, to exclude evidence of "double invoicing" as described by Island's expert, to exclude evidence of a failure to employ a customs broker, and to exclude

evidence and argument regarding the Sprink-let Scope Ruling which established that BWPFs were subject to anti-dumping duties.   On June 12, 2020, Island filed an additional motion in limine to exclude evidence contrary to the Court's summary judgment ruling that falsity had been established.

Based on the August 18, 2020 trial date, Sigma and Island began filing their pre-trial documents on July 13, 2020, including Memoranda of Contentions of Fact and Law, a Joint Exhibit List, and a Joint Witness List.  Island list contained 155 potential exhibits and Defendants jointly identified 267 potential exhibits.  Island identified 14 witnesses, six of whom would offer testimony relevant to the claims against Sigma and Sigma identified 10 witnesses, including six of the witnesses identified by Island. Island filed a Notice of Settlement with Defendant Allied Rubber and Gasket Company on July 17, 2020 and it was dismissed effective August 5, 2020.  The Final Pretrial Conference Order was lodged on July 23, 2020.  Oppositions to the Motions in Limine were filed by all parties on July 24, 2020.   Jury Voir Dire questions were filed by Island and Sigma on July 27, 2020.  However, given the pandemic and unavailability of jurors, the Court issued a Scheduling Notice on July 29, 2020 continuing the trial until February 9, 2021, unless the parties were willing to stipulate to a bench trial to be held on August 18, 2020.

In the same time frame, Sigma filed a motion to sever on July 20, 2020 seeking, pursuant to Fed. Rule Civ. Proc. 21, to have the claims against Sigma severed and tried separately because there was no same transaction or occurrence and no joint and several liability, and joining Sigma at trial with the other defendants would be prejudicial and confusing.  Island filed its opposition on July 24, 2020 claiming that the motion was untimely and all the claims shared a similar background which would make a single trial more efficient.   The motion was denied without prejudice on September 1, 2020.

(I)     **CIT Proceedings – Remand to DOC.**   Meanwhile, in the concurrent CIT proceedings, following extensive briefing by Sigma, Vandewater, SCI and the United States government, on October 16, 2020, the CIT remanded the Vandewater matter back to the DOC to

DECLARATION OF ROBERT K. SALL

conduct a further scope review under 19 CFR § 351.225(k)(2) on the applicability of the China Order to Defendants' products. In effect, the CIT concluded that the DOC had incorrectly determined that the language of the China Order was dispositive of the issue of whether Vandewater's product fell within the scope of the China Order.  The CIT's decision required that the DOC now consider, on remand, the five (k)(2) factors in relation to whether Vandewater's products (and by implication Sigma's and SCI's) fell within the scope of the China Order.  These factors are: the physical characteristics of the product; the expectations of ultimate users; the ultimate use of the product; the channels of trade in which the product is sold; and the manner in which the product is advertised and sold.  19 CFR § 351.225 (k)(2)(A)-(E).  In late 2020, Sigma, Vandewater, SCI and Island again submitted hundreds of pages of briefing and exhibits to the DOC for this formal scope inquiry.

The CIT's remand led to a Motion for Reconsideration of the Summary Judgment ruling filed by Defendant Vandewater, in which Sigma joined by its joinder filed on November 20, 2020.  On December 14, 2020, the Court denied the motion for reconsideration finding that it was premature until the DOC completed its (k)(2) scope inquiry.  Following this ruling, on December 18, 2020, the parties submitted a joint request to stay the case pending completion of the (k)(2) scope inquiry which was anticipated in March 2021. On January 4, 2021, the Court denied the motion to stay, but continued the trial until May 18, 2021, ordering the parties to submit a status report on the DOC scope ruling when it issued or March 5, 2021, whenever was later.  Sigma also renewed the motion to sever on December 4, 2020, on the same bases, with Island opposing on December 14, 2020.  The court granted the motion to sever on January 9, 2021.

In March through July 2021, the parties filed joint reports informing the Court that the DOC review was ongoing and not yet complete.  The DOC issued a 62-page draft Results of Redetermination on Remand on April 19, 2021 finding that under (k)(2) Vandewater's products fell within the scope of the China Order, and the parties again submitted extensive briefing commenting on the draft Redetermination.  Finally on July 23, 2021, DOC issued its Final

Redetermination Pursuant to Court Remand (the "Redetermination") which affirmed that under all five (k)(2) factors, Vandewater's products fell within the scope of the China Order. Although the Redetermination only explicitly referred to Vandewater's products, Sigma contended that the "reasoning of the *Vandewater* Remand Results applies with full force to Sigma because *Vandewater* is the lead case decided by the Court of International Trade ("CIT")" (ECF # 392, p. 2). Following the Redetermination, Sigma, Vandewater and SCI again challenged the DOC's (k)(2) analysis in briefs filed with the CIT in late 2021 and early 2022. Both the government and Island filed briefs with the CIT supporting the DOC's (k)(2) Redetermination. These proceedings are ongoing. Thus, Island continues to incur legal expense in connection with that challenge to the Redetermination and scope inquiry.

(J) **Trial Preparation Recommences**. While the DOC (k)(2) scope inquiry proceeded, the Court had, due to juror unavailability due to the pandemic continued the trial to August 17, 2021. By that time, Island had settled with SCI, which was dismissed on April 5, 2021. The case was also stayed effective April 30, 2021 as to Vandewater due to its bankruptcy. This left Sigma the sole remaining defendant with trial set for August 17, 2021. The delay combined with the reduction of Defendants to solely Sigma required reconfiguration and re-submission of the pretrial filings. Sigma and Island re-submitted the required pre-trial filings on July 12, 2021, including new Memoranda of Facts and Law, a Joint Exhibit List and Witness List modified to reflect that the trial would include only Island and Sigma. Island also filed a seventh motion in limine to exclude evidence of a purported routine practice of consulting customs brokers regarding antidumping duties by Sigma.

After the DOC issued its draft Redetermination, on July 2, 2021, Sigma filed an *ex parte* application for Summary Judgment based on the draft Redetermination. Sigma argued that the Redetermination must be interpreted to apply prospectively thus defeating the argument that its representations about its products were not false when made. The very next day, Island filed its opposition to Sigma's e*x parte* summary judgment motion arguing that the Court had already rejected the principles underlying Sigma's argument in its earlier ruling and that the motion was

improper and untimely.  Sigma's *ex parte* application for Summary Judgment was ultimately denied as untimely on September 8, 2021.

While this *ex parte* was pending, the parties continued submitting their pre-trial filings including Expert Narratives, Proposed Jury Instructions Trial Brief, Statements of the Case and Proposed Special Jury Verdicts in late July and early August 2021.  The Pretrial Conference occurred on August 2, 2021. The Court granted three of Island's motions in limine in full, and granted one in part as to Sigma's experts. Sigma fared similarly, with three of its motions being granted in full and the expert motion in limine, granted in part.   Due to a conflict with an ongoing criminal trial, on August 13, 2021, the Court continued the trial to September 28, 2021, and then again on September 28, 2021, the trial was continued to October 5, 2021.

(K) **Trial**. Trial commenced on October 5, 2021 and finished on October 7, 2021. Thirty-eight exhibits were received into evidence and eight witnesses were called. The jury reached its verdict on October 7, 2021 finding that Sigma had "violated the False Claims Act by knowingly making false statements to avoid an obligation to pay money to the Government" and awarded $8,085,546.03 in damages. Verdict Form, (ECF # 421), p. 2.   During trial, Sigma made a motion for judgment as a matter of law that it renewed after close of evidence, filing the Renewed Motion for Judgment as a Matter of Law and Alternative Motion for a New Trial Under Rules 50(b) and 59 of the Federal Rules of Civil Procedure (the "Motion for Judgment") on October 12, 2021.   The focus of the Motion for Judgment was on application and interpretation of the Redetermination to defeat the falsity and scienter aspects of the False Claims Act claim, the Motion for Judgment also attacked the sufficiency of the evidence to support the jury's verdict.  The Court took the Motion for Judgment under submission on November 10, 2021 and denied the Motion for Judgment on December 10, 2021.

Sigma filed a Notice of Appeal on January 7, 2022.  Final Judgment was entered on February 8, 2022 finding Sigma liable for treble damages under the False Claims Act in the amount of $24,256,638.09 and for civil penalties in the amount of $1,824,145.00.  The Final Judgment also stated "Pursuant to 31 U.S.C. § 3730(d)(2), Defendant Sigma Corporation is

liable for the costs of suit, including reasonable attorney's fees, in an amount to be determined by motion or stipulation."  (ECF # 454, p. 2).

(L) **Motion for Attorney's Fees and Costs**.  Since the trial in October 2021, the majority of time has been spent in preparing the motion for attorney's fees and memorandum of costs. Given the complexity of issues and span of time covered by this action (nearly 6 years), as well as the magnitude of discovery, law and motion practice and trial in this vigorously contested dispute, plus the related Scope  Matter, and the approximately $2.7  million in fees at issue in this motion, plus the need to allocate the time spent given the existence of multiple defendants the time spent in preparing the motion and supporting declarations and exhibits spent has been reasonable and necessary.

(M) **Allocation of Time Relating to Sigma.** At the outset of this action Sigma was one of five defendants.  Defendant Anvil settled out in October 2019 and was formally dismissed on or about March 21, 2020.  Island filed a Notice of Settlement with Defendant Allied Rubber and Gasket Company on July 17, 2020 and it was dismissed effective August 5, 2020.  Island also settled with defendant SCI in October 2020 and SCI was formally dismissed on April 5, 2021. Defendant Vandewater and its principal Neil Rubens declared bankruptcy on or about April 28, 2021 and the matter was stayed as to the Vandewater Defendants on or about April 30, 2021. Accordingly, by approximately April 2021, Sigma was the singular defendant left in the case and the trial proceeded only as to Sigma.

To limit this motion to seek fees in the FCA Action only relating to Sigma, I have been informed that Mayer Brown reviewed the bills and excluded entries pertaining solely to the other defendants, and then applied a multiplier to each entry that involved any work relating to Sigma based upon a reasonable estimate of the proportion of that entry spent on Sigma related-work. See Kramer Decl., ¶¶ 44-55.  It is my opinion that this allocation process is necessary, and I have assumed that it was reasonably performed by Mayer Brown to establish the fair allocation of time spent on work related to Island's claims against Sigma.

DECLARATION OF ROBERT K. SALL

For the Scope Matter for time recorded before the SCI settlement in October 2020, Mayer Brown applied a .25 multiplier to that time to reflect the fact that multiple defendants were involved in the proceedings.  For time after October 2020 when the CIT remanded the proceedings to the DOC for the formal scope inquiry under 19 CFR § 351.225(k)(2) and SCI settled out, Mayer Brown applied a .8 multiplier since retaining the finding that Vandewater's products and thus Sigma's were subject to the China Order was critical to the falsity finding relating to the FCA claim against Sigma.  By that time, Mayer Brown was aware of Vandewater's financial struggles and was developing concerns about collectability, thus Sigma was considered the primary target remaining in the FCA Action.  Also, by January 2021, the Court had granted Sigma's motion to sever so that the Sigma trial would proceed first.  These facts also support the reasonableness of the .8 allocation applied to time on the Scope Matter after October 2020.  See Kramer Decl., ¶¶ 50-52.

11.   <b><u>Reasonableness Opinion</u></b>.

(A)   As noted above, I have concluded that the rates recorded by Mayer Brown LLP in the FCA Action are reasonable for services performed by attorneys of their caliber and experience in federal courts in Los Angeles County, in litigation of this complexity. In addition, I have concluded that the rates charged to Island by Mayer Brown in the Scope Matter are reasonable for services performed by attorneys of their caliber and experience in Washington D.C. and in Los Angeles.   I recognize, of course, that it is the province of the Court to determine the Lodestar. I offer my opinions here only to be of assistance to the extent that the Court may find my opinions useful in its task. In my opinion, the services performed, as described in the motion, the evidence and exhibits submitted in support of the motion, the preceding summaries and the exhibits to this declaration, were reasonable and necessary to the prosecution of this case. The motion herein seeks recovery for approximately 2,936.46 hours of time in the case, consisting of 126.69 hours attributable to Sigma in the Scope Matter and 2,809.77 hours attributable to Sigma in the FCA Action, through the end of February 2022 and a total of $2,709,827.52 for fees at Mayer Brown's 2022 rates.   See Kramer Decl., ¶ 55. The hours sought

in this motion include a further reduction of 212.5 hours resulting from the removal of all hours for 24 different timekeepers who each had less than 25 hours allocated to Sigma in the matters, as well as the exclusion of all time (approximately 222 hours) for work performed by administrative personnel including internal electronic discovery staff, docket clerks, librarians, research assistants and summer associates. See Kramer Decl., ¶¶ 56-59. These are significant reductions that in my opinion support the conclusion that reasonable billing judgment was exercised by Mayer Brown to remove hours that may not have been efficient, reasonable or necessary. Based upon my above analysis, and for all of the reasons set forth herein, it is my opinion that the hours claimed in the motion for the nearly six (6) years of Mayer Brown's time and effort were reasonable and necessary. It is also my opinion that the fee award sought in this motion for the services of Mayer Brown in the sum of $2,709,827.52 at Mayer Brown's 2022 rates, through February 28, 2022 (excluding costs), is reasonable. As further support for my opinion I have reviewed a letter dated September 29, 2021 from White & Case attorney Lucius Lau to Kelly Kramer in which he states that as of September 29, 2021, "to date, Sigma has incurred $5.4 million in fees and costs to defend this matter itself, a figure that may approach $6 million should this matter actually be tried." See Kramer Decl., ¶ 26 and Exhibit A thereto (Letter dated Sept. 29, 2021 from L. Lau to K. Kramer). The fact that Sigma's lawyers claimed to have incurred, *before trial,* nearly twice the amount of fees that Island is seeking here (*which time includes trial*) is further support for the reasonableness of the fees sought in this motion.

(B)     Block Billing in the Time Records. In Exhibits C and D to the Kramer Decl., many of the reported time entries involve multiple tasks, with a single aggregated time allocation. I anticipate this may be criticized as a form of block billing, or lumping of time, and hence address the subject here. "Block Billing" is a terminology used to describe the practice of including two or more discrete tasks within a single time entry making it difficult to ascertain the amount of time spent on particular tasks within the time description. For this reason, some courts and commentators have criticized block billing. Despite such criticisms, many courts have found the practice acceptable. Block billing is a common occurrence in many law firms, and is not

DECLARATION OF ROBERT K. SALL

unlawful per se in California. As noted in the authorities cited below, the real issue is whether the time entries are so obscure as to preclude a court from being able to assess whether the reported tasks and the reported time spent were reasonable and necessary.

> "" 'Block billing' is 'the time-keeping method by which each lawyer and legal assistant enters the total daily time spent working on a case, rather than itemizing the time expended on specific tasks.' "  Block billing does not per se bar reimbursement for attorneys' fees.  "[V]erified time statements of the attorneys, as officers of the court, are entitled to credence in the absence of a clear indication the records are erroneous."
>
> It is debatable whether the challenged entries truly qualify as block billing. While they all include several tasks, they are extremely specific and include discrete tasks, and do not raise any concerns about how the time was spent. For example, one challenged item is "Preparation for and meeting with Mr. Chang in our office to hold the pretrial meeting of counsel; discussed case; discussed settlement; he gave me a copy of Ms. Kittok's deposition." Chilleen Decl., Ex. 8 at 68. Plaintiff 's counsel certainly could have broken down this 3.3 hour block into meeting preparation time and the meeting time itself, but was under no obligation to do so. The entry would only be a problem where it "obscure[s] the nature of some of the work claimed."  Here, the challenged items are more than sufficient to meet plaintiff's burden of showing reasonable time spent on the activities listed.""

*Kittok v. Leslie's Poolmart, Inc.,* 687 F.Supp.2d 953, 963–964 (C.D. Cal. 2009); *See also*, *Pierce v. County of Orange*, 905 F.Supp.2d 1017, 1030–1031 (C.D. Cal. 2012) ("A reduction for block-billed hours may not be appropriate if 'individual tasks are specified' and the entries are 'detailed enough for the Court to assess the reasonableness of the hours billed.'"); *Cataphora Inc. v. Parker*, 848 F. Supp. 2d 1064, 1071 (N.D. Cal. 2012) (declining to reduce fees for block-billing where time entries are "specific and itemized in a fashion that permit a meaningful review of the entries for purposes of determining their reasonableness.").   In light of Mayer Brown's

reasonable exercise of billing judgment which did not seek all fees for work relating to other parties that ultimately led to the successful result, and excluded time spent by other Mayer Brown personnel as stated above, as well as the risk that Mayer Brown would collect no fee if the case was lost, it is my opinion that block billing here should not be used as a basis to reduce the award of fees.

## **Declarant's Experience and Qualifications**

12. **Committee Appointments and Public Service in the Fields of Professional Responsibility and Attorney's Fees**. I have extensive volunteer work and committee service experience in the field of legal ethics and attorney's fees. This includes the following:

(A)     During 2003-2006, I was appointed by the State Bar's Board of Governors, and served a three-year term on the State Bar of California's Standing Committee on Professional Responsibility and Conduct ("COPRAC"). That is the committee which drafts and issues the official ethics opinions of the State Bar of California. On COPRAC, I worked on projects such as drafting ethics opinions, commenting on proposed legislation, commenting on proposed rules of professional conduct, and I served as the committee's liaison to the Rules Revision Commission of the State Bar of California.

(B)     During 1995-2000, I was appointed by the State Bar's Board of Governors, and served a three-year term on the State Bar of California's Standing Committee on Mandatory Fee Arbitration ("MFA") followed by an additional two-year term as the chair of that committee. The MFA committee oversaw the State Bar MFA Program implemented by Business and Professions Code Section 6200 *et seq*. In that capacity, I worked with other committee members in drafting the State Bar's approved forms of sample fee agreements, the Arbitration Advisories that are published by the State Bar's MFA Committee, the drafting and approval of rules for administration of the MFA programs of the State Bar and various county bar associations; and I participated in designing the training program and providing training seminars for MFA arbitrators for the State Bar of California, and the bar associations of Kern, San Joaquin, Santa Rosa, Orange, San Bernardino, Riverside, San Diego and Contra Costa counties. During my

DECLARATION OF ROBERT K. SALL

MFA committee service, I was the lead drafter of the State Bar MFA Committee's Arbitration Advisory 1998-03, entitled "*Determination of a Reasonable Fee*" which set forth advice and procedures for how to determine a reasonable fee.

(C)     For more than 10 years, I have served and continue to serve on the ethics committees of both the Orange County and Los Angeles County Bar Associations, and am a past chair of the Los Angeles County Bar's Professional Responsibility and Ethics Committee.

(D)     I have published over thirty articles on subjects of legal malpractice, attorney ethics, attorney's fees and fee disputes. My publications are listed in **Exhibit A**.

(E)     For nearly 30 years, I have regularly been a lecturer and panelist at seminars on topics of legal ethics, attorneys' fees, legal malpractice and attorney conduct for various organizations including Continuing Education of the Bar, the State Bar of California, the Orange County Bar Association and the Los Angeles County Bar Association. Programs that I have given as speaker or panelist are listed in **Exhibit A**.

(F)     I have taught law school courses on Professional Responsibility, and designed and taught a specialized course on Legal Malpractice and Fee Disputes.

(G)     I have been engaged over fifty times as an expert witness or consultant on matters involving lawyer conduct and attorneys' fees. I have testified as an expert witness at trials in the Superior Courts of Orange County, Los Angeles County, San Diego County, San Francisco County, the United States District Court (Central District of California) and in arbitration proceedings in Los Angeles, Orange, San Diego and Riverside Counties.

//

//

//

DECLARATION OF ROBERT K. SALL

(H)     I have served on the Judiciary Committee, the Client Relations Committee and the MFA Committee of the Orange County Bar Association (OCBA). For a number of years, I co-chaired the OCBA's MFA Committee. As a fee arbitrator for OCBA and for the State Bar, I have conducted multiple arbitrations as a single arbitrator, and as a panel chair, the purpose of which was to determine reasonable attorney's fees.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed at Laguna Beach, California on March 8, 2022.

_____

Robert K. Sall

DECLARATION OF ROBERT K. SALL